Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Christina S. Paek*
cpaek@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (213) 402-2537 (F)

*pro hac vice* forthcoming

*Attorneys for Plaintiffs*

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, by and through her parents and next friends, Rachel and Ryan Roe; SEXUALITY AND GENDER ALLIANCE, an association, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEBBIE CRITCHFIELD, in her official capacity as Idaho State Superintendent of Public Instruction; IDAHO STATE BOARD OF EDUCATION; LINDA CLARK, WILLIAM G. GILBERT JR., DAVID HILL, SHAWN KEOUGH, KURT LIEBICH, CALLY J. ROACH, and CINDY SIDDOWAY, in their official capacities as members of the Idaho State Board of | Case No. 1:23-cv-315 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Education; INDEPENDENT SCHOOL
DISTRICT OF BOISE CITY #1; DAVE
WAGERS, MARIA GREELEY, NANCY
GREGORY, ELIZABETH LANGLEY,
BETH OPPENHEIMER, SHIVA
RAJBHANDARI, in their official capacities
as members of the Independent School
District of Boise City #1 Board of Trustees;
COBY DENNIS, in his official capacity as
Superintendent of Independent School
District of Boise City #1,

*Defendants*.

## **COMPLAINT**

1.      This lawsuit challenges Idaho Senate Bill 1100 ("S.B. 1100"), a sweeping law

that excludes Idaho's transgender students from school restrooms and other facilities matching

their gender identity beginning on July 1, 2023, and thereby denies them the equal dignity and

respect that Idaho affords to non-transgender youth.  S.B. 1100 will hurt Idaho's transgender

youth—damaging their health, subjecting them to stigma and harassment in their schools, and

increasing their risk of anxiety, depression, and suicide.  And it will do so even though the

Legislature that passed S.B. 1100 could not identify evidence supporting its purported findings

that S.B. 1100 is necessary to protect the safety and privacy of non-transgender students.  To the

contrary, numerous Idaho schools have had inclusive facilities policies that respect the gender

identity of transgender students for almost a decade.  Such schools have had no reported

instances that such policies threatened the privacy or safety of non-transgender students.  As

numerous federal courts across the United States have held for years in regard to similar policies,

S.B. 1100 violates the fundamental promise of equality enshrined in the Equal Protection Clause

of the United States Constitution, among other protections, as well as Title IX of the Education

Amendments of 1972.

2

2.      S.B. 1100 is a solution in search of a problem.  Many schools across Idaho have allowed transgender students to use facilities matching their gender identity for years without incident.  There is no evidence that these policies and practices have harmed any non-transgender student.  Nevertheless, S.B. 1100 imposes a blanket statewide ban that schools must follow, strips transgender students of equal access to communal facilities, and subjects them to profound harm—in the name of protecting non-transgender students from privacy and safety harms that do not exist.

3.      S.B. 1100 does not stop there.  It also places a "bounty" on the heads of transgender students by allowing any student to recover thousands of dollars in minimum statutory damages any time they encounter a transgender student using a facility barred by the law (i.e., in alignment with their gender identity).  That private right of action, coupled with a substantial quantum of statutory damages, encourages peers of transgender students to search them out.  And it sends a message to Idaho youth that merely sharing the same communal space as a transgender student inherently harms other students.  That is, as a matter of fact and settled law, simply wrong.  *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1228-29 (9th Cir. 2020) ("Plaintiffs allegedly feel harassed by the mere presence of transgender students in locker and bathroom facilities.  This cannot be enough [to state a claim for violation plaintiffs' rights].")

4.      The exclusion of transgender youth from communal facilities matching their gender identity is deeply stigmatizing.  It also contravenes well-established standards of care for the appropriate treatment of gender dysphoria, which is the clinically significant distress that can be associated with the divergence between one's gender identity and the sex one was assigned at birth.  Treatment for gender dysphoria generally entails living in a manner consistent with one's gender identity in all aspects of life—including using restrooms and related facilities that align

with that gender identity. Prohibiting transgender youth from using those restrooms is nothing short of depriving them of the medical care they need, and it will expose vulnerable Idaho youth to a range of serious health consequences including depression, anxiety, and suicidality. Furthermore, depriving transgender students of equal access to facilities necessary for basic bodily functions can also lead to physical harms, from dehydration to infection (caused when transgender youth avoid using restrooms that negate their gender identity—a documented and common phenomenon), and, further, rob them of equal access to the benefits of education. And excluding transgender youth from the facilities aligned with their gender identity can force them to come out to others every time they use, or explain to others why they cannot use, certain facilities—causing transgender youth to disclose their transgender status involuntarily in situations where they would otherwise keep that information private. Such forcible outing will subject these youth to an increased of risk of harassment and even bodily harm in violation of their basic right to privacy.

5.      The Idaho Legislature exhibited callous disregard for these harms on transgender youth in legislative proceedings. It passed S.B. 1100 based on stereotypes, prejudice, and antipathy against transgender people, rather than any evidence that the law actually served any legitimate purpose. The political landscape leading to the law's adoption was rife with villainizing comments painting transgender people as threats, and the law was ultimately enacted based on false and unsubstantiated assertions that it was necessary to stop sexual assault, molestation, and rape. In fact, as the bill's supporters admitted, and as numerous experts agree, there was and is no material evidence that allowing transgender students to use the facilities that match their gender identity has ever caused the harms the law purports to address. Instead, it is transgender students who face harm when exposed to greater risk of harassment and violence

when forced to use facilities inconsistent with their gender identity; when they are forced to out themselves as transgender to fellow students who may not have otherwise known; and when they are not allowed to live in a manner consistent with the recommendations of health professionals. The Legislature failed to give any consideration to these realities.  Indeed, it passed the law a mere month after introduction, based entirely on animus and speculation.

6.      The Legislature, further, acknowledged in its findings that federal courts have repeatedly held that similar policies excluding transgender students from facilities matching their gender identity violate the Constitution.  It nevertheless refused to adhere to those rulings.

7.      Unless enjoined by this Court, S.B. 1100 will irreparably harm transgender youth across Idaho.  That includes Plaintiff Rebecca Roe, who is entering seventh grade, a pivotal time in adolescence, as well as members of Plaintiff Sexuality and Gender Alliance ("SAGA"), a student organization at Boise High School, whose transgender members stand in harm's way.

8.      For all of these reasons, Plaintiffs seek preliminary and permanent injunctive relief, declaratory relief, as well as nominal damages resulting from Defendants' discriminatory actions—to protect transgender people across the state, including Plaintiffs themselves, from the devastating impact of S.B. 1100.

## JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. § 1983 to redress the deprivation of rights secured by the United States Constitution under the color of state law, and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX").

10.      This court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983, the Constitution of the United States, and Title IX.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

11.    Venue lies in this District pursuant to 28 U.S.C. § 1391 as the Plaintiffs and Defendants are located in this District and a substantial part of the events or omissions giving rise to the action occurred in this District.

## PARTIES

12.    Plaintiff Rebecca Roe ("Rebecca") is a 12-year-old girl enrolled as a student within Boise School District.  Because Rebecca is transgender, S.B. 1100 bars her from using the girls' facilities at school.  Rebecca is a resident of Idaho and brings this action pursuant to Federal Rules of Civil Procedure 17(c) by and through her parents and next friends, Rachel and Ryan Roe.  Rebecca, Rachel, and Ryan all proceed anonymously in this action.[1]

13.    Plaintiff Sexuality and Gender Alliance ("SAGA"), an unincorporated association, is a student organization at Boise High School, a public high school in the Boise School District for grades ten through twelve.  One of SAGA's goals is to ensure that lesbian, gay, bisexual, transgender, and queer (LGBTQ) students are safe and welcome at school.  SAGA is open to all high school students at Boise High School, and its membership includes students who are transgender and would be harmed by S.B. 1100.

