Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Christina S. Paek*
cpaek@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†mailing address only
(213) 382-7600 (T) | (213) 402-2537 (F)

*pro hac vice forthcoming

Attorneys for Plaintiffs

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, et al., | Case No. 1:23-cv-315 |
| *Plaintiffs*, | **Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction** |
| v. | |
| DEBBIE CRITCHFIELD, et al., | |
| *Defendants*. | |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ..................................................................................2

I.     A Vast Medical Consensus Recognizes That Transgender People Must Be Allowed to Live in a Manner Consistent With Their Gender Identity in All Aspects of Life. ..............2

II.    For Years, Numerous Idaho Schools—and Thousands of Schools Nationwide—Have Permitted Transgender Students to Use Facilities Matching Their Gender Identity. ..........4

III.   The Legislative History of S.B. 1100 Is Bereft of Any Evidence to Substantiate the Legislature's Purported Findings. .......................................................................5

IV.   S.B. 1100 Excludes Transgender Students from Sex-Designated Facilities Matching Their Gender Identity..............................................................................................7

V.    S.B. 1100 Will Irreparably Harm Transgender Youth Like Plaintiff Rebecca Roe and Members of Plaintiff SAGA. ................................................................................8

STANDARD..........................................................................................................9

ARGUMENT ......................................................................................................10

I.     Plaintiffs Are Likely to Succeed on Their Equal Protection Claim...................................10

      A.    S.B. 1100 Triggers Heightened Scrutiny Because It Discriminates Against Transgender People Based on Transgender Status and Sex. ................................10

      B.    Defendants Cannot Satisfy Their Heavy Burden to Show That S.B. 1100 is Adequately Tailored to Privacy and Safety Interests.............................................12

II.    Plaintiffs Are Likely to Succeed on Their Title IX Claim................................................17

III.   Plaintiffs Are Likely to Succeed on Their Privacy Claim. ...............................................18

IV.   The Irreparable Harm Faced by Transgender People, Balance of Hardships, and Public Interest All Weigh in Favor of a Preliminary Injunction....................................................19

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.C. v. Metropolitan Sch. Dist. of Martinsville,*
   601 F. Supp. 3d 345 (S.D. Ind. 2022) ................................................................. 11

*A.H. v. Minersville Area Sch. Dist.,*
   408 F. Supp. 3d 536 (M.D. Pa. 2019) ................................................................. 11

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................................ 10

*Arroyo Gonzalez v. Rossello Nevares,*
   305 F. Supp. 3d 327 (D.P.R. 2018) ..................................................................... 18

*B.E. v. Vigo Cnty. Sch. Corp.,*
   608 F. Supp. 3d 725 (S.D. Ind. 2022) ................................................................. 11

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.,*
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ........................................................... 11, 17

*Bostock v. Clayton Cnty., Ga.,*
   140 S. Ct. 1731 (2020) ....................................................................................... 12

*Cal. Chamber of Commerce v. Council for Educ. and Rsch. on Toxics,*
   29 F.4th 468 (9th Cir. 2022) .............................................................................. 20

*Cruzan v. Special Sch. Dist., #1,*
   294 F.3d 981 (8th Cir. 2002) .............................................................................. 13

*Dodds v. United States Dep't of Educ.,*
   845 F.3d 217 (6th Cir. 2016) ........................................................... 11, 13, 17, 20

*Doe v. Boyertown Area School Dist.,*
   897 F.3d 518 (3d Cir. 2018) .......................................................................... 13, 15

*Doe v. Cnty. of San Diego,*
   576 F. Supp. 3d 721 (S.D. Cal. 2021) ................................................................. 18

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) .............................................................................. 9

*Evancho v. Pine-Richland Sch. Dist.,*
   237 F. Supp. 3d 267 (W.D. Pa. 2017) ............................................................ 11, 12

*F.V. v Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ........................................................................ 11, 19, 20

*Grabowski v. Ariz. Bd. of Regents*,
   69 F.4th 1100 (9th Cir. 2023) ........................................................................................ 17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ................................................................................ *passim*

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ...................................................................... 10, 11, 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ........................................................................................................ 9

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ......................................................................................... 9

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
   396 F. Supp. 3d 833 (S.D. Ind. 2019) ........................................................................ 11

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ............................................................................... 10, 11, 14

*Latta v. Otter*,
   771 F.3d 456 (9th Cir. 2014) ............................................................................. 10, 13, 14, 14

*Love v. Johnson*,
   146 F. Supp. 3d 848 (E.D. Mich. 2015) ..................................................................... 18

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
   286 F. Supp. 3d 704 (D. Md. 2018) ........................................................................... 11

*M.H. v. Jeppesen*,
   No. 1:22-cv-00409-REP, 2023 WL 4080542 (D. Idaho Jun. 20, 2023) ................... 10, 11

*Ollier v. Sweetwater Union High Sch. Dist.*,
   858 F. Supp. 2d 1093 (S.D. Cal. 2012) ..................................................................... 20

*Ostergren v. Cuccinelli*,
   615 F.3d 263 (4th Cir. 2010) ...................................................................................... 19

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ........................................................................ 13, 14, 15, 17

*Parents for Privacy v. Dallas Sch. Dist.*,
   326 F. Supp. 3d 1075 (D. Or. 2018) ................................................................... 17

*Planned Parenthood Arizona, Inc. v. Humble*,
   753 F.3d 905 (9th Cir. 2014) ............................................................................... 19

