Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Christina S. Paek*
cpaek@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (213) 402-2537 (F)

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

**pro hac vice* forthcoming*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| REBECCA ROE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEBBIE CRITCHFIELD, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-315<br><br>**DECLARATION OF DIANA BRUCE** |

**DECLARATION OF DIANA BRUCE**

I, Diana Bruce, hereby declare as follows:

1. I make this declaration based on my own personal knowledge. If necessary, I could and would testify to these facts and circumstances.

2. I am the former Director of Health and Wellness for the District of Columbia Public Schools ("DCPS"). I held this position from October 2008 until January 2019. I am currently a consultant based in the Washington, D.C. area, focusing on gender inclusivity, diversity, and health equity in schools.

3. I received my Bachelor of Arts in Journalism from the University of Texas at El Paso in 1994. In 1997, I received my masters of Public Administration and Policy from the Columbia University School of International and Public Affairs. I also hold a certificate from Cornell University in diversity, equity, and inclusion.

4. DCPS educates nearly 50,000 students across 118 schools in Washington, D.C.

5. Consistent with the District of Columbia's non-discrimination laws, as they were amended in 2006 to include gender identity and expression, DCPS has been providing transgender students with access to restroom and locker room facilities consistent with their gender identity since 2006. Data from the U.S. Centers for Disease Control and Prevention indicates that between 2% and 3% of middle and high school students in the District of Columbia identify as transgender. *See* Office of the State Superintendent of Education, 2021, Washington, D.C. Youth Risk Behavior Survey Data Files, available at https://osse.dc.gov/page/2021-dc-yrbs-data-files.

6. During my time with DCPS, I regularly consulted with other school administrators around the country about DCPS's experience with inclusive policies for transgender students, and learned from other schools' experiences. Drawing in part from those resources, we determined that it would be appropriate for DCPS to adopt a formal set of guidelines regarding those policies to ensure that everyone was aware of and understood them.

7. In June 2015, I led the effort surrounding DCPS's adoption of formal guidance regarding transgender students' access to school facilities, which codified our practice of allowing those students to use restroom and locker room facilities consistent with their gender identity. In addition, the policy also addresses many related matters, such as the procedure to change a student's name in the school's records, resources for teachers of transitioning students, enforcement of dress code, and so forth. The official policy that DCPS adopted formalized and superseded the informal policy that had been in place since 2006 and generally expounded upon DCPS's existing non-discrimination policy.

8. According to the 2015 policy guidance, if one student expresses discomfort with sharing facilities with a transgender student, the school will make another restroom available to the first student. During my time with DCPS, there were a few occasions where a parent called my office to ask about our policy. But no school reported to me that any students ever asked to use a different restroom.

9. In my capacity with DCPS, my goal was to make sure that every young person was as present and engaged in their academic work as possible. We determined at a very early point that promoting a safe and welcoming environment in schools helped promote these positive tendencies among DCPS's students, and therefore helped us reach that goal.

10. When we created the 2015 policy, we consulted with school administrators from around the country. In particular, we drew upon the Los Angeles Unified School District's policy, which had been in place for many years with great success. Armed with this information, we formed a new committee consisting of approximately 20-30 community advocates, teachers, students, and parents, which helped steer the development of the new policy.

11. When we developed the 2015 DCPS policy, we also consulted with DCPS's own

administrators, teachers, faculty, and students regarding their experiences with transgender students in our district. We discovered that when transgender students were unsure about whether they could use the restroom that matches their gender identity, many said that they simply avoided school restrooms for the entire length of the school day.

12. That kind of distraction—and possible health risk—cannot possibly help students learn. As educators, we do not want students preoccupied with avoiding restrooms when they should be present in the classroom and focusing on learning. We decided that a clear set of guidelines regarding restroom and locker room facilities would help transgender students feel more like any other student in their school, rather than outsiders.

13. The 2015 DCPS policy that we created was not difficult to adopt, and it did not present any lingering issues in our schools. In my experience, students are comfortable with a policy that requires equal treatment among students. They can understand and empathize with someone who just wants to use the restroom. If anything, in our experience any minor disruption was due to staff members' inconsistency before implementation of the formal policy, rather than student activity. This was why we determined that clear, formalized guidance regarding transgender students' use of locker room and restroom facilities in accordance with their gender identities was important and necessary for schools, as was training for teachers and administrators. By the time I left DCPS, we had trained thousands of DCPS personnel, including principals, school staff, faculty, and some parents.

14. Implementing the 2015 policy in DCPS's schools was a straight-forward process. In reality, all schools deal with a very wide variety of issues related to locker room and restroom

use, including student behavioral issues, which are completely unrelated to a student's gender identity.

15. We heard some concerns about the 2015 policy at first, typically from adults rather than DCPS students. These concerns usually involved hypothetical issues of student safety or privacy in the school restrooms or locker rooms. During my time with DCPS, I am aware of only one incident involving a transgender student's use of these facilities, and in that case it was the transgender student who was confronted by other students who were unaware that DCPS policy permitted her to use the girls' restroom. Those students, once informed of the policy, did not indicate any further concern. This was a blip on the radar that further indicated the need for clear written policies. Otherwise, no concerns materialized.

16. Similarly, when I conducted my regular trainings of DCPS staff, there were some occasions where staff members would ask hypothetical questions to understand the contours of DCPS's policy as it related to student privacy and safety. In my experience, the scenarios they suggested remained hypothetical and did not play out in reality. For instance, I am not aware of a single instance where a cisgender student pretended to be transgender in order to access sex-separated facilities.

17. Like other students, transgender students just want to use the restroom at school and be safe when they do it. And contrary to some concerns, transgender students are not interested in walking around restrooms or locker rooms exposing themselves and examining other students' anatomy. This is based on a misconception of what it means to be transgender. Like everyone else, transgender students just want to learn and to get through the school day safely.

18. The results of DCPS's 2015 formal policy guidelines—which remain in place today—were overwhelmingly positive, not only for transgender students, but for all students, faculty, administrators, and the community. As educators, we have an obligation to make sure every student feels valued, included, and respected. By treating all students the same without regard to their gender identity, the policy removed a tremendous source of distraction from DCPS's students, helped foster a safe and welcoming learning environment among all DCPS students, promoted awareness of important student safety and privacy issues for all DCPS students, and even informed our decisions regarding new construction and renovation of restroom and locker room facilities in DC public schools.

19. Since I departed DCPS in 2019, I have remained in contact with colleagues who continue to work within the school system. Everything that I have learned from them regarding DCPS's experience remains consistent with everything I have described above.

20. In my private consulting practice since 2019, I have been retained by public and private schools who wish to make their schools more welcoming and inclusive of their transgender students. I have provided policy development, implementation, and training support to these schools to assist them in adopting inclusive policies. Their experience in the adoption of these policies has been positive.

* * *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12 day of May, 2023.

_____
Diana Bruce