RAÚL R. LABRADOR
ATTORNEY GENERAL

LINCOLN DAVIS WILSON, ISB #11860
Chief, Civil Litigation and
Constitutional Defense

RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID  83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8073
lincoln.wilson@ag.idaho.gov
rafael.droz@ag.idaho.gov
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| REBECCA ROE, by and through her parents and next friends, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>DEBBIE CRITCHFIELD, in her official capacity as Idaho State Superintendent of Public Instruction, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00315-DCN<br><br>**RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Amid public controversy over some school districts allowing both male and female students to share restrooms, locker rooms, and overnight lodging,[1] Idaho enacted new legislation to uniformly protect the safety and privacy of all children in its public schools. The new law, S.B. 1100, upholds the long-standing sex-specific rules for these spaces that were already in place in the vast majority of Idaho schools. The law, which took effect last month, recognizes the "real and inherent physical differences between men and women" and posits that "[e]very person has a natural right to privacy and safety in restrooms and changing facilities where such person might be in a partial or full state of undress in the presence of others." Idaho Code § 33-6601 [33-6701] (1)-(2). And it protects those rights by codifying the common practices of limiting multi-occupancy restrooms and locker rooms to persons of the same sex and providing separate quarters for each sex for any overnight lodging. Idaho Code § 33-6603 [33-6703] (2)-(4). Correspondingly, the law also protects those who might be uncomfortable with multi-occupancy single-sex facilities—whether for gender dysphoria or any other reasons—by providing a right to reasonable accommodation (e.g., a unisex single-occupancy restroom). Idaho Code § 33-6605 [33-6705].

Plaintiffs want to topple these standards by enjoining the law before the schoolyear starts. But they do not meet the standard for a temporary restraining

---

[1] Caldwell School District, Annual and Regular Board Meeting, YOUTUBE (Jan. 9, 2023) (https://www.youtube.com/watch?v=ZynQenEjmJ4); Julie Luchetta, *Heated Caldwell School Board Meeting ends in Chaos*, BOISE STATE PUBLIC RADIO, (Jan. 10, 2023, 7:40 AM) https://tinyurl.com/2w7aew27.

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 1

order. The order they request would disturb rather than restore the status quo. They cannot show they are likely to succeed—tradition, settled science, and the trend of federal jurisprudence, in recent landmark decisions of both the Eleventh and Sixth Circuits, all point away from their novel theories. They cannot show irreparable harm because the law provides them an accommodation that they have not used. And the harms to the public—the many others who depend on these norms of safety and privacy—counsel against an injunction. The Court should deny a TRO.

## ARGUMENT

### I. A temporary restraining order would not preserve the status quo.

The TRO remedy "should be restricted to ... preserving the status quo," *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974), that is, "the legally relevant relationship between the parties before the controversy arose." *Hecox v. Little*, 479 F. Supp. 3d 930, 972 (D. Idaho 2020). The Ninth Circuit holds that, for a challenge to state law, the status quo presumes that the legislation will go into effect as enacted. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008). That is even more true here, since Plaintiffs did not file this action until after S.B. 1100 went into effect. They did not even seek a TRO until this Court granted, over their opposition, the Attorney General's motion for an extension. Thus, Plaintiffs' belated request for a TRO would disturb rather than restore the status quo.

Nevertheless, even accepting Plaintiffs' view that the status quo is the state of affairs before S.B. 1100 went into effect, the TRO they seek would not restore that

status quo. Having mounted a disfavored facial challenge to S.B. 1100, *see Does 1-134 v. Wasden*, 2018 WL 2275220, at *4 (D. Idaho May 17, 2018), Plaintiffs ask the Court to enter a TRO not just for them, but for all "transgender people in Idaho." Dkt. 34-1 at 2. That relief would overturn the pre-S.B. 1100 status quo that governed Idaho school districts, an overwhelming majority of which supported the sex-separated facilities that the new law requires. Greg Wilson Decl. ¶ 6.

