KRISTEN CLARKE, ASSISTANT ATTORNEY GENERAL
SHAHEENA A. SIMONS, CHIEF
VERONICA R. PERCIA, SPECIAL LITIGATION COUNSEL
**ARIA S. VAUGHAN, CO BAR NO. 44479**
SANDY E. JAMES
TRIAL ATTORNEYS
CIVIL RIGHTS DIVISION
EDUCATIONAL OPPORTUNITIES SECTION
950 PENNSYLVANIA AVE., NW
4CON, 10TH FLOOR
WASHINGTON, DC 20530
TELEPHONE: (202) 598-9629
Email: Aria.Vaughan@usdoj.gov

JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
**CHRISTINE G. ENGLAND, ID STATE BAR NO. 11390**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
1290 WEST MYRTLE STREET, SUITE 500
BOISE, ID  83702
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-9375
Email: Christine.England@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>DEBBIE CRITCHFIELD, et al.,<br><br>        Defendants. | Case No. 1:23-cv-00315-DCN<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

Before this Court is a challenge to the State of Idaho's attempt to designate the sex of individual students in K-12 public schools for the purpose of categorically excluding transgender[1] students from single-sex facilities consistent with their gender identity. Idaho Code Ann. §§ 33-6601 *et seq.* (S.B. 1100).[2]  Though Idaho students have long used facilities such as restrooms and locker rooms according to the sex with which they identify—and have done so without recorded incident—the law challenged here forbids this practice.  Purporting to address a purely hypothetical danger, S.B. 1100 demands that all Idaho K-12 public schools bar transgender students from using restrooms, changing facilities, and temporary sleeping quarters with students who share their gender identity.  Idaho claims, without evidence, that this categorical exclusion protects the privacy and safety of "all students."  But within the category of "all students" are transgender students, and S.B. 1100 threatens, in a very real and well-documented manner, their privacy and safety and denies them their federally guaranteed right to access their public education free from sex discrimination.

The United States has a significant interest in protecting the right of students to participate in an educational environment free of unlawful sex discrimination.  The U.S. Department of Justice (DOJ) and the U.S. Department of Education enforce Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Title IX), which protects students from sex discrimination in the education programs and activities of federal funding recipients.  DOJ is charged with coordinating

---

[1] The term "transgender" describes a person whose gender identity differs from the person's sex assigned at birth. *Karnoski v. Trump*, 926 F.3d 1180, 1187 n.1 (9th Cir. 2019).  A person's "gender identity" is their "deep-core sense of self as being a particular gender." *Hecox v. Little*, 479 F. Supp. 3d 930, 945 (D. Idaho 2020), aff'd, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023) (citations omitted).

[2] Citations to Idaho Code Ann. §§ 33-6601 *et seq.* and S.B. 1100 are to Idaho Code Ann. (West 2023), Title 33 Education, Chapter [67] 66 Protecting the Privacy and Safety of Students in Public Schools.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    2

federal agencies' implementation and enforcement of Title IX. 28 § C.F.R. Pt. 54; Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980); *see also* 28 § C.F.R. 0.51.  DOJ also has authority to investigate and resolve complaints that a public school board is depriving students of equal protection based on sex. 42 U.S.C. § 2000c-6.  The United States has a significant interest in ensuring that the proper legal standards are applied to private litigants' claims under Title IX and the Equal Protection Clause of the Fourteenth Amendment.

The United States therefore respectfully submits this Statement of Interest, under 28 U.S.C. § 517,[3] to advise the Court of its view that Title IX and the Equal Protection Clause do not permit Idaho to categorically exclude transgender students from using public schools' multi-user, single-sex facilities consistent with their gender identity.[4]

## BACKGROUND

S.B. 1100 purports to decree each person's "sex," declaring that sex is "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female."[5] Idaho Code Ann. § 33-6602(3).  S.B. 1100 requires public schools to designate all multi-occupancy restrooms and changing facilities "for use by male persons only or female persons only" and bar any person not a "member of that sex" from entering such facility. *Id.* § 33-6603(1) and (2).  The law also applies to overnight lodging arrangements for school-sponsored activities, which it refers to as "sleeping quarters." *Id.* § 33-

---

[3] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

[4] The United States takes no position on Plaintiffs' right to privacy claim.

[5] The United States does not concede to the accuracy of this definition.