14.    Defendant Debbie Critchfield is Superintendent of Public Instruction in Idaho. The Superintendent of Public Instruction is responsible for carrying out policies, procedures, and duties authorized by law regarding educational matters, including the provisions of S.B. 1100. Idaho Code § 33-125.  The Superintendent of Public Instruction is also a member of the Idaho State Board of Education.  *Id.* § 33-102.  She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Superintendent Critchfield resides in Idaho.  She is sued in her official capacity only.

---

[1] Plaintiff Roe, through her parents, has concurrently filed a motion to proceed anonymously.

15.     Defendant Idaho State Board of Education ("Board of Education") is Idaho's single governing body for public kindergarten through college education.  Idaho Const. Art. IX § 2.  The Board of Education is required to enforce state educational law, including S.B. 1100.  Idaho Code § 33-107(5)(a).  It also supervises and controls school districts in Idaho.  *Id.* § 33-116.  It is an education program receiving federal financial assistance.

16.     Defendants Linda Clark, William G. Gilbert Jr., David Hill, Shawn Keough, Kurt Liebich, Cally J. Roach, and Cindy Siddoway are the individual members of the Idaho State Board of Education, who have responsibility for the general supervision of Idaho's state educational institutions and its public school system.  Under Idaho Code § 33-107, the Board of Education and its members are empowered to supervise "all entities of public education," *id.* § 33-107(3), and to "[e]nforce the school laws of the state," *id.* § 33-107(5)(a), including S.B. 1100.  The Board of Education's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint.  All reside in Idaho and are sued in their official capacities only.  Idaho's public school system is an education program receiving federal financial assistance.

17.     Defendant Independent School District of Boise City #1 ("Boise School District") is a public school district located in Boise, Idaho, subject to S.B. 1100's enforcement mandate.  It is an education program receiving federal financial assistance.

18.     The individual members of the Boise School District's Board of Trustees— Defendants Dave Wagers, Maria Greeley, Nancy Gregory, Elizabeth Langley, Beth Oppenheimer, and Shiva Rajbhandari, along with any person who may fill any currently vacant board seat—are responsible for governing the District in compliance with state law and rules of the State Board of Education, including S.B. 1100.  Idaho Code § 33-512(13).  The Board of

Trustees' members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint.  The Board of Trustees' members all reside in Idaho, and they are all sued in their official capacities only.  The Boise School District is an education program receiving federal financial assistance.

19.     Defendant Coby Dennis is the Superintendent of the Boise School District.  He is responsible for carrying out the policies of the Boise School District, recommending policies to the District's Board of Trustees, and making decisions for the District when the Board of Trustees is in recess, including Boise School District's compliance with S.B. 1100.  The Superintendent shall "shall [] act as the authorized representative of the district whenever such is required."  Idaho Code § 33-513(2).  He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.  He resides in Idaho and is sued in his official capacity only.

## FACTUAL ALLEGATIONS

### I.  Gender Identity and Gender Dysphoria Are Well-Established Concepts in the Medical Community.

20.     Gender identity is a well-established medical and psychological term that refers to a person's fundamental, deeply felt understanding of their own gender.  As the medical community has long recognized, it is a core characteristic of human identity that everyone possesses.  There is also a medical consensus that gender identity is generally established at an early age, although a person's recognition of their gender identity can emerge at any time, and has significant biological roots.

21.     The phrase "sex assigned at birth" refers to the sex designation recorded on person's birth certificate, generally based on the appearance of external genitalia at birth.  While the majority of people possess a gender identity that matches their sex assigned at birth, that is

8

not the case for transgender people, who are defined as transgender because their gender identity does not match their sex assigned at birth. People whose gender identity is congruent with the sex they were assigned at birth are referred to as "cisgender" or non-transgender.

22.    People who are transgender have a consistent, persistent, and insistent understanding that their sex is different from the sex they were assigned at birth. People who are cisgender have a consistent, persistent, and insistent understanding that their sex is the same as the sex they were assigned at birth.

23.    There is a medical consensus that efforts to change a person's gender identity— including for the purpose of bringing that gender identity into alignment with a person's sex assigned at birth—are not only ineffective, but unethical, and deeply harmful. That consensus emerged after decades of harmful attempts to change transgender peoples' identities through therapies that consistently failed—and often resulted in depression and suicide.

24.    A person possesses multiple sex-related characteristics including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity. Medical experts who study human gender and sex, however, agree that gender identity is the single most important factor that determines a person's sex, including where a person's sex-related characteristics are not in typical alignment.

25.    Discordance between one's gender identity and sex assigned at birth can be associated with clinically significant distress, which is known as gender dysphoria. Gender dysphoria is a condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition. Without adequate treatment, gender dysphoria can result in profound psychological distress, anxiety, depression, and even suicidal ideation or self-harm.

26.     Treatment for gender dysphoria is governed by the internationally-recognized Standards of Care for the Health of Transgender and Gender Diverse People ("Standards of Care"), published by the World Professional Association for Transgender Health ("WPATH") since 1980.  WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others that promotes evidence-based care and research for transgender health.  WPATH published the eighth and most recent edition of the Standards of Care in 2022.  These standards are developed and continuously updated by the foremost experts in the field of transgender health based on a systematic review of the evidence-based research on transgender health.  They are also recognized by other mainstream medical organizations such as the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics.

27.     In accordance with the Standards of Care, treatment for gender dysphoria consists of the person transitioning to living openly and being treated by others as the sex corresponding to the person's gender identity.

28.     An essential part of that treatment is social transition, in which the individual lives in accordance with their gender identity in all aspects of life.  While the precise details are specific to each person, social transition typically includes adopting a new first name, using and asking others to use pronouns reflecting the individual's gender identity, wearing clothing typically associated with that gender, and using sex-specific facilities corresponding to that gender.  At school, for example, transgender boys may appear indistinguishable from boys whose gender identity aligns with their sex assigned at birth (i.e., cisgender boys), and transgender girls may appear indistinguishable from cisgender girls.

29.     To be effective at alleviating gender dysphoria, it is critical that social transition is respected consistently across all aspects of a transgender individual's life—for example, at home, in school, and at work.  Failing to recognize or respect a transgender person's gender is contrary to established medical protocols and can exacerbate the symptoms of gender dysphoria.

30.     In addition to social transition, medical treatments such as gender-affirming hormone therapy and surgical care may also be undertaken to facilitate transition and alleviate dysphoria by bringing a person's body into greater typical alignment with their gender identity.

31.     Psychotherapy to reduce the harmful effects of stigma that a transgender person may have internalized regarding their identity may also be an important form of support for individuals with gender dysphoria.  But it is not a substitute for social and medical transition as a means of treating gender dysphoria.

## II.     The Exclusion of Transgender People from Facilities Consistent with Their Gender Identity Causes Well-Documented Harms.

32.     In the United States, school and other public multiple-occupancy restrooms and locker rooms are often separately designated for females and males.  So-called "bathroom bills" like S.B. 1100 exclude transgender people from equal access to facilities matching their gender identity.  In the context of schools, such bills require that a transgender student be treated as the "sex" that corresponds with their sex assigned at birth for purposes of facilities access, even when that student's parents, health care professionals, teachers—and often peers—all recognize that student as the sex that corresponds to their gender identity.