*Powell v. Schriver*,
   175 F.3d 107 (2d Cir. 1999) .......................................................................... 18, 19

*Ray v. McCloud*,
   507 F. Supp. 3d 925 (S.D. Ohio 2020) ................................................................ 18

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ............................................................................. 20

*Romer v. Evans*,
   517 U.S. 620 (1996) ............................................................................................. 16

*Schwenk v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) ............................................................................. 12

*Tucson Woman's Clinic v. Eden*,
   379 F.3d 531 (9th Cir. 2004) ............................................................................... 18

*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................................................. 10

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..................................................................... *passim*

**Statutes, Regulations, and Bills**

20 U.S.C. § 1681 ........................................................................................................ 17

34 C.F.R. § 106.33 ..................................................................................................... 17

Idaho Senate Bill 1100 ......................................................................................... *passim*

**INTRODUCTION**

At the start of any school year, students engage in a range of familiar rituals accompanied by a range of familiar emotions: transitioning from the more carefree days of summer break to the hourly bells of a school schedule; picking out what they will wear on the first day of school and then agonizing over what first impressions that will make; and wondering who they will sit with at lunch and hoping that a table of friendly faces might welcome them.  Successfully navigating this landscape is challenging enough for all students.  But, this year, transgender students in Idaho must also confront a new daily challenge that other students will not face: their targeted exclusion from school restrooms and other facilities used by their peers.  As of July 1, 2023, Idaho Senate Bill 1100 ("S.B. 1100") imposes a blanket statewide ban excluding transgender students from school facilities consistent with their gender identity.

S.B. 1100 transforms transgender youth into pariahs in their own communities.  While every other student is able to continue using facilities that match their gender identity, transgender youth alone are barred from using those same communal facilities.  It is profoundly stigmatizing to be told that you are not welcome where everyone else is welcome and must instead go elsewhere.  This exclusion also mandates the exact opposite of what science and medicine have long confirmed is necessary for transgender people to have an equal chance to thrive: the ability to live in a manner consistent with one's gender identity in all aspects of life. That simple yet powerful treatment can help to avert grave consequences that can otherwise destroy the lives of transgender youth—including depression, anxiety, and suicidality—and that can keep parents of transgender youth awake at night.

S.B. 1100 is also a quintessential solution in search of a problem, sacrificing the well-being of a vulnerable minority with no benefit to the majority in return.  For many years,

1

numerous schools across Idaho, like others nationwide, have adopted inclusive policies and

practices that allowed transgender students to access facilities consistent with their gender

identity—without any evidence of harm.  S.B. 1100 is premised on the baseless fear that equality

cannot coexist with privacy and safety; but countless experiences have proven that false.

As numerous federal courts have recognized, policies like S.B. 1100 break the collective

promise of equal protection for all secured by both the Constitution and Title IX, and they violate

the constitutional right to privacy by exposing students' transgender status to others.  A

preliminary injunction is necessary to halt these irreparable injuries.  Each day that these students

suffer the unforgettable sting of discrimination, or the irreversible danger of a privacy violation,

is a day they cannot get back.  There is no do-over of seventh grade for Plaintiff Rebecca Roe,

nor of the singular experience of high school for members of Plaintiff Sexuality and Gender

Alliance at Boise High School ("SAGA"), and that reality is true for all of Idaho's transgender

youth.  Only a preliminary injunction can prevent the permanent scars of discrimination.

## FACTUAL BACKGROUND

**I.      A Vast Medical Consensus Recognizes That Transgender People Must Be Allowed
to Live in a Manner Consistent With Their Gender Identity in All Aspects of Life.**

As explained by Dr. Stephanie Budge, who is a psychologist and professor with expertise

in transgender health, people are typically assigned a sex designation at birth based on the

appearance of external genitalia—often called their "sex assigned at birth."  Decl. of Stephanie

Budge, Ph.D. ¶ 21.  But a person has multiple sex-related characteristics, including chromosomal

makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and

gender identity.  *Id.* ¶ 22.  Gender identity refers to a person's internal or psychological sense of

having a particular gender.  *Id.* ¶ 19.  For most people, these sex-related characteristics align with

each other.  But that is not so for all people.  A person's gender identity, in particular, can

diverge from other sex-related characteristics.  When there is a divergence among a person's sex-related characteristics, medical experts agree that gender identity is the most important and determinative factor.  *Id.* ¶ 22.

The majority of people are "cisgender," meaning their gender identity aligns with their sex assigned at birth.  But a minority of people are transgender, meaning their gender identity differs from their sex assigned at birth.  *Id.* ¶ 21.  Like cisgender people, transgender people experience a consistent, persistent, and insistent sense of being their gender; that gender, however, happens to be different from their sex assigned at birth.  *Id.* ¶ 23.

Medical professionals have long recognized that affirming a transgender person's gender identity is crucial to their health.  Gender dysphoria refers to the clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. *Id.* ¶ 25.  If left untreated, gender dysphoria can result in profound psychological distress, anxiety, depression, and even self-harm or suicidal ideation.  *Id.*

There are internationally accepted Standards of Care governing the treatment of gender dysphoria.  *Id.* ¶ 15.  A critical component of that treatment is social transition.  *Id.* ¶ 34.  To socially transition, a transgender person must live fully in accordance with their gender identity in all aspects of life.  *Id.*  To be effective, social transition must be respected consistently across all aspects of a transgender individual's life—for example, at home and in school.  *Id.*  Failing to recognize a transgender person's gender can undermine social transition and thereby exacerbate the negative consequences of gender dysphoria.  *Id.* ¶ 35.