Thus, while Plaintiffs frame their motion as a request for a prohibitory injunction, *see* Dkt. 34-1 at 4, in fact, granting effective relief as they request would require a "particularly disfavored" mandatory injunction to force all Idaho school districts to adopt new policies of the type Plaintiffs seek. *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir. 1979). But the facts and the law do not "clearly favor" Plaintiffs as a mandatory injunction requires. *See id.* And even if the requested TRO were prohibitory, it would still be subject to heightened scrutiny because it would alter the status quo. *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021); *Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020). The Court should decline to radically transform the legal landscape in Idaho with a TRO.

## II. Plaintiffs are not likely to succeed on the merits.

### A. Plaintiffs are unlikely to prevail on the law.

This case concerns what the en banc Eleventh Circuit recently termed "the unremarkable—and nearly universal—practice of separating school bathrooms based on biological sex." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc). Because S.B. 1100, like the school board

policy in *Adams*, classifies based on sex, it must meet heightened scrutiny—a showing that the classification is "substantially related" to "important governmental objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). No matter: just like in *Adams*, S.B. 1100 easily clears that hurdle, complying with both equal protection and with Title IX.

"[S]ex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding." W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019). These practices have occurred "[a]cross societies and throughout history … in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated and remanded by Gloucester Cnty. Sch. Bd. v. G. G. ex rel. Grimm*, 137 S. Ct. 1239 (2017); Carter, *supra*, at 228. Thus, even before Idaho's statehood, "[s]chools educating both sexes followed sex-separation in multi-entry intimate spaces." Carter, *supra*, at 277 n.212.

In fact, separating bathrooms by sex was "among the earliest state-wide attempts to protect women from workplace sexual harassment," *id.* at 279–283, and was a victory in the women's rights movement. Stuart & Stuart, *Behind Closed Doors: Public Restrooms and the Fight for Women's Equality*, 24 Tex. Rev. L. & Pol. 1, 28–29 (2019). Thus, Title IX, which Plaintiffs invoke as the basis for their claims,

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 4

"provides a statutory carve-out for 'maintaining separate living facilities for the different sexes.'" *Adams*, 57 F.4th at 813 (quoting 20 U.S.C. § 1686). As Justice Ginsburg wrote before taking the bench, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21.

Federal courts too have long recognized these well-worn justifications for sex separation of restrooms. Justice Thurgood Marshall famously quipped that "[a] sign that says 'men only' looks very different on a bathroom door than a courthouse door." *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 468–69 (Marshall, J., concurring). The Supreme Court acknowledged that admitting women to the Virginia Military Institute for the first time "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *U. S. v. Virginia*, 518 U.S. 515, 550 n.19. Courts of appeals have noted society's "undisputed approval of separate public rest rooms for men and women," *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993), in order "to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010). In particular, the Ninth Circuit has emphasized that "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011).

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 5

While Plaintiffs ignore *Byrd*, they make much of the Ninth Circuit's decision *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020). But that case was the converse of this one: it did not overturn sex-separated bathrooms, but rather rejected a challenge to a policy that allowed students with gender dysphoria to use bathrooms of the opposite sex. *Id.* at 1217–18. Quite plainly, by upholding that policy against a constitutional challenge, the Ninth Circuit did not imply that the constitution mandates that policy. To the contrary, the variety of legislative approaches on the question suggests the opposite: as the Sixth Circuit recently held, where "the States are currently engaged in serious, thoughtful debates about the issue," then "[t]he burden of … constitutionalizing new areas of American life is not—and should not be—a light one." *L.W. by & through Williams v. Skrmetti*, 73 F.4th 408, 412, 415–416 (6th Cir. 2023) (Sutton, J.) (quotation omitted). Plaintiffs do not meet that heavy burden.