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    3

6603(4).  S.B. 1100 provides for some exceptions, including for "coaching staff and personnel during athletic events," but makes no exception for transgender students. *Id.* § 33-6604.  And although S.B. 1100 includes "reasonable accommodation[s]," those accommodations do not, under any circumstances, allow a transgender student to access these sex-specific facilities if a person of the "opposite sex . . . could be present." *See id.* § 33-6605.

Idaho proffers "the privacy and safety of all students" as justification for these restrictions. Idaho Code Ann. § 33-6601(7).  Specifically, Idaho claims that this law is justified because allowing students of the "opposite sex" to share restrooms and changing facilities "increas[es] the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism" and "generates potential embarrassment, shame, and psychological injury to students." *Id.* § 33-6601(4).

S.B. 1100 creates a private cause of action, allowing any student to sue their public school for "each instance that [a] student encountered a person of the opposite sex" in a restroom, changing room, or sleeping quarters. Idaho Code Ann. § 33-6606(1) and (3).  These students are entitled to $5000 in damages for each incident, as well as additional monetary damages and reasonable attorney's fees. *Id.* § 33-6606(3) and (4).

Plaintiff Rebecca Roe is a 12-year-old girl who is transgender and has attended Boise School District schools since kindergarten. No. 15-2, at 2.[6]  Rebecca's declaration states that she is generally perceived as female by others and has used restrooms designated for girls outside of school without incident. No. 15-2, at 3.  She has not used a boys' or men's restroom at school or

---

[6] "No.__, at __" refers to the docket entry number and page number of documents filed in this case, using the Court's CM/ECF pagination.  For purposes of this Statement of Interest, the United States assumes the truth of Plaintiffs' personal declarations, Nos. 15-2 (Decl. of Rebecca Roe); 15-3 (Decl. of Rachel Roe); 15-4 (Decl. of A.J., President of Plaintiff SAGA), because those declarations are consistent with evidence and expert testimony the United States has encountered in its work about the experiences of many transgender students and their families, as well as with the findings of this Court and others in other litigation involving transgender students.

outside of school since the fifth grade. No. 15-2, at 4.  Before starting sixth grade, Rebecca planned to use the nurse's restroom, but reports in her declaration that it was "stigmatizing and isolating" and less accessible than restrooms used by all the other girls at school. No. 15-2, at 4.  As a result, Rebecca avers that she avoided using the restroom at school, limiting fluid intake and "hold[ing] it," which was unhealthy and created a physical and mental distraction throughout the school day. No. 15-2, at 4.  For seventh grade, Rebecca will attend a new school with new classmates and wants to use the girls' facilities. No. 15-2, at 4-5.  Rebecca's declaration expresses her fear that, if she is required to use the boys' restroom or a single-user restroom, classmates at her new school would know that she is transgender. No. 15-2, at 5.  She states that, as the school year approaches, she is experiencing stress and pain thinking about the stigma and burdens S.B. 1100 imposes. No. 15-2, at 4-5.  Rebecca's mother's declaration states that she and her husband worry about their child's physical safety, mental health, and general well-being because revealing that Rebecca is transgender makes her vulnerable to violence and targeting by other students. No. 15-3, at 4.

Plaintiff Sexuality and Gender Alliance (SAGA), is a student-led organization for high school students at Boise High School. No. 15-4, at 2.  As set forth in the declaration of A.J., current president of SAGA, one of the organization's goals is "to ensure that LGBTQ+ students are safe and welcome at school." No. 15-4, at 2.  SAGA has transgender members who, consistent with their school's policies pre-dating S.B. 1100, wish to use multi-occupancy restrooms and facilities that align with their gender identity. No. 15-4, at 2-3.  A.J. is one of these students.  Since the eleventh grade, A.J. reports in his declaration, he has used boys' restrooms consistent with his gender-support plan and has had no problems with other students when doing so. No. 15-4, at 3. Boise High School has only one single-user restroom that is less accessible than the various multi-

user restrooms and is sometimes closed for use. No. 15-4, at 4.  A.J.'s declaration states that the thought of being forced to use the girls' restroom makes him "feel ill." *Ibid*.