33.     That exclusion—which is nothing short of a denial of that student's true self—can cause a multitude of adverse mental and physical health consequences for transgender students.  Those include (1) interference with the process of social transition; (2) involuntary disclosure that the student is transgender; (3) promotion of the view that there is something wrong with the

transgender student and that the transgender student does not belong in spaces used by

classmates, a view that can foster additional discrimination, harassment, and even violence; (4)

negative health consequences caused when transgender students try to avoid going to the

restroom; and (5) impairment of the student's concentration and learning.  Together, such

consequences exacerbate the avoidable harms of gender dysphoria and lead to feelings of

rejection, invalidation, isolation, shame, and stigmatization.

34.     First, excluding transgender students from using facilities that align with their

gender identity impairs and impedes a central component of the treatment for gender

dysphoria—living in a manner consistent with one's gender identity in all aspects of life.

Transgender people generally use restrooms consistent with their identity after completing other

aspects of social transition (e.g., wearing clothing typically associated with their gender,

changing their hair, and otherwise modifying their physical appearance to match their gender).

Using such gender-affirming facilities is a significant part of a social transition—and an

important step in treating the symptoms of gender dysphoria.  Expecting or requiring transgender

students to use facilities that conflict with their gender identity can interfere with their treatment

and even undermine the positive effects of socially transitioning in other aspects of life.  S.B.

1000 thus exacerbates the symptoms of gender dysphoria, such as depression, anxiety, and

suicidal ideation, and damages a transgender person's mental and physical health.

35.     Second, transgender youth are often subjected to victimization in the school

environment, including bullying, physical assault, sexual assault, mistreatment, property

vandalism, and other direct and indirect attacks.  Forcing transgender students to use facilities

discordant with their gender identity can disclose the fact that they are transgender to other

students and adults who may not have otherwise known and to whom the student may not have

otherwise disclosed that fact.  A transgender girl, for instance, who lives as female in all aspects of life, including school, may be forced to use the restroom designated for males, thereby revealing to others that she is transgender.  This involuntary disclosure, in turn, increases the likelihood of the transgender student being targeted for harassment and mistreatment, and increases their fear of such victimization, with the accordant harms resulting from that stress.

36.    Third, the many harms inflicted by excluding transgender people from the facilities matching their gender identity cannot be avoided through purported "accommodations" that relegate transgender people to using separate facilities from other students, such as a faculty, nurse, or single-user restroom.  As a practical matter, these alternate facilities are often located in less accessible areas and are not always open or available.  And consigning a transgender student to use of these alternate facilities ostracizes and segregates them from their fellow students: It communicates a message of disapproval to both the student and the school community that the student's identity is not and should not be respected; that the student's presence in a restroom facility matching their gender identity represents a threat to others; and that transgender classmates must be separated from everyone else because of who they are.  Such facilities are separate and unequal in every respect.

37.    Fourth, when transgender students lack equal access to facilities that match their gender identity—and are relegated to "alternate facilities" in less accessible areas—they often avoid school restrooms, even for the entire length of the school day.  Such avoidance has negative consequences for the student's health, which can include urinary tract infections and kidney infections, as well as an adverse impact on the student's ability to concentrate and access the benefits of education.  Transgender students may also limit their food or fluid intake in an

attempt to lessen their need to use the restroom, with the same ill consequences for their health and attention level.

38.    Finally, educators and school administrators across the country also recognize that excluding boys and girls who are transgender from multiple occupancy restrooms that align with their gender interferes with their ability to learn and thrive at school.  It impairs their ability to develop a healthy sense of self, peer relationships, and the cognitive skills necessary to succeed in adult life.  In light of these harms, the National Association of School Psychologists, National Association of Secondary School Principals, National Association of Elementary School Principals, and the American School Counselor Association have all called upon schools to allow boys and girls who are transgender to use the same restrooms as their cisgender counterparts.

III.    **Plaintiffs' Background**

A.    **Rebecca Roe**

39.    Plaintiff Rebecca Roe is a 12-year-old girl who has attended school within Boise School District since she was in kindergarten.  She will be attending seventh grade during the 2023-24 academic year at a junior high school within Boise School District.

40.    Rebecca enjoys playing video games, hanging out with friends at the mall, watching anime shows, and doodling artwork.  She also takes *kung fu* lessons, both for physical exercise and potential self-defense.

41.    Although Rebecca is now thriving as a transgender girl, her mental health suffered in the past before she came to understand her gender identity better and received the support that she needed.  Rebecca's parents became concerned about her mental well-being around the time she was in fourth grade.  She exhibited signs of depression and seemed generally

"checked out."  She also began falling behind in coursework even though she otherwise generally excels academically.

42.     During the summer after fourth grade, the issue of Rebecca's gender arose in the context of a conversation with her parents regarding pride month for LGBTQ people.  Rebecca's parents wanted to reassure her that they would still love her no matter who she was.  In the course of that conversation, Rebecca expressed to her parents that she did not believe that she was a boy.  Rebecca's parents were unsure of what to make of this information at the time.

43.     In fifth grade, older students would sometimes pick on Rebecca, such as when they saw her by herself during recess.  Overall, she struggled socially at school during fifth grade, even though she also had a tight circle of friends.

44.     Motivated by concerns about Rebecca's well-being, Rebecca's parents began taking Rebecca to see a therapist to ensure that she received the mental health support she needed.  During her therapy sessions, Rebecca expressed that she did not feel like a boy, consistent with what she had conveyed to her parents during the summer after fourth grade.  The therapist also spoke with Rebecca about any distress that she felt around issues related to gender.

45.     Rebecca's gender identity is female.  She has never felt typically masculine like others assigned male at birth.  When she would look at her male friends, she would think to herself, "I don't feel like this."  When she would look at her female friends, however, she would think to herself, "I feel more like that."

46.     After discussions between Rebecca, Rebecca's therapist, and Rebecca's parents, the family decided to give Rebecca the opportunity to "be herself" for spring break in 2021, when Rebecca was not attending school, and to express her gender in the way that felt most comfortable to her.  Rebecca went shopping and chose more typically feminine clothes for

herself.  In contrast to the distress associated with gender dysphoria, Rebecca felt joy and relief when her gender expression matched her gender identity.  Rebecca's parents noticed the improvements in her mental health as well and that she seemed to be more confident in herself.

47.    Following this experience, and particularly after the end of fifth grade, Rebecca continued the process of social transition to live in a manner consistent with her gender identity.  For example, she began to use a more typically feminine name rather than a typically masculine name and asked others to use her new, female name; she dressed in clothes typically worn by girls; she adopted a more feminine hairstyle; and she started using female pronouns.

48.    Rebecca's friends accepted and supported her as she undertook the process of social transition.  They respected her name and pronouns.  In addition, Rebecca's name was also updated in the school information system, and school staff respected her name and pronouns as well.  Overall, Rebecca's experience in sixth grade was significantly better than her experience in fifth grade because she was able to live in a manner consistent with her gender identity in several respects and was generally treated by her fellow students like other girls.

49.    After Rebecca began her social transition, she also began using restrooms designated for females outside of school without incident.  Like other girls, she would enter the women's restroom, go into a stall and close the door behind her, use the toilet, and then wash her hands and leave.  It was a routine practice that did not cause any problems for anyone, including others using the restroom at the same time as her.

50.    Rebecca has not used a restroom designated for males, whether at school or outside of school, since fifth grade.  Using the restrooms designated for males would feel wrong to Rebecca because she is a girl.