Refusing to allow transgender students to use the restrooms and other facilities that align with their gender identity disrupts those students' social transition, thereby undermining the effectiveness of treatment for gender dysphoria.  *Id.* ¶¶ 58-60.  It also causes significant

psychological harms by causing these students to feel rejected, stigmatized, and shamed, and by increasing depression, anxiety, and suicidal ideation.  *Id.* ¶ 53.  In research where transgender youth were prevented or discouraged from using facilities matching their gender identity, 60% seriously considered suicide.  *Id.* ¶ 57.

Further, excluding transgender students from facilities that match their gender identity also exposes those students to external threats.  Transgender people regularly face harassment and victimization in restrooms when they are perceived not to belong.  *Id.* ¶ 56.  Consigning transgender individuals to use facilities that do not correspond to their gender identity and expression subjects those individuals to increased risk of victimization.  *Id.*

## II.    For Years, Numerous Idaho Schools—and Thousands of Schools Nationwide—Have Permitted Transgender Students to Use Facilities Matching Their Gender Identity.

Many schools in Idaho have long adopted inclusive policies and practices that allow transgender students to use facilities that correspond to their gender identity.  Decl. of Jimmy Biblarz ¶ 7, Ex. 5.  In 2015, for instance, the Idaho School Boards Association (ISBA) created Policy 3281, which specified that students should be permitted "to use the restrooms and locker rooms that correspond to the gender identity they consistently assert at school."  *Id.*, Ex. 2.  Since Policy 3281 was issued, a significant number of school districts have adopted it or implemented practices that align with it.  *Id.* ¶ 7, Ex. 5.  For example, Boise School District implemented a practice in 2016 in which transgender students can develop a gender support plan confirming their use of facilities matching their gender identity.  *Id.*, Ex. 7; Decl. of A.J., Ex. A.

There is no evidence that adoption of inclusive policies and practices across Idaho schools has caused any harm to students.  To the contrary, all of the evidence shows that such policies have only made transgender students feel more welcome and respected at school.  ISBA itself has confirmed that schools adopting inclusive policies have had no reported incidents as a

result.  Biblarz Decl., Ex. 4.  Experts who work in Idaho schools agree.  School Resource Officer

(SRO) Morgan Ballis works in the Blaine County School District and is also President of the

Idaho Association of School Resource Officers (IDASRO).  Ballis Decl. ¶¶ 15, 19.  In 2016,

Blaine County adopted a policy that allows transgender students to use facilities consistent with

their gender identity.  *Id.* ¶¶ 23, 25.  Officer Ballis has not seen any evidence that this policy has

harmed even a single non-transgender student.  He is unaware of transgender students posing

privacy risks to others or cisgender students pretending to be transgender to gain access the other

sex's facilities.  *Id.* ¶¶ 30-31.  Further, IDASRO maintains contact with approximately 205 SROs

across Idaho, who consistently use the organization as a resource to discuss trends in safety

issues.  *Id.* ¶¶ 19, 32.  As President of IDASRO, Officer Ballis has not seen any mention by any

of these SROs of a privacy or safety problem arising out of inclusive policies.  *Id.* ¶ 32.  To the

contrary, these policies "are important to protect the safety of transgender youth."  *Id.* ¶ 26.

Schools in countless other jurisdictions have also successfully implemented inclusive

policies and practices for years, without any evidence of harm.  For example, as a former school

administrator, Diana Bruce was involved with the adoption of an inclusive policy for the District

of Columbia Public Schools, which dates back to 2006 and has been implemented without issue.

*See* Decl. of Diana Bruce.  Similarly, assistant principal Foster Jones has direct experience with

the inclusive policy at his high school in Kentucky, which has existed since 2014 without

causing any privacy or safety issues.  *See* Decl. of Foster Jones.  As explained below, courts

analyzing discriminatory restroom policies across multiple jurisdictions have repeatedly found

that privacy and safety concerns are based on speculation and conjecture—not evidence.

III.    **The Legislative History of S.B. 1100 Is Bereft of Any Evidence to Substantiate the
        Legislature's Purported Findings.**

S.B. 1100 took shape shortly after a highly public fight in early 2023 about whether

Caldwell School District should join the numerous other schools in Idaho that have adopted an inclusive policy.  Biblarz Decl., Ex. 5.  At a school board meeting to discuss the policy, Idaho Senator Chris Trakel—who would ultimately become a key proponent of S.B. 1100—asserted that such a policy would jeopardize children's "moral health."  Biblarz Decl. ¶ 6.  Idaho Senator Cindy Carlson, who would later testify in favor of S.B. 1100, sent a public letter to Idaho Superintendent of Public Instruction Debbie Critchfield, urging Critchfield to take action to prevent enforcement of inclusive policies, and declaring, "[w]e need to send the message" about kids not being "indoctrinate[d]" with "this garbage."  *Id.*, Ex. 6.