Nor does it make a difference that the Ninth Circuit applied heightened scrutiny to classifications concerning gender dysphoria in *Karnoski v. Trump*, 926 F.3d 1180, 1192 (9th Cir. 2019), since there is no such classification here. S.B. 1100 "facially classifies based on biological sex" in accordance with time-tested practices, not based on gender dysphoria (like the military policy in *Karnoski*). *See Adams*, 57 F.4th at 808. S.B. 1100 "does not classify students" according to gender dysphoria "because a 'lack of identity' exists" between that diagnosis "and a policy that divides students into biological male and biological female groups … for purposes of separating the male and female bathrooms by biological sex." *Id.* at 809; *accord L. W.*, 73 F.4th at 412. In addition, even if S.B. 1100 did classify based on gender dysphoria, "the school

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 6

is not the workplace," *Adams,* 57 F.4th at 808, and there is a serious question whether *Karnoski*'s heighted scrutiny would apply to school-age children, whose identities are still being formed and whom the state has a much more acute duty to protect. *See id.* at 802. And even if heightened scrutiny applied under *Karnoski*, it would make no difference to the analysis: heightened scrutiny already applies based on the sex classification, and S.B. 1100 passes it with flying colors.

Finally, Plaintiffs cannot save their case by invoking the Supreme Court's statutory interpretation of Title VII's sex discrimination provisions in *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020). Plaintiffs rely on *Bostock*'s holding that "it is impossible to discriminate against a person for being transgender without discriminating against that individual based on sex." Dkt. 15-1 at 12 (quoting *Bostock*, 140 S. Ct. at 1741). But that's immaterial because it is the opposite of what they try to show here—that classifying based on sex necessarily classifies based on gender dysphoria. Plaintiffs do not attempt to justify their logical leap from *Bostock*. *Adams*, 57 F.4th at 808-09. And they cannot.

B.  **Plaintiffs are unlikely to prevail on the science.**

While a TRO can easily be denied in view of the ample support for this long legal tradition of sex-separated restrooms, Plaintiffs would fare no better if the Court were to accept their framing of this case as turning on the science of treating gender dysphoria. Based on the Declaration of Dr. Stephanie Budge, Plaintiffs say gender dysphoria must be treated by affirming the patient's belief about their gender identity. Dkt. 15-5 ¶¶ 34, 54. But Defendants' expert will explain that "gender identity"

is a wholly subjective and unscientific concept that can be neither falsified nor verified.[2] Not only that, but Defendants' expert testimony will show that the research indicates gender identity in children is neither innate nor immutable. In contrast, sex—the key criterion of S.B. 1100—is an objective, scientific standard that is determined at the moment of conception. Dr. Budge's subjective and unscientific understanding of these basic facts of biology does not support the bold demand that all of society participate in treatment of their condition.

More important, Plaintiffs' flawed and unscientific premises lead to flawed and unscientific conclusions. Dr. Budge follows the purported "Standards of Care" from the World Professional Association for Transgender Health (WPATH) that endorse "social transition" as part of their insistence on so-called "gender-affirming" treatments for gender dysphoria. Dkt. 15-5 ¶¶ 30-33. "Social transition refers to living in the world in a manner consistent with the individual's gender identity," including using "sex-designated facilities such as restrooms that align with their gender identity." *Id.* ¶¶ 33-34. But Dr. Budge cites no outcome studies that report that social transition with regard to bathroom use ameliorates the psychological and related harms that Plaintiffs claim to face. Instead, the "studies" cited by Dr. Budge were

---

[2] As Defendants previously explained to the Court, part of the reason Defendants sought an extension of time to respond to Plaintiffs' preliminary-injunction motion was to develop expert testimony in response to Dr. Budge. Dkt. 21 at 3-4. Plaintiffs' request for a TRO short-circuits the extension the Court granted and seeks to force this Court to decide, in the Court's words, "complex" questions, Dkt. 31 at 3, without the benefit of expert testimony from both sides.

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 8

just surveys of self-selected subjects who reported on their subjective experiences regarding use of bathrooms. And the conclusion of Dr. Budge—and WPATH in turn—that "gender-affirming" care ameliorates psychological harms is unreliable and unscientific.