S.B. 1100 now prohibits all Idaho public schools from allowing transgender students to use single-sex facilities with peers who share their gender identity.  As a result, transgender students like Plaintiffs face an impossible choice: use facilities that do not align with their gender identities at the expense of their health, privacy, and safety; use separate, incomparable, single-user facilities and be outed as transgender to their peers, also at the expense of their health, privacy, and safety; *or* continue to use their established facilities and risk a damages lawsuit against their school. Plaintiffs therefore ask this Court to maintain the pre-S.B. 1100 status quo and enjoin Idaho from enforcing S.B. 1100. No. 1, at 38.[7]

## ARGUMENT

On a motion for a preliminary injunction, the court reviews: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant absent an injunction; (3) the balance of hardships; and (4) the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  The United States believes that Plaintiffs will likely succeed on the

---

[7] Where plaintiffs seek to preserve the status quo pending a decision on the merits, there is no heightened burden of proof.  *Hecox*, 479 F. Supp. 3d at 972.  The relevant "status quo" for purposes of an injunction "refers to the legally relevant relationship between the parties before the controversy arose." *Ibid*. (citing *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014)).  Here, Plaintiffs filed a motion for preliminary injunction to contest the enforceability of S.B. 1100.  The status quo, therefore, is the policy in Idaho prior to S.B. 1100's enactment. *See ibid*.  Prior to the enactment of S.B. 1100, Plaintiffs' school district designated multiuser, single-sex restrooms and changing facilities women/girls or men/boys and permitted students to use facilities consistent with their gender identity.  Idaho's legislative finding that the "long-standing" practice was to separate such facilities based on "biological sex" discounts the long history of people who are transgender using single-sex facilities in Idaho that align with their gender identities without incident.  Idaho's attempt at restrictively defining a person's sex to limit transgender students' access to school facilities is what is new.

merits of their Title IX and Equal Protection Clause claims and does not address the other preliminary injunction factors.

First, S.B. 1100 restrictively defines "sex" to categorically exclude students who are transgender from their public schools' multiuser, single-sex restrooms and changing facilities that are consistent with their gender identity.  Taking as true Plaintiffs' personal declarations—which are consistent with the findings of this Court and others regarding transgender youth generally— this sex-based exclusion causes Plaintiffs substantial harm and deprives them of educational opportunities.  S.B. 1100 therefore forces Plaintiffs' public schools to discriminate against them on the basis of sex in violation of Title IX, and no statutory or regulatory exception permits them to do so.

Second, S.B. 1100 runs afoul of the Equal Protection Clause's demand that the law's sex-based classifications be substantially related to the achievement of an important governmental objective. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*).  S.B. 1100, both by its terms and against the backdrop of its legislative record, lacks an "exceedingly persuasive justification" for its categorical exclusion of transgender students from single-sex facilities consistent with their gender identity, and therefore cannot withstand constitutional scrutiny. *See ibid.*

## I.  Plaintiffs Are Likely to Prevail on Their Title IX Claim

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs prevail on their Title IX claim by showing that: (1) their educational institution receives federal financial assistance; (2) they were excluded from participation in an education program or

activity on the basis of sex; and (3) the exclusion caused them legally cognizable harm. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616-17 (4th Cir. 2020) (citation omitted), as amended (Aug. 28, 2020), cert. denied, 141 S. Ct. 2878 (2021).  Plaintiffs are likely to make these showings.

First, Boise School District is a public school district that receives federal funds.  Second, S.B. 1100 requires the district to exclude transgender students like Plaintiffs from an education program or activity—namely, school facilities—"on the basis of sex." *See Grimm*, 972 F.3d at 616.  S.B. 1100 defines what it means to be of the male or female "sex" and then bars students whose gender identity is different from their "sex" as defined in the statute from entering school restrooms and changing facilities designated for "the opposite sex." Idaho Code Ann. §§ 33-6602-33-6603.  The purpose and effect of S.B. 1100 is to exclude transgender students like Plaintiffs from those public-school facilities because of their sex assigned at birth, or, as the legislature terms it, their "biological sex." *Id.* § 33-6604(2).  This is, by definition, exclusion "on the basis of sex." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739, 1741 (2020); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116-17 (9th Cir. 2023) (citing *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (finding *Bostock* controlling with respect to the meaning of discrimination on the basis of sex under Title IX).

Finally, assuming the truth of Plaintiffs' personal declarations, the sex-based exclusions mandated by S.B. 1100 subject them to cognizable harm.  It is this injury that renders Plaintiffs' exclusion from single-sex facilities "discriminatory" under Title IX. *See Bostock,* 140 S. Ct. at 1753 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 59 (2006)) ("[T]he term 'discriminate against' refers to 'distinctions or differences in treatment that injure protected individuals.'").

Plaintiffs' declarations describe the concrete and substantial harms this exclusion will impose on them. *See, e.g.,* Nos. 15-2, 15-3, 15-4.  Plaintiffs also offer declarations from school law enforcement, a psychologist and professor with expertise in transgender health, and school administrators who work with transgender students to underscore these harms. *See, e.g.,* Nos. 15-8, at 12; 15-5, at 22; 15-6, at 4.  The harms described in these declarations are consistent with harms recognized by courts in other cases involving the exclusion of transgender students from single-sex facilities. *See Grimm*, 972 F.3d at 597-601, 617-18 (bathroom policy made plaintiff feel "alienat[ed]" and "humiliat[ed]"); *Dodds v. U. S. Dep't of Educ.,* 845 F.3d 217, 221-22 (6th Cir. 2016) (exclusion from the girls' restrooms "had substantial and immediate adverse effects" on plaintiff's "daily life," "health," and "well-being"); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, No. 22-1786, 2023 WL 4881915, at *8 (7th Cir. Aug. 1, 2023) (transgender boys "reported feeling depressed, humiliated and excluded by the requirement to use either the girls' bathrooms or the unisex bathroom"); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-47 (7th Cir. 2017) (exclusion from boys' restroom "stigmatized" transgender boy, causing him "significant psychological distress" including "depression and anxiety"), cert. dismissed, 138 S. Ct. 1260 (2018).

Likewise, courts have recognized that relegating transgender students to single-user facilities generally does not ameliorate—and may amplify—these injuries. Nos. 15-2, at 5; 15-4, at 2; *Grimm*, 972 F.3d at 617-18 (quoting *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018)) (forcing transgender students to use gender-neutral facility would likewise "constitute harm under Title IX, as it 'invites more scrutiny and attention' from other students, 'very publicly branding all transgender students with a scarlet 'T'.") (brackets omitted), cert. denied, 139 S. Ct. 2636 (2019).

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**                    9

If this Court credits the Plaintiffs' declarations, Plaintiffs satisfy the elements of their Title IX claim. The only question, then, is whether Title IX contains an exception that would allow recipients to subject Plaintiffs to sex-based harm in the context that S.B. 1100 applies. It does not.

Since 1975, Title IX's implementing regulations have specified that separate or differential treatment on the basis of sex is presumptively a form of prohibited sex discrimination. *See, e.g.,* 34 CFR § 106.31(b)(4), (7) ("Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex . . . [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment; [or] [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."). Nevertheless, the regulations have recognized limited contexts in which recipients are permitted to separate students on the basis of sex, including restrooms and locker rooms. *See* 34 C.F.R § 106.33 (toilet, locker room, and shower facilities); *see also, e.g., id.* § 106.34(a)(3) (human sexuality classes). But these limited instances of allowable separation do not, and cannot, sanction sex-based harm to students in these contexts. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex."). Rather, the regulations allow this separation precisely because excluding a student from a particular single-sex restroom or locker room facility designated for another sex, as a general rule, does not cause that student harm. *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (Title VII does not reach non-harmful "differences in the ways men and women routinely interact with" each other). That general rule, however, does not hold when the student is transgender. In that circumstance, such exclusion *does* impose not only legally cognizable but substantial harm of the type Plaintiffs' declarations describe. *See* Nos. 15-2, 15-3, 15-4.

Thus, to the extent that Title IX's regulations permit sex-separation of restrooms and changing facilities in K-12 schools, a recipient may not carry out such separation in a manner that discriminates against students by subjecting them to the kind of harms at issue here—which, as reflected in numerous court opinions—are substantial. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1227 (9th Cir.) ("[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity."), cert. denied, 141 S. Ct. 892 (2020); *Grimm*, 972 F.3d at 618 ("All [Title IX's implementing regulation] suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying bathroom policies to [transgender] students . . . the Board may rely on its own discriminatory notions of what 'sex' means.").

There are likewise no statutory exemptions or other statutory provisions that allow recipients to discriminate in the context of sex-separate bathrooms and changing facilities in K-12 public schools.  Indeed, Congress has specified limited circumstances where Title IX does not prohibit harm resulting from sex separation. *See, e.g.*, 20 U.S.C. §1681 (a) (1-9); 20 U.S.C. § 1686. In particular, the statute's "living facilities" provision carves out from Title IX's general prohibition on sex discrimination an allowance for recipients to maintain sex-separate living facilities. 20 U.S.C. §1686 ("Notwithstanding anything to the contrary contained in [Title IX]," nothing in Title IX "shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes.").  But that carve out does not apply to restrooms, locker rooms, or shower facilities, which the Title IX regulations have long addressed separately from "living facilities." *Compare* 34 C.F.R. § 106.32 (housing, citing Section 907 of the Education Amendments (20 U.S.C. §1686) as its statutory authority) *with* 34 C.F.R. § 106.33 (toilet, locker

room, and shower facilities, citing Section 901 of the Education Amendments (20 U.S.C. §1681) as its statutory authority); 40 Fed. Reg. 24128, 24141 (June 4, 1975).[8]  Congress therefore created no statutory exemption or carve out for sex-separate restrooms and changing facilities in K-12 public schools, which are governed by Title IX's general non-discrimination mandate prohibiting sex-based exclusions that "injure protected individuals." *See Bostock*, 140 S. Ct. at 1753.[9]

In short, Title IX and its regulations provide no "safe harbor" for S.B. 1100 and other laws and policies that seek to exclude students who are transgender from using the single-sex bathrooms and changing facilities that are consistent with their gender identity.  If this Court determines Plaintiffs have established the facts described in their declarations, which are consistent with facts found in other cases cited above, the United States believes they are likely to prevail on the merits of their Title IX claim.

## II.   S.B. 1100 Violates the Equal Protection Clause of the Fourteenth Amendment

The Constitution prohibits Idaho from implementing S.B. 1100.  The law classifies on the basis of sex and discriminates against people who are transgender, a "quasi-suspect class." *See Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019).  S.B. 1100 must therefore withstand heightened scrutiny.  It does not.  Even assuming Idaho's asserted interest in "protecting the privacy and safety of all students" is genuine, S.B. 1100 is not, either on its face or on the basis of

---

[8]  *See* https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-A/part-86.

[9] This Court should therefore decline to follow the Eleventh Circuit's reasoning that the statutory carve out for living facilities should somehow be understood to also create a carve out for bathrooms and locker rooms, which are clearly governed not by Section 1686, but by the statute's general nondiscrimination mandate, Section 1681. *See Adams v. Sch. Bd. Of St. Johns Cnty.*, 57 F.4th 791, 813-14 (11th Cir. 2022) (en banc).  Such reasoning cannot be reconciled with Title IX's plain text and ignores that Congress could have, but did not, address anything other than the practice of maintaining sex-separate "living facilities" in Section 1686.

its legislative record, substantially related to the achievement of that goal.  Plaintiffs are therefore likely to succeed on the merits on their equal protection claim.

### A.   S.B. 1100 Warrants Heightened Scrutiny Under the Equal Protection Clause

Heightened scrutiny applies here because S.B. 1100 classifies based on sex and because it discriminates against people who are transgender, a quasi-suspect class. *See Grimm*, 972 F.3d at 608 (holding that an exclusionary bathroom policy relied on sex-based classifications); *Karnoski*, 926 F.3d at 1201 (accepting district court's determination that transgender people are members of a quasi-suspect class).

S.B. 1100 restrictively defines "sex," then limits how students may access facilities based on that definition.  The law therefore relies on a sex-based classification and cannot be enforced "without referencing sex." *Grimm*, 972 F.3d at 608 (quoting *Whitaker*, 858 F.3d at 1051).  The Supreme Court has long recognized that such sex-based classifications warrant heightened scrutiny. *See, e.g.*, *VMI*, 518 U.S. at 532-33 (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982)).  Indeed, every circuit to address transgender students' access to sex-separated spaces has applied heightened scrutiny. *Grimm*, 972 F.3d at 607-10; *Dodds,* 845 F.3d at 221 (affirming district court decision that employed heightened scrutiny because bathroom policy discriminates based on sex stereotypes); *Whitaker*, 858 F.3d at 1051 (same); *Martinsville*, No. 2023 WL 4881915, at *8; *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc)*.*

Heightened scrutiny also applies here because transgender people are a quasi-suspect class. In *Karnoski*, the Ninth Circuit upheld the district court's determination that, applying the relevant factors, transgender people constitute a quasi-suspect class. 926 F.3d at 1201 ("the district court reasonably applied the factors ordinarily used to determine whether a classification affects a suspect or quasi-suspect class").  This conclusion is consistent with the decisions of many other

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          13

courts to have considered the question. *See, e.g., Grimm,* 972 F.3d at 610-13.[10] This Court should not hesitate to reach the same conclusion.  It is irrelevant that S.B. 1100 refrains from explicitly using the word "transgender": under the law's definition of "sex," transgender students are the only students banned from facilities that align with their gender identity. *See Hecox v. Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020), aff'd, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023).  S.B. 1100 thus discriminates against transgender students, who are members of a quasi-suspect class, and employs a classification based on sex.  Idaho, therefore, must show that S.B. 1100 survives heightened scrutiny.

### B.    S.B. 1100 Cannot Survive Heightened Scrutiny

To survive heightened scrutiny, Idaho must show the law "serves important governmental objectives" and the "discriminatory means employed are substantially related to the achievement of those objectives." *See VMI*, 518 U.S. at 524 (quoting *Miss. Univ. for Women*, 458 U.S. at 724). "The burden of justification is demanding[,] rests entirely on the State," and must be "'exceedingly persuasive.'" *Id.* at 533 (quoting *Miss. Univ. for Women,* 458 U.S. at 724).  The governmental interest "must be genuine, not hypothesized" and "must not rely on overbroad generalizations." *Ibid*.  A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women,* 458 U.S. at 730.

---

[10] *See also Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), decision clarified sub nom. *F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wisc. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

S.B. 1100 cannot survive the rigorous analysis that heightened scrutiny demands.  Idaho claims that S.B. 1100 furthers the important governmental interest of "protecting the privacy and safety of *all* students." Idaho Code Ann. § 33-6601(7) (emphasis added).  Even if this stated purpose is genuine, S.B. 1100 is not "substantially related" to the achievement of that objective. *See VMI*, 518 U.S. at 533 (citation omitted).  In fact, S.B. 1100's categorical exclusion of transgender students from sex-specific facilities consistent with their gender identity significantly jeopardizes *their* safety and privacy, and does little, if anything, to advance the privacy and safety of other students. *See Hecox*, 479 F. Supp. 3d at 976 (citing *Latta v. Otter*, 19 F. Supp. 3d 1054, 1077 (D. Idaho), aff'd, 771 F.3d 456 (9th Cir. 2014)) (courts evaluate whether the "proffered justifications overcome the injury and indignity inflicted on Plaintiffs and others like them.").  S.B. 1100 is therefore not substantially related to its stated purpose.

First, S.B. 1100's stated purpose of "protecting the privacy and safety of all students" necessarily includes the safety and privacy of transgender students, as the word "all," by definition, is encompassing.  The law, however, threatens rather than protects transgender students' safety and privacy.  Using school facilities matching their gender identity is essential to the mental health and physical safety of transgender students. *See Grimm*, 972 F.3d at 595-97 (discussing the significant body of evidence and research on this topic and describing the mental and physical harms associated with excluding a transgender child from school facilities consistent with their gender identity); *Whitaker*, 858 F.3d at 1040-42, 1045-46 (discussing the irreparable harm, including depression, thoughts of suicide, and intrusion on privacy, that transgender student was likely to suffer if excluded from the boys' bathroom and required to use single-user restroom).  As the Third Circuit recognized, "transgender students face extraordinary social, psychological, and medical risks" that weigh heavily in favor of allowing them to live consistent with their gender

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          15

identities at school, which includes access to appropriate facilities. *Boyertown*, 897 F.3d at 529 (finding that policies allowing transgender students to use facilities consistent with their gender identity is necessary because doing otherwise "can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior.").[11]

Moreover, S.B. 1100 creates a private cause of action that incentivizes students to surveil transgender students, or any student suspected of being transgender, further placing their safety and privacy at risk. Idaho Code Ann. § 33-6606 (providing that any student who "encounters a person of the opposite sex" in a public-school restroom, changing facility, or sleeping quarters has a private cause of action against the school district and may recover $5000). S.B. 1100 provides a financial inducement for students to police one another, even in schools where transgender students have used the facilities consistent with their gender identity without incident, creating new and pressing safety issues for transgender students who are already the subject of increased victimization by their peers. *See Grimm*, 972 F.3d at 597. Should a transgender student, or any student for that matter, be accused of entering the "wrong" restroom or changing room, they may very well be made the subject of an inquiry into their "external reproductive anatomy." Idaho Code Ann. § 33-6602(3). This provision shows that S.B. 1100 was clearly not intended to ensure the safety and privacy of *all* students.

S.B. 1100's "accommodations" provisions do nothing to alleviate these threats to transgender students' safety and privacy. In fact, forcing transgender students to use single-user restrooms threatens to out them as transgender to their peers. *See Boyertown*, 897 F.3d at 530 (forcing transgender students to use single-user facilities causes "extraordinary consequences" that

---

[11] S.B. 1100's legislative findings acknowledge these cases. *See* Idaho Code Ann. § 33-6601. Yet, the statute and legislative record fail to grapple with their holdings and detailed analyses.

non-transgender students who voluntarily use single-user facilities do not experience); *Whitaker*, 858 F.3d at 1045 (requiring a transgender student to use single-user facilities "actually invited more scrutiny and attention from his peers").  As courts have recognized, requiring transgender students to use single-user facilities publicly brands them as unequal, invades their privacy, and renders them vulnerable to violence and harassment. *See Boyertown*, 897 F.3d at 530; *see also Grimm*, 972 F.3d at 609; *Whitaker*, 858 F.3d at 1045.

In short, S.B. 1100 creates rather than solves safety and privacy problems, particularly for transgender students.  Because S.B. 1100 itself subjects transgender students to harm and severely compromises their privacy and safety, Idaho cannot show that the law is "substantially related" to its stated purpose of protecting "all students." *See VMI*, 518 U.S. at 533.

Second, S.B. 1100 does little, if anything, to advance the safety and privacy of non-transgender students.  S.B. 1100 claims the law protects students from "sexual assault, molestation, rape, voyeurism, and exhibitionism." Idaho Code Ann. § 33-6601(4).  But schools already create and enforce nondiscriminatory rules designed to ensure the safety of their facilities. *See Martinsville*, 2023 WL 4881915, at *9 (noting that schools monitor student conduct in bathrooms and locker rooms and gender-affirming policies "neither thwart rule enforcement nor increase the risk of misbehavior" in those facilities).  The legislative record is bereft of any evidence of transgender students in Idaho engaging in any of the named conduct.  Instead, proponents conceded that there were no "documented cases of trans person violence on non-trans people." *Protecting the Privacy and Safety of Students in Public Schools: Hearing on S.B. 1100 Before the H. Educ. Comm.*, 67th Leg., 1st Sess. (Idaho 2023) (00:40:05-00:40:50) (statements of Rep.

Woodings and Rep. Hill, Members, H. Comm. on Educ.).[12]  Thus, even if this Court were to credit the legislative record's statements about supposed safety threats to public school students arising from the use of restrooms by persons of the "opposite sex," as the law defines that term, Idaho offers no justification for applying those assumptions so sweepingly to all transgender students. *See VMI*, 518 U.S. at 541-42 (justifications for sex-based classifications must not rely on "overbroad generalizations," and "we have cautioned reviewing courts to take a hard look at generalizations or tendencies of the kind pressed by [the State]") (citations and internal quotation marks omitted).

Similarly, Idaho claims that S.B. 1100's categorical ban is justified because of the "potential embarrassment, shame, and psychological injury" some students might feel if they share a restroom or changing facility with a person of "the opposite biological sex." Idaho Code Ann. § 33-6601(4).  Courts have found that such privacy justifications cannot substantiate the exclusion of transgender students from single-sex facilities consistent with their gender identity, given the reality of how they use those facilities. *See, e.g., Grimm,* 972 F.3d at 613-15 (Excluding transgender students from restrooms that correspond to their gender identity "ignores the reality of how a transgender child uses the bathroom: by entering a stall and closing the door.") (quoting *Whitaker,* 858 F.3d at 1052); *Martinsville,* 2023 WL 4881915, at *9 ("Gender-affirming facility access does not implicate the interest in preventing bodily exposure because there is no such

---

[12] Idaho legislators appeared to rely on an incident in Loudoun County, Virginia as justification for S.B. 1100. *See Protecting the Privacy and Safety of Students in Public Schools: Hearing on S.B. 1100 Before the H. Educ. Comm.*, 67th Leg., 1st Sess. (Idaho 2023) (00:32:44-00:33:10) (statement of Rep. Wisniewski, Member, H. Comm. On Education).  Nebulous references to a single out-of-state incident that may not even involve a transgender student do not provide an "exceedingly persuasive" justification for the sweeping exclusion of transgender students from all single-sex facilities in Idaho public schools. *See Hecox,* 479 F. Supp. 3d at 978-79 (anecdotes about runners from other states were insufficient to support banning transgender athletes in Idaho) (citation omitted).

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          18

exposure."); *Whitaker*, 858 F.3d at 1052 ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than . . . any other student who uses the bathroom at the same time.").  Such injuries are insufficient to justify categorically excluding all transgender students from single-sex school facilities consistent with their gender identity, particularly when doing so subjects *them* to concrete, demonstrable embarrassment, shame, and psychological, and even physical, injuries. *See Boyertown*, 897 F.3d at 529-30 (finding that non-transgender students' discomfort could not be "equate[d] . . . with the very drastic consequences that the transgender students must endure if the school were to ignore the latter's needs and concerns"); *see also Parents for Privacy*, 949 F.3d at 1225 (holding that transgender students' access to bathrooms matching their gender identity did not violate non-transgender students' constitutional privacy right).  Idaho's "proffered justification[]" of privacy for non-transgender students does not "overcome the injury and indignity inflicted on [transgender students]." *See Hecox*, 479 F. Supp. 3d at 976 (citation omitted).

Finally, to the extent Idaho claims S.B. 1100 is clearly related to its important objective of protecting the privacy interests of students to use facilities away from the "opposite biological sex *as S.B. 1100 defines that term*, this reasoning is fatally circular. *See, e.g., Adams,* 57 F.4th at 805 (reasoning, in circular fashion, that "[t]he School Board's bathroom policy is clearly related to—indeed, is almost a mirror of—its objective of protecting the privacy interests of students to use the bathroom away from the opposite sex").  The State cannot simply argue that its discriminatory means (excluding students from facilities based on "sex" without regard for gender identity) is justified by its discriminatory ends (separating facilities on the basis of "sex" without regard for gender identity). *See VMI*, 518 U.S. at 545 (rejecting as "notably circular" and a misperception of the Court's precedent the State's argument that "[s]ingle-sex education at VMI serves an important

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**        19

governmental objective, . . . and exclusion of women is not only substantially related, it is essential to that objective") (internal citations omitted).  If this sort of circular reasoning were sufficient to withstand heightened scrutiny, all sex-based exclusions could be justified as substantially related to the "important" goal of sex separation simply by stating as much.  *VMI* explicitly rejected this faulty logic, *see ibid.*, and this Court should too.

In sum, if privacy and safety of all students is Idaho's goal, S.B. 1100 does not further it. S.B. 1100 disregards the safety and privacy of transgender students and exacerbates dangers they already face.  And the legislative record fails to demonstrate that the categorical exclusion of transgender students from single-sex facilities consistent with their gender identity is "substantially related" to protecting the safety and privacy of other, non-transgender students.  Because Idaho has not demonstrated an "exceedingly persuasive justification" for its discriminatory law, Plaintiffs are likely to succeed on the merits of their equal protection claim.

## CONCLUSION

S.B. 1100 requires public schools to discriminate against transgender students by subjecting them to sex-based harms and depriving them of equal educational opportunities in violation of Title IX.  S.B. 1100's exclusionary sex-based means also do not further Idaho's purported goal of protecting all students' privacy and safety.  Instead, S.B. 1100 imposes state-sanctioned injuries and indignity on transgender students.  Such a law cannot withstand the heightened scrutiny the Constitution requires.  Plaintiffs are therefore likely to succeed on the merits of their Title IX and equal protection claims.

Respectfully submitted, this 8th day of August, 2023.

JOSHUA D. HURWIT
United States Attorney
District of Idaho

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

 /s/ Christine G. England
CHRISTINE G. ENGLAND
Assistant U.S. Attorney

SHAHEENA A. SIMONS
Chief
VERONICA R. PERCIA
Special Litigation Counsel
ARIA S. VAUGHAN
SANDY E. JAMES
Trial Attorneys
Educational Opportunities Section

*Attorneys for the United States of America*

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**          21