51.     When Rebecca is in public, she is generally perceived by others as female.  Thus, if she were to use the restroom designated for males, it would appear to others that a girl was using the men's restroom, something far more disruptive to social expectations than her use of the women's restroom.  As part of treatment for her gender dysphoria, Rebecca also receives puberty-delaying medication, which allows transgender adolescents to avoid physical changes associated with their endogenous puberty, and can be followed by gender-affirming hormone therapy where medically appropriate, which facilitates even greater alignment between one's gender identity and body.  Living in a manner consistent with her gender identity, including having access to the girls' restroom, is an important aspect of the treatment for Rebecca's gender dysphoria.

52.     Prior to the start of the sixth grade school year, it was initially envisioned that Rebecca would use the nurse's restroom rather than the boys' restroom.  Rebecca ultimately did not feel comfortable using the nurse's restroom, however, because it felt stigmatizing and isolating to use in comparison to her female peers, who were not limited to using only that single-stall facility.  It was also in a less accessible location than the restrooms used by Rebecca's female classmates.

53.     As a result, Rebecca generally avoided using the restroom at school.  She limited her fluid intake and would "hold it" at school to avoid using the restroom.  These measures were not only unhealthy but they were increasingly difficult to endure as the school day progressed.  They also created a physical and mental distraction while Rebecca was in class, as she spent her time thinking to herself that she was "almost there" as she waited for the school day finally to end so that she could use the restroom at home.

54.     Rebecca will be attending a new school in seventh grade, alongside new classmates, and she would like to fit in with her female classmates.  Rebecca's parents have significant concerns about Rebecca's physical safety, mental health, and her general well-being if she is ultimately excluded from girls' facilities.  As parents who love their child and want to see her thrive, they agonize that Rebecca's use of the boys' restroom, which may be unavoidable at times if she is excluded from the girls' facilities, would expose her transgender status in situations where it would otherwise remain private and leave her vulnerable to violence and targeting by other students.  If Rebecca is only allowed to use either the boys' restroom or a single-stall restroom, Rebecca is also afraid that any of her classmates at her new school could find out that she is transgender, and she wishes to have control over her private information.

55.     The idea that Rebecca will be excluded from using facilities designated for girls is painful and stressful to her and makes her feel unequal to other girls.  It makes her feel like an outsider.  Her new school is also farther from home, making it even more difficult and unhealthy for her to delay using the restroom until the end of the day.  Furthermore, living in a manner consistent with her gender identity, including access to the girls' restroom, is an important aspect of the treatment for Rebecca's gender dysphoria, and at this stage in her social transition, Rebecca wishes to use the girls' restroom when she is outside the home, including at school, just like other girls.

**B.     SAGA**

56.     SAGA is a student organization for high school students at Boise High School.  SAGA and its activities are led by students, and the organization meets weekly on school grounds during the school year.  SAGA's goals are to provide LGBTQ+ students and their allies with support, resources, and information about events.  Part of SAGA's mission is to make the

school environment a safe and welcoming place for LGBTQ+ students. S.B. 1100 inflicts serious and ongoing harm against certain of SAGA's members.

57.   SAGA brings this action on behalf of its members harmed by S.B. 1100.

58.   Certain transgender SAGA members, consistent with school practices pre-dating S.B. 1100, wish to use multi-occupancy facilities on school grounds, including during the 2023-24 school year, consistent with their gender identity, and inconsistent with their sex assigned at birth. That includes those with a gender support plan, approved by the school and their parents, that allows them to use multi-occupancy facilities consistent with their gender identity. These gender support plans play an important role in transgender students' mental and physical health, including their social transition. Under S.B. 1100, transgender students would have to change their facilities use on campus by either using facilities that do not correspond to their gender identity or by avoiding the use of multi-occupancy facilities altogether.

59.   On their school campus, transgender SAGA members have inconsistent access to one, single-stall, gender-neutral restroom in a building separate from most classrooms. That restroom is frequently unavailable either because it is occupied or closed. It is also further from most classrooms than the multi-occupancy restrooms, making it more difficult to access during short breaks between classes.

60.   Any transgender SAGA member who is prohibited from using facilities consistent with their gender identity under S.B. 1100 will be harmed by being treated differently than their classmates who can use facilities consistent with their gender identity. They will have to choose between using facilities inconsistent with their identity, causing distress and potential harassment, or avoiding facilities use, causing discomfort and potential health issues.

61.     Some members will face the risk of being outed as transgender under S.B. 1100, including in situations where they would not otherwise disclose their status, by having to change their established restroom use or by being forced to use restrooms inconsistent with their identities (including the names and pronouns they use in the school community).

62.     S.B. 1100 is contrary to the mission of SAGA, which exists to support all members of the LGBTQ+ community and ensure that school is a safe and welcoming environment for them.  If S.B. 1100 remains in effect, SAGA will also have to spend additional time supporting students that have lost restroom access and advocating for more gender-neutral restroom options for students so they can make it through their school day.  Because SAGA does not have the capacity to handle multiple projects at a time, this would interfere with its ability to complete other mission-driven student services, such as the clothing drive it has done in the past and would like to do again this year.

**IV.     Idaho Enacted S.B. 1100 Without Any Evidence that It Furthers Privacy or Safety.**

**A.     Inclusive School Policies and Practices Had Been in Effect Long Before S.B. 1100.**

63.     For many years preceding the enactment of S.B. 1100, and at many schools across Idaho, transgender students have had the ability to access school facilities matching their gender identity pursuant to inclusive policies and practices.  Collectively, these inclusive policies and practices have covered the educational experience of tens of thousands of Idaho students, cisgender and transgender alike, without causing harm.

64.     Upon information and belief, at least 60 local educational agencies across Idaho, including school districts and charter schools, have adopted inclusive policies recognizing that, like other students, transgender students must have the ability to access facilities that match their gender identity.

65.    Many of these policies were based on a model policy regarding sexual orientation and gender identity, Policy 3281, developed by the Idaho School Boards Association ("ISBA") in 2015.  Policy 3281 sought to foster a safe educational environment for all students regardless of gender identity, gender expression, or sexual orientation.  As relevant here, Policy 3281 specified that students are allowed to use the facilities that correspond to the gender identity they consistently assert at school, and that no student would be required to use facilities that conflict with their gender identity.  It also recognized that any student, whether transgender or not, with a need or desire for increased privacy could be given the option of a separate or private restroom or changing area.  Since Policy 3281 was issued, a significant number of school districts adopted it or implemented practices that align with it.

66.    An increasing number of school districts nationwide, including those in Idaho, adopted inclusive policies and practices like Policy 3281 after the U.S. Department of Education took various actions, beginning around 2010 and including a 2015 "Dear Colleague" letter from its Office of Civil Rights, that confirmed the obligation of schools to treat transgender students equally under federal law.

67.    Some Idaho districts have also adopted inclusive policies or practices without necessarily adopting Policy 3281 itself.  For example, since at least 2016 if not earlier, transgender students in Boise School District have been able to work with their parents and school staff to develop a written gender support plan.  The plan addresses topics such as student safety, the name and gender marker to be used in the student's school records, and the student's use of school restrooms and locker rooms.  Thus, a transgender boy, for example, is able to have a gender support plan, signed by school staff, confirming his use of the boys' facilities at school.

68.     In 2016, Boise School District issued a public statement explaining that, "under federal civil law, the District is required to provide access to public facilities consistent with the student's gender identity."  It further explained that, for purposes of facilities use, "Gender identity is not a fluid concept.  A student may not choose to identify as male one day and a female the next.  School districts elsewhere that have implemented these policies require that the gender identification be both persistent and consistent over time."  The District's statement also recognized that there was nothing mutually exclusive between providing transgender students with access to facilities consistent with their gender identity, on the one hand, and "continu[ing] to provide safe and supportive school environments for all students, including transgender students," on the other hand.

69.     Despite the widespread adoption of inclusive policies and practices in Idaho over the last several years, there has been no evidence that such policies have caused any of the purported harms the Legislature lists in its "findings" as supposed justification for S.B. 1100. *See* 33-6601(4)[2] (finding that "[r]equiring students to share restrooms and changing facilities with members of the opposite biological sex generates potential embarrassment, shame, and psychological injury to students, as well as increasing the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism").

70.     The experiences of other jurisdictions are in accord.  For example, the District of Columbia Public Schools have provided transgender students with access to restroom and locker room facilities consistent with their gender identity since 2006 and implemented the practice

_____

[2] Citations to S.B. 1100 (referenced as 33-6601 to 33-607) are to Idaho Code, Title 33 Education, Chapter 66 [67] Protecting the Privacy and Safety of Students in Public Schools.

through an official policy in 2015.  No school has reported any incident in which a cisgender

student has been harmed because of the policy.

71.     In another example, the State of California enacted legislation in 2013 confirming

that students have the right to use restrooms and other facilities based on their gender identity.

The Los Angeles Unified School District, the second largest public school district in the country,

has had a similar policy in place even longer.  Millions of students have attended school under

these inclusive policies, and there is no evidence that providing transgender students with this

access has harmed any students.

72.     Similarly, schools in countless other jurisdictions—including in Arizona,

Delaware, Florida, Illinois, Kentucky, Maine, Massachusetts, Michigan, Minnesota, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode

Island, Tennessee, Texas, Washington, and Wisconsin—have successfully implemented

inclusive policies and practices, without evidence of harm to students.

**B.      In 2023, After Years of Inclusive Policies, the Idaho Legislature Proposed
S.B. 1100.**

73.     Like numerous other Idaho school districts, on January 10, 2023, Caldwell School

District in central Idaho considered adopting an inclusive restroom policy.  The meeting abruptly

ended, however, after Senator Chris Trakel, who attended the school board meeting and

orchestrated opposition to the policy, asserted that the policy would risk children's "moral

health."  When the board chair attempted to speak, Senator Trakel raised his voice, asserting that

"he had the floor" at the local school board meeting.  Protesters then disrupted the meeting by

yelling threats at board members, and district officials had to abruptly adjourn.

74.     Other state officials also weighed in on the situation in Caldwell later that month.

Idaho Attorney General Raul Labrador, who had recently assumed office, took to Twitter to

23

interject his view in opposition to Caldwell School District's potential adoption of an inclusive policy recognizing transgender students' equal right to access facilities matching their gender identity, insisting that he needed to defend Idaho children.  He publicly attacked ISBA, a non-profit organization founded in 1942 to serve school boards and members throughout Idaho, for "peddling" Policy 3281, through a January 25, 2023 letter that he also posted to Twitter.  He specifically targeted transgender girls, whom he referred to as "biological boys," and dismissed transgender students' "gender—along with potential gender dysphoria" as "choices."

75.     In a January 30, 2023 letter, ISBA responded to the Attorney General that all of ISBA's model policies are drafted in-house and go through an intensive legal review process.  It confirmed that its model policies are not based on any special interest group or entity, and that any legal questions about its policies are referred to outside legal counsel whose lawyers practice education law and represent education clients throughout the state.  It explained that "Current interpretation of Title IX – and likewise for Title VII – does protect discrimination on the basis of sex to include a person's gender identity and sexual orientation."

76.     ISBA also confirmed that "in places where these policies have been adopted and operating for many years, there have been no reported incidents of unlawful behavior."  It explained that its policies "assist school communities address practical issues that arise in their schools on a daily basis and require a clear, uniform and workable solution."

77.     On the heels of the situation in Caldwell, State Superintendent of Public Instruction Debbie Critchfield also wrote a letter dated January 19, 2023, to Senator Cindy Carlson to provide clarification and context regarding gender-related policies that address student facilities in public schools.  Senator Carlson responded that Superintendent Critchfield's office should take action to prevent enforcement of policies that protect transgender students' use

24

of facilities consistent with their gender identity, on the grounds that they were purportedly inconsistent with existing state law.  Senator Carlson closed her letter by declaring that "[w]e need to send the message" about kids not being "indoctrinate[d]" with "this garbage."

**C.    Legislative Proceedings Identify No Evidence That S.B. 1100 Protects Any Student from Being Harmed in Any Respect.**

78.    On February 13, 2023, Senator Ben Adams introduced S.B. 1100 in the Idaho Senate.  Short-titled "Protecting the Privacy and Safety of Students in Public Schools," the law was widely referred to as the "Idaho bathroom bill."  While S.B. 1100 has multiple provisions, as detailed further below, its central provision is a statewide ban that excludes transgender students from school restrooms and other facilities consistent with their gender identity.

79.    S.B. 1100 was drafted by the Idaho Family Policy Center, an organization that advocates for public policy based on "biblical truths in sexuality and gender."  Supporters of S.B. 1100 expressed their disapproval of transgender people.  For example, Senator Trakel testified: "The Idaho Republican Party recognizes that children are a heritage of the Lord.  We believe biological gender to be an essential characteristic of a child's identity and purpose . . . We strongly oppose any person, entity, or policy that attempts to confuse minors regarding their bio[logical] gender."  Another supporter testified at the Education Committee that "God made men and women . . . and eventually men and women made men's and women's bathrooms for men and women," and that "[W]e either have part A or part B.  Let's keep it simple."

80.    In passing S.B. 1100, the Idaho Senate identified no reported incidents in Idaho of transgender people committing acts of violence in public restrooms.  Instead, they resorted to speculation.  For example, Senator Trakel hypothesized that the bill would prevent "some small child" from otherwise being "molested or raped in the bathroom."  To the contrary, opponents of S.B. 1100 explained that privacy and safety justifications were affirmatively disproven by the

many years that transgender students had been using facilities matching their gender identity. Even legislators supporting S.B. 1100 conceded that they were not aware of any documented case of a transgender person committing violence against a non-transgender person in a restroom.

81.     The Senate also ignored testimony of youth who would be harmed by the law, including through the stigmatizing effect of being relegated, at best, to single-occupancy facilities away from their peers if available.  A transgender student explained that the bill would further marginalize transgender students, perpetuate harmful mythologies that associate transgender people with sexual deviance, and isolate the transgender community.

82.     Instead, although the Legislature would ultimately justify S.B. 1100 based on purported findings about protecting the privacy and safety of students, the actual legislative history included only unfounded speculation, contradicted by all the available evidence.

83.     The bill emerged from committee with a "do pass" recommendation on a 6-2 vote.  On March 9, 2013, S.B. 1100 passed the full Senate on a 28-7 vote.  There was no meaningful debate on the floor.

84.     Proceedings in the House had a similar tenor as proceedings in the Senate. Supporters of S.B. 1100 reprised unsubstantiated views that allowing transgender people to use facilities aligning with their gender identity would lead to "predators" entering restrooms. Opposing the bill, Representative Holli Woodings commented that "it's not my understanding that there's been any documented cases of trans person violence on non-trans people?" with which Representative Edward Hill, who supported S.B. 1100, agreed.

85.     On March 16, 2023, S.B. 1100 passed the full House on 59-10-1 vote, sponsored by Representative Hill.  There was no debate.

86.     Governor Brad Little then signed S.B. 1100 on March 22, 2023.  With scant legislative deliberation, it took just over one month from the bill's introduction to its signing.

87.     During the same session, the Legislature also enacted other anti-LGBTQ laws, including a criminal prohibition against providing transgender youth with medically necessary gender-affirming healthcare.

**D.     S.B. 1100's Provisions and Purported Justifications**

88.     S.B. 1100, a copy of which is attached as Exhibit 1, defines "sex" as the "immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female."  33-6602(3).

89.     In other words, under S.B. 1100's definition of sex, a transgender person is a member of the "sex" that is the opposite of their gender identity.  But that definition ignores the scientific and medical consensus that recognizes that gender identity is the critical determinant of sex where gender identity diverges from an individual's sex assigned at birth.  Indeed, the Legislature's definition of sex was constructed in order to deny transgender people recognition of their gender.

90.     Based on its definition of "sex," S.B. 1100 requires that every public school multiple-occupancy restroom or changing facility must be designated for use by male persons only or female persons only, and used only by members of that "sex," and prohibits any person from entering these facilities unless they are of the designated "sex."  33-6603(1).  S.B. 1100 also mandates that public schools must "ensure that all restrooms and changing facilities provide its users with privacy from members of the opposite sex."  33-6603(2).

91.     In addition to imposing a statewide mandate, S.B. 1100 also creates a private right of action that places a "bounty" on the heads of transgender students and encourages peers to search them out.  Any student who encounters someone of the "opposite sex" in covered facilities may obtain statutory damages of at least $5,000, in addition to damages for any harm purportedly experienced, and attorneys' fees for the school's non-compliance with the terms of S.B. 1100.  33-6606.  By creating this right of action, the Legislature sent a clear message: A cisgender student sharing a restroom with a transgender student—even for a brief moment— should receive thousands of dollars as a reward for reporting that they were in the vicinity of a transgender person using facilities consistent with their gender identity.

92.     Although S.B. 1100 lays out various exemptions where its provisions do not apply—notwithstanding the law's assumption that access to sex-designated facilities by members of the "opposite sex" causes harm—none of these exemptions provide transgender students with equal access to facilities matching their gender identity as compared to their cisgender peers. One of these exemptions permits coaching staff and personnel to enter otherwise prohibited facilities specifically during athletic events—which legislative proceedings indicated was to facilitate a halftime "pep talk"—notwithstanding purported concerns about privacy.

93.     Similarly, while S.B. 1100 requires that schools provide purported "reasonable accommodations" to anyone who provides a written request detailing that they are "unwilling or unable" to use the multi-occupancy facilities designated for the person's "sex," it makes clear that this does not include access to facilities "designated for use by members of the opposite sex while persons of the opposite sex are present or could be present."  33-6605.  When transgender people are relegated to alternate "accommodations," they are often inferior to the facilities used by others, located in less accessible locations, and stigmatizing for them to use.

94.     While S.B. 1100 targets transgender students, its provisions also apply to other transgender people as well, such as school staff or a student's siblings or parents who are transgender and may need to use school facilities while on campus.

95.     Additionally, S.B. 1100 provides that for any school-sponsored events with overnight lodging, no person may share sleeping quarters, a restroom, or a changing facility with a person of the "opposite sex" unless they are members of the same family.  33-6603(4).  Thus, for example, if four students generally stay in one hotel room for a school trip, a transgender student may be forced to stay in a room without any other students, causing them to feel isolated and stigmatized and depriving them of the same social bonding that other students experience.

96.     S.B. 1100 was enacted on a foundation of imagined fears and stereotypes that transgender people are predators from whom children must be shielded—rather than a recognition that transgender people are friends, neighbors, relatives, and members of the community entitled to equal dignity and respect.

97.     These impermissible motivations are reflected in S.B. 1100 itself.  While couched in terms of "privacy and safety," lawmakers targeted transgender students, and their use of facilities matching their gender identity, as purportedly "increasing the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism" and causing "potential embarrassment, shame, and psychological injury to students."  33-6601(2-5).

98.     These purported justifications are baseless and unsupported.  There is no evidence to substantiate that transgender people who use facilities associated with their gender identity are more likely to harm others compared to their non-transgender peers.

99.     There is also no evidence to substantiate that inclusive policies or practices cause cisgender people to pretend to be transgender and thereby engage in misconduct that would not

otherwise occur.  Such misconduct is already directly barred by other prohibitions, and nothing about an inclusive policy alters that reality.  In stark contrast, it is transgender people who are more likely to be harassed, mistreated, or assaulted in facilities, particularly where they are forced to use facilities inconsistent with their gender identity.

100.    In addition, transgender people using facilities consistent with their gender identity does not intrude on others' reasonable expectations of privacy in those facilities.  The Legislature failed to identify any evidence to support this claim during legislative proceedings, even though inclusive policies and practices have existed in many Idaho schools for years.  For example, there is no evidence indicating that transgender people are any more likely to unnecessarily expose themselves to others than non-transgender people.  To the contrary, transgender people often take steps to avoid drawing unnecessary attention to themselves and thereby reduce the risk of harassment.

101.    Merely sharing the same physical space as transgender people does not infringe upon the privacy of cisgender people.  There are also measures that can be undertaken to increase privacy for anyone desiring additional privacy, transgender or not, without excluding transgender people from facilities matching their gender identity.

## CAUSES OF ACTION

### COUNT I

### Violation of Equal Protection

### U.S. Const. Amend. XIV

*(Against Defendants Critchfield, Clark, Gilbert Jr., Hill, Keough, Liebich, Roach, Siddoway, Dennis, Wagers, Greeley, Gregory, Langley, Oppenheimer, and Rajbhandari)*

102.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

103.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenging S.B. 1100 facially and as applied.

104.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

105.    S.B. 1100 facially and intentionally discriminates against transgender people like Plaintiffs based on sex-related considerations. Discrimination based on sex includes but is not limited to discrimination based on gender nonconformity, gender identity, transgender status, gender transition, and nonconformity to sex-based stereotypes.

106.    S.B. 1100 engages in sex-based classification by limiting access to school restrooms and other facilities based on sex assigned at birth, even where such facilities are inconsistent with an individual's gender identity. S.B. 1100 also discriminates against transgender people based on sex by imposing harmful differential treatment on those who fail to conform to the stereotypes associated with their sex assigned at birth. The assumption that someone's gender identity will and should align with their sex assigned at birth is a sex-based stereotype. S.B. 1100 discriminates against individuals who fail to conform to this stereotype— which the medical community has long understood is not true for all individuals. For example, although S.B. 1100 denies Plaintiff Rebecca Roe access to girls' restrooms because her female

gender identity does not conform to her sex assigned at birth, a cisgender peer whose female identity does conform to her sex assigned at birth can use girls' restrooms.

107.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

108.    S.B. 1100 facially and intentionally discriminates against transgender people like Plaintiffs based on transgender status.  S.B. 1100 classifies based on transgender status by prohibiting transgender people from using school restrooms and other facilities that align with their gender identity, while permitting cisgender students to use school restrooms and other facilities that align with their gender identity.  In other words, it treats people differently solely based on whether their assigned sex at birth aligns with their gender identity: if it does, they may use the facilities that correspond to their sex; if it does not, they may not.  That is discrimination on the basis of transgender status.

109.    Under the Equal Protection Clause of the Fourteenth Amendment, any discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny. *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019).  Government discrimination against transgender people bears all the indicia of a classification requiring heightened scrutiny by the courts.

a.    Transgender people have long been victims of extreme discrimination across the country, including in Idaho, and continue to suffer such discrimination to this day.

b.    Transgender status and gender identity bear no relation to one's ability to contribute to society.

c.    Transgender people are politically vulnerable to attack and lack sufficient power to adequately protect their rights through the legislative process.  Transgender people have

32

been unable, in large measure, to secure explicit federal, state, and local protections to protect themselves against discrimination, and they have been and continue to be regularly targeted by anti-transgender legislation, regulations, bills, and other government action.

d.      Gender identity is a core, defining trait, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.  Gender identity is also generally fixed at an early age and cannot be voluntarily changed.  Thus, transgender status is immutable.

110.    S.B. 1100 treats transgender people differently and worse than cisgender people who are similarly situated.  Under S.B. 1100, cisgender people are able to access restrooms and other sex-specific facilities consistent with their gender identity, but transgender people are banned from restrooms and other sex-specific facilities consistent with their gender identity.

111.    S.B. 1100 deprives transgender people such as Plaintiffs of their right to equal protection by branding them as less worthy than their cisgender peers.

112.    S.B. 1100's discrimination against transgender people based on sex and transgender status fails every level of scrutiny.  It is not substantially related to an important government interest.  It is not even rationally related to any legitimate government interest. Schools across the nation, and in Idaho, regularly allow transgender students to use restrooms that align with their gender identity without causing increased safety or privacy problems for any students.

113.    Far from advancing any interest in safety or privacy, S.B. 1100 endangers the safety, privacy, and well-being of transgender people.  For example, if a transgender girl were forced to use the boys' restroom, she would be exposed to a heightened risk of harassment and assault by students who believe that she should not be in the boys' restroom, even though that is

the facility aligned with her "sex" as defined by S.B. 1100.  Alternatively, forcing transgender students to only use single-occupancy or other "reasonable accommodation" facilities will stigmatize them as "others," similarly exposing them to a heightened risk of harassment and assault and jeopardizing their psychological health.

114.    In enacting S.B. 1100, the Legislature disguised conclusory allegations rooted in bias and misunderstanding as "legislative findings" that lack any factual support.  But rather than advancing any legitimate governmental interest, S.B. 1100's requirement that transgender students use facilities incongruent with their gender identity communicates the State's disapproval of their gender identity, which the Constitution and federal law protect.

115.    For example, the Legislature deemed every student to have a "natural right to privacy in the bathroom," but that right to privacy cannot create—and has been held not to by the Ninth Circuit—any right on the part of cisgender students not to share a restroom with transgender individuals.  *Parents for Privacy*, 949 F.3d at 1228.

**COUNT II**

**Violation of Title IX**

**20 U.S.C. § 1681**

*(Against Defendants Idaho Board of Education and Boise School District)*

116.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

117.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX's prohibitions on sex discrimination extend to "any academic, extracurricular,

research, occupational training, or other education program or activity operated by a recipient" of federal funding.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.400; 45 C.F.R. § 86.31.

118.    Under Title IX, discrimination "on the basis of sex" encompasses discrimination based on gender nonconformity, gender identity, transgender status, gender transition, and nonconformity to sex-based stereotypes.

119.    Conduct specifically prohibited under Title IX includes, *inter alia*, treating one person differently from another in determining whether such person satisfies any requirement or condition for the provision of aid, benefits, or services; providing different aid, benefits, or services in a different manner; denying any person any such aid, benefit, or service; or otherwise subjecting any person to separate or different rules of behavior, sanctions, or other treatment.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.31; 45 C.F.R. § 86.31.

120.    The public schools that Plaintiffs attend are education programs receiving federal financial assistance.  This means the schools, including the academic, extracurricular, and other educational opportunities provided, are subject to Title IX's prohibitions on sex- and gender-based discrimination against any student.

121.    By prohibiting transgender people like Plaintiffs from using the same restrooms and other facilities that their cisgender peers are allowed to use, Defendants have and continue to exclude Plaintiffs from participation in, deny them the benefits of, and subject them to discrimination in education programs and activities at their respective schools "on the basis of sex."  This violates Plaintiffs' rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  For example, Defendants violate Rebecca Roe's rights under Title IX by barring her from using the same girls' restrooms that every other girl is allowed to use and relegating her to separate restroom facilities.

122.    Defendants' violation of Plaintiffs' Title IX rights has caused injury and damage as a result, for which they seek nominal damages of $1 (only as to their Title IX claim).

## COUNT III

### Violation of Right to Privacy

### U.S. Const. Amend. XIV

*(Against Defendants Critchfield, Clark, Gilbert Jr., Hill, Keough, Liebich, Roach, Siddoway, Dennis, Wagers, Greeley, Gregory, Langley, Oppenheimer, and Rajbhandari)*

123.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

124.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenging Idaho's S.B. 1100 facially and as applied.

125.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

126.    The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure. Government infringement of these protections requires courts to apply strict scrutiny to such government action.

127.    The involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  The fact that a person is transgender constitutes highly personal and intimate information.  A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive.

128.    The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.  This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

129.    S.B. 1100 violates the fundamental right to privacy of transgender people, including Plaintiff Rebecca Roe and members of Plaintiff SAGA, by causing the involuntary disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure.

130.    There are no adequate safeguards to prevent the harms of the involuntary disclosure of one's transgender status caused by S.B. 1100.  For example, once other students learn of the fact that a student is transgender, nothing prevents those students from disclosing that information to others.

131.    There is no compelling, important, or even legitimate interest in the government causing transgender people such as Rebecca Roe to disclose their transgender status involuntarily any time they need to use school facilities.  There is also no public policy interest that is served by causing transgender people to disclose their transgender status to third parties where they would not otherwise do so.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that proper process issue and be served upon Defendants, requiring them to answer the Complaint within the time prescribed by law and further Plaintiffs request an order and judgment:

132.    Declaring that the provisions of and enforcement by Defendants of Idaho S.B. 1100 as discussed above, including the exclusion of transgender people like Plaintiffs from covered facilities or quarters consistent with their gender identity, violate their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

133.    Declaring that the provisions of and enforcement by Defendants of Idaho S.B. 1100 as discussed above, including the exclusion of transgender people like Plaintiffs from covered facilities consistent with their gender identity, violate their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

134.    Declaring that the provisions of and enforcement by Defendants Board of Education and Boise School District of S.B. 1100 as discussed above, including the exclusion of transgender people like Plaintiffs from covered facilities or quarters, consistent with their gender identity, violate their rights under Title IX;

135.    Declaring that Idaho S.B. 1100 is void and of no force or effect;

136.    Preliminarily and permanently enjoining enforcement by Defendants of Idaho S.B. 1100 as discussed above, including the exclusion of transgender people like Plaintiffs from covered facilities or quarters, consistent with their gender identity;

137.    Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

138.    Awarding nominal damages of $1 for violation of Title IX only as well as Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

139.    Awarding such other relief as the Court deems just and proper.

140.    The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

Dated: July 6, 2023                          Respectfully Submitted,

                                             /s/ Samuel L. Linnet
                                             Samuel L. Linnet
Katherine M. Forster                         ALTURAS LAW GROUP, PLLC
Robyn K. Bacon
J. Max Rosen
Nicholas R. Sidney                           Peter C. Renn
Paul Martin                                  Kell L. Olson
Avery P. Hitchcock                           Tara L. Borelli
Jimmy P. Biblarz                             Christina S. Paek
MUNGER TOLLES & OLSON LLP                    LAMBDA LEGAL DEFENSE & EDUCATION FUND

# Exhibit 1

LEGISLATURE OF THE STATE OF IDAHO
Sixty-seventh Legislature                    First Regular Session - 2023

IN THE SENATE

SENATE BILL NO. 1100, As Amended

BY EDUCATION COMMITTEE

1      AN ACT
2   RELATING TO PROTECTING THE PRIVACY AND SAFETY OF STUDENTS IN PUBLIC SCHOOLS;
3      AMENDING TITLE 33, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER 66, TITLE
4      33, IDAHO CODE, TO PROVIDE LEGISLATIVE FINDINGS, TO DEFINE TERMS, TO ES-
5      TABLISH PROVISIONS REGARDING SCHOOL RESTROOMS, TO PROVIDE EXEMPTIONS,
6      TO PROVIDE FOR REASONABLE ACCOMMODATION IN CERTAIN INSTANCES, TO PRO-
7      VIDE FOR A CIVIL CAUSE OF ACTION, AND TO PROVIDE FOR PREEMPTION; PROVID-
8      ING SEVERABILITY; AND DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE
9      DATE.

10  Be It Enacted by the Legislature of the State of Idaho:

11      SECTION 1. That Title 33, Idaho Code, be, and the same is hereby amended
12  by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
13  ter 66, Title 33, Idaho Code, and to read as follows:

14                           CHAPTER 66
15      PROTECTING THE PRIVACY AND SAFETY OF STUDENTS IN PUBLIC SCHOOLS

16      33-6601.  LEGISLATIVE FINDINGS. The legislature finds that:
17      (1)  There are real and inherent physical differences between men and
18  women;
19      (2)  Every person has a natural right to privacy and safety in restrooms
20  and changing facilities where such person might be in a partial or full state
21  of undress in the presence of others;
22      (3)  This natural right especially applies to students using public
23  school restrooms and changing facilities where student privacy and safety is
24  essential to providing a safe learning environment for all students;
25      (4)  Requiring students to share restrooms and changing facilities with
26  members of the opposite biological sex generates potential embarrassment,
27  shame, and psychological injury to students, as well as increasing the like-
28  lihood of sexual assault, molestation, rape, voyeurism, and exhibitionism;
29      (5)  Providing separate public school restrooms and changing facilities
30  for the different biological sexes is a long-standing and widespread prac-
31  tice protected by federal law, state law, and case law;
32      (6)  Federal legislative action, federal executive action, and fed-
33  eral court judgments that prevent public schools from maintaining separate
34  restrooms and changing facilities for different biological sexes are in-
35  consistent with the United States constitution and violate the privacy and
36  safety rights of students; and
37      (7)  A statewide policy ensuring separate school restrooms and chang-
38  ing facilities on the basis of biological sex is substantially related to the
39  important governmental interest in protecting the privacy and safety of all
40  students.

1    33-6602.   DEFINITIONS. For the purposes of this chapter:
2    (1) "Changing facility" means a facility in which a person may be in a
3    state of undress in the presence of others, including a locker room, changing
4    room, or shower room.
5    (2)  "Public school" means any public school teaching K-12 students
6    within an Idaho school district or charter school.
7    (3) "Sex" means the immutable biological and physiological character-
8    istics, specifically the chromosomes and internal and external reproductive
9    anatomy, genetically determined at conception and generally recognizable at
10   birth, that define an individual as male or female.

11   33-6603.   SCHOOL RESTROOMS. (1) Every public school restroom or chang-
12   ing facility accessible by multiple persons at the same time must be:
13   (a) Designated for use by male persons only or female persons only; and
14   (b) Used only by members of that sex.
15   (2) No person shall enter a multi-occupancy restroom or changing facil-
16   ity that is designated for one sex unless such person is a member of that sex.
17   The public school with authority over the building shall ensure that all re-
18   strooms and changing facilities provide its users with privacy from members
19   of the opposite sex.
20   (3)  In any other public school setting where a person may be in a state
21   of undress in the presence of others, school personnel must provide separate
22   and private areas designated for use by persons based on their sex, and no
23   person may enter these private areas unless such person is a member of the
24   designated sex.
25   (4)  During any school authorized activity or event where persons share
26   overnight lodging, school personnel must provide separate sleeping quar-
27   ters for members of each sex.  No person shall share sleeping quarters, a
28   restroom, or a changing facility with a person of the opposite sex, unless
29   the persons are members of the same family.

30   33-6604.   EXEMPTIONS. This chapter shall not apply:
31   (1)  To single-occupancy restrooms and changing facilities or restrooms
32   and changing facilities that are conspicuously designated for unisex or fam-
33   ily use;
34   (2)  To restrooms and changing facilities that have been temporarily
35   designated for use by that person's biological sex;
36   (3)  To a person of one sex who uses a single-sex facility designated for
37   the opposite sex, if such single-sex facility is the only facility reason-
38   ably available at the time of the person's use of the facility;
39   (4)  To a person employed to clean, maintain, or inspect a restroom or
40   single-sex facility;
41   (5)  To a person who enters a restroom or facility to render medical as-
42   sistance;
43   (6)  To a person who is in need of assistance and, for the purposes
44   of receiving that assistance, is accompanied by a family member, a legal
45   guardian, or the person's designee who is a member of the designated sex for
46   the single-sex restroom or changing facility;
47   (7) To coaching staff and personnel during athletic events; or

1    (8)  During an ongoing natural disaster or emergency, or when necessary
2 to prevent a serious threat to good order or student safety.

3    33-6605.   REASONABLE ACCOMMODATION. (1) A public school shall provide
4 a reasonable accommodation to a student who:
5    (a)  For any reason, is unwilling or unable to use a multi-occupancy re-
6    stroom or changing facility designated for the person's sex and located
7    within a public school building, or multi-occupancy sleeping quarters
8    while attending a public school-sponsored activity; and
9    (b)  Provides a written request for reasonable accommodation to the pub-
10   lic school.
11   (2)  A reasonable accommodation does not include access to a restroom,
12 changing facility, or sleeping quarter that is designated for use by members
13 of the opposite sex while persons of the opposite sex are present or could be
14 present.

15   33-6606.   CIVIL CAUSE OF ACTION. (1) Any student who, while accessing a
16 public school restroom, changing facility, or sleeping quarters designated
17 for use by the student's sex, encounters a person of the opposite sex has a
18 private cause of action against the school if:
19   (a)  The school gave that person permission to use facilities of the op-
20   posite sex; or
21   (b)  The school failed to take reasonable steps to prohibit that person
22   from using facilities of the opposite sex.
23   (2)  Any civil action arising under this chapter must be commenced
24 within four (4) years after the cause of action has occurred.
25   (3)  Any student who prevails in an action brought under this chapter may
26 recover from the defendant public school five thousand dollars ($5,000) for
27 each instance that the student encountered a person of the opposite sex while
28 accessing a public school restroom, changing facility, or sleeping quarters
29 designated for use by aggrieved student's sex.  The student may also recover
30 monetary damages from the defendant public school for all psychological,
31 emotional, and physical harm suffered.
32   (4)  Any student who prevails in action brought under this chapter is en-
33 titled to recover reasonable attorney's fees and costs from the defendant
34 public school.
35   (5)  Nothing in this chapter limits other remedies at law or equity
36 available to the aggrieved student against the school.

37   33-6607.   PREEMPTION. This chapter preempts any law, regulation, pol-
38 icy, or decree enacted or adopted by any city, county, municipality, or other
39 political subdivision within the state that purports to permit or require
40 public schools to allow persons to use facilities designated for the other
41 sex.

42   SECTION 2. SEVERABILITY. The provisions of this act are hereby declared
43 to be severable and if any provision of this act or the application of such
44 provision to any person or circumstance is declared invalid for any reason,
45 such declaration shall not affect the validity of the remaining portions of
46 this act.

4

1    SECTION 3.  An emergency existing therefor, which emergency is hereby
2    declared to exist, this act shall be in full force and effect on and after
3    July 1, 2023.