Shortly thereafter, S.B. 1100 was introduced in the Senate, racing through the Legislature in a mere month.  Supporters professed a belief that transgender people do not or should not exist.  Senator Trakel stated that "[w]e believe biological gender to be an essential characteristic of a child's identity and purpose."  *Id.* ¶ 13.  One supporter testified that "God made man and woman . . . and eventually men and women made men's and women's bathrooms for men and women," and that "We either have Part A or Part B.  Let's keep it simple."  *Id.*

In attempting to justify the law, legislators cited hypothetical concerns about safety and privacy, while simultaneously painting transgender students as threats to other students.  Senator Trakel hypothesized that the bill would prevent "some small child" from otherwise being "molested or raped in the bathroom."  *Id.*  Even as they speculated as to these unsubstantiated concerns, legislators supporting the bill simultaneously conceded that there were no "documented cases of trans person violence on non-trans people."  *Id.*

Tellingly, the Legislature acknowledged in its findings that "federal court judgments" had repeatedly invalidated similar policies.  33-6601(6).[1]  Undeterred, it passed S.B. 1100.

---

[1] Citations to S.B. 1100 (referenced as 33-6601 to 33-6607) are to Idaho Code, Title 33

IV.    **S.B. 1100 Excludes Transgender Students from Sex-Designated Facilities Matching Their Gender Identity.**

S.B. 1100 defines "sex" based solely on chromosomes and reproductive anatomy.  33-6602.  Based on this definition, S.B. 1100 requires that every public school multiple-occupancy restroom or changing facility must be designated by sex and used only by members of that "sex." 33-6603(1).  This requires public schools to banish transgender people from the facilities matching their gender identity.  33-6602; 33-6603.

In addition to this statewide mandate, S.B. 1100 also creates a private right of action that places a "bounty" on the heads of transgender students.  Any student who encounters someone of the "opposite sex" in covered facilities may obtain statutory damages of at least $5,000, thereby transforming the peers of transgender students into compensated informants.  33-6606.

S.B. 1100 requires that schools provide "reasonable accommodations" to anyone who is "unwilling or unable" to use the facilities designated for the person's "sex," but this does not include access to facilities "designated for use by members of the opposite sex while persons of the opposite sex are present or could be present."  33-6605.  S.B. 1100 thus relegates transgender youth to "other" facilities, which is stigmatizing and damaging.  Budge Decl. ¶ 52.  S.B. 1100 also lays out various exemptions—such as permitting coaching staff to enter otherwise prohibited facilities to deliver a halftime "pep talk"—but none provides transgender students with equal access to facilities matching their gender identity.  33-6604; Biblarz Decl. ¶ 13.[2]

S.B. 1100 also includes legislative "findings" asserting that the law protects the "privacy and safety" of students, and that allowing transgender students to use facilities matching their

_____

Education, Chapter 66 [67] Protecting the Privacy and Safety of Students in Public Schools.

[2] S.B. 1100 also applies to school-sponsored events with overnight lodging.  33-6603(4).  Tus, for example, on a school trip where four students would stay in a hotel room together, a transgender student may be forced to stay in a room without other students.

gender identity would purportedly "increas[e] the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism" and cause "potential embarrassment, shame, and psychological injury to students." 33-6601(2-5). As noted, no evidence substantiated these findings.

**V.      S.B. 1100 Will Irreparably Harm Transgender Youth Like Plaintiff Rebecca Roe and Members of Plaintiff SAGA.**

If not preliminarily enjoined, S.B. 1100 will harm transgender students across Idaho like Plaintiff Rebecca Roe and members of SAGA, who merely seek to safely attend public school in accordance with their gender identity, just as their peers are able to do.

Rebecca Roe is a twelve-year-old girl who has attended school within Boise School District since kindergarten. Decl. of Rebecca Roe ("Rebecca Decl.") ¶ 2; Decl. of Rachel Roe ("Rachel Decl.") ¶ 2. Rebecca enjoys playing video games, hanging out with friends at the mall, watching anime shows, and doodling artwork. Rebecca Decl. ¶ 3. For the 2023-24 academic year, she will be attending seventh grade at a junior high within Boise School District. *Id.* ¶ 2.

Rebecca is transgender. She began her social transition in fifth grade, when she started to live her life in accord with her gender identity. *Id.* ¶¶ 9-10. Before she transitioned, Rebecca exhibited signs of depression, struggled socially, and fell behind academically. Rachel Decl. ¶¶ 4-7. After she transitioned, her mental health improved. *Id.* ¶ 8. As part of her transition, Rebecca began to use a girl's name; dressed in girls' clothes; adopted a more feminine hairstyle; and started using female pronouns. Rebecca Decl. ¶ 10. Her friends accepted her. *Id.* ¶ 11.

Heading into junior high, Rebecca wishes to use the girls' restroom—just like all the other girls. Excluding her from those facilities will jeopardize her social transition, imperil her mental and physical health, and violate her right to privacy by outing her to peers. Before S.B. 1100, junior high held the prospect of acceptance, which is especially critical for the well-being of transgender youth. Now, when she wishes to go with friends into the girls' restroom, she will

have to explain to them why she alone is not permitted to enter.

Plaintiff SAGA is a student organization focused on supporting, uplifting, and representing lesbian, gay, bisexual, transgender, and queer (LGBTQ) students at Boise High School.  A.J. Decl. ¶ 2.  One of SAGA's goals is to ensure that LGBTQ students are safe and welcome at school.  There are transgender members of SAGA, including current SAGA president A.J., who is a transgender boy.[3]  Pursuant to Boise School District's inclusive practice, transgender students at Boise High School have been able to use facilities matching their gender identity.  A.J. is one of those students.  He used the boys' restroom at school without incident during his junior year, and he wishes to continue doing so during his senior year, just like other boys.  *Id.* ¶ 8.  S.B. 1100, however, casts him out from those facilities, inflicting the same irreparable injuries on him as other transgender youth like Rebecca.

## STANDARD

A preliminary injunction is warranted where a party has shown that "(1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public interest."  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Alternately, a preliminary injunction is also appropriate when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," combined with a likelihood of irreparable injury and a showing that the injunction serves the

---

[3] SAGA has standing to seek relief because of the injuries that S.B. 1100 inflicts on the organization, including its transgender members who are excluded from facilities matching their gender identity.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341-42 (1977).

public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## ARGUMENT

**I.      Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

To safeguard the constitutional rights of vulnerable groups who are most often targeted for mistreatment, laws that discriminate against a quasi-suspect class must satisfy heightened scrutiny under the Equal Protection Clause.  *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019).  The import of heightened scrutiny is several-fold.  First, the court must presume that the law is unconstitutional, and the government bears the heavy burden of proving otherwise.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Second, the government must show an "exceedingly persuasive justification" in which there is a substantial relationship between the discriminatory means employed and the achievement of important government interests.  *Id.* at 534.  And these must be actual interests—"not hypothesized or invented post hoc in response to litigation."  *M.H. v. Jeppesen*, No. 1:22-cv-00409-REP, 2023 WL 4080542, at *8 (D. Idaho Jun. 20, 2023) (quotes omitted).  Third, where the government's means are grossly over-inclusive or under-inclusive to achieving its interests, or where less intrusive means can substantially achieve those interests without discrimination, the law fails heightened scrutiny.  *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *Karnoski*, 926 F.3d at 1200.  Finally, these interests must be sufficient to "overcome the injury and indignity inflicted" on the group—including "messages of stigma or second-class status."  *Hecox v. Little*, 479 F. Supp. 3d 930, 976 (D. Idaho 2020) (quotes omitted).

Plaintiffs are likely to succeed because (1) S.B. 1100 discriminates based on transgender status and sex, triggering heightened scrutiny; and (2) S.B. 1100 fails to satisfy that scrutiny.

**A.      S.B. 1100 Triggers Heightened Scrutiny Because It Discriminates Against Transgender People Based on Transgender Status and Sex.**

While people who are not transgender are able to access school facilities consistent with

their gender identity, S.B. 1100 bars transgender people like Rebecca Roe and SAGA members from doing so. As courts have long recognized, that type of exclusion discriminates against transgender people, because it is discrimination based on both transgender status and sex.[4]

*Transgender Status.* In *Karnoski v. Trump*, 926 F.3d at 1200-01, the Ninth Circuit recognized that transgender people bear all the indicia of a quasi-suspect class, such as being subjected to a history of discrimination and lacking sufficient political power to protect themselves. Thus, a government policy that purported to allow transgender people to serve in the military "in their biological sex"—but barred them from doing so consistent with their gender identity—triggered the heightened scrutiny. *Id.* at 1191.

S.B. 1100 similarly discriminates against transgender people. Courts have overwhelmingly recognized that excluding transgender people from facilities matching their gender identity—while allowing cisgender people to use facilities matching their gender identity—discriminates based on transgender status.[5] *See, e.g.*, *Grimm*, 972 F.3d at 610; *Whitaker*, 858 F.3d at 1051. "[U]nlike every other student, [transgender students] would have to use restrooms where they are wholly unlike everyone else in appearance, manner, mode of

---

[4] *E.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-14 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 220-22 (6th Cir. 2016); *B.E. v. Vigo Cnty. Sch. Corp.*, 608 F. Supp. 3d 725, 729-33 (S.D. Ind. 2022); *A.C. v. Metropolitan Sch. Dist. of Martinsville*, 601 F. Supp. 3d 345, 350-54 (S.D. Ind. 2022); *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 575-78 (M.D. Pa. 2019); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842-43 (S.D. Ind. 2019); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 716-18 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288-89 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874-76 (S.D. Ohio 2016).

[5] Courts in this district have similarly held that the government discriminates based on transgender status where it denies transgender people treatment consistent with their gender identity—from birth certificates to sports to healthcare. *F.V. v Barron*, 286 F. Supp. 3d 1131, 1141 (D. Idaho 2018); *Hecox*, 479 F. Supp. 3d at 975; *M.H.*, 2023 WL 4080542, at *11-13.

living, and treatment at school." *Evancho*, 237 F. Supp. 3d at 285.

**Sex.**  Heightened scrutiny is also independently required because discrimination against transgender people necessarily involves discrimination based on sex.  The Supreme Court has now settled the point, once and for all: "it is impossible to discriminate against a person for being transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1741 (2020).

S.B. 1100 inescapably imposes sex-based discrimination because it treats transgender people differently based on "sex," regardless of how that term is defined, and that differential treatment inflicts injury by depriving them of access to facilities matching their gender identity. Indeed, the law's exclusion of transgender people from such facilities cannot even be articulated without regard to "sex."  33-6603 (prohibiting entry into covered facilities unless the person is of the designated "sex"); *cf. Grimm*, 972 F.3d at 608 (denying transgender student access to restroom based on "biological gender" was sex discrimination); *Whitaker*, 858 F.3d at 1051.

S.B. 1100 also discriminates based on sex stereotypes.  "Discrimination because one fails to act in the way expected of a man or woman is forbidden," including where transgender people are targeted for their nonconformity to expectations associated with their sex assigned at birth. *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).  A policy that bars transgender people from facilities matching their gender identity "is essentially the epitome of discrimination based on gender nonconformity." *Evancho*, 237 F. Supp. 3d at 285; *Grimm*, 972 F.3d at 617 n.15 (restroom "policy punished [plaintiff] for not conforming to his sex-assigned-at-birth").

**B.    Defendants Cannot Satisfy Their Heavy Burden to Show That S.B. 1100 is Adequately Tailored to Privacy and Safety Interests.**

While S.B. 1100 tries to cloak its discrimination under the guise of protecting privacy and safety, there is no support for the baseless notion that transgender students pose a privacy or

safety risk to their cisgender peers.  "Unsupported legislative conclusions as to whether particular policies will have societal effects" as to policies that "implicate constitutional rights []  have not been afforded deference by the Court."  *Latta*, 771 F.3d at 469.  These justifications (1)  fail as a matter of law under existing Ninth Circuit authority, and (2) fail as a matter of fact,  given the demonstrated absence of actual harms, the availability of other tools to protect privacy  or safety for everyone, and the ways in which the law actively undermines those interests.

      *Privacy.*  First, the Ninth Circuit has already considered similar privacy arguments as a  justification for discrimination against transgender students and rejected them as a matter of law.  In *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020), the Ninth Circuit considered  whether cisgender students who object to sharing communal facilities with transgender students  could state a claim for violation of a right to privacy.  The answer: an unequivocal no.  *Id.* at  1226.  This is because nothing in "the contours of the privacy right" includes a right to banish  transgender students from shared spaces.[6]  *Id.* at 1225.  And in the context of addressing Title  IX, the court held that "the mere presence of transgender students in locker and bathroom  facilities" "cannot be enough" to constitute harassment.  *Id.* at 1228-29.  As reflected in its  findings, S.B. 1100 is premised on the notion that cisgender students possess a "natural right to  privacy" not to share space with transgender students using facilities matching their gender  identity.  33-6601(2).  This premise is incompatible with the reasoning and holding of *Parents  for Privacy*.

      To the extent that S.B. 1100's privacy interest distills to a desire to shunt transgender

---

[6] Many other courts have rejected similar privacy arguments as a basis to discriminate against  transgender people in communal facilities.  *Grimm*, 972 F.3d at 613-14; *Doe v. Boyertown Area  School Dist.*, 897 F.3d 518, 530-31 (3d Cir. 2018); *Whitaker*, 858 F.3d at 1053; *Dodds*, 845 F.3d  at 221-22; *see also Cruzan v. Special Sch. Dist., #1*, 294 F.3d 981, 984 (8th Cir. 2002).

students to separate facilities because of private disapproval and discomfort—and the legislative record was rife with such sentiments—that only further confirms S.B. 1100 is unconstitutional. "[P]rivate disapproval is a categorically inadequate justification." *Latta*, 771 F.3d at 471.

Second, S.B. 1100's privacy justification is wholly unsupported as a matter of fact. As a threshold matter, it "ignores the reality of how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Grimm*, 972 F.3d at 613. Nothing about a transgender student's ordinary use of school facilities, in the same ordinary way as every other student, infringes upon anyone else's privacy rights. *See Parents for Privacy*, 949 F.3d at 1229 ("The use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender."); *see also Whitaker*, 858 F.3d at 1052.

Furthermore, as legislative proceedings revealed, and as Plaintiffs' evidence confirms, there is no evidence of transgender students in Idaho engaging in behaviors that infringe upon the privacy of others, despite years of experience with inclusive policies in numerous schools. Ballis Decl. ¶¶ 30-32; Biblarz Decl. ¶ 7, Ex. 4. The experiences of school officials—who have first-hand experience with inclusive policies that have governed the welfare of thousands of students—reinforce that there is nothing mutually exclusive between privacy and equality. *See generally* Bruce Decl. (D.C. Public Schools); Jones Decl. (Atherton High School in Kentucky). That dovetails with the experiences of transgender youth like those in SAGA, who have used facilities matching their gender identity without incident. A.J. Decl. ¶ 8. Like other restroom policies discriminating against transgender students that courts have struck down, S.B. 1100's appeal to privacy "is based on sheer conjecture and abstraction." *Whitaker*, 858 F.3d at 1051; *Grimm*, 972 F.3d at 614; *infra* n.4. That is hardly an "exceedingly persuasive justification."

S.B. 1100 also lacks the tailoring required under heightened scrutiny. *See Karnoski*, 926

F.3d at 1200 (less intrusive means can achieve a government interest); *Latta*, 771 F.3d at 472. There are non-discriminatory measures available to increase privacy for *all* students, transgender or not, such as providing them with the option—but not the obligation—to utilize spaces offering even greater privacy if desired.  The availability of those measures belies any claim that the categorical exclusion of transgender youth is rationally or substantially related to privacy.[7]  *Cf. Parents for Privacy*, 949 F.3d at 1225 (noting cisgender students' purported privacy concerns were further addressed because policy "provide[ed] alternative options and privacy protections to those who do not want to share facilities with a transgender student").

In truth, "the real privacy risk comes from forcing transgender students to reveal their identity to others, in contexts when it may not be safe for them to do so."  Ballis Decl. ¶ 30.  If anything, protecting privacy is often of heightened importance to transgender students.  As the Ninth Circuit observed, while "adolescence and the bodily and mental changes it brings can be difficult for students," making exposure to others "a potential source of anxiety . . . this is *particularly* true for transgender students who experience gender dysphoria."  *Parents for Privacy*, 949 F.3d at 1217 (emphasis added).  Transgender students are likely to be modest not only to avoid the risk of bullying and harassment, but also to avoid disclosure of physical features that likely exacerbate the painful experience of gender dysphoria.  Budge Decl. ¶ 68. S.B. 1100 thus not only fails to advance privacy for cisgender students, but undermines privacy by "brand[ing] all transgender students with a scarlet 'T.'"  *Boyertown*, 897 F.3d at 530.

***Safety.***  Nor are Defendants likely to show that S.B. 1100 substantially furthers any

---

[7] Conversely, while S.B. 1100 takes a hard line against transgender people's use of facilities matching their gender on the grounds that sharing space with the "opposite sex" supposedly causes grievous harm, it simultaneously exempts coaches who may want to give a halftime "pep talk" in a locker room—notwithstanding those purported privacy harms.  Biblarz Decl. ¶ 13.

interest in safety.  Again, the Legislature tellingly failed to identify any evidence to support its claim that inclusive policies cause "sexual assault, molestation, rape, voyeurism, and exhibitionism," 33-6601, even though many Idaho schools have implemented such policies for years.  *See Grimm*, 972 F.3d at 614 (noting that the "insubstantiality of the Board's fears" have not been borne out in the experiences of the numerous schools in the state providing equal treatment).  And again, it is transgender students, rather than their cisgender peers, who are at higher risk of harassment and violence as a result of discrimination.  Ballis Decl. ¶ 27; Budge Decl. ¶¶ 46-47.  Forcing transgender students to use facilities discordant with their gender identity can disclose to others that the student is transgender, increasing the likelihood of the transgender student becoming targeted for discrimination.  Ballis Decl. ¶ 27; Budge Decl. ¶ 67. Under heightened scrutiny, the government must be able to "overcome the injury and indignity inflicted" on transgender people, which S.B. 1100 cannot conceivably do given the gravity of the harms at stake here.  *Hecox*, 479 F. Supp. 3d at 976.

There is also no evidence that inclusive policies have led to cisgender students engaging in an elaborate charade of pretending to be transgender just to gain access to restrooms for the other sex—which, in any event, could not justify discriminating against transgender students. Ballis Decl. ¶ 31.  To the extent that any student engages in misconduct, S.B. 1100 does nothing to further the ability of law enforcement to respond to it.  School Resource Officers are already equipped with tools under school policies and the criminal code that actually deal with misconduct.  *Id.* ¶ 28.  S.B. 1100 adds nothing to them.  *Id.* ¶ 29.

For all of these reasons, Defendants are unlikely to satisfy their burden under heightened scrutiny—but S.B. 1100 lacks even "a rational relation to some legitimate end," because it *undermines* rather than advances its stated goals, as explained above.  *Romer v. Evans*, 517 U.S.

620, 631 (1996).  Such a measure cannot survive any level of review.

## II.     Plaintiffs Are Likely to Succeed on Their Title IX Claim.

For the same reasons that S.B. 1100 violates equal protection by discriminating against transgender people based on sex, it also violates Title IX's bar against sex discrimination.  20 U.S.C. § 1681 ("No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance").  As funding recipients, the Idaho Board of Education and Boise School District are bound by Title IX's strictures.  Biblarz Decl., Ex. 9.

The Ninth Circuit has confirmed that *Bostock*'s holding—that discrimination against transgender people constitutes discrimination based on sex—applies equally to Title IX. *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1100, 1116 (9th Cir. 2023).  And a multitude of courts have recognized that excluding transgender people from facilities matching their gender identity violates Title IX.[8]  S.B. 1100 treats transgender students differently, and worse, than other students.  *See Grimm*, 972 F.3d at 618 (explaining that discrimination under Title IX requires differential treatment and resulting injury).  A transgender boy, for instance, is "treated worse than students with whom he [is] similarly situated because he alone [cannot] use the restroom corresponding with his gender."  *Id.*  That treatment inflicts psychological distress and stigma, among other injuries.  *Highland*, 208 F. Supp. 3d at 870-71.  Title IX does not force transgender students to endure these harms as the price of public education.

---

[8] *Infra* n.4; *Grimm*, 972 F.3d at 616; *Whitaker*, 858 F.3d at 1049-50; *Dodds*, 845 F.3d at 220-22; *Parents for Privacy v. Dallas Sch. Dist.*, 326 F. Supp. 3d 1075, 1106 (D. Or. 2018), *aff'd*, 949 F.3d 1210 (9th Cir. 2020).  Notably, courts have also rejected the argument that the existence of a regulation merely allowing facilities to be sex-separated, 34 C.F.R. § 106.33, therefore means discrimination against transgender students is permissible—which would render Title IX's protection against such discrimination meaningless.  *See, e.g.*, *Grimm*, 972 F.3d at 618.

**III.    Plaintiffs Are Likely to Succeed on Their Privacy Claim.**

By excluding transgender people from facilities matching their gender identity, and consigning them to other facilities that can reveal their sex assigned at birth, S.B. 1100 recklessly exposes their transgender status to others in violation of their constitutional right to privacy.

"Ninth Circuit cases have uniformly recognized a constitutional right to informational privacy." *Doe v. Cnty. of San Diego*, 576 F. Supp. 3d 721, 734 (S.D. Cal. 2021).  Courts assessing such claims may consider factors such as the type of information at issue; the potential for harm in disclosure; the adequacy of safeguards to prevent disclosure; the need for access to the information; and whether public policy militates towards access. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004).  Every factor weighs in favor of Plaintiffs here.

"The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999).  Courts have thus held that government actions that can involuntarily disclose that status—such as saddling transgender people with identity documents reflecting their sex assigned at birth—violate transgender people's constitutional right to privacy. *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 931-32 (S.D. Ohio 2020); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015).  When a transgender girl is forced to use the boys' restroom because that is the only facility she can reach in the five minutes between classes, or when she cannot go with her female friends into the girls' restroom, the government has similarly jeopardized the disclosure of her transgender status. *See* Budge Decl. ¶¶ 61-64; Rebecca Decl. ¶ 16.

The potential for harm from disclosure can be catastrophic.  The disclosure of one's transgender status, particularly in circumstances where one would otherwise keep that

information private, can provoke intense "hostility and intolerance from others." *Powell*, 175 F.3d at 111.  As this Court has observed, a "mismatch" between a transgender person's outward expression of their gender identity and information reflecting their sex assigned at birth can incite harassment or even physical assault.  *F.V.*, 286 F. Supp. 3d at 1137.  And once other students learn of the fact that a student is transgender, there are no safeguards to prevent those third parties from disclosing that information to others.  S.B. 1100 thus deprives transgender students of control over the circumstances in which personal matters are disseminated, which is an essential aspect of privacy.  *See Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010).

There is also no public policy or need served by the gratuitous disclosure of students' transgender status to others.  Cisgender students do not benefit from the disruption created by S.B. 1100, in which transgender girls are shunted into boys' restrooms, and transgender boys are shunted into girls' restrooms, and their transgender status is thereby involuntarily disclosed. There is no justification for the privacy violations that S.B. 1100 needlessly inflicts.

## IV.     The Irreparable Harm Faced by Transgender People, Balance of Hardships, and Public Interest All Weigh in Favor of a Preliminary Injunction.

All the remaining preliminary injunction factors also strongly support granting relief.

*Irreparable Harm.*  S.B. 1100 will inflict severe and irreparable harm on transgender people.  To begin, violation of a constitutional right is *per se* irreparable harm.  *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014).  But that is just the beginning.  Implementing S.B. 1100 will subject transgender youth to profound stigma during pivotal periods of development; increase their risk of depression, anxiety, and self-harm; interfere with treatment for gender dysphoria; and cause irreversible privacy violations that expose them to danger.  Budge Decl. ¶¶ 53-64.  And avoiding school facilities entirely as a result of S.B. 1100 causes physical pain and discomfort, impairing students' focus and academic

19

performance. *Id.* ¶ 66. Courts have recognized these irreparable harms in affirming preliminary injunctions in similar contexts. *See, e.g., Whitaker*, 858 F.3d at 1055; *Dodds*, 845 F.3d at 222.

**Balance of Hardships.**   The balance of harms also weighs strongly in favor of granting a preliminary injunction. Allowing transgender students to use the facilities that align with their gender identity will not impair the privacy or safety of any other student, as explained above. The government also cannot credibly argue that a pause in any implementation of S.B. 1100 will somehow change the balance here. Numerous Idaho schools have had inclusive policies since 2015—but the Legislature did not pass S.B. 1100 until 2023. That alone belies any claim of urgency. Preliminarily enjoining S.B. 1100 pending final resolution of this litigation will only protect transgender students, while doing nothing to harm anyone else in the interim.

**Public Interest.**   Finally, a preliminary injunction serves the public interest. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Cal. Chamber of Commerce v. Council for Educ. and Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up). The government "cannot suffer harm from an injunction that merely ends an unlawful practice," or that prevents its start. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And "promoting compliance with Title IX is an important societal value." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1115 (S.D. Cal. 2012).

## CONCLUSION

S.B. 1100 is only the most recent confirmation that the "history of prosecution and discrimination" faced by transgender people "is not yet history." *F.V.*, 286 F. Supp. 3d at 1144 (quotes omitted). As the guardian charged with protecting vulnerable minorities, this Court has the authority and responsibility to prevent the harm that S.B. 1100 threatens to unleash on youth.

Dated: July 6, 2023                                    Respectfully Submitted,

Katherine M. Forster
Robyn K. Bacon
J. Max Rosen
Nicholas R. Sidney
Paul Martin
Avery P. Hitchcock
Jimmy P. Biblarz
MUNGER TOLLES & OLSON LLP

/s/ Samuel L. Linnet
Samuel L. Linnet
ALTURAS LAW GROUP, PLLC

Peter C. Renn
Kell L. Olson
Tara L. Borelli
Christina S. Paek
LAMBDA LEGAL DEFENSE & EDUCATION FUND