Plaintiffs are not likely to prevail based on this flimsy scientific foundation. At the very least, the "medical and scientific uncertainty" surrounding this question warrants deference to state legislative action, not boldness. *L.W.*, 73 F.4th at 417. Federal judges should be "wary of removing a vexing and novel topic of medical debate from the ebbs and flows of democracy" with the blunt instrument of an injunction. *Id.* at 415. The Court should exercise caution and deny their request for a TRO.

### III. The balance of harms tips away from Plaintiffs.

Apart from the many flaws in Plaintiffs' case on the merits, they cannot show that the question of harm favors a TRO. They lack irreparable harm from S.B. 1100, and the interests of all others who use the bathrooms show that the balance of harms weighs decidedly against them.

Plaintiffs cannot show irreparable harm. Plaintiffs emphasize the purported stigma of not being able to use the facility that matches their subjective gender identity, *see* Dkt. 15-1 at 1, 4, 7, 19, and Plaintiff Roe expresses concern that using the multiple-occupancy facility that S.B. 1100 allows will result in "outing" Roe to peers. *Id.* at 8. But even if the Court found these psychological stresses constitute irreparable harm, there is an easy answer: S.B. 1100 specifically provides the right to an accommodation to anyone uncomfortable with multiple occupancy restrooms. Idaho

RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER – 9

Code § 33-6605 [33-6705]. In this case, that would take the form of the right to use a unisex, single-occupancy bathroom. Plaintiffs do not allege they have sought to avail themselves of this accommodation.

Instead, Plaintiffs say that single-occupancy bathrooms "impose practical burdens where located in less accessible areas away from classes" and are themselves a form of "stigmatization." Dkt. 34-1 at 8. But surely walking to a different restroom is not irreparable harm of constitutional dimension. And any minimal stigma remaining from this accommodation must necessarily be weighed against the interests of the other students whose privacy and safety S.B. 1100 also protects through sex-separated facilities. *Adams*, 57 F.4th at 806. If single-occupancy restrooms are not good enough, then the only constitutionally adequate way to protect all students' privacy would be "single-stall, sex-neutral bathrooms." *Id.* And that is clearly not the law.

## CONCLUSION

The legislature's attempt to balance these interests and protect all students tilts further away from judicial intervention. These "vexing line-drawing dilemmas for legislatures" over "access to bathrooms" and other issues ought to provoke "hesitancy" for the courts to step in and constitutionalize another area of American life based on "unenumerated guarantees." *L.W.*, 73 F.4th at 417, 420. Plaintiffs are not likely to succeed on the merits, nor have they shown that the balance of hardships tips in their favor. The Court should leave the status quo in place and deny a TRO.

DATED: August 4, 2023.

        STATE OF IDAHO
        OFFICE OF THE ATTORNEY GENERAL

By: /s/ *Lincoln D. Wilson*
     LINCOLN DAVIS WILSON
     Chief, Civil Litigation and
     Constitutional Defense

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 4, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Samuel L. Linnet<br>sam@alturaslawgroup.com | Avery P. Hitchcock<br>avery.hitchcock@mto.com |
| Christina S. Paek<br>cpaek@lambdalegal.org | Jacob Max Rosen<br>max.rosen@mto.com |
| Kell L. Olson<br>kolson@labdalegal.org | Jimmy Biblarz<br>jimmy.biblarz@mto.com |
| Peter C. Renn<br>prenn@lambdalegal.org | Katherine M. Forster<br>katherine.forster@mto.com |
| Tara L. Borelli<br>tborelli@lamdalegal.org | Nicholas Sidney<br>nick.sidney@mto.com |
| Paul Martin<br>paul.martin@mto.com | Robyn K. Bacon<br>robyn.bacom@mto.com |
| *Counsel for Plaintiffs* | *Counsel for Plaintiffs* |

    /s/ *Lincoln Davis Wilson*
LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense