```
1              IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF IDAHO
3
     REBECCA ROE, et al.,                )
4                                        )
                          Plaintiffs,    ) Case No.
5                                        ) 1:23-cv-00315-DCN
     vs.                                 )
6                                        )
     DEBBIE CRITCHFIELD, in her          )
7    official capacity as Idaho State    )
     Superintendent of Public            )
8    Instruction, et al.,                )
                                         )
9                         Defendants.    )
     _____)
10
11
12
13
14    REMOTE VIDEOTAPED DEPOSITION OF STEPHANIE BUDGE, PH.D.
15                      August 16, 2023
16
17
18
19
20
21
22
23
24   Reported by:
25   Rebecca Martin, CSR #1108, RPR, CRR
```

                                                    Page 1

**EXHIBIT**

**1**

```
 1    REMOTE VIDEOTAPED DEPOSITION OF STEPHANIE BUDGE, PH.D.
 2
 3         BE IT REMEMBERED that the remote videotaped
 4    deposition of STEPHANIE BUDGE, PH.D. was taken via
 5    videoconference by the Defendants before Associated
 6    Reporting & Video, a Veritext Company, Rebecca Martin,
 7    Court Reporter and Notary Public in and for the County
 8    of Ada, State of Idaho, on Wednesday, the 16th day of
 9    August, 2023, commencing at the hour of 8:00 a.m.
10    Mountain Time in the above-entitled matter.
11
12
13    APPEARING REMOTELY:
14
      For the Defendants:
15         OFFICE OF THE ATTORNEY GENERAL
           By: LINCOLN D. WILSON, Esq.
16             RAFAEL J. DROZ, Esq.
           Post Office Box 83720
17         Boise, Idaho  83720-0010
           Telephone: (208) 334-2400
18         Facsimile: (208) 854-8073
           lincoln.wilson@ag.idaho.gov
19         rafael.droz@ag.idaho.gov
20    For the Plaintiffs:
           LAMBDA LEGAL
21         By: TARA BORELLI, Esq.
               CHRISTINA PAEK, Esq.
22             PETER C. RENN, Esq.
           1 West Court Square, Ste. 105
23         Decatur, Georgia  30030
           Telephone: (404) 897-1880
24         tborelli@lambdalegal.com
           cpaek@lambdalegal.com
25         prenn@lambdalegal.com
```

```
 1    APPEARANCES (Cont.)
 2    For the Plaintiffs:
              MUNGER TOLLES & OLSON
 3            BY: J. MAX ROSEN, Esq.
                  PAUL MARTIN, Esq.
 4            560 Mission Street, 27th Floor
              San Francisco, California  94105
 5            Telephone: (415) 512-4094
              max.rosen@mto.com
 6            paul.martin@mto.com
 7            ALTURAS LAW GROUP
              BY:  SAMUEL L. LINNET, Esq.
 8            101 E. Bullion Street
              Hailey, Idaho  83333
 9            Telephone: (208) 788-6688
              sam@alturaslawgroup.com
10
      Also Present:  Chris Ennis, videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1                    I N D E X
 2              E X A M I N A T I O N
 3
    STEPHANIE BUDGE, PH.D.                        PAGE
 4
 5  By:  MR. WILSON                                6
 6
                    E X H I B I T S
 7
 8   No.                                         Page
 9    Exhibit 1    Expert Declaration of ..........5
                   Stephanie L. Budge, Ph.D.
10                 (68 pages)
11    Exhibit 2    "A Follow-Up Study of Boys ......73
                   With Gender Identity Disorder"
12                 (18 pages)
13    Exhibit 3    "Impact of Bathroom .............93
                   Discrimination on Mental
14                 Health Among Transgender and
                   Nonbinary Youth" (1142 pages)
15
      Exhibit 4    "Medical Group Backs Youth ......102
16                 Gender Treatments, but Calls
                   for Research Review" (2 pages)
17
      Exhibit 5    "Changing the Culture" ..........112
18                 (5 pages)
19
20
21
22
23
24
25
                                            Page  4
```

Stephanie Budge, Ph.D. August 16, 2023

```
1              P R O C E E D I N G S
2
3          (Deposition Exhibit No. 1 was marked.)
4       THE VIDEOGRAPHER:  So we are recording and
5   we are on the record.  Today's date is August 16th,
6   2023.  The time is 8:05 a.m. Mountain Time.
7            For the record, this is the remote
8   videotaped deposition of Dr. Stephanie Budge.  It's
9   taken by the defendants in the matter of Roe, et
10  al., versus Debbie Critchfield, et al.  It is Case
11  Number 1:23-cv-00315-DCN.  It is in the United
12  States District Court for the District of Idaho.
13           The videotaped deposition is being held
14  remotely via Zoom videoconference.  The videotaped
15  deposition is being recorded by Chris Ennis and
16  reported by Becky Martin of Associated Reporting
17  and Video, a Veritext company.
18           And if Counsel will please state their
19  appearances and any stipulations for the record.
20      MR. WILSON:  Lincoln Wilson for the Idaho
21  Attorney General's Office, representing the
22  defendant.
23      MS. BORELLI:  Tara Borelli for the
24  plaintiffs.
25      MR. DROZ:  Rafael Droz, Attorney General's
```

Page 5

```
 1    Office -- Idaho Attorney General's Office for
 2    defendants.
 3          MR. RENN:  Peter Renn for the plaintiffs.
 4          MR. ROSEN:  Max Rosen for the plaintiffs.
 5          MR. LINNET:  Sam Linnet for the plaintiffs.
 6          MR. MARTIN:  Paul Martin for the plaintiffs.
 7          MS. PAEK:  Christina Paek for the
 8    plaintiffs.
 9          THE VIDEOGRAPHER:  And if the court reporter
10    will please swear the witness.
11                      STEPHANIE BUDGE, PH.D.,
12    a witness having been first duly sworn to tell the
13    truth, the whole truth and nothing but the truth,
14    was examined and testified as follows:
15
16                      EXAMINATION
17    BY MR. WILSON:
18          Q.   Good morning.
19               Would you please state your name for the
20    record?
21          A.   Yes.  My name is Stephanie Budge.
22          Q.   Thank you, Dr. Budge.
23               We've been introduced off the record.
24    My name is Lincoln Wilson.  I'm with the Idaho
25    Attorney General's Office and will be taking your
```

Stephanie Budge, Ph.D. August 16, 2023

1    deposition in this case today.

2              I know this isn't your first rodeo as

3    far as depositions are concerned, so I will skip

4    over some of the standard preliminaries and I'll

5    just say maybe a couple of them.

6              First of all, have you done a video

7    deposition before?

8         A.   I have.

9         Q.   Okay.  So you're even used to this

10   format on some level.

11             And I think the only thing we have to be

12   mindful of in particular here is to take extra

13   special care not to speak over one another and wait

14   'til I finish a question before giving an answer,

15   just so that we make things nice and easy for the

16   court reporter and the record that we have here.

17             And make sure that you're giving verbal

18   answers and not sort of, you know, nodding your

19   head or uh-huh, mm-hmm, because that's the sort of

20   thing that won't come across very clearly on the

21   transcript.

22             Does that make sense?

23        A.   That does make sense.

24        Q.   All right.  Thank you.

25             So I have circulated before what we'd

Page  7

Stephanie Budge, Ph.D. August 16, 2023

1    like to mark as Exhibit 1 to your deposition.

2              Have you received the e-mail that I

3    sent?

4         A.   Yes.

5         Q.   And can you tell me what this is that's

6    attached to that e-mail?

7         A.   It is my expert declaration for this

8    case.

9         Q.   Are you able to tell me whether this

10   declaration is a complete and accurate statement of

11   the opinions that you intend to give in this case

12   in relation to Plaintiff's motion for a preliminary

13   injunction?

14        A.   It is.

15        Q.   And so any opinions that you have that

16   are relevant to that motion would be stated in this

17   declaration; is that correct?

18        A.   That's correct.

19        MS. BORELLI:   Counsel, let me just interpose

20   an objection, which is:   Briefing obviously isn't

21   complete and this wouldn't encompass any rebuttal

22   opinions that Dr. Budge would be offering, so I

23   want to make sure the record is clear on that

24   point.

25        MR. WILSON:   Appreciate that clarification.

Page 8

1      Q.   (BY MR. WILSON) And if there are any
2  authorities that you relied on in forming the
3  opinions that are stated in your declaration, they
4  would be included within that declaration; is that
5  correct?
6      A.   That's correct.  And I still might be
7  able to add some additional components at some
8  point in time related to this case.
9      Q.   But to the extent that it's already
10 relating to an opinion that you've already formed,
11 those authorities would be listed in this
12 declaration; is that correct?
13     A.   That's correct.
14     Q.   Thank you.
15          If you'd take a look --
16     MS. BORELLI:  If I can just -- I don't mean
17 to be too interruptive here, but I just want to
18 clarify that of course Dr. Budge is a clinician,
19 has a great deal of clinical experience, and so
20 would be relying on clinical experience and other
21 related authorities that she would use in her
22 day-to-day clinical practice.
23     MR. WILSON:  So I don't think that's a
24 proper objection because it seems to be supplying
25 an answer.  Your point taken, not an issue here,

Page 9

Stephanie Budge, Ph.D. August 16, 2023

1    but I'd just like to make sure that we're not

2    adding to the record through objections.

3             But I think we can move forward.

4        Q.  (BY MR. WILSON) If you'd take a look at

5    paragraph 3 of your declaration and let me know

6    when you're there.

7        A.  I'm there.

8        Q.  The paragraph begins, it says:  I have

9    been retained by counsel for the plaintiffs in the

10    above-captioned matter to provide expert opinions

11    about.

12             And then it lists five topics under

13    separate headings; is that correct?

14        A.  That's correct.

15        Q.  And are those the opinions that you're

16    offering in this case at this time in relation to

17    the preliminary injunction motion?

18        A.  That's correct.

19        Q.  And you don't have at this time any

20    other opinions than those that are stated here; is

21    that correct?

22        A.  I'll be opining on the things that were

23    listed in this statement.  If there are components

24    that are related to it, I will be offering some

25    evidence that's related to that within the context

Stephanie Budge, Ph.D. August 16, 2023

1     of what I was hired to do.

2          Q.   I certainly understand.  Thanks for that

3     clarification.

4               To be clear, you did not examine the

5     plaintiffs -- or the plaintiff in this case; is

6     that correct?

7          A.   That's correct.

8          Q.   And would it be fair to say that you are

9     not giving an opinion about the particular minor

10    plaintiff or the particular plaintiff organization

11    in this case?  Is that also correct?

12         A.   My opinions are related to them, but I

13    have not met with them personally.

14         Q.   Yeah.  I'm just trying to clarify.  Let

15    me see if I can maybe phrase that in a better way.

16              You're giving opinions that are sort of

17    general opinions about psychological and medical

18    phenomena, not about these specific people.  Now,

19    they may -- is that correct?

20         MS. BORELLI:  Lincoln, I just want to

21    interpose an objection to the extent that the

22    testimony submitted relates to the PI.  So if we're

23    talking more broadly about the case, obviously we

24    haven't disclosed opinions related more broadly to

25    the case.  I want to make sure we're talking about

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1   the same thing, which is just the scope of the
 2   preliminary injunction motion.
 3              Are we on the same page?
 4        MR. WILSON:  We're on the same page.
 5        MS. BORELLI:  Thanks.
 6        Q.   (BY MR. WILSON) Let me see if I can --
 7   I'm really just trying to clarify here that your
 8   opinions are general opinions that are about your
 9   understanding of the science and medicine and
10   psychology of these issues, they're not directed to
11   these specific plaintiffs; is that correct?
12        MS. BORELLI:  Objection; compound and vague.
13        Q.   (BY MR. WILSON) You can answer.
14        A.   My answers relate to the plaintiffs.
15        Q.   I'm just trying to clarify here, though.
16   Maybe I'll just leave the second part out of it.
17              These opinions are general opinions that
18   are -- you would maintain that they are true as a
19   general matter and also with reference to these
20   specific plaintiffs, but you were giving these
21   opinions as a general matter; is that correct?
22        MS. BORELLI:  Compound and vague.
23        Q.   (BY MR. WILSON) You can answer.
24        A.   That's correct.
25        Q.   Okay.  Just to clarify that when -- your
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1    counsel may object, but you can continue to answer

2    if you have an answer to the question.

3            Now, at least one of those opinions, if

4    you look at that paragraph 3, subsection D says

5    you're giving an opinion about "the harms caused by

6    excluding transgender students from using

7    sex-separated facilities that are aligned with

8    their gender identity."

9            Did I read that correctly?

10       A.   That's correct.

11       Q.   And would it be fair to say, then, that

12   you were giving a causation opinion --

13       MS. BORELLI:  Objection --

14       Q.   (BY MR. WILSON) -- in that regard?

15       MS. BORELLI:  -- vague.

16       THE WITNESS:  I will be, and I'm opining

17   around the harms that are related to the exclusion

18   of transgender students from the sex-segregated

19   facilities.

20       Q.   (BY MR. WILSON) When you say you're

21   opining about the harms caused by excluding

22   transgender students, you aren't necessarily giving

23   an opinion about causation; is that correct?

24       MS. BORELLI:  Objection; vague.

25       Q.   (BY MR. WILSON) You can answer.

Page 13

Stephanie Budge, Ph.D. August 16, 2023

1        A.    Yes.   I'm talking about the harm that's

2    directly related to the discrimination and

3    exclusion of transgender students.

4        Q.    And would it be fair to say that for

5    subsection C -- let me just read that first.   I'll

6    ask my question differently.

7             Subsection C says you're opining about:

8    The importance of access to sex-separated

9    facilities as part of social transition.

10             Did I read that correctly?

11        A.    Yes.

12        Q.    Would it be fair to say that that is

13    also a causation opinion, that you're saying that

14    the access to sex-separated facilities as part of

15    social transition causes certain benefits to

16    transgender persons?

17        MS. BORELLI:   Objection; compound and vague.

18        Q.    (BY MR. WILSON) You can answer.

19        A.    Will you repeat the question, please?

20        Q.    Is your opinion in subsection C, is that

21    an opinion that access to sex-separated facilities

22    causes certain benefits to transgender persons or

23    persons with gender dysphoria?

24        MS. BORELLI:   Objection; vague.

25        THE WITNESS:   The component that I'm opining

                                        Page 14

Stephanie Budge, Ph.D. August 16, 2023

1    about here is that social transition is an

2    essential component of transgender adolescence

3    experience, and that having access to sex

4    segregated spaces is an important component of

5    that.

6            Q.   (BY MR. WILSON) And is it an important

7    component because it causes -- or you maintain that

8    it causes benefits to those persons?

9            MS. BORELLI:  Objection; misstates

10   testimony.

11           THE WITNESS:  My opinion is that it's --

12   that being able to access sex-segregated facilities

13   for transgender adolescents is something that is

14   just, like, a natural component for them that

15   maintains, you know, a baseline level of mental

16   health that would be the same for any adolescent.

17           Q.   (BY MR. WILSON) So you are not opining

18   that doing that causes any particular benefits for

19   transgender persons; is that correct?

20           MS. BORELLI:  Objection; vague.

21           THE WITNESS:  My opinion is that -- I mean,

22   it's the same kind of benefit that would exist for

23   cisgender youth as well.  I don't actually

24   understand what the definition of "benefit" is in

25   this case.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1     Q.   (BY MR. WILSON) That they're better off

2   having that access than not having that access; is

3   that correct, that you are opining that that causes

4   benefits for them?

5         MS. BORELLI:   Compound, vague.

6         THE WITNESS:   I am opining that transgender

7   adolescents are better off for them -- you know, in

8   the sense that they will be harmed if they are not

9   allowed access to those spaces.

10        Q.   (BY MR. WILSON) Okay.   I think that's

11  the clarification that I needed.   Thank you.

12             You describe the method that you used to

13  reach the opinions that you state in this

14  declaration?

15        MS. BORELLI:   Objection; vague.

16        Q.   (BY MR. WILSON) You can answer.

17        A.   I describe my qualifications as a

18  component of the declaration, and that component of

19  my qualifications indicates my level of expertise

20  and my areas of expertise, and I use that area --

21  those levels and areas of expertise to assist with

22  the process of writing the report.

23        Q.   Other than that, is there any other

24  aspect of the method that you used to reach these

25  opinions in this case?

1        MS. BORELLI:  Objection; vague.

2        THE WITNESS:  I used the same method that I

3   use for all psychological and scientific processes

4   in terms of reviewing the full extent of the

5   literature, ensuring that I'm including all of the

6   evidence-based information.

7            So I have an extensive level of training

8   regarding how to consider scientific evidence, and

9   I use all of that expertise in my process of

10  identifying the information for the report.

11       Q.   (BY MR. WILSON) Thank you.

12           So you said that you use -- you reviewed

13  the full extent of the literature in forming your

14  opinions in this case; is that correct?

15       MS. BORELLI:  Objection; misstates

16  testimony.

17       Q.   (BY MR. WILSON) You can answer.

18       A.   Yes.  I used the same process of

19  searching for scientific literature and

20  understanding the scope of the scientific

21  literature.

22       Q.   What was your method for searching for

23  relevant studies on this issue to use in your

24  report?

25           MS. BORELLI:  Objection; vague.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1          THE WITNESS:  For the process of researching

2     for this particular case, I used scientific

3     databases and academic databases to be able to

4     search for the scientific literature.

5          Q.   (BY MR. WILSON) And the literature that

6     you reviewed in forming your opinions is noted and

7     cited in your report or included as references at

8     the end of it; is that correct?

9          MS. BORELLI:  Objection; vague.

10         THE WITNESS:  Can you restate the question,

11    please?

12         Q.   (BY MR. WILSON) So the scientific

13    literature that you reviewed in forming your

14    opinion would either be cited in your declaration

15    or included as one of your references at the end;

16    is that correct?

17         A.   When relevant.  So, you know, I reviewed

18    a lot of different components that wouldn't have

19    been relevant to the questions at hand, but when

20    relevant, I did include those articles in this

21    particular declaration.

22         Q.   So you were applying a scientific

23    process to form the opinions that you stated in

24    this case; is that correct?

25         MS. BORELLI:  Objection; vague.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1          THE WITNESS:  Yes.  I used a scientific

2     process to inform my methodology for finding the

3     articles and scientific literature for this

4     declaration.

5          Q.   (BY MR. WILSON) Are you familiar with

6     the Federal Judicial Center's reference manual on

7     scientific evidence?

8          MS. BORELLI:  Objection; vague.

9          THE WITNESS:  I am not.

10         Q.   (BY MR. WILSON) So in terms of thinking

11    about science, would you agree that it's the

12    testing of hypotheses to see if they can be

13    falsified that distinguishes science from other

14    fields of human inquiry?

15         MS. BORELLI:  Objection; lacks foundation,

16    calls for a legal conclusion.

17         Q.   (BY MR. WILSON) You can answer.

18         A.   That's a general statement around

19    science, yes.

20         Q.   Sorry, just to be clear, was your answer

21    "yes" there?  I didn't quite hear it.

22         MS. BORELLI:  Objection; misstates prior

23    testimony.

24         Q.   (BY MR. WILSON) I missed it over the

25    objection.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1            Was your answer yes?

2       A.   I said generally.  Generally, yes.

3       Q.   Would you also agree that an association

4  is not equivalent to causation?

5       MS. BORELLI:  Objection; calls for legal

6  conclusion, vague.

7       THE WITNESS:  Associations in scientific

8  literature indicate direct relationships; and

9  therefore, you can make conclusions regarding those

10 types of relationships.  So they're variations of

11 similar processes.

12      Q.   (BY MR. WILSON) But you would agree that

13 an association is not equivalent to causation; is

14 that correct?

15      MS. BORELLI:  Objection; vague.

16      THE WITNESS:  They're not exactly the same

17 thing.

18      Q.   (BY MR. WILSON) What's your

19 understanding of the term "cherry-picking" when

20 it's used in scientific research?

21      MS. BORELLI:  Objection; vague.

22      THE WITNESS:  My understanding of that

23 terminology is that that is when people choose

24 evidence or different kinds of information that

25 fits a very particular component.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1          Q.   (BY MR. WILSON) What do you mean
2     by "component"?
3          A.   Well, I think it may depend on what
4     people are talking about with cherry-picking, but
5     in this instance, perhaps it could be something
6     where someone is choosing evidence or information
7     that fits an idea.
8          Q.   Like, a particular conclusion?
9          MS. BORELLI:  Objection; vague.
10         Q.   (BY MR. WILSON) Fair to say?
11         MS. BORELLI:  Same objection.
12         THE WITNESS:  That could be.
13         Q.   (BY MR. WILSON) Would you agree that
14    sound scientific methodology requires a scientist
15    to consider all of the scientific evidence when
16    making causation determinations?
17         MS. BORELLI:  Objection; vague, calls for a
18    legal conclusion.
19         THE WITNESS:  I do think that scientists
20    should take into account all of the information
21    when making conclusions.
22         Q.   (BY MR. WILSON) Would you agree that
23    coming to a firm conclusion first and then doing
24    the research to support it is the antithesis of a
25    scientific method?

Page 21

 1          MS. BORELLI:  Objection; vague, compound,
 2     calls for legal conclusion.
 3          THE WITNESS:  Well, typically scientists
 4     have hypotheses or research questions that they
 5     come up with, and when they do that, they look at
 6     relevant theory, they understand the relevant
 7     theory, and then they look through the relevant
 8     scientific evidence, and after they've done those
 9     pieces, then they engage in the science.
10          Q.   (BY MR. WILSON) But is the objective
11     with the hypothesis to test it to prove it false or
12     to test it to prove it true?
13          MS. BORELLI:  Objection; vague, compound.
14          THE WITNESS:  Well, there are multiple ways
15     to test hypotheses.  So you can look at null
16     hypotheses, which is a component of -- you know,
17     it's making a statement and then trying -- and then
18     determining exactly if that -- what you're testing
19     does not actually fit.
20               And so, you know, it depends on the type
21     of hypothesis that someone might be describing in
22     terms of hypothesis testing in science.
23          Q.   (BY MR. WILSON) Regardless of how the
24     hypothesis is defined, isn't the procedure always
25     designed to see whether it can be falsified?

                                              Page 22

Stephanie Budge, Ph.D. August 16, 2023

1       MS. BORELLI:  Objection; vague, assumes

2   facts not in evidence.

3       THE WITNESS:  The process is trying to test

4   a research question to determine the extent of the

5   research question or what -- or what the

6   conclusions are related to that.

7       Q.   (BY MR. WILSON) Is a research question

8   different than a hypothesis?

9       MS. BORELLI:  Objection; vague.

10      THE WITNESS:  They can be the same thing,

11  but they can be different as well.

12      Q.   (BY MR. WILSON) Can you describe the

13  difference between a research question and a

14  hypothesis?

15      MS. BORELLI:  Objection; vague.

16      THE WITNESS:  There are multiple different

17  types of hypotheses and research questions, and so,

18  you know, I guess part of this is that it's not

19  just a simple "this is what a hypothesis is and

20  this is what a research question is."

21          But like I said, sometimes they can

22  overlap.  Research questions are often more kind of

23  broader, "What is the landscape of this particular

24  phenomenon," and then a hypothesis often does test

25  directionality, but that doesn't have to be true

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1    necessarily for either one of those.  Sometimes

2    they can be the same thing.

3         Q.   (BY MR. WILSON) Can you describe what

4    you mean by "directionality"?

5         A.   Uh-huh.

6              So in hypotheses, we often indicate if

7    something may be more or less or how something may

8    be related to one thing or another.

9         Q.   I think I understand what you mean.

10             Would you agree that it's wrong for a

11   scientist to selectively discuss studies most

12   supportive of her conclusions and fail to account

13   adequately for contrary evidence?

14        MS. BORELLI:  Objection; vague, compound.

15        THE WITNESS:  I do think that scientists

16   should understand the scope of their evidence and

17   that they should understand the literature and that

18   they should use the literature that is the most

19   scientifically sound in understanding and

20   explaining scientific concepts.

21        Q.   (BY MR. WILSON) Would you agree that a

22   theory that fails to explain information that would

23   otherwise tend to cast doubt on that theory is

24   inherently suspect?

25        MS. BORELLI:  Objection; vague, compound.

Page 24

1       THE WITNESS:  Can you repeat the question,

2  please?

3       Q.   (BY MR. WILSON) Would you agree that any

4  theory that fails to explain information that

5  otherwise would tend to cast doubt on that theory

6  is inherently suspect?

7       MS. BORELLI:  Same objections.

8       THE WITNESS:  I don't think I understand

9  your question.

10      Q.   (BY MR. WILSON) That's fine.  We can

11 move along.

12           So if you take a look at paragraph 9 of

13 your declaration, you refer to an open clinical

14 trial that you're working on.

15           Could you just tell me about that

16 clinical trial, how it's designed and what it's

17 studying?

18      MS. BORELLI:  Objection; compound, vague.

19      THE WITNESS:  In this particular clinical

20 trial, we are looking at the feasibility and

21 acceptability of the process of understanding

22 access to mental health care for transgender

23 people.

24           We are also testing a particular type of

25 psychotherapy and we're testing longitudinally the

                                        Page 25

Stephanie Budge, Ph.D. August 16, 2023

1    effects of that psychotherapy.

2         Q.   (BY MR. WILSON) So can you describe the

3    clinical trial, how the control group is set up and

4    the test group?

5         MS. BORELLI:  Objection; compound.

6         THE WITNESS:  In an open clinical trial --

7    the definition of an open clinical trial is that

8    there is not a control group.  So there is only one

9    group that's included in an open clinical trial,

10   and that's to test feasibility and acceptability.

11        Q.   (BY MR. WILSON) Thanks for clarifying

12   that.

13             Can you explain to me why clinical

14   trials that have a control group, why that is

15   preferred, if you agree that it is preferred?

16        MS. BORELLI:  Objection; assumes facts not

17   in evidence, speculation.

18        THE WITNESS:  In this particular instance,

19   we conducted a randomized controlled trial prior to

20   this particular open clinical trial, and there were

21   components and research questions that we had based

22   on the randomized controlled trial that led to

23   research questions that were only focused on one

24   particular group.

25             In terms of, for example, testing a

Page 26

1    specific type of psychotherapy training module and

2    testing the feasibility and acceptability of the

3    research process, you don't need comparison groups

4    for those types of research questions.

5              For the randomized controlled trial that

6    we conducted previous to that, we did have

7    questions regarding the effectiveness and efficacy

8    of one treatment compared to another.  So a lot of

9    these designs just depend on the types of questions

10   that you're testing.

11             Q.   (BY MR. WILSON) Thank you.

12             I'm thinking just a little bit more

13   generally.

14             Apart from that particular study that

15   you were doing, why is it that researchers like to

16   use controlled trials as opposed to open trials?

17        MS. BORELLI:  Objection; vague, assumes

18   facts not in evidence.

19        THE WITNESS:  My experience isn't that

20   researchers like to use one over the other.  It

21   really just depends on what the research questions

22   are and what you're trying to test.

23        Q.   (BY MR. WILSON) What would be the

24   advantage of a controlled clinical trial?

25        MS. BORELLI:  Objection; assumes facts not

Page 27

1    in evidence, vague.

2         THE WITNESS:  Honestly, it depends on what

3    the research question is.  Like I said, in

4    questions where you're trying to determine is one

5    treatment better than another treatment -- for

6    example, in the randomized controlled trial that we

7    did, we were trying to determine:  Is one type of

8    psychotherapy more effective than another type of

9    psychotherapy?

10             You need to be able to randomize for

11   that particular design, but for the open clinical

12   trial, we weren't testing the efficacy of a

13   specific type of treatment.  We were testing the

14   feasibility and acceptability of the process.

15             So there isn't one design that's

16   necessarily going to be better than the other in

17   general.  Really what you need to do is say:  What

18   is the research question at hand, and what's going

19   to be the best design for those research questions?

20        Q.   (BY MR. WILSON) So supposing all else

21   being equal, if we had a given research question

22   that could be studied through a randomized

23   controlled trial or an open trial, would you agree

24   that the controlled trial is preferred?

25        MS. BORELLI:  Objection; vague, compound,

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1   assumes facts not in evidence, misstates testimony,

2   calls for a hypothetical, speculative.

3       MR. WILSON:  You gave me the whole laundry

4   list there.

5       MS. BORELLI:  I did.

6       Q.   (BY MR. WILSON) You can answer, though,

7   Dr. Budge.

8       A.   Yeah.  My previous testimony was such

9   that the research design depends on what the

10  research question is at hand.

11      Q.   I'm saying:  Suppose if you have a

12  situation where the research question can be

13  studied through either form, is the randomized

14  controlled trial preferred?

15      MS. BORELLI:  Objection; calls for

16  speculation, assumes facts not in evidence.

17      THE WITNESS:  My answer remains the same.

18  Really -- the design really depends on what the

19  research question is and what's being tested.

20      Q.   (BY MR. WILSON) So I guess the question

21  maybe would be:  You do agree that study design is

22  important for the reliability of a study; is that

23  correct?

24      MS. BORELLI:  Objection; vague, asked and

25  answered.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1        THE WITNESS:  In general, my statement would

2    be that reliability is an important component of

3    research and, I would say, again, it depends on the

4    exact research design and what the questions are at

5    hand.

6        Q.   (BY MR. WILSON) And you agree that

7    researchers should design their studies to be as

8    reliable as possible to study the given question

9    they're confronting; is that correct?

10       MS. BORELLI:  Objection; misstates

11   testimony, calls for speculation, vague.

12       THE WITNESS:  I agree that quantitative

13   studies should ensure that there is reliability at

14   hand.  Like I said, there are different kinds of

15   research questions, qualitative research, for

16   example, and some other components that use

17   different methods for rigor in their methodology.

18   So a lot of it does depend on what the research

19   questions are and what the design is.

20       Q.   (BY MR. WILSON) And the conclusions that

21   we can draw from research should be in proportion

22   to the reliability of the processes that led to it;

23   is that correct?

24       MS. BORELLI:  Objection; vague, calls for

25   speculation, lacks foundation.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1      THE WITNESS:  Yeah.  I think we might be

2  using different definitions of reliability.

3          So, you know, in my expertise and the

4  way that I was trained -- you know, I have a

5  master's degree in educational psychology, I have a

6  Ph.D. in counseling psychology, I have years of

7  experience learning the process of conducting

8  qualitative and quantitative research, and there

9  are really specific ways of ensuring methodological

10  rigor in all aspects of research.

11          Reliability is one particular component

12  that can be included in certain components of

13  quantitative research.  But I think -- you know,

14  and what I would say is that scientists do need to

15  have methodological rigor in their process of how

16  they're conducting research.

17      Q.   (BY MR. WILSON) So is it fair to say

18  that you don't believe that reliability is

19  essential to your research?  Is that correct?

20      MS. BORELLI:  Objection; misstates

21  testimony.

22      THE WITNESS:  That's not correct.  That's

23  not what I'm saying.

24      Q.   (BY MR. WILSON) So you do believe that

25  reliability is essential to your research?

Page 31

1          MS. BORELLI:  Objection; misstates

2     testimony --

3          Q.   (BY MR. WILSON) Is that correct?

4          MS. BORELLI:  -- asked and answered, vague.

5          THE WITNESS:  I already answered the

6     question.  Reliability can be an essential

7     component and a lot of it depends on what the

8     research design and the questions are.

9          Q.   (BY MR. WILSON) Well, if it can be

10    essential, then it is not necessarily essential; is

11    that correct?

12         MS. BORELLI:  Objection; calls for

13    speculation, vague, asked and answered.

14         THE WITNESS:  I answered the question

15    already.

16         Q.   (BY MR. WILSON) Is reliability always

17    essential to your research?

18         MS. BORELLI:  Objection; calls for

19    speculation, vague.

20         THE WITNESS:  It depends on the type of

21    research and the research questions.

22         Q.   (BY MR. WILSON) So your answer would be

23    no, it is not always essential to your research; is

24    that correct?

25         MS. BORELLI:  Objection; misstates

1   testimony, argumentative, asked and answered.

2       THE WITNESS:  In the quantitative studies

3   that I have conducted, all of them have included

4   reliability.

5       Q.  (BY MR. WILSON) But it is not essential

6   to all of your research; is that correct?

7       MS. BORELLI:  Objection; vague, asked and

8   answered, argumentative.

9       Q.  (BY MR. WILSON) Is that correct?

10      MS. BORELLI:  Same objections.

11      THE WITNESS:  I would say, for the

12  qualitative research that I conduct, even though

13  "reliability" isn't a term that we use for

14  qualitative research, and the qualitative research

15  is conducted in the most methodologically rigorous

16  way that is possible and that it follows all of the

17  journal article reporting standards and all of the

18  scientific methodologies that are included within

19  that.

20      MR. WILSON:  Tara, just to interject, I've

21  been giving you a bit of latitude on sort of the

22  speaking objections.  I don't think they're proper.

23  I think objection is going to be sufficient to

24  preserve your record, and I just want to make sure

25  that we're staying away from coaching the witness

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
1    from how to answer.
2              I certainly understand why you're saying
3    those things, but I'd like to ask that we just keep
4    that to "objection" going forward.
5         MS. BORELLI:  Look, let me object to that
6    characterization.  Improper speaking objections,
7    coach the witness, I'm not doing anything of the
8    sort.  I have a duty to preserve the objections.
9    I'm stating them simply and clearly to make sure
10   that they're preserved.
11        MR. WILSON:  I think only objections to the
12   form would be the issue here, and all that's
13   required to preserve the objection to the form is
14   to say "objection" or "object to the form," and
15   that's the only thing that you need to preserve
16   here.
17             So I would ask that you limit your
18   objections to just saying "objection."
19        MS. BORELLI:  Lincoln, identifying the
20   nature of the objection is proper.  We're allowed
21   to articulate the problem, and there are Courts
22   that often require that you articulate the basis of
23   the objection, and so I want to make sure that I've
24   done so.  I'm doing so simply and clearly.  It's
25   not an improper speaking objection.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

1          MR. WILSON:  We'll agree to disagree on

2     that, but I think that we can progress through this

3     deposition in a friendly and collegial manner.

4          MS. BORELLI:  I agree.

5          MR. WILSON:  Good.

6          Q.   (BY MR. WILSON) So would you agree that

7     for preserving the reliability of research, it's

8     important to be able to account for the role of

9     chance?

10          MS. BORELLI:  Objection; vague.

11          THE WITNESS:  In quantitative research, we

12     do understand that they're -- and look at the level

13     of chance that can be included via statistical

14     processes.

15          Q.   (BY MR. WILSON) And would you also agree

16     that for scientific research it's important to

17     account for the role of bias?

18          MS. BORELLI:  Objection; vague.

19          THE WITNESS:  I do think it's important to

20     account for specific types of bias and to

21     understand how bias can impact the research

22     process.

23          Q.   (BY MR. WILSON) And do you agree that

24     it's also important to account for the role of

25     confounding in scientific research?

Page 35

1        MS. BORELLI:  Objection; vague.

2        THE WITNESS:  In most of the quantitative

3   research that I have conducted, confounding

4   variables are included as a part of the process

5   that we look into.  It is important to understand

6   variables that can impact different components of

7   variability statistically.

8        Q.   (BY MR. WILSON) Would you agree that

9   observational studies are lower-quality evidence

10  than clinical trials?

11       MS. BORELLI:  Objection; vague, compound,

12  assumes facts not in evidence.

13       THE WITNESS:  I think depending on what the

14  research questions are at hand and what kind of

15  ethical processes can take place.  It depends on

16  what kinds of research design that you can conduct.

17  There are some questions and some processes that

18  can't be conducted via randomized controlled trial,

19  either ethically or just based on research design.

20          So my answer is that it depends on what

21  the research question is based on the type of

22  research design that needs to be used.

23       Q.   (BY MR. WILSON) Would you agree that

24  clinical trials of all the available tools are the

25  best at eliminating the role of chance, bias, and

Page 36

Stephanie Budge, Ph.D. August 16, 2023

```
 1   confounding?
 2        MS. BORELLI:  Objection; vague, compound,
 3   assumes facts not in evidence.
 4        THE WITNESS:  Depending on the type of
 5   research question that is at hand, randomized
 6   controlled trials can provide very important
 7   information regarding the effectiveness and
 8   efficacy of certain types of treatments, but it
 9   also -- like I said, it depends.  There are lots of
10   research questions that can't be discussed by
11   randomized controlled trials.
12             For example, like, do transgender kids
13   experience harm in bathrooms?  That's not something
14   that can actually be studied via randomized
15   controlled trial.  So my answer is that it kind of
16   depends on what the research question is.
17        Q.   (BY MR. WILSON) Would you agree that
18   surveys are lower-quality evidence than
19   observational studies as a scientific matter?
20        MS. BORELLI:  Objection; vague, calls for
21   speculation.
22        THE WITNESS:  My answer is such that the
23   research questions that are being asked need to
24   follow -- you know, need to be followed by the most
25   appropriate methodology.  So if a research question
```

Page 37

 1   is specific to some -- to an observational study or

 2   longitudinal study, then those are the designs that

 3   need to be used.

 4          If there is a question regarding

 5   effectiveness or efficacy of treatments, then

 6   designs related to that will be used.

 7          So my answer is that it kind of -- it

 8   just depends on what the research questions are.

 9      Q.   (BY MR. WILSON) Can surveys be used to

10   effectively test a hypothesis?

11      MS. BORELLI:  Objection; vague, calls for

12   speculation.

13      THE WITNESS:  In general, surveys can be

14   used to test hypotheses.

15      Q.   (BY MR. WILSON) Surveys are less

16   effective than observational studies at controlling

17   for the risks of chance, bias, and confounding; is

18   that correct?

19      MS. BORELLI:  Objection; vague, compound,

20   assumes facts not in evidence, calls for

21   speculation.

22      THE WITNESS:  I would say it depends on what

23   the study -- what the research question is and

24   what's being studied.

25      Q.   (BY MR. WILSON) And when you referred to

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

1    "qualitative evidence" before, would you include

2    surveys as a form of qualitative evidence?

3          MS. BORELLI:  Objection; vague, misstates

4    testimony.

5          THE WITNESS:  No.  Typically surveys are not

6    qualitative research.

7          Q.   (BY MR. WILSON) They have a qualitative

8    component; is that correct?

9          MS. BORELLI:  Objection; vague.

10         THE WITNESS:  Unless we have a different

11   understanding of what this is.

12              So in my experience, qualitative

13   research is research where open-ended questions are

14   being asked.

15              And in general, surveys are closed-ended

16   questions that usually include numbers.

17         Q.   (BY MR. WILSON) Thanks for that

18   clarification.

19              Let's move on to paragraph 19 of your

20   declaration, and just let me know when you're

21   there.

22         A.   I'm there.

23         Q.   Great.

24              So paragraph 19 says:  The term "gender

25   identity" is a well-established concept in

                                        Page 39

1  psychology and medicine referring to a person's

2  internal or psychological sense of having a

3  particular gender.  All human beings have a gender

4  identity.  People usually begin to explore and

5  understand their gender identity at around the age

6  of 3, with some variation, although some

7  transgender individuals may not begin to recognize

8  or express their gender identity until later in

9  life.

10          Apart from a small hiccup, did I read

11  that correctly?

12       A.   Yes, what I heard was correct.

13       MR. WILSON:  Okay.  Great.

14       MS. BORELLI:  Lincoln.

15       MR. WILSON:  Yes.

16       MS. BORELLI:  Since we're moving on to a new

17  paragraph and new topic, does it make sense to take

18  a short break?  We'd appreciate it.

19       MR. WILSON:  Yeah, that's fine.

20       MS. BORELLI:  Great.

21       THE VIDEOGRAPHER:  Okay.  So the time is

22  8:51 a.m. Mountain Time, and we are off the record.

23     (A recess was taken from 8:51 a.m. to 9:03 a.m.)

24       THE VIDEOGRAPHER:  All right.  So we are

25  recording.  The time is 9:03 a.m. Mountain Time,

Page 40

Stephanie Budge, Ph.D. August 16, 2023

1    and we are back on the record.

2          Q.   (BY MR. WILSON) Dr. Budge, I'd actually

3    like to jump ahead to paragraph 22 of your

4    declaration.

5               It says:  Every individual sex is

6    multifaceted and composed of many distinct

7    biologically-influenced characteristics, including

8    but not limited to:  Chromosomal make-up, hormones,

9    internal and external reproductive organs,

10   secondary sex characteristics, and gender identity.

11              Where there is a divergence between

12   these characteristics, gender identity is the most

13   important and determinative factor.

14              Did I read that correctly?

15         A.   That's correct.

16         Q.   If someone wanted to design an

17   experiment to test whether that statement was true,

18   how would they design that experiment?

19         MS. BORELLI:  Objection; vague, calls for

20   speculation.

21         THE WITNESS:  So there are multiple

22   components that are included in that paragraph, so

23   I am -- would you like me to share different types

24   of research questions that are answering different

25   components of that paragraph?

Page 41

Stephanie Budge, Ph.D. August 16, 2023

1     Q.   (BY MR. WILSON) No.  I'm wanting to

2   know -- let's just take the first sentence.

3          That first sentence is a statement,

4   correct?

5     MS. BORELLI:  Objection; vague, compound.

6     Q.   (BY MR. WILSON) It ends in a period and

7   it's a statement; is that correct?

8     MS. BORELLI:  Same objections.

9     THE WITNESS:  Yes, it's a sentence.

10     Q.   (BY MR. WILSON) And if we wanted to test

11  whether that statement was false with a scientific

12  procedure, how would we design that scientific

13  procedure?

14     MS. BORELLI:  Objection; vague, calls for

15  speculation, compound.

16     THE WITNESS:  So there are a lot of

17  different ways to test this.  Would you like for me

18  to share multiple components?

19     Q.   (BY MR. WILSON) Why don't you go ahead

20  and share one and we can talk about it.

21     A.   For the whole statement or for

22  components of it?

23     MS. BORELLI:  Just restating objections that

24  this is vague and compound, calls for speculation.

25     Q.   (BY MR. WILSON) Go ahead.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1      A.   Oh, I'm sorry, I was clarifying a
2  question.  So I guess I'll just choose a component
3  of this.
4           So there are pieces related to hormones,
5  for example, that you can test what somebody's
6  hormone levels are.  So you can have questions
7  related to what are the levels of hormones in
8  someone's body, and then you can go about testing
9  that question, for example.
10          Regarding gender identity, you can also
11  go about different components related to the gender
12  dysphoria diagnosis and use measures that are
13  specific to gender dysphoria to be able to
14  determine levels of gender dysphoria that are
15  included within gender identity for people who are
16  transgender.
17          You know, there are lots of different
18  pieces that are included in this particular
19  paragraph.
20      Q.   I think that's a separate question.
21  That seems to be about how do we measure those
22  things, not how do we know that those things
23  determine sex.
24          If you're asserting that these things
25  determine sex, how do we test whether that's true?

                                      Page 43

Stephanie Budge, Ph.D. August 16, 2023

1      MS. BORELLI:  Objection; misstates

2   testimony, vague.

3      THE WITNESS:  I've included the definition

4   that is used in every medical -- major medical and

5   psychological organization.  These statements are

6   based on scientific and psychological scientific

7   inquiry.

8           This is a broad component, so there are

9   a lot of different studies that go into the factors

10   of making up this particular definition.

11          So I'm using the large authoritative

12   bodies that describe these pieces in indicating

13   what I shared here.

14      Q.   (BY MR. WILSON) Hold on for just a

15   second here.

16          So is it your testimony that this is a

17   widespread accepted definition of sex?

18      MS. BORELLI:  Objection; misstates

19   testimony, vague.

20      THE WITNESS:  My testimony is such that this

21   definition is based on the major medical and

22   psychological organizations and how they describe

23   these components.

24      Q.   (BY MR. WILSON) And you don't cite any

25   support for this statement in this paragraph, do

Page 44

Stephanie Budge, Ph.D. August 16, 2023

```
 1   you?
 2        MS. BORELLI:  Objection; vague, misstates
 3   the document.
 4        THE WITNESS:  In this particular paragraph,
 5   I don't provide a citation.
 6        Q.   (BY MR. WILSON) Now, you referred to --
 7   in your declaration, to the concept of sex assigned
 8   at birth; is that correct?
 9        A.   That's correct.
10        Q.   What would you say to someone who said
11   that, "Well, we took a NIP test of a fetus in utero
12   and we determined the fetus's sex in utero," is
13   that something that you believe to be a correct
14   scientific process?
15        MS. BORELLI:  Objection; vague, compound,
16   calls for speculation.
17        THE WITNESS:  My understanding of the NIP
18   test is that you can get different types of
19   chromosomes from that test, so that -- chromosomes
20   are considered a component of sex.
21        Q.   (BY MR. WILSON) So if someone said,
22   based on a NIP test, that they conclusively
23   determined the gender of the fetus -- I'm sorry,
24   conclusively determined the sex of the fetus based
25   on the test, would you say that was not correct?
```

Page 45

1      MS. BORELLI:  Objection; vague, assumes

2  facts not in evidence.

3      THE WITNESS:  I would say that there are a

4  lot of different components that go into sex, and

5  so chromosomes are considered one component.

6      Q.   (BY MR. WILSON) And you don't cite

7  anything for that in your report, do you?

8      MS. BORELLI:  Objection; vague, misstates

9  the document.

10      THE WITNESS:  I provide a lot of citations

11  in this particular declaration that are supportive

12  of my conclusions and what I opine on.

13      Q.   (BY MR. WILSON) But you don't cite

14  anything in support of this concept of sex assigned

15  at birth, do you?

16      MS. BORELLI:  Objection; asked and answered.

17      THE WITNESS:  The citations that I include

18  talk about sex assigned at birth, and it's a

19  concept that's discussed by all of these major

20  medical and psychological organizations.  It's a

21  concept that is well-known and well-understood

22  within these organizations and within our broader

23  field and how we understand how this works.

24      Q.   (BY MR. WILSON) I'd like you to take a

25  look at paragraph 34 of your declaration.

Page 46

1             It says:  For transgender people, social

2    transition can be an important aspect of treatment

3    to reduce the symptoms of gender dysphoria.  As

4    part of a social transition, the individual will

5    typically, among other things, use a name and

6    pronouns congruent with their gender identity,

7    dress and groom in a manner typically associated

8    with their gender identity and use sex-designated

9    facilities, such as restrooms, that align with

10   their gender identity.

11             To be clinically effective at

12   alleviating the distress associated with gender

13   dysphoria, the social transition must be respected

14   consistently across all aspects of a transgender

15   individual's life, for example, at home, in school,

16   and at work.

17             Did I read that correctly?

18        A.   That's correct.

19        Q.   And you don't cite any studies in

20   support of the statements in this paragraph, do

21   you?

22        MS. BORELLI:  Objection; vague, misstates

23   the document.

24        THE WITNESS:  I provide citations in the

25   paragraph below.  So this paragraph, 35, was kind

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1  of an overarching component that's related to the

2  science and understanding of social transition, and

3  then I include more context and information

4  throughout the document, but even specifically in

5  the paragraph below it.

6          Q.   (BY MR. WILSON) Would you agree that

7  sometimes gender dysphoria desists?

8          MS. BORELLI:  Objection; vague, calls for

9  speculation.

10          THE WITNESS:  In my clinical experience, I

11  have not -- I have not worked with an adolescent

12  who has identified as transgender and who has

13  detransitioned.

14          Q.   (BY MR. WILSON) Have you had in your

15  clinical experience anyone who identified as

16  transgender and their gender dysphoria desisted?

17          MS. BORELLI:  Objection; vague, compound.

18          THE WITNESS:  In my clinical experience,

19  when somebody -- so there is the experience of

20  someone who is trans who then starts -- let's say,

21  for example, starts to go through a social

22  transition and maybe goes through some type of

23  medical transition, like hormone therapy, their

24  gender dysphoria would decrease because that's

25  being treated.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1          So when the gender dysphoria is being

2    treated, it does decrease, and that's what we know

3    from the data.  So I have had that experience

4    happen.

5          Q.   (BY MR. WILSON) Let me rephrase or

6    clarify terms by what I mean by "desist" and maybe

7    you can tell me it's a different term.

8          A.   Okay.

9          Q.   Not that someone feels that -- not that

10   their gender dysphoria abates because they feel

11   that they are now congruent with what they believe

12   to be their gender identity, but rather, that they

13   feel -- that they no longer have those feelings

14   because they feel they're living consistent with

15   what you call their sex assigned at birth.

16          That's what I'm referring to

17   by "desist?"  Are we clear on the definition that

18   I'm using there?

19          MS. BORELLI:  Objection; vague.

20          THE WITNESS:  Yes.

21          Q.   (BY MR. WILSON) Okay.  And is that

22   something that you have seen in your clinical

23   experience?

24          A.   I have not --

25          MS. BORELLI:  Objection; vague, compound.

Page 49

Stephanie Budge, Ph.D. August 16, 2023

1      Q.   (BY MR. WILSON) I'm sorry?

2      A.   I have not had any patients who have

3   desisted or detransitioned.

4      Q.   And you are aware that desistance does

5   occur; is that correct?

6      MS. BORELLI:  Objection; vague, assumes

7   facts not in evidence.

8      THE WITNESS:  So in my experience of

9   understanding desistance within the scientific

10  literature, is that when it was first brought up in

11  the scientific literature, it was talked about

12  regarding children who did not actually identify as

13  transgender.  For many of them, they were children

14  who were gender-nonconforming but were classified

15  in some way, shape, or form as transgender in the

16  literature, even though a lot of these kids didn't

17  actually identify as transgender or that, you know,

18  the previous DSM diagnoses were used, and those

19  were a lot different from the ones that we use

20  right now.

21          And so some of the data that talk about

22  this desistance actually does not capture, for the

23  most part, transgender children and adolescents.

24  And so when I'm answering your question, I'm

25  thinking about that scientific literature in mind.

Page 50

1      Q.   (BY MR. WILSON) So in your clinical

2   practice, in what percentage of the cases where

3   someone comes to you with gender dysphoria who is a

4   minor, in what percentage of the cases do you

5   recommend social transition?

6           MS. BORELLI:   Objection; vague, compound.

7           THE WITNESS:   In my experience, social

8   transition isn't something that's recommended

9   necessarily.  It's something that where when a

10  transgender adolescent comes in to the office and

11  starts indicating, you know, "Hey, this isn't what

12  my identity is, this is where my distress is, this

13  is how all of my pieces can fit within this gender

14  dysphoria diagnosis," then based on -- you know, in

15  conversations with caregivers and with other

16  supportive people, we go through the process of

17  discussing with that transgender youth and the

18  family what the process will look like in terms of

19  ensuring that this young person's distress can be

20  decreased.

21           So I would say, you know, in my

22  experience, social transition is something that has

23  been very effective for all of the clients who have

24  come in and indicated that they're -- and who are

25  transgender, and so -- but that social transition

Page 51

1    will be specific to the family and to the specific

2    processes that are needed.

3         Q.   (BY MR. WILSON) Have you ever had a case

4    where someone came to you and they had gender

5    dysphoria and you said, "Social transition is not

6    appropriate here"?

7         MS. BORELLI:  Objection; vague.

8         THE WITNESS:  In my clinical experience, all

9    of the clients who I've worked with who are

10   transgender have gone through a social transition

11   process, or at least were needing to go through

12   that process, and sometimes they might have been

13   barred from that process if, for example, you know,

14   they didn't have supportive families or things like

15   that.

16        But maybe just to say that in the

17   instances where transgender adolescents or adults

18   who I've worked with have needed to social

19   transition but perhaps maybe couldn't have because

20   of social components that were barring them from

21   moving forward.

22        Q.   (BY MR. WILSON) Now, if we wanted to

23   study how a transgender identity adheres to an

24   adolescent, could we conduct a cohort study where

25   we followed a group of people over time to see if

Page 52

Stephanie Budge, Ph.D. August 16, 2023

1  their gender identity remained constant over time?

2       MS. BORELLI:  Objection; vague, compound,

3  assumes facts not in evidence.

4       THE WITNESS:  In my experience with the

5  scientific literature -- so there are a lot of

6  researchers who are researching transgender

7  adolescents longitudinally, and in fact, you know,

8  a lot of these kind of larger-scale clinicians that

9  work with transgender children and adolescents are

10  following a lot of these patients through the

11  process of transitioning.

12          And so we do have data regarding the

13  longitudinal nature and aspect of transgender

14  adolescents' identity processes and their mental

15  health and other outcomes that follow.

16       Q.   (BY MR. WILSON) Would it be possible to

17  study whether that transgender -- oh, sorry, let me

18  rephrase that.

19          Would it be possible to study whether

20  that gender dysphoria would desist over time in the

21  absence of any clinical intervention?

22       MS. BORELLI:  Objection; vague, compound,

23  assumes facts not in evidence.

24       THE WITNESS:  There are some studies that

25  have followed transgender adolescents regarding if

Page 53

Stephanie Budge, Ph.D. August 16, 2023

```
 1   they have been able to receive any kind of
 2   treatment or not, and in those studies, you know,
 3   studies follow youth who have both received
 4   treatment and some youth who did not or were not
 5   able to.  And so there are some study designs that
 6   would be able to determine what the process of a
 7   transgender adolescent's trajectory would be, like,
 8   mental health processes.
 9        Q.   (BY MR. WILSON) In fact, there have been
10   11 of those studies, haven't there?
11        MS. BORELLI:  Objection; vague, assumes
12   facts not in evidence.
13        THE WITNESS:  I can't tell you exactly how
14   many there are.  In fact, I think that there are
15   probably more than that.  So I'm not sure where
16   you're getting that number from.
17        Q.   (BY MR. WILSON) And in the cohort
18   studies that have followed youth with gender
19   dysphoria without intervention, in each one of
20   those studies, the majority of the patients have
21   seen their gender dysphoria desist; is that
22   correct?
23        MS. BORELLI:  Objection; vague, compound,
24   assumes facts not in evidence, lacks foundation.
25        THE WITNESS:  That is not my understanding
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1    of the data.

2           Q.   (BY MR. WILSON) There are studies that

3    follow those people with gender dysphoria and that

4    have reported that their gender dysphoria desists

5    over time without intervention; is that correct?

6           MS. BORELLI:  Objection; vague, compound,

7    assumes facts not in evidence.

8           THE WITNESS:  My understanding of those

9    studies is that the majority of transgender youth

10   who are followed who do not receive any kind of

11   social transition or medical intervention, that

12   their distress remains or increases over time.

13   That is -- that's what the data typically say.

14          Q.   (BY MR. WILSON) Are you aware of studies

15   like those that I've described where the gender

16   dysphoria desists over time for the majority of the

17   adolescent patients?

18          MS. BORELLI:  Objection; vague, compound,

19   assumes facts not in evidence.

20             Lincoln, if we're going to continue

21   going down this line of questioning, we would ask

22   that you present the study or studies that you're

23   referring to so that Dr. Budge can review them.

24   Lacks foundation.

25          MR. WILSON:  I might present them.  At this

Page 55

1   point it's just a question of whether Dr. Budge is

2   aware of those studies.

3        MS. BORELLI:  Again, object to the vagueness

4   of that question without any study having been

5   identified.

6        THE WITNESS:  I am not aware of any study

7   that has followed transgender adolescents who never

8   received any kind of social transition or medical

9   transition treatment whose gender identity was --

10  you know, the majority of whom were no longer

11  transgender anymore.  I'm not aware of any study

12  that says that.

13       Q.   (BY MR. WILSON) Are you aware of the

14  Lebovitz 1972 study on:  Feminine Behavior in Boys:

15  Aspects of its outcome?

16       MS. BORELLI:  Objection.  We'd restate the

17  request to present the study if you're going to ask

18  her questions about it.  Lacks foundation.

19       MR. WILSON:  I'm just asking if she's aware

20  of it.

21       THE WITNESS:  I am not aware of a

22  50-year-old study on what you described.

23       Q.   (BY MR. WILSON) Are you aware of the

24  study by Zuger in 1978, Effeminate behavior present

25  in boys from childhood:  Ten additional years of

Stephanie Budge, Ph.D. August 16, 2023

```
 1  follow-up?
 2        MS. BORELLI:  Same objections.
 3        THE WITNESS:  Is this Zucker, Z-u-c-k-e-r?
 4        Q.   (BY MR. WILSON) Z-u-g-e-r.
 5        A.   Okay.
 6             No.
 7        Q.   Are you aware of the Money study from
 8  1979, Homosexual Outcome of Discordant Gender
 9  Identity/Role in Childhood:  Longitudinal
10  Follow-Up?
11        MS. BORELLI:  Same objections.
12        THE WITNESS:  I'm aware of that study.
13        Q.   (BY MR. WILSON) It's not cited in your
14  report, though, is it?
15        A.   There's no way for any expert witness to
16  indicate hundreds of thousands of studies,
17  especially ones that are old and that actually
18  don't fit the questions that are at hand.
19        Q.   Are you aware that in the Money study,
20  out of nine patients with gender dysphoria, all
21  nine identified as gay at the conclusion of the
22  study, and not as trans?
23        MS. BORELLI:  Objection; assumes facts not
24  in evidence, lacks foundation.
25             Again, if you continue asking questions
```

Page 57

Stephanie Budge, Ph.D. August 16, 2023

1    about these articles, we would request you give her

2    an opportunity to review the articles.

3         MR. WILSON:  She said she was familiar with

4    this study, so I'm asking questions about it.

5    We'll see where it goes.

6         THE WITNESS:  I would need to see -- that's

7    exactly what I was about to say.  Sorry.  I would

8    need to see this one.

9         Q.   (BY MR. WILSON) Is it correct that the

10   Money study is not cited in your declaration?

11        A.   That's correct.

12        Q.   Would a study that showed that patients

13   who previously identified as trans ultimately all

14   identified as gay be relevant to the question of

15   desistance?

16        MS. BORELLI:  Objection; vague, assumes

17   facts not in evidence, lacks foundation.

18             We would request that you present a copy

19   of the study.

20        THE WITNESS:  These studies are very old,

21   and they don't actually talk about the concepts in

22   the way that we understand them right now.  And

23   even -- so these studies that I've mentioned that

24   talk about desistance, again, like I said, the way

25   that they categorized people in terms of identity

                                        Page 58

Stephanie Budge, Ph.D. August 16, 2023

1    is very different than how we understand it now.

2              And so the studies that you're citing

3    tend to have a very different way of talking about

4    gender and talking about these processes, just by

5    way of them being outdated.

6              Q.   (BY MR. WILSON) Are you aware of the

7    2021 study by Singh titled:  A Follow-Up Study of

8    Boys with Gender Identity Disorder, Frontiers in

9    Psychiatry?

10             MS. BORELLI:  Objection; vague.

11             We request that you present the study.

12             MR. WILSON:  I'm just asking if she's aware

13   of it first.

14             MS. BORELLI:  Same objections.

15             THE WITNESS:  I would need to see it to see

16   if it's one that I've read.

17             Q.   (BY MR. WILSON) You would not classify a

18   2021 study as an old study, would you?

19             MS. BORELLI:  Objection; assumes facts not

20   in evidence, lacks foundation.

21             THE WITNESS:  In general, no, I would not

22   call a 2021 study old.

23             Q.   (BY MR. WILSON) And would a study that

24   in following 139 patients in 2021 in which 122

25   patients identified as cis at the conclusion of the

Page 59

Stephanie Budge, Ph.D. August 16, 2023

1   study, would that be relevant to the question of

2   desistance of gender dysphoria?

3          MS. BORELLI:  Objection.

4             Lincoln, we're getting into substantive

5   questions about the article.  We have asked that

6   you mark the article and present the witness with

7   it.  If she's going to answer further questions

8   about this article, it needs to be marked an

9   exhibit.  She needs to be given an opportunity to

10  review it.

11         MR. WILSON:  I'm just asking if that would

12  be relevant to the outcome here.

13         MS. BORELLI:  Lincoln, that question builds

14  so many assumptions into it.  I just don't know how

15  she can accurately answer that.  She said she would

16  like to see the article.  We would ask that you

17  mark it and present it to the witness.

18         MR. WILSON:  Let me ask the question, and

19  we'll see if we want to discuss it further.

20         MS. BORELLI:  So just to be clear, you're

21  refusing to --

22         MR. WILSON:  I'm not refusing to present it.

23  Please don't interrupt me while I'm in the middle

24  of a sentence.

25         Q.   (BY MR. WILSON) I'm going to ask the

Page 60

1   question:  Would a 2021 study showing that the

2   majority of patients no longer identified as trans

3   at the conclusion be relevant to the question of

4   desistance?

5        MS. BORELLI:  Objection.

6             Lincoln, we've allowed a lot of leeway.

7   You've asked questions about awareness of articles.

8   You're now asking about the substance of the

9   article.  I've requested several times that you

10  present -- mark the study and present it to the

11  witness so that she can look at it and answer that

12  question with the information in front of her.

13            We would ask that you mark -- is there a

14  reason that you don't seem to want to mark it and

15  present it to the witness?

16       MR. WILSON:  I'm getting there --

17       MS. BORELLI:  It's a reasonable request.

18       MR. WILSON:  I'm getting there.  I'd like an

19  answer to the question of whether this would be

20  relevant.

21       MS. BORELLI:  Objection.  I just don't know

22  how she can answer that without seeing the study.

23       MR. WILSON:  I'm not appreciating these

24  speaking objections to the question I'm asking.

25       Q.   (BY MR. WILSON) So the question is:

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1    Would this be relevant?

2         MS. BORELLI:  Objection; calls for

3    speculation, hypothetical, lacks foundation,

4    assumes facts not in evidence.

5         THE WITNESS:  I would need to see the

6    article to be able to answer your question.

7         Q.   (BY MR. WILSON) Dr. Budge, you were

8    designated as -- you were designated as an expert

9    in the Bridge case in Oklahoma; is that correct?

10        A.   That's correct.

11        Q.   And Dr. Cantor served a rebuttal to your

12   report in that case, didn't he?

13        A.   That's correct.

14        Q.   Do you recall that he identified all

15   these studies in that report?

16        MS. BORELLI:  Objection; vague.

17        THE WITNESS:  I would need to see his

18   report.

19        Q.   (BY MR. WILSON) So I'm going to put a

20   pin in this for the moment and we might come back

21   to it.

22             Can we take a look at paragraph 39 of

23   your report -- or your declaration, and let me know

24   when you're there.

25        A.   Okay.

1          Q.   Paragraph 39 says:  Before gender
2     identity and gender dysphoria were well understood
3     by the medical and psychological communities, there
4     were attempts to use psychotherapy to try to change
5     the individual's gender identity to match their sex
6     assigned at birth.  This has been referred to as
7     "conversion" or "reparative therapy" in much of the
8     academic or clinical literature.  Such efforts were
9     found to be ineffective and harmful and are
10    therefore now considered unethical, and their use
11    on minors is now illegal in numerous states.
12          Did I read that correctly?
13          A.   That's correct.
14          Q.   This paragraph doesn't cite any support
15    for these assertions, does it?
16          MS. BORELLI:  Objection; vague.
17          THE WITNESS:  I do not include any citations
18    in this particular paragraph.
19          However, the -- a lot of the information
20    that I include throughout the declaration is
21    supportive of this, especially specific types of
22    citations, like the James, et al., study.
23          So there are a lot of studies that I
24    cite in this particular document that support this,
25    and this is also part of my clinical experience as

Page 63

Stephanie Budge, Ph.D. August 16, 2023

```
 1    well.
 2         Q.   (BY MR. WILSON) And when it says that
 3    "such efforts were found to be ineffective and
 4    harmful," it doesn't say who found them to be
 5    ineffective and harmful, does it?
 6         MS. BORELLI:  Objection; argumentative.
 7         THE WITNESS:  I didn't provide that
 8    information here.  The American Psychological
 9    Association, for example, has published a full
10    statement with guidelines and information about the
11    unethical nature of conversion or reparative
12    therapy, and many other organizations have followed
13    in suit.
14              But the American Psychological
15    Association is one of the primary sources I use in
16    terms of rigor to the data and in how that process
17    is assessed.
18         Q.   (BY MR. WILSON) And you mentioned that
19    these therapies are illegal in numerous states,
20    correct?
21         MS. BORELLI:  Objection; misstates the
22    document.
23         Q.   (BY MR. WILSON) The document says:
24    These therapies are illegal in numerous states.
25              Is that correct?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1       A.   It says:  Their use on minors is now

2    illegal in numerous states.

3       Q.   I'm sorry, that is correct.  I didn't

4    mean to miss the "on minors" clause.

5            So, Dr. Budge, you believe that in --

6    there are certain circumstances where surgical

7    therapies are appropriate for minors with gender

8    dysphoria; is that correct?

9       MS. BORELLI:  Objection; misstates

10   testimony, calls for speculation.

11      THE WITNESS:  In my clinical experience,

12   surgeries on minors are pretty rare and not usually

13   the typical course of treatment, and that if there

14   is a surgery that is performed on a minor that's

15   related to gender-affirming care, that that is a

16   very, very specific process that that particular

17   youth and the family must go through in terms of

18   providing consent and assent and being assessed

19   regarding the psychological process underlying the

20   medical necessity for that.

21      Q.   (BY MR. WILSON) You have had patients

22   where you believe that that was an appropriate

23   therapy; is that correct?

24      MS. BORELLI:  Objection; vague, compound,

25   assumes facts not in evidence.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1          THE WITNESS:  I have had a small number of

2     patients in which surgery was appropriate when they

3     were older minors.

4          Q.   (BY MR. WILSON) And that is now illegal

5     in numerous states as well; is that correct?

6          MS. BORELLI:  Objection; calls for

7     speculation and a legal conclusion.

8          THE WITNESS:  When you say "that," I -- so

9     it seems my understanding is that there are some

10    states that have put forward some bans for

11    gender-affirming care for transgender youth, that

12    some of those bans are in place and some of them

13    have been paused.  It depends on the state.

14         Q.   (BY MR. WILSON) So I'd like to take a

15    look at paragraphs 22 and 25 of your declaration.

16              First, 22.  We already talked about this

17    one.  Just take a quick look at it.  Can you

18    confirm that you're familiar with this paragraph

19    that we've discussed before?

20         A.   Yes.

21         Q.   Then paragraph 25 says that:  Gender

22    dysphoria, codified in the American Psychiatric

23    Association's 2022 Diagnostic and Statistical

24    Manual of Mental Disorders Fifth Edition Text

25    Revision (DSM-5-TR), is the psychiatric diagnosis

Page 66

1    for the distress associated with gender

2    incongruence.  Individuals who are diagnosed with

3    gender dysphoria can experience a number of

4    different symptoms.  When individuals with distress

5    related to gender incongruence do not obtain

6    competent and necessary treatment, serious and

7    debilitating psychological distress (for example,

8    suicidal ideation, substance abuse, depression,

9    anxiety, and self-harm) often occurs.

10              Did I read that correctly?

11         MS. BORELLI:  Objection.

12              Lincoln, I think you may have said

13   "substance abuse" instead of "substance use."

14         MR. WILSON:  I'm sorry.  If I did not read

15   it correctly, I'm glad you noted that.

16         Q.   (BY MR. WILSON) Apart from Tara's

17   eagle-eye read of the text there, is there anything

18   else I missed?

19         A.   No.

20         Q.   Okay.  So what I'm trying to understand

21   is paragraph 22 describes sex as relating primarily

22   to gender identity, that someone's sex is their

23   gender identity, it's the most important and

24   determinative factor; is that correct?

25         MS. BORELLI:  Objection; misstates

Page 67

Stephanie Budge, Ph.D. August 16, 2023

1    testimony.

2         THE WITNESS:  So what paragraph 22 says:

3    When there's a divergence between these

4    characteristics, gender identity is the most

5    important and determinative factor.

6         Q.   (BY MR. WILSON) Then paragraph 25

7    describes a condition and the treatments that you

8    maintain are necessary for that condition; is that

9    correct?

10        MS. BORELLI:  Objection; misstates

11   testimony, the document speaks for itself.

12        Q.   (BY MR. WILSON) You can answer.

13        A.   Paragraph 25 indicates the importance

14   of, you know, obtaining competent and necessary

15   treatment for people who have the incongruence

16   that's described in paragraph 22.

17        Q.   So what I'm trying to understand is:

18   Are you describing these therapies as treatments

19   for a condition that people have or as things that

20   are making them become what they are?

21        MS. BORELLI:  Objection; vague, misstates

22   the testimony, compound.

23        THE WITNESS:  So for the diagnosis of gender

24   dysphoria, the distress is related to the

25   incongruence.  So that's how we conceptualize and

Page 68

Stephanie Budge, Ph.D. August 16, 2023

1    understand gender dysphoria, that that incongruence

2    that somebody has, it is what causes the distress,

3    not the gender identity itself.

4          Q.   (BY MR. WILSON) So is that incongruence

5    a condition that needs to be treated?

6          MS. BORELLI:  Objection; vague.

7          THE WITNESS:  Gender dysphoria is a

8    diagnosis that can be treated with different

9    components, such as social transition and medical

10   transition procedures.

11         Q.   (BY MR. WILSON) Is it primarily an

12   identity or a condition?

13         MS. BORELLI:  Objection; misstates

14   testimony, vague, compound.

15         THE WITNESS:  Gender dysphoria is the

16   diagnosis and transgender is the identity.

17         Q.   (BY MR. WILSON) If we did a Venn diagram

18   of gender dysphoria and transgender identity, is it

19   the same circle, in your view?

20         MS. BORELLI:  Objection; vague.

21         Q.   (BY MR. WILSON) I know you're pretty

22   smart, so I think you know what I mean, but if you

23   don't know what I mean, let me know.

24         A.   Well, as an expert in this area, what I

25   can tell you is that the gender dysphoria is the

Page 69

1   actual diagnosis, and that in order to receive the

2   diagnosis, you do need to be transgender.

3              But the identity itself is not -- is not

4   the component that is what you're trying to say,

5   like, a condition.  The identity is not a

6   condition, right?  But the distress that's related

7   to the incongruence is the diagnosis.  That's how

8   we conceptualize it.

9        Q.   So is it true that the two things are

10  coextensive, that all transgender people have

11  gender dysphoria and all people with gender

12  dysphoria are transgender?

13       MS. BORELLI:  Objection; vague, compound,

14  asked and answered.

15       THE WITNESS:  In order to receive a

16  diagnosis of gender dysphoria, one must be

17  transgender.

18       Q.   (BY MR. WILSON) And if one is

19  transgender, one should receive a diagnosis of

20  gender dysphoria.

21              Is that also correct?

22       MS. BORELLI:  Objection; vague, assumes

23  facts not in evidence.

24       THE WITNESS:  The majority of people who are

25  transgender, at least in my clinical practice, have

Page 70

Stephanie Budge, Ph.D. August 16, 2023

1  been diagnosed with gender dysphoria.  It's

2  possible that there -- it could be a -- you know, a

3  minor -- small group of people who are transgender

4  who do not meet criteria for gender dysphoria.

5       MR. WILSON:  That's a helpful clarification.

6            I think we're probably at a good place

7  for another break.

8            And, Tara, just for -- well, we can go

9  off the record, if that's all right with you.

10      MS. BORELLI:  Sure.

11      THE VIDEOGRAPHER:  Okay.  So the time is

12  9:46 a.m. Mountain Time, and we are off the record.

13     (A recess was taken from 9:46 a.m. to 9:58 a.m.)

14      THE VIDEOGRAPHER:  All right.  So we are

15  recording.  The time is 9:58 a.m. Mountain Time,

16  and we are back on the record.

17      Q.   (BY MR. WILSON) Dr. Budge, would it be

18  fair to say that you believe in the importance of

19  gender-affirming care?

20      MS. BORELLI:  Objection; vague.

21      THE WITNESS:  It would be fair to say that

22  the evidence indicates that gender-affirming care

23  is the component that we attribute to improved

24  mental health and identity congruence for

25  transgender people.

Page 71

Stephanie Budge, Ph.D. August 16, 2023

1    Q.   (BY MR. WILSON) And because you believe

2    in doing the things that improve those things, you

3    believe in the importance of gender-affirming care;

4    is that correct?

5         MS. BORELLI:  Objection; vague, misstates

6    testimony.

7         THE WITNESS:  I mean, I would say, when I

8    read the evidence and the evidence that I have seen

9    that's done in the most rigorous way and the way

10   that seems -- that focuses on all of the components

11   that are supposed to be included in scientific

12   study, that my read of the data for

13   gender-affirming care is that it is the most

14   effective treatment.

15        Q.   (BY MR. WILSON) To clarify our terms,

16   when we say "gender-affirming care," we mean that

17   you would do therapies that would affirm someone's

18   gender identity, even if it is incongruent with

19   their biological sex; is that correct?

20        MS. BORELLI:  Objection; vague, compound,

21   misstates testimony.

22        THE WITNESS:  If there is a transgender

23   person in my office who comes to see me clinically,

24   I do affirm that transgender identity, that that's

25   something that -- you know, if they indicate that

Page 72

1   they are trans, that's the process that we go

2   through in terms of using care and techniques that

3   are supportive of that identity.

4        Q.   (BY MR. WILSON) You would do that for

5   minors as well as for adults; is that correct?

6        MS. BORELLI:  Objection; vague.

7        THE WITNESS:  Yes.  If a transgender

8   adolescent comes into my office and indicates that

9   they're transgender, the -- I use similar processes

10  regarding psychotherapy techniques and also

11  assessment processes for gender-affirming care.

12       MR. WILSON:  So I just sent around, via

13  e-mail, the study that you were dying to see.  It's

14  Exhibit 2.  So just let me know when you've got it

15  in front of you.

16            (Deposition Exhibit No. 2 was marked.)

17       MS. BORELLI:  Thank you, Lincoln.

18       THE WITNESS:  I have it in front of me.

19       MS. BORELLI:  Actually, can I ask us just to

20  pause?  I unfortunately have not received it.

21       MR. WILSON:  Sorry if our Internet is slow

22  in Idaho.

23       MS. BORELLI:  I suspect it's Atlanta

24  Internet.

25                All right.  Thank you.  I just received

Page 73

1    it.

2          MR. WILSON:  Yeah.

3          Q.   (BY MR. WILSON) So Kenneth Zucker is a

4    name you're familiar with in your research

5    community; is that correct, Dr. Budge?

6          A.   That's correct.

7          MS. BORELLI:  Objection; vague.

8          Q.   (BY MR. WILSON) Are you also familiar

9    with Dr. Susan Bradley and Dr. Devita Singh?

10         MS. BORELLI:  Compound.

11         THE WITNESS:  I have seen both of their

12   names.

13         Q.   (BY MR. WILSON) So this is a study that

14   -- it says in the first sentence of the abstract

15   that it:  Reports follow-up data on the largest

16   sample to date of boys clinic-referred for gender

17   dysphoria (N equals 139) with regard to gender

18   identity and sexual orientation.

19             Did I read that correctly?

20         A.   Did you include the N in there?

21         Q.   I think I did.

22         A.   Okay.

23         MS. BORELLI:  Lincoln, I just want to pause

24   for a moment.  One of our primary objections was

25   that there wasn't an ability to review it, but that

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
1   also means meaningful time to review it.
2            Can we pause so that Dr. Budge can
3   familiarize herself with the study before we
4   continue with questions?
5        MR. WILSON:  Why don't we say, if it's all
6   right with you, let's take a break.  So I don't
7   want this time to count against us, especially
8   since there's a dispute about how time will count.
9   So let's go off the record.  She can take -- you
10  can take whatever time you need, and then we'll go
11  back on.  Is that okay?
12       MS. BORELLI:  That's fine.  Just while we're
13  on the record, before we go off, I do want to make
14  sure that we've memorialized our positions about
15  the dispute that you refer to.  Let's make sure
16  that we're clear.  I understand that to be
17  Plaintiff's position that the federal rules allow a
18  total of seven hours of deposition time, and our
19  position is also of course that this deposition
20  time would count against that total and that any
21  remaining time would be confined to the total of
22  seven hours minus the time spent today.  That's
23  Plaintiff's position.
24            Is that the dispute that you're
25  referring to?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1          MR. WILSON:  That's the dispute we're

2     referring to, and I'm going to state our position

3     super fast because I don't want to waste any time.

4               But our position is that if the witness

5     serves another report at a later stage in the case,

6     that we would be entitled to seven hours on that

7     report as well.  We're not going to use our full

8     seven hours today, though, in an abundance of

9     caution in not knowing how this issue is going to

10    sort out.

11              With that, can we go off the record?

12         MS. BORELLI:  I think we've preserved our

13    positions.  Let's go off the record.

14         THE VIDEOGRAPHER:  Okay.  So the time is

15    10:05 a.m. Mountain Time, and we are off the

16    record.

17       (A recess was taken from 10:05 a.m. to 10:11 a.m.)

18         THE VIDEOGRAPHER:  Okay.  So we are

19    recording.  The time is 10:11 a.m. Mountain Time,

20    and we are back on the record.

21         Q.   (BY MR. WILSON) So, Dr. Budge, as the

22    DSM criteria for gender dysphoria have changed over

23    time, have the criteria become more broad or more

24    strict for a diagnosis?

25         MS. BORELLI:  Objection; vague, compound.

Page 76

Stephanie Budge, Ph.D. August 16, 2023

1      THE WITNESS:  The criteria are more specific

2   about gender identity.

3      Q.  (BY MR. WILSON) And diagnoses of gender

4   dysphoria have increased over time on the whole; is

5   that correct?

6      MS. BORELLI:  Objection; assumes facts not

7   in evidence, vague.

8      THE WITNESS:  We have -- so the diagnosis of

9   gender dysphoria was only introduced in the DSM-5

10   in 2013, so we only have data regarding that

11   specific diagnosis from 2013 until now.

12      Q.  (BY MR. WILSON) And the corresponding

13   terms of gender identity disorder in prior DSMs,

14   there are more diagnoses with gender dysphoria now

15   than there were for that prior diagnosis; is that

16   correct?

17      MS. BORELLI:  Objection; vague, compound.

18      THE WITNESS:  Well, they are different

19   diagnoses.

20      Q.  (BY MR. WILSON) Is it your position that

21   there's no correspondence between a diagnosis of

22   gender identity disorder in the DSM-3 and the

23   gender dysphoria in the DSM-5?

24      MS. BORELLI:  Objection; lacks foundation.

25           You can answer.

```
 1          THE WITNESS:  The diagnosis has become more
 2    specific.
 3          Q.  (BY MR. WILSON) Is there correspondence,
 4    though, between those diagnoses?
 5          MS. BORELLI:  Objection; vague, misstates
 6    testimony.
 7          THE WITNESS:  Well, I don't know if
 8    "correspondence" is the word that I would use.
 9              I would say that gender dysphoria has
10    built upon or that we understand more about gender
11    dysphoria because of what we know from previous
12    diagnoses, specifically becoming more -- more
13    specific about what the actual diagnosis is, like
14    making sure that we're actually including
15    transgender people in the diagnosis.
16          Q.  (BY MR. WILSON) If we did that Venn
17    diagram thing again, the circle that's the gender
18    dysphoria circle is a bigger circle than the gender
19    identity disorder circle; is that correct?
20          MS. BORELLI:  Objection; vague.
21          Q.  (BY MR. WILSON) Again, I think you're
22    smart and you know what I mean, but if you don't,
23    then I can try to be less dumb.
24          A.  I believe I am smart related to this; I
25    don't understand what your question is.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1      Q.   Okay.  So is the subset of -- are those

2  who are diagnosed with gender dysphoria under

3  DSM-5, is that a larger set of people than those

4  who were diagnosed with gender identity disorder

5  under DSM-3?

6      MS. BORELLI:  Objection; vague, compound.

7      THE WITNESS:  The data say, right now, that

8  there has been an increase in diagnoses related to

9  gender dysphoria, and our understanding of that is

10 because there is more visibility regarding

11 transgender identity, and not that there's a change

12 in how many people are actually transgender, that

13 the change is actually in how -- in what type of

14 visibility and the kinds of access to medical care

15 that's available now.

16      Q.   (BY MR. WILSON) So would you expect that

17 if the DSM-5 criteria had been applied back in the

18 1980s and 1990s, that we would see more diagnoses

19 with gender dysphoria than we did of gender

20 identity disorder at that time?

21      MS. BORELLI:  Objection; vague, compound,

22 calls for speculation.

23      THE WITNESS:  I would predict -- so right

24 now, we're in a very different time period than it

25 was in the '80s and '90s, so it's impossible to

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1    actually answer your question.
 2              I think if all things were exactly the
 3    same as they are right now, I would predict that
 4    would see the same thing in the '80s and '90s.
 5         Q.   (BY MR. WILSON) What do you mean by "the
 6    same thing"?
 7         A.   Like, the same level of diagnoses, same
 8    number.  But that would have to include all the
 9    same social processes, visibility, greater
10    understanding.
11         Q.   The Singh study that we are talking
12    about, it states in the abstract, midway down the
13    page:  Of the 139 participants, 17, that's 12.2
14    percent, were classified as persisters, and the
15    remaining 122, 87.8 percent, were classified as
16    desisters.
17              Did I read that correctly?
18         A.   I didn't follow where you were in the
19    end.  What part are you at?  What does the
20    sentence --
21         Q.   Well, it's a little bit above halfway
22    through the first paragraph.
23         A.   Okay.  Does it start with "Of"?
24         Q.   Yes.
25              Of the 139 participants, 17, 12.2
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1   percent, were classified as persisters, and the
2   remaining 122, 87.8 percent, were classified as
3   desisters.
4           Did I read that correctly?
5       A.   You read that correctly.
6       Q.   And under your approach, all of these
7   people, if they were diagnosable with gender
8   dysphoria from the outset, should have been treated
9   with gender-affirming care; is that correct?
10      MS. BORELLI:  Objection; misstates
11  testimony, vague.
12      THE WITNESS:  Can you say that question
13  again, please?
14      Q.   (BY MR. WILSON) Under your approach, all
15  of these participants, if they were diagnosed with
16  gender dysphoria, should have been treated with
17  gender-affirming care; is that correct?
18      MS. BORELLI:  Objection; vague, misstates
19  testimony, lacks foundation.
20      THE WITNESS:  I can't believe that this
21  study got published.  When I was reading through
22  the study, the participants are from 1975 to 2006,
23  and they've classified these -- the kids are as
24  boys.  And so the thing is is that none of these
25  kids that I could even see potentially -- they

Page 81

1    couldn't even be classified as transgender from my

2    read of how they talk about these children in this

3    article.

4              And so it's impossible to talk about

5    where we are right now with our understanding of

6    gender dysphoria and transgender identity and to

7    compare that with what was happening in this

8    particular article.

9         Q.   (BY MR. WILSON) I'll just repeat my

10   question.

11             Under your approach, these 139

12   participants, if they were diagnosable with gender

13   dysphoria, they should have all been treated with

14   gender-affirming care; is that correct?

15        MS. BORELLI:  Objection; vague, lacks

16   foundation, misstates testimony, asked and

17   answered.

18        THE WITNESS:  It's impossible for me to

19   answer the question because the kids who were

20   included in the study, from my read, don't --

21   aren't actually transgender.  None of them were

22   transgender from the way that they're described in

23   the article.

24             So if a kid who is not transgender comes

25   into my office and indicates that they are not

Page 82

Stephanie Budge, Ph.D. August 16, 2023

1    transgender, then I wouldn't move forward with

2    this -- with gender-affirming care.  It's really

3    the gender-affirming care and the gender-affirming

4    treatment is specific to transgender adolescents

5    and transgender adults.

6         Q.   (BY MR. WILSON) Are you saying that

7    because they ultimately did not have a gender

8    identity that was incongruent with their biological

9    sex, that you were determining that they are not

10   transgender?

11        A.   Oh, they weren't classified --

12        MS. BORELLI:  Dr. Budge, let me just make

13   sure I get my objections in.

14             Objection; vague, misstates testimony,

15   lacks foundation, compound.

16             You can answer.

17        THE WITNESS:  This article never says that

18   any of these children were transgender at the

19   start.

20        Q.   (BY MR. WILSON) And what's your basis

21   for concluding that they were not?

22        A.   The article does not state that any of

23   the children were transgender when they began to be

24   seen at the clinic.

25        Q.   It says they were all referred for

Page 83

1    gender identity disorder; is that correct?

2        MS. BORELLI:  Objection; vague, misstates

3    the document.

4        THE WITNESS:  Can you point me to the

5    referral piece?

6        Q.   (BY MR. WILSON) The first sentence:

7    This study reports follow-up data on the largest

8    sample to date of boys clinic-referred for gender

9    dysphoria.

10       A.   Sure.  They -- yeah, right.  This

11   article, when you talk about it, these kids were

12   assessed at a clinic, but they were never

13   identified as transgender.

14       Q.   Is today the first day you've read this

15   study?

16       A.   I can't recall if this is the first time

17   that I've read this study.

18       Q.   Are you aware that it was cited in

19   Dr. Cantor's rebuttal to your report in Oklahoma?

20       MS. BORELLI:  Objection; lacks foundation.

21       THE WITNESS:  I would need to see the

22   report.

23       Q.   (BY MR. WILSON) And this report is not

24   cited in your expert report, is it?

25       A.   Which report are you referring to?

Stephanie Budge, Ph.D. August 16, 2023

```
 1         Q.    Sorry.

 2               This study, the Singh study, is not

 3    cited in your declaration, is it?

 4         A.    That's correct.  It's not cited in my

 5    declaration.

 6         Q.    And you were not aware of it until

 7    today; is that correct?

 8         MS. BORELLI:  Objection; lacks foundation,

 9    misstates testimony.

10         THE WITNESS:  I don't recall when or if I've

11    seen this previously, but it's possible that I have

12    seen it, especially if it was cited in a previous

13    declaration that I've read.

14         Q.    (BY MR. WILSON) You say that it should

15    not have been published; is that correct?

16         A.    That's correct.

17         Q.    And you don't believe that it's

18    reliable; is that correct?

19         MS. BORELLI:  Objection; vague.

20         THE WITNESS:  My critique of this article is

21    that they don't follow transgender adolescents or

22    children.

23               And also my other critique is that this

24    is old.  It's old data that don't follow the

25    procedures and understandings that we now have
```

Page 85

Stephanie Budge, Ph.D. August 16, 2023

1   regarding the best practices for transgender

2   adolescents, the -- yeah.

3        Q.   (BY MR. WILSON) Now, do you think that a

4   researcher who disagrees with other conclusions in

5   the literature needs to give an account of those

6   conclusions when expressing an opinion?

7        MS. BORELLI:   Objection; vague, calls for

8   speculation.

9        THE WITNESS:   Can you repeat the question,

10  please?

11       Q.   (BY MR. WILSON) When a researcher is

12  expressing an opinion on an issue, they need to

13  give an account for contrary findings in the

14  literature; isn't that correct?

15       MS. BORELLI:   Same objections.

16       THE WITNESS:   When researchers are providing

17  information about the research questions and the

18  hypotheses, it's most typical that we talk about

19  the theories, the theory testing that's happening,

20  and that we also provide literature that indicates

21  supportive pieces.

22            Typically, in the discussion of an

23  article when we're publishing our results, we can

24  provide and do provide articles that either

25  contradict or don't agree with the findings that we

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

1  have in order to talk about the scope of the data.

2  So that's a very typical practice.

3          Q.   (BY MR. WILSON) If I told you that

4  Dr. Cantor's report in the Bridge matter rebutting

5  you was served on November 16th, 2022, would you

6  have any reason to disagree with that?

7          MS. BORELLI:  Objection; lacks foundation.

8          THE WITNESS:  I would need to see the date.

9          Q.   (BY MR. WILSON) But you have no reason

10  to think that it's any date other than that, do

11  you?

12          MS. BORELLI:  Same objection.

13          THE WITNESS:  No.

14          Q.   (BY MR. WILSON) And your report was

15  dated July 6th, 2023; is that correct -- or filed

16  at that time?

17          A.   There were two reports for the Bridge

18  case.

19          Q.   I'm sorry.

20               Your declaration in this case was --

21  actually, we'll go down to the bottom here and get

22  the signature date.

23               It was executed the 12th of May 2023; is

24  that correct?

25          A.   For this case?

Stephanie Budge, Ph.D. August 16, 2023

1      Q.    Yes.

2      A.    Yes.

3      Q.    And you didn't cite the Singh study, did

4  you?

5      MS. BORELLI:  Objection; argumentative,

6  asked and answered.

7      THE WITNESS:  I did not cite the Singh

8  study.

9      Q.    (BY MR. WILSON) In fact, Dr. Cantor's

10 report identified 11 cohort studies regarding

11 persistence of gender dysphoria in adolescents, and

12 you didn't cite any of them in your declaration in

13 this case, did you?

14     MS. BORELLI:  Objection; assumes facts not

15 in evidence, lacks foundation.

16     THE WITNESS:  I would need to see the

17 citations that he included to answer that question.

18     Q.    (BY MR. WILSON) So the law that's at

19 issue in this case, Senate Bill 1100, it provides

20 for an accommodation to individuals, whether they

21 have gender dysphoria or otherwise, that would

22 allow them to use a single-user restroom if they're

23 not comfortable using the restroom that correlates

24 with their biological sex.

25          Is that your understanding?

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1        MS. BORELLI:  Objection; compound, vague.

2        THE WITNESS:  That's my understanding of one

3    component of the bill.

4        Q.   (BY MR. WILSON) And is it your opinion

5    that that accommodation is not adequate?

6        MS. BORELLI:  Objection; vague.

7        THE WITNESS:  It is my opinion that that is

8    not an appropriate -- it's not even an

9    accommodation.

10            In this instance, it's denying access to

11    a facility that relates to someone's gender

12    identity that's different from their sex assigned

13    at birth.

14        Q.   (BY MR. WILSON) Now, if we wanted to

15    study how that affects people with gender

16    dysphoria, then we could do a study that compared

17    the results for those who had access to those

18    single-user facilities and those who did not and

19    see if there was a statistically significant

20    difference; is that right?

21        MS. BORELLI:  Objection; vague, compound,

22    calls for speculation.

23        THE WITNESS:  When I had mentioned before

24    that you're using controlled studies for

25    treatments, this is not the instance in which you

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
1    would use a control group.
2              We have a lot of data that indicate that
3    it is harmful for transgender students to be forced
4    to use a bathroom that does not align with their
5    gender identity, and that's -- the data are robust
6    and there are many studies that have indicated that
7    that's the case.
8         Q.   (BY MR. WILSON) So is there anything
9    that would be improper, though, about that type of
10   a study, about single-user restrooms, that I've
11   described?
12        MS. BORELLI:   Objection; vague, calls for
13   speculation.
14        THE WITNESS:   From a research ethics
15   perspective, I don't -- I can't imagine that an
16   institutional review board would approve that
17   because we know that it's harmful to have -- or
18   force a transgender youth to use a bathroom that
19   isn't in alignment with their identity.
20             We also have a lot of data regarding
21   that youth -- that these bathrooms are often not
22   easily available.  They're often far away from
23   their classrooms, they have to hold their urine, or
24   it outs them to be able to have to use a bathroom
25   that they're made to use because they are trans.
```

Page 90

1           So there are a lot of things that we

2   know in the data why that would be a harmful

3   process, and institutional review boards, when they

4   review data, they look at the ethics surrounding

5   the design.  And so this -- that would be a

6   component that institutional review boards would

7   consider as part of the research design.

8           Q.   (BY MR. WILSON) So if you take a look at

9   paragraph 52 of your report.

10          A.   Hold on just a second.

11          Q.   Let me know when you're there.

12          A.   Okay.

13          Q.   So if you go after the paragraph with

14  all the numbers, it says:  In addition, when -- I'm

15  sorry, the sentence with all the numbers.

16          A.   Okay.

17          Q.   It says:  In addition, when

18  accommodations are offered to transgender

19  individuals that require them to use a separate

20  restroom that is not usually designated for their

21  group (e.g., sending a high school student to a

22  faculty or nurse's restroom) or when a transgender

23  person, unlike others, is told that they, but not

24  their peers, must use a single-user restroom, that

25  individual, likewise, is being told not only that

Page 91

Stephanie Budge, Ph.D. August 16, 2023

1    their gender identity is invalid, but that they are

2    something "other" and must be separated from all

3    their peers because of who they are.

4              Numerous research studies have confirmed

5    the negative psychological impact of being

6    invalidated and "othered" in these ways.

7              Then there's a few citations.

8              Did I read that correctly?

9        A.   Yes.

10       Q.   And are these the citations that you

11   were referring to when you said there was robust

12   data on this question?

13       MS. BORELLI:  Objection; misstates the

14   document.

15       THE WITNESS:  These studies are all

16   methodologically sound and indicate the harm

17   regarding being required to use a bathroom that

18   doesn't match your gender identity.

19       Q.   (BY MR. WILSON) How many of these

20   studies specifically addressed single-user

21   restrooms?

22       MS. BORELLI:  Objection; vague.

23       THE WITNESS:  I would have to read through

24   them.  My recollection is that at least two of them

25   discuss the concept of single-user restrooms, but I

Page 92

1  would have to go back to those studies to look

2  specifically at what they say.

3      MR. WILSON:  I'm sending another document

4  here.  I've just sent what's being marked as

5  Exhibit 3.

6          (Deposition Exhibit No. 3 was marked.)

7      Q.   (BY MR. WILSON) This is the Price-Feeney

8  study, the first study cited there.

9          Let me know when you received it.

10     A.   I received it.

11     MS. BORELLI:  It's my Atlanta Internet.

12 Unfortunately, it hasn't come through.  It will be

13 just a minute.

14     MR. WILSON:  Let me know when you've got it,

15 Tara.

16     MS. BORELLI:  Also, so as not to slow you

17 down, I don't know if you're able to upload to the

18 chat as well.  That way I would be able to access

19 it directly.  But I'm also happy to do e-mail to

20 keep things simple.  I'm just recognizing it seems

21 to have a delay on my end.

22     MR. WILSON:  I think we're okay, but I

23 appreciate you being sensitive to my time.

24     Q.   (BY MR. WILSON) Now, a single-user

25 bathroom is gender-neutral; is that correct?

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1          MS. BORELLI:  Objection; vague.

2          THE WITNESS:  That's a term that we

3    sometimes use for them.  It's usually just a

4    single-stall bathroom that anybody can use.

5          MR. WILSON:  Tara, are you still waiting for

6    the article on your end?

7          MS. BORELLI:  Unfortunately.

8          MR. WILSON:  Now you're forcing me to

9    actually know how to use Zoom and that's never a

10   good idea.  I'll try again here.

11              (Clarification by the court reporter.)

12         MR. WILSON:  That's because Veritext wants

13   us to use Exhibit Share, right?

14              (Clarification by the court reporter.)

15         MR. WILSON:  Okay.  Yeah.  Well, the State

16   of Idaho is really cheap and we don't do that.

17         MS. BORELLI:  Has anybody else gotten it?

18   Could anyone re-forward it to me?  Or we could go

19   off the record if you prefer, Lincoln.

20         MR. WILSON:  Yeah.  Why don't we just go off

21   the record for a second.

22         MS. BORELLI:  Okay.  Thanks.

23         THE VIDEOGRAPHER:  Okay.  So the time is

24   10:35 a.m. Mountain Time, and we are off the

25   record.

Stephanie Budge, Ph.D. August 16, 2023

```
1        (A recess was taken from 10:35 a.m. to 10:36 a.m.)
2        THE VIDEOGRAPHER:  Okay.  So we are
3   recording.  The time is 10:36 a.m. Mountain Time,
4   and we are back on the record.
5        Q.   (BY MR. WILSON) Dr. Budge, if you'd take
6   a look at the second page of this PDF marked 1143
7   at the top, this is the Price-Feeney article cited
8   in your declaration.
9             Do you see the first full paragraph on
10  the left-hand column on that page?
11       A.   Yes.
12       Q.   Okay.  And if you look at the fourth
13  sentence down, it says:  Specifically, providing
14  gender-neutral bathrooms or allowing youths to use
15  the bathroom that corresponds to their gender
16  identity can be viewed as part of gender-affirming
17  support and care.
18            Did I read that correctly?
19       A.   Yes.
20       Q.   Do you disagree with that statement?
21       MS. BORELLI:  Objection; vague, misstates
22  the document.
23       THE WITNESS:  For that statement, that
24  applies -- my interpretation of that is that it
25  applies to youth who desire to use a gender-neutral
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1    bathroom, not to youth who are being required to
 2    use a bathroom that doesn't align with their
 3    gender.
 4          Q.   (BY MR. WILSON) Right.
 5               So do you disagree that it can be viewed
 6    as gender-affirming care to provide a
 7    gender-neutral bathroom?
 8          MS. BORELLI:  Objection; vague, misstates
 9    the document.
10          THE WITNESS:  Yeah.  My -- so in my field
11    and the way that we talk about this, it is
12    considered affirming care for a transgender youth
13    where that is something that they desire and that
14    they want, but not if they're being restricted from
15    using the bathrooms that align with their gender
16    identity.
17          Q.   (BY MR. WILSON) So this study, you
18    cited, correct?
19               And you said that it was so clear that
20    gender-neutral bathrooms were not an adequate
21    accommodation that we couldn't even get a review
22    board to approve a study about them.
23               But this study says that they are
24    properly viewed as gender-affirming care; is that
25    correct?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

1        MS. BORELLI:  Objection; vague compound,

2   misstates testimony.

3        THE WITNESS:  What I said was that I can't

4   imagine that an institutional review board would

5   approve a study regarding youth who were told that

6   they are banned from using a bathroom that aligns

7   with their gender identity and that they then had

8   to use a single-stall bathroom.

9            That's different than youth who elect to

10   use a gender-neutral bathroom.

11        Q.   (BY MR. WILSON) We could also do an

12   observational study where we had data on people who

13   had access to a gender-neutral bathroom and data on

14   those who had only sex-separated bathrooms and

15   compare the two; is that correct?

16        MS. BORELLI:  Objection; vague, compound,

17   assumes facts not in evidence.

18        THE WITNESS:  There are a lot of things that

19   are included in this.  I would say if youth are

20   being told that they are banned from using a

21   bathroom that aligns with their gender identity as

22   part of this process, that would be an unethical

23   component related to a research process.

24            So it's impossible to actually answer

25   the question given the context that's at hand.

Page 97

```
1          Q.   (BY MR. WILSON) So I'm referring to sort
2     of a retrospective study on what's already
3     happened, because there are places that only allow
4     for sex-separated restrooms; is that correct?
5          MS. BORELLI:  Objection; vague.
6          THE WITNESS:  Is the question that there are
7     places that only allow gender-neutral bathrooms?
8          Q.   (BY MR. WILSON) No.  Let me try to break
9     it down.
10          There are some places in America that
11    only allow sex-separated restrooms and do not allow
12    those with gender dysphoria to use a bathroom
13    different than their biological sex; is that
14    correct?
15          MS. BORELLI:  Objection; vague.
16          THE WITNESS:  They don't allow people to
17    use...
18          I mean, I would imagine that that would
19    be an instance.  I think that you're saying that in
20    some places in the United States, that there are
21    places that there are only sex-segregated bathrooms
22    where trans people aren't allowed to use the
23    bathroom that aligns with their gender identity.
24          Is that what you're asking?
25          Q.   (BY MR. WILSON) Yes.
```

Page 98

Stephanie Budge, Ph.D. August 16, 2023

1        A.    I mean, that's possible.

2        Q.    I think I'm okay on this.

3              As you sit here today, you don't know

4    whether any of the other articles cited in your

5    report specifically studied gender-neutral or

6    single-sex restrooms; is that correct?

7        A.    Well, I would need to see them, but

8    this --

9        MS. BORELLI:   Let me just interpose on

10   objection.

11             Objection; misstates her testimony and

12   the document.

13             You can answer.

14       THE WITNESS:   I would need to see them, but

15   this Price-Feeney article does -- is inclusive of

16   transgender youth who were required to use a

17   single-stall bathroom in place of, you know, a

18   sex-designated bathroom that aligned with their

19   gender identity, given -- the research question

20   that was at hand regarding bathroom discrimination

21   was inclusive of this scenario that's described in

22   the bill.

23       Q.    (BY MR. WILSON) I'm going to have you

24   take a look at paragraph 30 of your report.

25             Let me know when you're there.

Page 99

1          A.    Okay.

2          Q.    So it's referring to the WPATH standards

3     of care, and it says in the last sentence of the

4     paragraph:  These standards are developed by the

5     foremost experts in the field of transgender health

6     based on systematic review of the evidence-based

7     research on transgender health.

8               Is that correct?

9          A.    That's correct.

10         Q.    Did you conduct your own systematic

11    review in this case to determine what the

12    appropriate standards of care are for individuals

13    with gender dysphoria?

14         MS. BORELLI:  Objection; vague.

15         THE WITNESS:  I've been an expert in this

16    field for many years, so I've been able to conduct

17    a host of systematic reviews regarding the field of

18    evidence for transgender care, and so that is

19    something that is a part of my expertise.

20         Q.    (BY MR. WILSON) Are any of those

21    articles published?

22         MS. BORELLI:  Objection; misstates the

23    testimony, vague.

24         Q.    (BY MR. WILSON) Let me rephrase.

25               Are any of those systematic reviews that

Page 100

1  you've conducted published?

2      MS. BORELLI:  Same objection.

3      THE WITNESS:  Yes.  I published a systematic

4  review with Dr. Elliott Tebbe in 2022.

5      Q.  (BY MR. WILSON) In paragraph 31, it

6  says:  Every major medical and mental health

7  organization within the United States that has

8  taken a position on gender-affirming care -- and

9  then it lists several examples -- agrees with WPATH

10  and the Endocrine Society that, when clinically

11  indicated, puberty-delaying medication and

12  gender-affirming hormones are appropriate and

13  medically necessary treatments for adolescents.

14          Did I read that correctly?

15      A.  Yes.

16      MS. BORELLI:  Objection; document speaks for

17  itself.

18      THE WITNESS:  Did you hear my response?

19          I'm sorry, I said yes.

20      MR. WILSON:  I believe -- yeah, you said

21  yes.  Thank you.

22          Hold on just a second here.  I gotta

23  check something.

24          Now, I'm going to send another article

25  around here.  This is going to be Exhibit 4.  If

Stephanie Budge, Ph.D. August 16, 2023

1    you let me know when you got it.  And, Tara, you as

2    well.

3                (Deposition Exhibit No. 4 was marked.)

4          MS. BORELLI:  Will do.

5          THE WITNESS:  I've received it.

6          MR. WILSON:  Tara, you got it yet?

7          MS. BORELLI:  It looks like I'm going to

8    need another minute.  Thank you for bearing with.

9                I've received it.  Thank you.

10         Q.   (BY MR. WILSON) Dr. Budge, this is an

11   article in the New York Times dated August 3rd,

12   2023, by Azeen Ghorayshi; is that correct -- or

13   Ghorayshi.  I'm sorry.

14         A.   That's correct.

15         Q.   It refers to a recent decision by the

16   American Academy of Pediatrics; is that correct?

17         A.   That's correct.

18         Q.   Are you familiar with --

19         MS. BORELLI:  Sorry, Lincoln, can I just

20   take a moment?

21               Dr. Budge, have you had a chance to

22   review the document?  I just want to make sure

23   you've had a chance to look at it.  I don't know if

24   you've seen it previously.

25         THE WITNESS:  I have seen it previously, but

Page 102

Stephanie Budge, Ph.D. August 16, 2023

```
 1    I haven't had a chance to review it.
 2         MS. BORELLI:  Could we give her a moment
 3    just to review it?
 4         MR. WILSON:  Should we go off the record?
 5         Q.  (BY MR. WILSON) Do you need more than a
 6    few moments or...
 7         A.  It shouldn't -- it's short.  It
 8    shouldn't take very long.
 9         MR. WILSON:  Okay.  Tara, I assume that if
10    we come back for a fight over an extra five minutes
11    at the end of all this case, you're going to give
12    it to me, but maybe you play hardball.  I don't
13    know.
14         Q.  (BY MR. WILSON) Are we close enough
15    there or should we go off the record?
16         A.  I'm almost done.
17              Okay.
18         Q.  So, Dr. Budge, are you familiar with the
19    decision by the American Academy of Pediatrics
20    that's referred to in this article?
21         A.  Yes.
22         Q.  And the American Academy of Pediatrics
23    has commissioned a systematic review of the
24    evidence concerning the efficacy for puberty
25    blockers in treating gender dysphoria; is that
```

Page 103

Stephanie Budge, Ph.D. August 16, 2023

1    correct?

2          MS. BORELLI:  Objection; vague.

3          THE WITNESS:  My understanding is that every

4    five years the AAP guidelines for any medical

5    condition or component, that they do a review every

6    five years, so this is just -- my reading of it is

7    that it's standard practice.

8          Q.   (BY MR. WILSON) They review their

9    position statements every year, but they don't

10   commission a systematic review every five years; is

11   that correct?

12         MS. BORELLI:  Objection -- sorry.

13   Objection; form.

14         THE WITNESS:  I mean, I would need to review

15   all of the procedures that the AAP does.  My

16   understanding is that this is not limited -- doing

17   systematic reviews is not limited to this

18   particular component, this particular diagnosis.

19         Q.   (BY MR. WILSON) And there's a

20   reference -- let me ask it a different way.

21              Gender dysphoria isn't just something

22   that happens in America, right?

23         MS. BORELLI:  Objection; vague.

24         THE WITNESS:  The diagnosis that we use in

25   the DSM is based on the American Psychiatric

Page 104

1   Association.  Worldwide, usually the ICD

2   classification is used for gender incongruence.

3          Q.   (BY MR. WILSON) But the phenomenon is a

4   worldwide phenomenon; is that correct?

5          MS. BORELLI:  Objection; vague.

6          THE WITNESS:  Transgender people exist

7   everywhere.

8          Q.   (BY MR. WILSON) And there's data from

9   other countries and commissioned by other countries

10  on the question; is that correct?

11         MS. BORELLI:  Objection; compound, lacks

12  foundation.

13         THE WITNESS:  On the question?  Can you be

14  more specific, please?

15         Q.   (BY MR. WILSON) Regarding gender

16  dysphoria and transgender people; is that correct?

17         MS. BORELLI:  Same objections.

18         THE WITNESS:  Can you restate the whole

19  question, please?

20         Q.   (BY MR. WILSON) Other countries besides

21  America have studied these issues; is that correct?

22         MS. BORELLI:  Objection; vague.

23         THE WITNESS:  So my read of other countries

24  describing gender-affirming care is that all of

25  them so far, that I have read, indicate a support

Stephanie Budge, Ph.D. August 16, 2023

```
1    for -- specifically if we're talking about
2    transgender adolescents, support for transgender
3    adolescents, and especially the ones in Europe that
4    are talked about in this particular article, none
5    of them have banned any particular care.
6         Q.   (BY MR. WILSON) So if you look at the
7    second paragraph from the bottom on page 1, it
8    says:  In June, England's National Health Service
9    announced that it would restrict the use of puberty
10   blockers to clinical trials because there's not
11   enough evidence to support their safety or clinical
12   effectiveness as a routinely available treatment.
13        Did I read that correctly?
14        A.   Yes.
15        Q.   Do you disagree with that position that
16   the National Health Service has taken in England?
17        MS. BORELLI:  Objection; assumes facts not
18   in evidence, lacks foundation.
19        THE WITNESS:  When I've read some of the
20   statements regarding what is happening in England,
21   as I mentioned, the statements are in support of
22   transgender adolescents and that there is no ban
23   regarding the care that's involved.
24        Q.   (BY MR. WILSON) So you agree, then -- if
25   you don't disagree, you agree there's not enough
```

Page 106

Stephanie Budge, Ph.D. August 16, 2023

1    evidence to support the safety or clinical

2    effectiveness of puberty blockers as routinely

3    available treatment?

4           MS. BORELLI:  Objection; misstates

5    testimony.

6           THE WITNESS:  I do not agree that there is

7    not enough evidence.  The evidence that we have is

8    strong, it's robust, and indicates that it is not

9    unsafe for youth, and in fact, that it is

10   lifesaving.

11          Q.   (BY MR. WILSON) So that came out in

12   June of this year; is that right?

13          MS. BORELLI:  Objection; lacks foundation.

14          THE WITNESS:  In the article, it says:  In

15   June.

16          Q.   (BY MR. WILSON) And then it says:  Last

17   year Sweden's national healthcare oversight body

18   similarly determined that, on the basis of its

19   systematic review, the risks of puberty-inhibiting

20   and gender-affirming hormone treatment for those

21   under 18 currently outweigh the possible benefits.

22          Did I read that correctly?

23          MS. BORELLI:  Objection -- sorry.

24          Let me just finish this before you --

25   and then you can answer the question, Dr. Budge.

Page 107

Stephanie Budge, Ph.D. August 16, 2023

1                    Assumes facts not in evidence, lacks

2      foundation, vague.

3          THE WITNESS:  Yes.

4          Q.   (BY MR. WILSON) And were you aware of

5      these two determinations by the National Health

6      Service and by Sweden around the time that they

7      happened?

8          MS. BORELLI:  Objection; assumes facts not

9      in evidence, lacks foundation, vague, compound.

10         THE WITNESS:  Yes.

11         Q.   (BY MR. WILSON) And you disagree with

12     Sweden's determination, just like you disagree with

13     the National Health Service's determination; is

14     that correct?

15         MS. BORELLI:  Objection; vague, misstates

16     testimony.

17         THE WITNESS:  These particular sentences are

18     taken out of context for the entirety of the

19     report.  The report doesn't say that transgender

20     adolescents shouldn't receive care.

21              And in fact, the -- when these reports

22     are being written, they are talked about in terms

23     of the evidence that does exist.  I think that

24     these -- these particular reports are indicating

25     that, you know -- that they want to gather more

                                              Page 108

Stephanie Budge, Ph.D. August 16, 2023

1  data and more information, and that's my read of

2  what they're calling for.

3       Q.   (BY MR. WILSON) And so do you agree or

4  disagree with the statement that, "The risks of

5  puberty-inhibiting and gender-affirming hormone

6  treatment for those under 18 currently outweigh the

7  possible benefits"?

8       MS. BORELLI:  Objection; vague, lacks

9  foundation.

10      THE WITNESS:  The evidence for transgender

11  adolescents right now regarding puberty-delaying

12  hormones and gender-affirming hormone treatment all

13  indicate that they are improve -- improve mental

14  health and improve the quality of life for

15  transgender adolescents, and that's the large body

16  of research that we're finding, especially in the

17  longitudinal data.

18         So the body of evidence that I know and

19  that I have reviewed is indicative that it is

20  important for transgender adolescents to receive

21  this treatment.

22       Q.   (BY MR. WILSON) So you disagree with

23  what Sweden says; is that correct?

24       MS. BORELLI:  Objection; vague, misstates

25  testimony.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

1        THE WITNESS:  As I mentioned previously, the

2   entirety of the report that you're describing, that

3   there are -- that one sentence isn't exactly the

4   conclusion of the entirety report.

5        Q.   (BY MR. WILSON) But you disagree with

6   that particular conclusion; is that correct?

7        MS. BORELLI:  Objection; vague, asked and

8   answered, misstates testimony.

9        THE WITNESS:  The evidence that I have

10   reviewed indicates that -- it's that the benefits

11   of gender-affirming care, especially related to

12   hormones and puberty-delaying treatments, outweigh

13   risks.

14        Q.   (BY MR. WILSON) And you would agree that

15   it says:  Significant development for two European

16   countries to have reached these conclusions.

17         Is that correct?

18        MS. BORELLI:  Objection; vague, lacks

19   foundation, assumes facts not in evidence.

20        THE WITNESS:  My read of the situation with

21   these reports is that they are -- again, like I

22   said, actually, both reports say that it's

23   important to support transgender adolescents and

24   that care should not be banned.

25         And so, you know, these reports are not

Stephanie Budge, Ph.D. August 16, 2023

1    indicating that transgender adolescents should not

2    receive any kind of treatment and that, in general,

3    they indicate the importance of that process of

4    supporting transgender adolescents.

5         Q.   (BY MR. WILSON) And you didn't cite

6    either of these systematic reviews by the National

7    Health Service or by Sweden in your report, did

8    you?

9         MS. BORELLI:  Objection; vague, lacks

10   foundation.

11        THE WITNESS:  I did not.

12             How are we doing on time, everybody?

13        MR. WILSON:  Yeah.  Can we do this?  I

14   think -- first of all, let's just go off the

15   record.

16        THE VIDEOGRAPHER:  Okay.  So the time is

17   10:59 a.m., and we are off the record.

18     (A recess was taken from 10:59 a.m. to 11:09 a.m.)

19        THE VIDEOGRAPHER:  All right.  So we are

20   recording.  The time is 11:09 a.m. Mountain Time,

21   and we are back on the record.

22        MR. WILSON:  I've just got to handle one

23   thing here.

24             Okay.  I'm going to send another

25   exhibit.  This will be Exhibit 5.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1              (Deposition Exhibit No. 5 was marked.)
 2         Q.   (BY MR. WILSON) Dr. Budge, just let me
 3    know when you've received it.
 4         A.   I've received it.
 5         MS. BORELLI:  I need one more minute.
 6    Sorry.
 7         MR. WILSON:  I'm just going to ask a
 8    foundation question, if it's all right, Tara, while
 9    we're waiting?
10         MS. BORELLI:  I received it.
11         MR. WILSON:  Okay.  Great.  You got it.
12    We're moving faster now.
13         Q.   (BY MR. WILSON) Dr. Budge, do you
14    recognize this article I just sent?
15         A.   I do.
16         Q.   This is an article about your lab at
17    UW-Madison; is that correct?
18         MS. BORELLI:  Objection; vague.
19         THE WITNESS:  That's correct.
20         Q.   (BY MR. WILSON) That's your picture with
21    three other people at the top, right?
22         A.   Yes.
23         Q.   If you head down to the third page of
24    the PDF, there's a heading that says:  UW-Madison's
25    Trans Research Lab doesn't work only on research.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1   Members of the lab aren't shy about their advocacy

2   and activism, something that is unusual in

3   research.

4           Did I read that correctly?

5       A.   Yes.

6       MS. BORELLI:   Objection; misstates the

7   document, lacks foundation.

8       Q.   (BY MR. WILSON) And it says, "Budge

9   isn't concerned about tainting the lab's work or

10  how some might view it as biased.  'I think all

11  research is biased in some way, shape, or form.

12  It's just what you do to ensure that all of that is

13  out on the table,' Budge says."

14          Did I read that correctly?

15      A.   Yes.

16      Q.   Was that an accurate quote of you in

17  this article?

18      MS. BORELLI:   Objection; vague.

19      THE WITNESS:   I do believe that in some way,

20  shape, or form that there is bias that's involved

21  in all aspects of life because we're human.

22      Q.   (BY MR. WILSON) Is it also true that you

23  aren't concerned about tainting the lab's work or

24  how some might view it as biased?

25      MS. BORELLI:   Objection; vague, misstates

Page 113

Stephanie Budge, Ph.D. August 16, 2023

```
 1    the document.
 2          THE WITNESS:  Can you say that again,
 3    please?
 4          Q.   (BY MR. WILSON) Do you also agree with
 5    the statement that "Budge isn't concerned about
 6    tainting the lab's work or how some might view it
 7    as biased"?
 8          A.   Yeah, what I meant there --
 9          MS. BORELLI:  Objection; misstates the
10    document.
11                You can answer.
12          THE WITNESS:  What I meant there is that we
13    are transparent about our process and about who we
14    are and the work that we do.  Insofar that that
15    information is available for people to see and to
16    understand and that I -- the way that we now talk
17    about bias related to science and research is that
18    it's important for you to put out all of the
19    information about different components of the work
20    so that that way people can understand how research
21    questions come about and how they're understood and
22    also how that information is communicated.
23                And as you can see right below that
24    statement, I say that that particular component, it
25    is a part of the rigorous part of our approach and
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

1   that we use all of the best evidence-based practice

2   guidelines and processes in the way that we conduct

3   research.

4         Q.   (BY MR. WILSON) So in disclosing a

5   potential bias, in academia that's typically done

6   through a conflict disclosure at the beginning of

7   an article; is that correct?

8         MS. BORELLI:  Objection; vague.

9         THE WITNESS:  Yeah.  I think the bias that

10  I'm talking about here is different from a conflict

11  of interest.

12             So bias -- the way that I'm defining

13  bias in this particular quote is just that, you

14  know, humans in general -- like, there is not a

15  human who doesn't have any level of bias at all,

16  and everybody in this room is included, every human

17  being has it.

18             I think that our -- our goal as

19  researchers and as scientists is to describe the

20  science and to do the science in the most rigorous

21  way possible so that any type of bias that may

22  exist from any human being can be taken out of that

23  equation or understood within the context of how

24  the research is conducted.

25             Q.   (BY MR. WILSON) It says, a couple

Page 115

Stephanie Budge, Ph.D. August 16, 2023

1   paragraphs down:  Aside from its research, lab

2   members meet once a week to engage in activism.  In

3   some meetings, members write letters to elected

4   officials on issues, such as healthcare and

5   nondiscrimination.  Lab researchers met two

6   UW-Madison employees who sued the state and the UW

7   system over their refusal to pay for gender

8   reassignment surgery, Budge says.  The lab also

9   does educational training on transgender issues for

10  community groups and organizations.

11          Did I read that correctly?

12      A.   You did.

13      Q.   And that's a bit more than just sort of

14  the basic bias that everybody inherently has,

15  right?

16      MS. BORELLI:  Objection; misstates the

17  document, assumes facts not in evidence.

18      THE WITNESS:  No.  So the thing is is that

19  when there is discrimination at hand, the

20  scientists who I know who study discrimination,

21  that it's an ethical duty that we have as

22  scientists to ensure that discrimination doesn't

23  continue.

24          And so in that instance, that's how

25  scientists function and how they engage in the

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

```
 1    work.
 2         Q.   (BY MR. WILSON) If someone were an
 3    activist, an admitted activist on a question, do
 4    you think that's something they should disclose
 5    when they write an academic paper on the subject of
 6    their activism?
 7         MS. BORELLI:  Objection; vague.
 8         THE WITNESS:  I think it depends on what the
 9    activism is.  In this instance, it's advocacy work,
10    which is something that is included within any kind
11    of, you know, scientific academic work regarding
12    when people's rights are being -- are not being
13    maintained, that that kind of advocacy is part and
14    parcel of the work and it's also part of my
15    institution's mission.
16         Q.   (BY MR. WILSON) So when you wrote this
17    article with Dr. Tebbe, the systematic review, you
18    didn't disclose that you're an activist on these
19    questions, did you?
20         MS. BORELLI:  Objection; vague, assumes
21    facts not in evidence.
22         THE WITNESS:  I don't have any conflicts of
23    interest that were needed -- that needed to be
24    disclosed.
25         Q.   (BY MR. WILSON) And you didn't disclose
```

Stephanie Budge, Ph.D. August 16, 2023

```
1    that you're an activist in that article, did you?
2         MS. BORELLI:  Objection; asked and answered,
3    argumentative, assumes facts not in evidence,
4    vague.
5         THE WITNESS:  I did not indicate that I was
6    an activist in that article.
7         Q.   (BY MR. WILSON) And you are an activist
8    on this question; is that correct?
9         MS. BORELLI:  Objection; asked and answered,
10   argumentative, misstates testimony, lack of
11   foundation.
12        THE WITNESS:  I would describe my work more
13   as advocacy and that that advocacy is something
14   that is included within understanding the ways in
15   which discrimination is experienced and how it
16   comes about and that my work is to reduce the level
17   of discrimination, and that's the advocacy that I
18   engage in.
19        Q.   (BY MR. WILSON) So is this article wrong
20   when it says that you aren't shy about your
21   advocacy and activism?
22        MS. BORELLI:  Objection; vague, misstates
23   the document.
24        THE WITNESS:  I would describe my work more
25   as advocacy, but I would say, you know, that this
```

Page 118

Stephanie Budge, Ph.D. August 16, 2023

```
1    is how the journalist decided to write that

2    information.

3         Q.   (BY MR. WILSON) And in fact, you -- a

4    correction was submitted to this journal -- it's

5    noted at the bottom -- after this article was

6    published; is that correct?

7         A.   Sorry --

8         MS. BORELLI:  Lincoln, I'm sorry, where are

9    you?

10        MR. WILSON:  If you go down to Editor's Note

11   at the bottom, it says:  Editor's Note:  This

12   article originally stated that 30 people have

13   agreed to have their therapy sessions monitored by

14   the lab.  The lab has not yet started recruiting

15   people for the study, but the goal is to monitor 30

16   people's sessions.

17             Did I read that correctly?

18        A.   You did.

19        Q.   That would have been a correction that

20   would have come from your lab after the original

21   version of the article was published; is that

22   correct?

23        MS. BORELLI:  Objection; vague.

24        THE WITNESS:  That's correct.

25        Q.   (BY MR. WILSON) But you didn't ask them
```

Page 119

Stephanie Budge, Ph.D. August 16, 2023

1    to correct the statement that you're not shy about

2    your advocacy and activism, did you?

3          MS. BORELLI:  Objection; vague,

4    argumentative, misstates testimony.

5          THE WITNESS:  I did not.

6          Q.   (BY MR. WILSON) I'd love to end there,

7    but I have to ask one more question.

8               So, Dr. Budge, I just want to clarify

9    for the record that in the adolescent patients that

10   you've seen for gender dysphoria, have you ever

11   been presented with a case where it was not

12   appropriate for the patient to go through a social

13   transition, in your view?

14         MS. BORELLI:  Objection; vague, compound.

15         THE WITNESS:  In my clinical practice, I

16   have not seen a transgender adolescent who has

17   not -- where it's not been appropriate to move

18   forward with a social transition.

19         MR. WILSON:  I have no further questions,

20   subject to anything that Tara has.

21         MS. BORELLI:  Let's go ahead and take a

22   break, then, go off the record and take a break,

23   and we will confer and come back to let you know

24   whether we have any questions of our own.

25         MR. WILSON:  All right.  Sounds good.

Page 120

1          Is this a five-minute?  Ten-minute?

2          MS. BORELLI:  Let's do at least ten minutes.

3          MR. WILSON:  Okay.

4          MS. BORELLI:  We'll come back sooner if

5   we're able to finish earlier.

6          MR. WILSON:  All right.

7          THE VIDEOGRAPHER:  Okay.  So the time is

8   11:21 a.m. Mountain Time, and we are off the

9   record.

10     (A recess was taken from 11:21 a.m. to 11:32 a.m.)

11         THE VIDEOGRAPHER:  All right.  So we are

12  recording.  The time is 11:32 a.m. Mountain Time,

13  and we are back on the record.

14         MS. BORELLI:  Thank you.  The plaintiffs

15  have no further questions for Dr. Budge at this

16  point, and we will read and sign.

17         MR. WILSON:  (Inaudible.)

18         MS. BORELLI:  I'm sorry, could you say that

19  again?

20         MR. WILSON:  I said it poorly.

21         That concludes the deposition, then.

22  Thank you.

23         MS. BORELLI:  Thank you, Lincoln.

24         We will read and sign.

25         THE VIDEOGRAPHER:  Okay.  So then this

                                        Page 121

1    concludes our video deposition with Dr. Stephanie

2    Budge.  It is August 16th, 2023.  The time is

3    11:33 a.m. Mountain Time, and we are off the

4    record.

5

6            (The deposition concluded at 11:33 a.m.)

7                      * * *

8               (Signature was requested.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 122

```
 1                    VERIFICATION

 2

    STATE OF _____)

 3                          ) ss.

    COUNTY OF _____)

 4

 5     I, STEPHANIE BUDGE, PH.D., being first duly sworn on

 6   my oath, depose and say:

 7     That I am the witness named in the foregoing

 8   deposition taken the 16th day of August, 2023,

 9   consisting of pages numbered 1 to 122, inclusive; that I

10   have read the said deposition and know the contents

11   thereof; that the questions contained therein were

12   propounded to me; that the answers to said questions

13   were given by me, and that the answers as contained

14   therein (or as corrected by me therein) are true and

15   correct.

16

17   Corrections Made:  Yes_____ No_____

18

19          _____

                  STEPHANIE BUDGE, PH.D.

20

       Subscribed and sworn to before me this ___ day of

21   _____, 2023, at _____, _____.

22

23

                     _____

24                   Notary Public for

                     Residing at_____,

25                   My Commission Expires: _____
```

Page 123

Stephanie Budge, Ph.D. August 16, 2023

1                    REPORTER'S CERTIFICATE

2

   STATE OF IDAHO   )
3                    )  ss.
   COUNTY OF ADA    )

4

5      I, REBECCA MARTIN, Certified Shorthand Reporter and

6   Notary Public in and for the State of Idaho, do hereby

7   certify:

8        That prior to being examined, the witness named in

9   the foregoing deposition was duly sworn remotely by me to

10   testify to the truth, the whole truth and nothing but

11   the truth;

12        That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction,

15   and that the foregoing transcript contains a full, true

16   and verbatim record of said deposition.

17        I further certify that I have no interest in the

18   event of the action.

19        WITNESS my hand and seal this 16th day of August,

20   2023.

21

22

23                    REBECCA MARTIN

                      RPR and Notary

24                    Public in and for the

                      State of Idaho

25   My Commission Expires: 08-27-2024

                                              Page 124

**[& - 9:58]**

| & |
|---|
| **&**   2:6 3:2 |

| 0 |
|---|
| **00315**   1:5 5:11 |
| **08-27-2024** |
| 124:25 |

| 1 |
|---|
| **1**   2:22 4:9 5:3 |
| 8:1 106:7 |
| 123:9 |
| **101**   3:8 |
| **102**   4:15 |
| **105**   2:22 |
| **10:05**   76:15,17 |
| **10:11**   76:17,19 |
| **10:35**   94:24 |
| 95:1 |
| **10:36**   95:1,3 |
| **10:59**   111:17 |
| 111:18 |
| **11**   54:10 88:10 |
| **1100**   88:19 |
| **1108**   1:25 |
| **112**   4:17 |
| **1142**   4:14 |
| **1143**   95:6 |
| **11:09**   111:18 |
| 111:20 |
| **11:21**   121:8,10 |
| **11:32**   121:10 |
| 121:12 |
| **11:33**   122:3,6 |
| **12.2**   80:13,25 |

**122**   59:24
80:15 81:2
123:9
**12th**   87:23
**139**   59:24
74:17 80:13,25
82:11
**16**   1:15
**16th**   2:8 5:5
87:5 122:2
123:8 124:19
**17**   80:13,25
**18**   4:12 107:21
109:6
**19**   39:19,24
**1972**   56:14
**1975**   81:22
**1978**   56:24
**1979**   57:8
**1980s**   79:18
**1990s**   79:18
**1:23**   1:5 5:11

| 2 |
|---|
| **2**   4:11,16 73:14 |
| 73:16 |
| **2006**   81:22 |
| **2013**   77:10,11 |
| **2021**   59:7,18,22 |
| 59:24 61:1 |
| **2022**   66:23 |
| 87:5 101:4 |
| **2023**   1:15 2:9 |
| 5:6 87:15,23 |
| 102:12 122:2 |
| 123:8,21 |

124:20
**208**   2:17,18 3:9
**22**   41:3 66:15
66:16 67:21
68:2,16
**25**   66:15,21
68:6,13
**27th**   3:4
**29429**   124:22

| 3 |
|---|
| **3**   4:13 10:5 |
| 13:4 40:6 |
| 77:22 79:5 |
| 93:5,6 |
| **30**   99:24 |
| 119:12,15 |
| **30030**   2:23 |
| **31**   101:5 |
| **334-2400**   2:17 |
| **34**   46:25 |
| **35**   47:25 |
| **39**   62:22 63:1 |
| **3rd**   102:11 |

| 4 |
|---|
| **4**   4:15 101:25 |
| 102:3 |
| **404**   2:23 |
| **415**   3:5 |

| 5 |
|---|
| **5**   4:9,17,18 |
| 66:25 77:9,23 |
| 79:3,17 111:25 |
| 112:1 |

**50**   56:22
**512-4094**   3:5
**52**   91:9
**560**   3:4

| 6 |
|---|
| **6**   4:5 |
| **68**   4:10 |
| **6th**   87:15 |

| 7 |
|---|
| **73**   4:11 |
| **788-6688**   3:9 |

| 8 |
|---|
| **80s**   79:25 80:4 |
| **83333**   3:8 |
| **83720**   2:16 |
| **83720-0010** |
| 2:17 |
| **854-8073**   2:18 |
| **87.8**   80:15 81:2 |
| **897-1880**   2:23 |
| **8:00**   2:9 |
| **8:05**   5:6 |
| **8:51**   40:22,23 |

| 9 |
|---|
| **9**   25:12 |
| **90s**   79:25 80:4 |
| **93**   4:13 |
| **94105**   3:4 |
| **9:03**   40:23,25 |
| **9:46**   71:12,13 |
| **9:58**   71:13,15 |

Page 1

**[a.m. - agree]**

**a**

**a.m.** 2:9 5:6
40:22,23,23,25
71:12,13,13,15
76:15,17,17,19
94:24 95:1,1,3
111:17,18,18
111:20 121:8
121:10,10,12
122:3,6
**aap** 104:4,15
**abates** 49:10
**ability** 74:25
**able** 8:9 9:7
15:12 18:3
28:10 35:8
43:13 54:1,5,6
62:6 90:24
93:17,18
100:16 121:5
**above** 2:10
10:10 80:21
**absence** 53:21
**abstract** 74:14
80:12
**abundance**
76:8
**abuse** 67:8,13
**academia**
115:5
**academic** 18:3
63:8 117:5,11
**academy**
102:16 103:19
103:22

**acceptability**
25:21 26:10
27:2 28:14
**accepted** 44:17
**access** 14:8,14
14:21 15:3,12
16:2,2,9 25:22
79:14 89:10,17
93:18 97:13
**accommodati...**
88:20 89:5,9
96:21
**accommodati...**
91:18
**account** 21:20
24:12 35:8,17
35:20,24 86:5
86:13
**accurate** 8:10
113:16
**accurately**
60:15
**action** 124:18
**activism** 113:2
116:2 117:6,9
118:21 120:2
**activist** 117:3,3
117:18 118:1,6
118:7
**actual** 70:1
78:13
**actually** 15:23
22:19 37:14
41:2 50:12,17
50:22 57:17

58:21 73:19
78:14 79:12,13
80:1 82:21
87:21 94:9
97:24 110:22
**ada** 2:8 124:3
**add** 9:7
**adding** 10:2
**addition** 91:14
91:17
**additional** 9:7
56:25
**addressed**
92:20
**adequate** 89:5
96:20
**adequately**
24:13
**adheres** 52:23
**admitted** 117:3
**adolescence**
15:2
**adolescent**
15:16 48:11
51:10 52:24
55:17 73:8
120:9,16
**adolescent's**
54:7
**adolescents**
15:13 16:7
50:23 52:17
53:7,9,14,25
56:7 83:4
85:21 86:2

88:11 101:13
106:2,3,22
108:20 109:11
109:15,20
110:23 111:1,4
**adults** 52:17
73:5 83:5
**advantage**
27:24
**advocacy** 113:1
117:9,13
118:13,13,17
118:21,25
120:2
**affects** 89:15
**affirm** 72:17,24
**affirming**
65:15 66:11
71:19,22 72:3
72:13,16 73:11
81:9,17 82:14
83:2,3,3 95:16
96:6,12,24
101:8,12
105:24 107:20
109:5,12
110:11
**ag.idaho.gov**
2:18,19
**age** 40:5
**agree** 19:11
20:3,12 21:13
21:22 24:10,21
25:3 26:15
28:23 29:21

**[agree - asking]**

30:6,12 35:1,4
35:6,15,23
36:8,23 37:17
48:6 86:25
106:24,25
107:6 109:3
110:14 114:4
**agreed** 119:13
**agrees** 101:9
**ahead** 41:3
42:19,25
120:21
**al** 1:3,8 5:10,10
63:22
**align** 47:9 90:4
96:2,15
**aligned** 13:7
99:18
**alignment**
90:19
**aligns** 97:6,21
98:23
**alleviating**
47:12
**allow** 75:17
88:22 98:3,7
98:11,11,16
**allowed** 16:9
34:20 61:6
98:22
**allowing** 95:14
**alturas** 3:7
**alturaslawgro...**
3:9

**america** 98:10
104:22 105:21
**american** 64:8
64:14 66:22
102:16 103:19
103:22 104:25
**announced**
106:9
**answer** 7:14
9:25 12:13,23
13:1,2,25
14:18 16:16
17:17 19:17,20
20:1 29:6,17
32:22 34:1
36:20 37:15,22
38:7 60:7,15
61:11,19,22
62:6 68:12
77:25 80:1
82:19 83:16
88:17 97:24
99:13 107:25
114:11
**answered**
29:25 32:4,5
32:13,14 33:1
33:8 46:16
70:14 82:17
88:6 110:8
118:2,9
**answering**
41:24 50:24
**answers** 7:18
12:14 123:12

123:13
**antithesis**
21:24
**anxiety** 67:9
**anybody** 94:4
94:17
**anymore** 56:11
**apart** 27:14
40:10 67:16
**appearances**
3:1 5:19
**appearing** 2:13
**applied** 79:17
**applies** 95:24
95:25
**applying** 18:22
**appreciate** 8:25
40:18 93:23
**appreciating**
61:23
**approach** 81:6
81:14 82:11
114:25
**appropriate**
37:25 52:6
65:7,22 66:2
89:8 100:12
101:12 120:12
120:17
**approve** 90:16
96:22 97:5
**area** 16:20
69:24
**areas** 16:20,21

**argumentative**
33:1,8 64:6
88:5 118:3,10
120:4
**article** 33:17
60:5,6,8,16
61:9 62:6 82:3
82:8,23 83:17
83:22 84:11
85:20 86:23
94:6 95:7
99:15 101:24
102:11 103:20
106:4 107:14
112:14,16
113:17 115:7
117:17 118:1,6
118:19 119:5
119:12,21
**articles** 18:20
19:3 58:1,2
61:7 86:24
99:4 100:21
**articulate**
34:21,22
**aside** 116:1
**asked** 29:24
32:4,13 33:1,7
37:23 39:14
46:16 60:5
61:7 70:14
82:16 88:6
110:7 118:2,9
**asking** 56:19
57:25 58:4

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[asking - best]**

59:12 60:11
61:8,24 98:24
**aspect** 16:24
47:2 53:13
**aspects** 31:10
47:14 56:15
113:21
**assent** 65:18
**asserting** 43:24
**assertions**
63:15
**assessed** 64:17
65:18 84:12
**assessment**
73:11
**assigned** 45:7
46:14,18 49:15
63:6 89:12
**assist** 16:21
**associated** 2:5
5:16 47:7,12
67:1
**association**
20:3,13 64:9
64:15 105:1
**association's**
66:23
**associations**
20:7
**assume** 103:9
**assumes** 23:1
26:16 27:17,25
29:1,16 36:12
37:3 38:20
46:1 50:6 53:3

53:23 54:11,24
55:7,19 57:23
58:16 59:19
62:4 65:25
70:22 77:6
88:14 97:17
106:17 108:1,8
110:19 116:17
117:20 118:3
**assumptions**
60:14
**atlanta** 73:23
93:11
**attached** 8:6
**attempts** 63:4
**attorney** 2:15
5:21,25 6:1,25
**attribute** 71:23
**august** 1:15 2:9
5:5 102:11
122:2 123:8
124:19
**authoritative**
44:11
**authorities** 9:2
9:11,21
**available** 36:24
79:15 90:22
106:12 107:3
114:15
**aware** 50:4
55:14 56:2,6
56:11,13,19,21
56:23 57:7,12
57:19 59:6,12

84:18 85:6
108:4
**awareness** 61:7
**azeen** 102:12

**b**

**b** 4:6
**back** 41:1
62:20 71:16
75:11 76:20
79:17 93:1
95:4 103:10
111:21 120:23
121:4,13
**backs** 4:15
**ban** 106:22
**banned** 97:6,20
106:5 110:24
**bans** 66:10,12
**barred** 52:13
**barring** 52:20
**based** 17:6
26:21 36:19,21
44:6,21 45:22
45:24 51:14
100:6,6 104:25
115:1
**baseline** 15:15
**basic** 116:14
**basis** 34:22
83:20 107:18
**bathroom** 4:13
90:4,18,24
92:17 93:25
94:4 95:15
96:1,2,7 97:6,8

97:10,13,21
98:12,23 99:17
99:18,20
**bathrooms**
37:13 90:21
95:14 96:15,20
97:14 98:7,21
**bearing** 102:8
**becky** 5:16
**becoming**
78:12
**began** 83:23
**beginning**
115:6
**begins** 10:8
**behavior** 56:14
56:24
**beings** 40:3
**believe** 31:18
31:24 45:13
49:11 65:5,22
71:18 72:1,3
78:24 81:20
85:17 101:20
113:19
**benefit** 15:22
15:24
**benefits** 14:15
14:22 15:8,18
16:4 107:21
109:7 110:10
**best** 28:19
36:25 86:1
115:1

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

**[better - broadly]**

| | | | |
|---|---|---|---|
| **better** 11:15 | **boise** 2:17 | 55:6,18 56:3 | 106:17 107:4 |
| 16:1,7 28:5,16 | **borelli** 2:21 | 56:16 57:2,11 | 107:13,23 |
| **bias** 35:17,20 | 5:23,23 8:19 | 57:23 58:16 | 108:8,15 109:8 |
| 35:21 36:25 | 9:16 11:20 | 59:10,14,19 | 109:24 110:7 |
| 38:17 113:20 | 12:5,12,22 | 60:3,13,20 | 110:18 111:9 |
| 114:17 115:5,9 | 13:13,15,24 | 61:5,17,21 | 112:5,10,18 |
| 115:12,13,15 | 14:17,24 15:9 | 62:2,16 63:16 | 113:6,18,25 |
| 115:21 116:14 | 15:20 16:5,15 | 64:6,21 65:9 | 114:9 115:8 |
| **biased** 113:10 | 17:1,15,25 | 65:24 66:6 | 116:16 117:7 |
| 113:11,24 | 18:9,25 19:8 | 67:11,25 68:10 | 117:20 118:2,9 |
| 114:7 | 19:15,22 20:5 | 68:21 69:6,13 | 118:22 119:8 |
| **bigger** 78:18 | 20:15,21 21:9 | 69:20 70:13,22 | 119:23 120:3 |
| **bill** 88:19 89:3 | 21:11,17 22:1 | 71:10,20 72:5 | 120:14,21 |
| 99:22 | 22:13 23:1,9 | 72:20 73:6,17 | 121:2,4,14,18 |
| **biological** | 23:15 24:14,25 | 73:19,23 74:7 | 121:23 |
| 72:19 83:8 | 25:7,18 26:5 | 74:10,23 75:12 | **bottom** 87:21 |
| 88:24 98:13 | 26:16 27:17,25 | 76:12,25 77:6 | 106:7 119:5,11 |
| **biologically** | 28:25 29:5,15 | 77:17,24 78:5 | **box** 2:16 |
| 41:7 | 29:24 30:10,24 | 78:20 79:6,21 | **boys** 4:11 56:14 |
| **birth** 45:8 | 31:20 32:1,4 | 81:10,18 82:15 | 56:25 59:8 |
| 46:15,18 49:15 | 32:12,18,25 | 83:12 84:2,20 | 74:16 81:24 |
| 63:6 89:13 | 33:7,10 34:5 | 85:8,19 86:7 | 84:8 |
| **bit** 27:12 33:21 | 34:19 35:4,10 | 86:15 87:7,12 | **bradley** 74:9 |
| 80:21 116:13 | 35:18 36:1,11 | 88:5,14 89:1,6 | **break** 40:18 |
| **blockers** | 37:2,20 38:11 | 89:21 90:12 | 71:7 75:6 98:8 |
| 103:25 106:10 | 38:19 39:3,9 | 92:13,22 93:11 | 120:22,22 |
| 107:2 | 40:14,16,20 | 93:16 94:1,7 | **bridge** 62:9 |
| **board** 90:16 | 41:19 42:5,8 | 94:17,22 95:21 | 87:4,17 |
| 96:22 97:4 | 42:14,23 44:1 | 96:8 97:1,16 | **briefing** 8:20 |
| **boards** 91:3,6 | 44:18 45:2,15 | 98:5,15 99:9 | **broad** 44:8 |
| **bodies** 44:12 | 46:1,8,16 | 100:14,22 | 76:23 |
| **body** 43:8 | 47:22 48:8,17 | 101:2,16 102:4 | **broader** 23:23 |
| 107:17 109:15 | 49:19,25 50:6 | 102:7,19 103:2 | 46:22 |
| 109:18 | 51:6 52:7 53:2 | 104:2,12,23 | **broadly** 11:23 |
| | 53:22 54:11,23 | 105:5,11,17,22 | 11:24 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[brought - citations]**

**brought** 50:10
**budge** 1:14 2:1
2:4 4:3,9 5:8
6:11,21,22
8:22 9:18 29:7
41:2 55:23
56:1 62:7 65:5
71:17 74:5
75:2 76:21
83:12 95:5
102:10,21
103:18 107:25
112:2,13 113:8
113:13 114:5
116:8 120:8
121:15 122:2
123:5,19
**builds** 60:13
**built** 78:10
**bullion** 3:8

**c**

**c** 2:22 5:1 14:5
14:7,20 57:3
**california** 3:4
**call** 49:15
59:22
**calling** 109:2
**calls** 4:16 19:16
20:5 21:17
22:2 29:2,15
30:11,24 32:12
32:18 37:20
38:11,20 41:19
42:14,24 45:16
48:8 62:2

65:10 66:6
79:22 86:7
89:22 90:12
**cantor** 62:11
**cantor's** 84:19
87:4 88:9
**capacity** 1:7
**captioned**
10:10
**capture** 50:22
**care** 7:13 25:22
65:15 66:11
71:19,22 72:3
72:13,16 73:2
73:11 79:14
81:9,17 82:14
83:2,3 95:17
96:6,12,24
100:3,12,18
101:8 105:24
106:5,23
108:20 110:11
110:24
**caregivers**
51:15
**case** 1:4 5:10
7:1 8:8,11 9:8
10:16 11:5,11
11:23,25 15:25
16:25 17:14
18:2,24 52:3
62:9,12 76:5
87:18,20,25
88:13,19 90:7
100:11 103:11

120:11
**cases** 51:2,4
**cast** 24:23 25:5
**categorized**
58:25
**causation**
13:12,23 14:13
20:4,13 21:16
**caused** 13:5,21
**causes** 14:15,22
15:7,8,18 16:3
69:2
**caution** 76:9
**center's** 19:6
**certain** 14:15
14:22 31:12
37:8 65:6
**certainly** 11:2
34:2
**certificate**
124:1
**certified** 124:5
**certify** 124:7,17
**chance** 35:9,13
36:25 38:17
102:21,23
103:1
**change** 63:4
79:11,13
**changed** 76:22
**changing** 4:17
**characteristics**
41:7,10,12
68:4

**characterizati...**
34:6
**chat** 93:18
**cheap** 94:16
**check** 101:23
**cherry** 20:19
21:4
**childhood**
56:25 57:9
**children** 50:12
50:13,23 53:9
82:2 83:18,23
85:22
**choose** 20:23
43:2
**choosing** 21:6
**chris** 3:10 5:15
**christina** 2:21
6:7
**chromosomal**
41:8
**chromosomes**
45:19,19 46:5
**circle** 69:19
78:17,18,18,19
**circulated** 7:25
**circumstances**
65:6
**cis** 59:25
**cisgender**
15:23
**citation** 45:5
**citations** 46:10
46:17 47:24
63:17,22 88:17

**[citations - compound]**

92:7,10

**cite** 44:24 46:6
46:13 47:19
63:14,24 88:3
88:7,12 111:5

**cited** 18:7,14
57:13 58:10
84:18,24 85:3
85:4,12 93:8
95:7 96:18
99:4

**citing** 59:2

**clarification**
8:25 11:3
16:11 39:18
71:5 94:11,14

**clarify** 9:18
11:14 12:7,15
12:25 49:6
72:15 120:8

**clarifying**
26:11 43:1

**classification**
105:2

**classified** 50:14
80:14,15 81:1
81:2,23 82:1
83:11

**classify** 59:17

**classrooms**
90:23

**clause** 65:4

**clear** 8:23 11:4
19:20 49:17
60:20 75:16

96:19

**clearly** 7:20
34:9,24

**clients** 51:23
52:9

**clinic** 74:16
83:24 84:8,12

**clinical** 9:19,20
9:22 25:13,16
25:19 26:3,6,7
26:9,13,20
27:24 28:11
36:10,24 48:10
48:15,18 49:22
51:1 52:8
53:21 63:8,25
65:11 70:25
106:10,11
107:1 120:15

**clinically** 47:11
72:23 101:10

**clinician** 9:18

**clinicians** 53:8

**close** 103:14

**closed** 39:15

**coach** 34:7

**coaching** 33:25

**codified** 66:22

**coextensive**
70:10

**cohort** 52:24
54:17 88:10

**collegial** 35:3

**column** 95:10

**come** 7:20 22:5
51:24 62:20
93:12 103:10
114:21 119:20
120:23 121:4

**comes** 51:3,10
72:23 73:8
82:24 118:16

**comfortable**
88:23

**coming** 21:23

**commencing**
2:9

**commission**
104:10 123:25
124:25

**commissioned**
103:23 105:9

**communicated**
114:22

**communities**
63:3

**community**
74:5 116:10

**company** 2:6
5:17

**compare** 82:7
97:15

**compared** 27:8
89:16

**comparison**
27:3

**competent** 67:6
68:14

**complete** 8:10
8:21

**component**
14:25 15:2,4,7
15:14 16:18,18
20:25 21:2
22:16 30:2
31:11 32:7
39:8 43:2 44:8
45:20 46:5
48:1 70:4
71:23 89:3
91:6 97:23
104:5,18
114:24

**components**
9:7 10:23
18:18 26:21
30:16 31:12
36:6 41:22,25
42:18,22 43:11
44:23 46:4
52:20 69:9
72:10 114:19

**composed** 41:6

**compound**
12:12,22 14:17
16:5 22:1,13
24:14,25 25:18
26:5 28:25
36:11 37:2
38:19 42:5,15
42:24 45:15
48:17 49:25
51:6 53:2,22

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[compound - correct]**

54:23 55:6,18
65:24 68:22
69:14 70:13
72:20 74:10
76:25 77:17
79:6,21 83:15
89:1,21 97:1
97:16 105:11
108:9 120:14
**concept**   39:25
45:7 46:14,19
46:21 92:25
**concepts**   24:20
58:21
**conceptualize**
68:25 70:8
**concerned**   7:3
113:9,23 114:5
**concerning**
103:24
**concluded**
122:6
**concludes**
121:21 122:1
**concluding**
83:21
**conclusion**
19:16 20:6
21:8,18,23
22:2 57:21
59:25 61:3
66:7 110:4,6
**conclusions**
20:9 21:21
23:6 24:12

30:20 46:12
86:4,6 110:16
**conclusively**
45:22,24
**condition**   68:7
68:8,19 69:5
69:12 70:5,6
104:5
**conduct**   33:12
36:16 52:24
100:10,16
115:2
**conducted**
26:19 27:6
33:3,15 36:3
36:18 101:1
115:24
**conducting**
31:7,16
**confer**   120:23
**confined**   75:21
**confirm**   66:18
**confirmed**   92:4
**conflict**   115:6
115:10
**conflicts**
117:22
**confounding**
35:25 36:3
37:1 38:17
**confronting**
30:9
**congruence**
71:24

**congruent**   47:6
49:11
**consent**   65:18
**consider**   17:8
21:15 91:7
**considered**
45:20 46:5
63:10 96:12
**consistent**
49:14
**consistently**
47:14
**consisting**
123:9
**constant**   53:1
**cont**   3:1
**contained**
123:11,13
**contains**
124:15
**contents**
123:10
**context**   10:25
48:3 97:25
108:18 115:23
**continue**   13:1
55:20 57:25
75:4 116:23
**contradict**
86:25
**contrary**   24:13
86:13
**control**   26:3,8
26:14 90:1

**controlled**
26:19,22 27:5
27:16,24 28:6
28:23,24 29:14
36:18 37:6,11
37:15 89:24
**controlling**
38:16
**conversations**
51:15
**conversion**
63:7 64:11
**copy**   58:18
**correct**   8:17,18
9:5,6,12,13
10:13,14,18,21
11:6,7,11,19
12:11,21,24
13:10,23 15:19
16:3 17:14
18:8,16,24
20:14 29:23
30:9,23 31:19
31:22 32:3,11
32:24 33:6,9
38:18 39:8
40:12 41:15
42:4,7 45:8,9
45:13,25 47:18
50:5 54:22
55:5 58:9,11
62:9,10,13
63:13 64:20,25
65:3,8,23 66:5
67:24 68:9

Page 8

**[correct - delaying]**

70:21 72:4,19
73:5 74:5,6
77:5,16 78:19
81:9,17 82:14
84:1 85:4,7,15
85:16,18 86:14
87:15,24 93:25
96:18,25 97:15
98:4,14 99:6
100:8,9 102:12
102:14,16,17
104:1,11 105:4
105:10,16,21
108:14 109:23
110:6,17
112:17,19
115:7 118:8
119:6,22,24
120:1 123:15
**corrected**
123:14
**correction**
119:4,19
**corrections**
123:17
**correctly** 13:9
14:10 40:11
41:14 47:17
63:12 67:10,15
74:19 80:17
81:4,5 92:8
95:18 101:14
106:13 107:22
113:4,14
116:11 119:17

**correlates**
88:23
**corresponden...**
77:21 78:3,8
**corresponding**
77:12
**corresponds**
95:15
**counsel** 5:18
8:19 10:9 13:1
**counseling** 31:6
**count** 75:7,8,20
**countries** 105:9
105:9,20,23
110:16
**county** 2:7
123:3 124:3
**couple** 7:5
115:25
**course** 9:18
65:13 75:19
**court** 1:1 2:7
2:22 5:12 6:9
7:16 94:11,14
**courts** 34:21
**cpaek** 2:24
**critchfield** 1:6
5:10
**criteria** 71:4
76:22,23 77:1
79:17
**critique** 85:20
85:23
**crr** 1:25

**csr** 1:25
**culture** 4:17
**currently**
107:21 109:6
**cv** 1:5 5:11

**d**

**d** 2:15 4:1 5:1
13:4
**data** 49:3 50:21
53:12 55:1,13
64:16 72:12
74:15 77:10
79:7 84:7
85:24 87:1
90:2,5,20 91:2
91:4 92:12
97:12,13 105:8
109:1,17
**databases** 18:3
18:3
**date** 5:5 74:16
84:8 87:8,10
87:22
**dated** 87:15
102:11
**day** 2:8 9:22,22
84:14 123:8,20
124:19
**dcn** 1:5 5:11
**deal** 9:19
**debbie** 1:6 5:10
**debilitating**
67:7
**decatur** 2:23

**decided** 119:1
**decision** 102:15
103:19
**declaration** 4:9
8:7,10,17 9:3,4
9:12 10:5
16:14,18 18:14
18:21 19:4
25:13 39:20
41:4 45:7
46:11,25 58:10
62:23 63:20
66:15 85:3,5
85:13 87:20
88:12 95:8
**decrease** 48:24
49:2
**decreased**
51:20
**defendant** 5:22
**defendants** 1:9
2:5,14 5:9 6:2
**defined** 22:24
**defining** 115:12
**definition**
15:24 26:7
44:3,10,17,21
49:17
**definitions** 31:2
**degree** 31:5
**delay** 93:21
**delaying**
101:11 109:11
110:12

**[denying - disagree]**

denying  89:10
depend  21:3
  27:9 30:18
depending
  36:13 37:4
depends  22:20
  27:21 28:2
  29:9,18 30:3
  32:7,20 36:15
  36:20 37:9,16
  38:8,22 66:13
  117:8
depose  123:6
deposition  1:14
  2:1,4 5:3,8,13
  5:15 7:1,7 8:1
  35:3 73:16
  75:18,19 93:6
  102:3 112:1
  121:21 122:1,6
  123:8,10 124:9
  124:12,16
depositions  7:3
depression
  67:8
describe  16:12
  16:17 23:12
  24:3 26:2
  44:12,22
  115:19 118:12
  118:24
described
  55:15 56:22
  68:16 82:22
  90:11 99:21

describes  67:21
  68:7
describing
  22:21 68:18
  105:24 110:2
design  28:11,15
  28:19 29:9,18
  29:21 30:4,7
  30:19 32:8
  36:16,19,22
  41:16,18 42:12
  91:5,7
designated
  47:8 62:8,8
  91:20 99:18
designed  22:25
  25:16
designs  27:9
  38:2,6 54:5
desire  95:25
  96:13
desist  49:6,17
  53:20 54:21
desistance  50:4
  50:9,22 58:15
  58:24 60:2
  61:4
desisted  48:16
  50:3
desisters  80:16
  81:3
desists  48:7
  55:4,16
determination
  108:12,13

determinations
  21:16 108:5
determinative
  41:13 67:24
  68:5
determine  23:4
  28:4,7 43:14
  43:23,25 54:6
  100:11
determined
  45:12,23,24
  107:18
determining
  22:18 83:9
detransitioned
  48:13 50:3
developed
  100:4
development
  110:15
devita  74:9
diagnosable
  81:7 82:12
diagnosed  67:2
  71:1 79:2,4
  81:15
diagnoses
  50:18 77:3,14
  77:19 78:4,12
  79:8,18 80:7
diagnosis  43:12
  51:14 66:25
  68:23 69:8,16
  70:1,2,7,16,19
  76:24 77:8,11

77:15,21 78:1
  78:13,15
  104:18,24
diagnostic
  66:23
diagram  69:17
  78:17
difference
  23:13 89:20
different  18:18
  20:24 23:8,11
  23:16 30:14,17
  31:2 36:6
  39:10 41:23,24
  42:17 43:11,17
  44:9 45:18
  46:4 49:7
  50:19 59:1,3
  67:4 69:8
  77:18 79:24
  89:12 97:9
  98:13 104:20
  114:19 115:10
differently  14:6
direct  20:8
directed  12:10
direction
  124:14
directionality
  23:25 24:4
directly  14:2
  93:19
disagree  35:1
  87:6 95:20
  96:5 106:15,25

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[disagree - effectiveness]**

108:11,12
109:4,22 110:5
**disagrees** 86:4
**disclose** 117:4
117:18,25
**disclosed** 11:24
117:24
**disclosing**
115:4
**disclosure**
115:6
**discordant**
57:8
**discrimination**
4:13 14:2
99:20 116:19
116:20,22
118:15,17
**discuss** 24:11
60:19 92:25
**discussed** 37:10
46:19 66:19
**discussing**
51:17
**discussion**
86:22
**disorder** 4:11
59:8 77:13,22
78:19 79:4,20
84:1
**disorders** 66:24
**dispute** 75:8,15
75:24 76:1
**distinct** 41:6

**distinguishes**
19:13
**distress** 47:12
51:12,19 55:12
67:1,4,7 68:24
69:2 70:6
**district** 1:1,2
5:12,12
**divergence**
41:11 68:3
**document** 45:3
46:9 47:23
48:4 63:24
64:22,23 68:11
84:3 92:14
93:3 95:22
96:9 99:12
101:16 102:22
113:7 114:1,10
116:17 118:23
**doing** 15:18
21:23 27:15
34:7,24 72:2
104:16 111:12
**doubt** 24:23
25:5
**dr** 5:8 6:22
8:22 9:18 29:7
41:2 55:23
56:1 62:7,11
65:5 71:17
74:5,9,9 75:2
76:21 83:12
84:19 87:4
88:9 95:5

101:4 102:10
102:21 103:18
107:25 112:2
112:13 117:17
120:8 121:15
122:1
**draw** 30:21
**dress** 47:7
**droz** 2:16 5:25
5:25
**dsm** 50:18
66:25 76:22
77:9,22,23
79:3,5,17
104:25
**dsms** 77:13
**duly** 6:12 123:5
124:9
**dumb** 78:23
**duty** 34:8
116:21
**dying** 73:13
**dysphoria**
14:23 43:12,13
43:14 47:3,13
48:7,16,24
49:1,10 51:3
51:14 52:5
53:20 54:19,21
55:3,4,16
57:20 60:2
63:2 65:8
66:22 67:3
68:24 69:1,7
69:15,18,25

70:11,12,16,20
71:1,4 74:17
76:22 77:4,9
77:14,23 78:9
78:11,18 79:2
79:9,19 81:8
81:16 82:6,13
84:9 88:11,21
89:16 98:12
100:13 103:25
104:21 105:16
120:10

**e**

**e** 3:8 4:1,2,6 5:1
5:1 8:2,6 57:3
57:4 73:13
93:19
**e.g.** 91:21
**eagle** 67:17
**earlier** 121:5
**easily** 90:22
**easy** 7:15
**edition** 66:24
**editor's** 119:10
119:11
**educational**
31:5 116:9
**effective** 28:8
38:16 47:11
51:23 72:14
**effectively**
38:10
**effectiveness**
27:7 37:7 38:5
106:12 107:2

**[effects - experience]**

effects  26:1
effeminate
　56:24
efficacy  27:7
　28:12 37:8
　38:5 103:24
efforts  63:8
　64:3
either  18:14
　24:1 29:13
　36:19 86:24
　111:6
elect  97:9
elected  116:3
eliminating
　36:25
elliott  101:4
employees
　116:6
encompass
　8:21
ended  39:13,15
endocrine
　101:10
ends  42:6
engage  22:9
　116:2,25
　118:18
england  106:16
　106:20
england's
　106:8
ennis  3:10 5:15
ensure  30:13
　113:12 116:22

ensuring  17:5
　31:9 51:19
entirety  108:18
　110:2,4
entitled  2:10
　76:6
equal  28:21
equals  74:17
equation
　115:23
equivalent  20:4
　20:13
especially
　57:17 63:21
　75:7 85:12
　106:3 109:16
　110:11
esq  2:15,16,21
　2:21,22 3:3,3,7
essential  15:2
　31:19,25 32:6
　32:10,10,17,23
　33:5
established
　39:25
et  1:3,8 5:9,10
　63:22
ethical  36:15
　116:21
ethically  36:19
ethics  90:14
　91:4
europe  106:3
european
　110:15

event  124:18
everybody
　111:12 115:16
　116:14
evidence  10:25
　17:6,8 19:7
　20:24 21:6,15
　22:8 23:2
　24:13,16 26:17
　27:18 28:1
　29:1,16 36:9
　36:12 37:3,18
　38:20 39:1,2
　46:2 50:7 53:3
　53:23 54:12,24
　55:7,19 57:24
　58:17 59:20
　62:4 65:25
　70:23 71:22
　72:8,8 77:7
　88:15 97:17
　100:6,18
　103:24 106:11
　106:18 107:1,7
　107:7 108:1,9
　108:23 109:10
　109:18 110:9
　110:19 115:1
　116:17 117:21
　118:3
exact  30:4
exactly  20:16
　22:18 54:13
　58:7 80:2
　110:3

examination
　6:16
examine  11:4
examined  6:14
　124:8
example  26:25
　28:6 30:16
　37:12 43:5,9
　47:15 48:21
　52:13 64:9
　67:7
examples  101:9
excluding  13:6
　13:21
exclusion  13:17
　14:3
executed  87:23
exhibit  4:9,11
　4:13,15,17 5:3
　8:1 60:9 73:14
　73:16 93:5,6
　94:13 101:25
　102:3 111:25
　111:25 112:1
exist  15:22
　105:6 108:23
　115:22
expect  79:16
experience  9:19
　9:20 15:3
　27:19 31:7
　37:13 39:12
　48:10,15,18,19
　49:3,23 50:8
　51:7,22 52:8

**[experience - follow]**

53:4 63:25
65:11 67:3
**experienced**
118:15
**experiment**
41:17,18
**expert** 4:9 8:7
10:10 57:15
62:8 69:24
84:24 100:15
**expertise** 16:19
16:20,21 17:9
31:3 100:19
**experts** 100:5
**expires** 123:25
124:25
**explain** 24:22
25:4 26:13
**explaining**
24:20
**explore** 40:4
**express** 40:8
**expressing** 86:6
86:12
**extensive** 17:7
**extent** 9:9
11:21 17:4,13
23:4
**external** 41:9
**extra** 7:12
103:10
**eye** 67:17

**f**

**facilities** 13:7
13:19 14:9,14
14:21 15:12
47:9 89:18
**facility** 89:11
**facsimile** 2:18
**fact** 53:7 54:9
54:14 88:9
107:9 108:21
119:3
**factor** 41:13
67:24 68:5
**factors** 44:9
**facts** 23:2
26:16 27:18,25
29:1,16 36:12
37:3 38:20
46:2 50:7 53:3
53:23 54:12,24
55:7,19 57:23
58:17 59:19
62:4 65:25
70:23 77:6
88:14 97:17
106:17 108:1,8
110:19 116:17
117:21 118:3
**faculty** 91:22
**fail** 24:12
**fails** 24:22 25:4
**fair** 11:8 13:11
14:4,12 21:10
31:17 71:18,21

**false** 22:11
42:11
**falsified** 19:13
22:25
**familiar** 19:5
58:3 66:18
74:4,8 102:18
103:18
**familiarize**
75:3
**families** 52:14
**family** 51:18
52:1 65:17
**far** 7:3 90:22
105:25
**fast** 76:3
**faster** 112:12
**feasibility**
25:20 26:10
27:2 28:14
**federal** 19:6
75:17
**feel** 49:10,13,14
**feelings** 49:13
**feels** 49:9
**feeney** 93:7
95:7 99:15
**feminine** 56:14
**fetus** 45:11,23
45:24
**fetus's** 45:12
**field** 46:23
96:10 100:5,16
100:17

**fields** 19:14
**fifth** 66:24
**fight** 103:10
**filed** 87:15
**finding** 19:2
109:16
**findings** 86:13
86:25
**fine** 25:10
40:19 75:12
**finish** 7:14
107:24 121:5
**firm** 21:23
**first** 6:12 7:2,6
14:5 21:23
42:2,3 50:10
59:13 66:16
74:14 80:22
84:6,14,16
93:8 95:9
111:14 123:5
**fit** 22:19 51:13
57:18
**fits** 20:25 21:7
**five** 10:12
103:10 104:4,6
104:10 121:1
**floor** 3:4
**focused** 26:23
**focuses** 72:10
**follow** 4:11
37:24 53:15
54:3 55:3 57:1
57:10 59:7
74:15 80:18

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[follow - go]**

84:7 85:21,24
**followed**   37:24
52:25 53:25
54:18 55:10
56:7 64:12
**following**   53:10
59:24
**follows**   6:14
33:16
**force**   90:18
**forced**   90:3
**forcing**   94:8
**foregoing**
123:7 124:9,15
**foremost**   100:5
**form**   18:23
29:13 34:12,13
34:14 39:2
50:15 104:13
113:11,20
**format**   7:10
**formed**   9:10
**forming**   9:2
17:13 18:6,13
**forward**   10:3
34:4 52:21
66:10 83:1
94:18 120:18
**found**   63:9
64:3,4
**foundation**
19:15 30:25
54:24 55:24
56:18 57:24
58:17 59:20

62:3 77:24
81:19 82:16
83:15 84:20
85:8 87:7
88:15 105:12
106:18 107:13
108:2,9 109:9
110:19 111:10
112:8 113:7
118:11
**fourth**   95:12
**francisco**   3:4
**friendly**   35:3
**front**   61:12
73:15,18
**frontiers**   59:8
**full**   17:4,13
64:9 76:7 95:9
124:15
**function**
116:25
**further**   60:7,19
120:19 121:15
124:17

**g**

**g**   5:1 57:4
**gather**   108:25
**gay**   57:21
58:14
**gender**   4:11,16
13:8 14:23
39:24 40:3,3,5
40:8 41:10,12
43:10,11,13,14
43:15 45:23

47:3,6,8,10,12
48:7,16,24
49:1,10,12
50:14 51:3,13
52:4 53:1,20
54:18,21 55:3
55:4,15 56:9
57:8,20 59:4,8
60:2 63:1,2,5
65:7,15 66:11
66:21 67:1,3,5
67:22,23 68:4
68:23 69:1,3,7
69:15,18,25
70:11,11,16,20
71:1,4,19,22
72:3,13,16,18
73:11 74:16,17
76:22 77:2,3,9
77:13,14,22,23
78:9,10,17,18
79:2,4,9,19,19
81:7,9,16,17
82:6,12,14
83:2,3,3,7 84:1
84:8 88:11,21
89:11,15 90:5
92:1,18 93:25
95:14,15,16,25
96:3,6,7,15,20
96:24 97:7,10
97:13,21 98:7
98:12,23 99:5
99:19 100:13
101:8,12

103:25 104:21
105:2,15,24
107:20 109:5
109:12 110:11
116:7 120:10
**general**   2:15
11:17 12:8,17
12:19,21 19:18
28:17 30:1
38:13 39:15
59:21 111:2
115:14
**general's**   5:21
5:25 6:1,25
**generally**   20:2
20:2 27:13
**georgia**   2:23
**getting**   54:16
60:4 61:16,18
**ghorayshi**
102:12,13
**give**   8:11 58:1
86:5,13 103:2
103:11
**given**   28:21
30:8 60:9
97:25 99:19
123:13
**giving**   7:14,17
11:9,16 12:20
13:5,12,22
33:21
**glad**   67:15
**go**   42:19,25
43:8,11 44:9

**[go - idaho]**

46:4 48:21
51:16 52:11
65:17 71:8
73:1 75:9,10
75:13 76:11,13
87:21 91:13
93:1 94:18,20
103:4,15
111:14 119:10
120:12,21,22
**goal** 115:18
119:15
**goes** 48:22 58:5
**going** 28:16,18
33:23 34:4
55:20,21 56:17
60:7,25 62:19
76:2,7,9 99:23
101:24,25
102:7 103:11
111:24 112:7
**good** 6:18 35:5
71:6 94:10
120:25
**gotta** 101:22
**gotten** 94:17
**great** 9:19
39:23 40:13,20
112:11
**greater** 80:9
**groom** 47:7
**group** 3:7 4:15
26:3,4,8,9,14
26:24 52:25
71:3 90:1

91:21
**groups** 27:3
116:10
**guess** 23:18
29:20 43:2
**guidelines**
64:10 104:4
115:2

## h

**h** 4:6
**hailey** 3:8
**halfway** 80:21
**hand** 18:19
28:18 29:10
30:5,14 36:14
37:5 57:18
95:10 97:25
99:20 116:19
124:19
**handle** 111:22
**happen** 49:4
**happened** 98:3
108:7
**happening** 82:7
86:19 106:20
**happens**
104:22
**happy** 93:19
**hardball**
103:12
**harm** 14:1
37:13 67:9
92:16
**harmed** 16:8

**harmful** 63:9
64:4,5 90:3,17
91:2
**harms** 13:5,17
13:21
**head** 7:19
112:23
**heading** 112:24
**headings** 10:13
**health** 4:14
15:16 25:22
53:15 54:8
71:24 100:5,7
101:6 106:8,16
108:5,13
109:14 111:7
**healthcare**
107:17 116:4
**hear** 19:21
101:18
**heard** 40:12
**held** 5:13
**helpful** 71:5
**hey** 51:11
**hiccup** 40:10
**high** 91:21
**hired** 11:1
**hmm** 7:19
**hold** 44:14
90:23 91:10
101:22
**home** 47:15
**homosexual**
57:8

**honestly** 28:2
**hormone** 43:6
48:23 107:20
109:5,12
**hormones** 41:8
43:4,7 101:12
109:12 110:12
**host** 100:17
**hour** 2:9
**hours** 75:18,22
76:6,8
**huh** 7:19 24:5
**human** 19:14
40:3 113:21
115:15,16,22
**humans** 115:14
**hundreds**
57:16
**hypotheses**
19:12 22:4,15
22:16 23:17
24:6 38:14
86:18
**hypothesis**
22:11,21,22,24
23:8,14,19,24
38:10
**hypothetical**
29:2 62:3

## i

**icd** 105:1
**idaho** 1:2,7 2:8
2:17 3:8 5:12
5:20 6:1,24
73:22 94:16

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[idaho - inquiry]**

124:2,6,24
**idea** 21:7 94:10
**ideation** 67:8
**identified**
48:12,15 56:5
57:21 58:13,14
59:25 61:2
62:14 84:13
88:10
**identify** 50:12
50:17
**identifying**
17:10 34:19
**identity** 4:11
13:8 39:25
40:4,5,8 41:10
41:12 43:10,15
47:6,8,10
49:12 51:12
52:23 53:1,14
56:9 57:9
58:25 59:8
63:2,5 67:22
67:23 68:4
69:3,12,16,18
70:3,5 71:24
72:18,24 73:3
74:18 77:2,13
77:22 78:19
79:4,11,20
82:6 83:8 84:1
89:12 90:5,19
92:1,18 95:16
96:16 97:7,21
98:23 99:19

**illegal** 63:11
64:19,24 65:2
66:4
**imagine** 90:15
97:4 98:18
**impact** 4:13
35:21 36:6
92:5
**importance**
14:8 68:13
71:18 72:3
111:3
**important** 15:4
15:6 29:22
30:2 35:8,16
35:19,24 36:5
37:6 41:13
47:2 67:23
68:5 109:20
110:23 114:18
**impossible**
79:25 82:4,18
97:24
**improper** 34:6
34:25 90:9
**improve** 72:2
109:13,13,14
**improved**
71:23
**inaudible**
121:17
**include** 18:20
39:1,16 46:17
48:3 63:17,20
74:20 80:8

**included** 9:4
18:7,15 26:9
31:12 33:3,18
35:13 36:4
41:22 43:15,18
44:3 72:11
82:20 88:17
97:19 115:16
117:10 118:14
**including** 17:5
41:7 78:14
**inclusive** 99:15
99:21 123:9
**incongruence**
67:2,5 68:15
68:25 69:1,4
70:7 105:2
**incongruent**
72:18 83:8
**increase** 79:8
**increased** 77:4
**increases** 55:12
**indicate** 20:8
24:6 57:16
72:25 90:2
92:16 105:25
109:13 111:3
118:5
**indicated** 51:24
90:6 101:11
**indicates** 16:19
68:13 71:22
73:8 82:25
86:20 107:8
110:10

**indicating**
44:12 51:11
108:24 111:1
**indicative**
109:19
**individual** 41:5
47:4 91:25
**individual's**
47:15 63:5
**individuals**
40:7 67:2,4
88:20 91:19
100:12
**ineffective** 63:9
64:3,5
**influenced** 41:7
**inform** 19:2
**information**
17:6,10 20:24
21:6,20 24:22
25:4 37:7 48:3
61:12 63:19
64:8,10 86:17
109:1 114:15
114:19,22
119:2
**inherently**
24:24 25:6
116:14
**inhibiting**
107:19 109:5
**injunction** 8:13
10:17 12:2
**inquiry** 19:14
44:7

**[insofar - latitude]**

| | | | |
|---|---|---|---|
| **insofar**  114:14 | **involved** | 117:10,13 | **l** |
| **instance**  21:5 | 106:23 113:20 | **kinds**  20:24 | |
| 26:18 89:10,25 | **issue**  9:25 | 30:14 36:16 | **l**  3:7 4:9 |
| 98:19 116:24 | 17:23 34:12 | 79:14 | **lab**  112:16,25 |
| 117:9 | 76:9 86:12 | **know**  7:2,18 | 113:1 116:1,5 |
| **instances**  52:17 | 88:19 | 10:5 15:15 | 116:8 119:14 |
| **institution's** | **issues**  12:10 | 16:7 18:17 | 119:14,20 |
| 117:15 | 105:21 116:4,9 | 22:16,20 23:18 | **lab's**  113:9,23 |
| **institutional** | **j** | 31:3,4,13 | 114:6 |
| 90:16 91:3,6 | | 37:24 39:20 | **lack**  118:10 |
| 97:4 | **j**  2:16 3:3 | 42:2 43:17,22 | **lacks**  19:15 |
| **instruction**  1:8 | **james**  63:22 | 49:2 50:17 | 30:25 54:24 |
| **intend**  8:11 | **journal**  33:17 | 51:11,14,21 | 55:24 56:18 |
| **interest**  115:11 | 119:4 | 52:13 53:7 | 57:24 58:17 |
| 117:23 124:17 | **journalist** | 54:2 56:10 | 59:20 62:3 |
| **interject**  33:20 | 119:1 | 60:14 61:21 | 77:24 81:19 |
| **internal**  40:2 | **judicial**  19:6 | 62:23 68:14 | 82:15 83:15 |
| 41:9 | **july**  87:15 | 69:21,22,23,23 | 84:20 85:8 |
| **internet**  73:21 | **jump**  41:3 | 71:2 72:25 | 87:7 88:15 |
| 73:24 93:11 | **june**  106:8 | 73:14 78:7,11 | 105:11 106:18 |
| **interpose**  8:19 | 107:12,15 | 78:22 90:17 | 107:13 108:1,9 |
| 11:21 99:9 | **k** | 91:2,11 93:9 | 109:8 110:18 |
| **interpretation** | | 93:14,17 94:9 | 111:9 113:7 |
| 95:24 | **k**  57:3 | 99:3,17,25 | **lambda**  2:20 |
| **interrupt**  60:23 | **keep**  34:3 93:20 | 102:1,23 | **lambdalegal....** |
| **interruptive** | **kenneth**  74:3 | 103:13 108:25 | 2:24,24,25 |
| 9:17 | **kid**  82:24 | 109:18 110:25 | **landscape** |
| **intervention** | **kids**  37:12 | 112:3 115:14 | 23:23 |
| 53:21 54:19 | 50:16 81:23,25 | 116:20 117:11 | **large**  44:11 |
| 55:5,11 | 82:19 84:11 | 118:25 120:23 | 109:15 |
| **introduced** | **kind**  15:22 | 123:10 | **larger**  53:8 |
| 6:23 77:9 | 23:22 36:14 | **knowing**  76:9 | 79:3 |
| **invalid**  92:1 | 37:15 38:7 | **known**  46:21 | **largest**  74:15 |
| **invalidated** | 47:25 53:8 | | 84:7 |
| 92:6 | 54:1 55:10 | | **latitude**  33:21 |
| | 56:8 111:2 | | |

**[laundry - matter]**

**laundry** 29:3
**law** 3:7 88:18
**learning** 31:7
**leave** 12:16
**lebovitz** 56:14
**led** 26:22 30:22
**leeway** 61:6
**left** 95:10
**legal** 2:20
19:16 20:5
21:18 22:2
66:7
**letters** 116:3
**level** 7:10 15:15
16:19 17:7
35:12 80:7
115:15 118:16
**levels** 16:21
43:6,7,14
**life** 40:9 47:15
109:14 113:21
**lifesaving**
107:10
**likewise** 91:25
**limit** 34:17
**limited** 41:8
104:16,17
**lincoln** 2:15
5:20 6:24
11:20 34:19
40:14 55:20
60:4,13 61:6
67:12 73:17
74:23 94:19
102:19 119:8

121:23
**lincoln.wilson**
2:18
**line** 55:21
**linnet** 3:7 6:5,5
**list** 29:4
**listed** 9:11
10:23
**lists** 10:12
101:9
**literature** 17:5
17:13,19,21
18:4,5,13 19:3
20:8 24:17,18
50:10,11,16,25
53:5 63:8 86:5
86:14,20
**little** 27:12
80:21
**living** 49:14
**long** 103:8
**longer** 49:13
56:10 61:2
**longitudinal**
38:2 53:13
57:9 109:17
**longitudinally**
25:25 53:7
**look** 9:15 10:4
13:4 22:5,7,15
25:12 34:5
35:12 36:5
46:25 51:18
61:11 62:22
66:15,17 91:4

91:8 93:1 95:6
95:12 99:24
102:23 106:6
**looking** 25:20
**looks** 102:7
**lot** 18:18 27:8
30:18 32:7
42:16 44:9
46:4,10 50:16
50:19 53:5,8
53:10 61:6
63:19,23 90:2
90:20 91:1
97:18
**lots** 37:9 43:17
**love** 120:6
**lower** 36:9
37:18

**m**

**m** 4:2
**made** 90:25
123:17
**madison**
112:17 116:6
**madison's**
112:24
**mail** 8:2,6
73:13 93:19
**maintain** 12:18
15:7 68:8
**maintained**
117:13
**maintains**
15:15

**major** 44:4,21
46:19 101:6
**majority** 54:20
55:9,16 56:10
61:2 70:24
**make** 7:15,17
7:22,23 8:23
10:1 11:25
20:9 33:24
34:9,23 40:17
41:8 75:13,15
83:12 102:22
**making** 21:16
21:21 22:17
44:10 68:20
78:14
**manner** 35:3
47:7
**manual** 19:6
66:24
**mark** 8:1 60:6
60:17 61:10,13
61:14
**marked** 5:3
60:8 73:16
93:4,6 95:6
102:3 112:1
**martin** 1:25 2:6
3:3 5:16 6:6,6
124:5,23
**master's** 31:5
**match** 63:5
92:18
**matter** 2:10 5:9
10:10 12:19,21

**[matter - name]**

| | | | |
|---|---|---|---|
| 37:19 87:4 | **memorialized** | 66:3 73:5 | **moment**  62:20 |
| **max**  3:3 6:4 | 75:14 | **minus**  75:22 | 74:24 102:20 |
| **max.rosen**  3:5 | **mental**  4:13 | **minute**  93:13 | 103:2 |
| **mean**  9:16 | 15:15 25:22 | 102:8 112:5 | **moments**  103:6 |
| 15:21 21:1 | 53:14 54:8 | 121:1,1 | **money**  57:7,19 |
| 24:4,9 49:6 | 66:24 71:24 | **minutes**  103:10 | 58:10 |
| 65:4 69:22,23 | 101:6 109:13 | 121:2 | **monitor**  119:15 |
| 72:7,16 78:22 | **mentioned** | **missed**  19:24 | **monitored** |
| 80:5 98:18 | 58:23 64:18 | 67:18 | 119:13 |
| 99:1 104:14 | 89:23 106:21 | **mission**  3:4 | **morning**  6:18 |
| **meaningful** | 110:1 | 117:15 | **motion**  8:12,16 |
| 75:1 | **met**  11:13 | **misstates**  15:9 | 10:17 12:2 |
| **means**  75:1 | 116:5 | 17:15 19:22 | **mountain**  2:10 |
| **meant**  114:8,12 | **method**  16:12 | 29:1 30:10 | 5:6 40:22,25 |
| **measure**  43:21 | 16:24 17:2,22 | 31:20 32:1,25 | 71:12,15 76:15 |
| **measures**  43:12 | 21:25 | 39:3 44:1,18 | 76:19 94:24 |
| **medical**  4:15 | **methodologi...** | 45:2 46:8 | 95:3 111:20 |
| 11:17 44:4,4 | 31:9,15 | 47:22 64:21 | 121:8,12 122:3 |
| 44:21 46:20 | **methodologi...** | 65:9 67:25 | **move**  10:3 |
| 48:23 55:11 | 33:15 92:16 | 68:10,21 69:13 | 25:11 39:19 |
| 56:8 63:3 | **methodologies** | 72:5,21 78:5 | 83:1 120:17 |
| 65:20 69:9 | 33:18 | 81:10,18 82:16 | **moving**  40:16 |
| 79:14 101:6 | **methodology** | 83:14 84:2 | 52:21 112:12 |
| 104:4 | 19:2 21:14 | 85:9 92:13 | **mto.com**  3:5,6 |
| **medically** | 30:17 37:25 | 95:21 96:8 | **multifaceted** |
| 101:13 | **methods**  30:17 | 97:2 99:11 | 41:6 |
| **medication** | **middle**  60:23 | 100:22 107:4 | **multiple**  22:14 |
| 101:11 | **midway**  80:12 | 108:15 109:24 | 23:16 41:21 |
| **medicine**  12:9 | **mind**  50:25 | 110:8 113:6,25 | 42:18 |
| 40:1 | **mindful**  7:12 | 114:9 116:16 | **munger**  3:2 |
| **meet**  71:4 | **minor**  11:9 | 118:10,22 | |
| 116:2 | 51:4 65:14 | 120:4 | **n** |
| **meetings**  116:3 | 71:3 | **mm**  7:19 | **n**  4:1,2,2 5:1 |
| **members**  113:1 | **minors**  63:11 | **module**  27:1 | 74:17,20 |
| 116:2,3 | 65:1,4,7,12 | | **name**  6:19,21 |
| | | | 6:24 47:5 74:4 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[named - objection]**

named  123:7
124:8,13
names  74:12
national  106:8
106:16 107:17
108:5,13 111:6
natural  15:14
nature  34:20
53:13 64:11
necessarily
13:22 24:1
28:16 32:10
51:9
necessary  67:6
68:8,14 101:13
necessity  65:20
need  27:3 28:10
28:17 31:14
34:15 37:23,24
38:3 58:6,8
59:15 62:5,17
70:2 75:10
84:21 86:12
87:8 88:16
99:7,14 102:8
103:5 104:14
112:5
needed  16:11
52:2,18 117:23
117:23
needing  52:11
needs  36:22
60:8,9 69:5
86:5

negative  92:5
neutral  93:25
95:14,25 96:7
96:20 97:10,13
98:7 99:5
never  56:7
83:17 84:12
94:9
new  40:16,17
102:11
nice  7:15
nine  57:20,21
nip  45:11,17,22
nodding  7:18
nonbinary  4:14
nonconforming
50:14
nondiscrimin...
116:5
notary  2:7
123:24 124:6
124:23
note  119:10,11
noted  18:6
67:15 119:5
november  87:5
null  22:15
number  5:11
54:16 66:1
67:3 80:8
numbered
123:9
numbers  39:16
91:14,15

numerous
63:11 64:19,24
65:2 66:5 92:4
nurse's  91:22

**o**

o  4:2 5:1
oath  123:6
object  13:1
34:5,14 56:3
objection  8:20
9:24 11:21
12:12 13:13,24
14:17,24 15:9
15:20 16:15
17:1,15,25
18:9,25 19:8
19:15,22,25
20:5,15,21
21:9,11,17
22:1,13 23:1,9
23:15 24:14,25
25:18 26:5,16
27:17,25 28:25
29:15,24 30:10
30:24 31:20
32:1,12,18,25
33:7,23 34:4
34:13,14,18,20
34:23,25 35:10
35:18 36:1,11
37:2,20 38:11
38:19 39:3,9
41:19 42:5,14
44:1,18 45:2
45:15 46:1,8

46:16 47:22
48:8,17 49:19
49:25 50:6
51:6 52:7 53:2
53:22 54:11,23
55:6,18 56:16
57:23 58:16
59:10,19 60:3
61:5,21 62:2
62:16 63:16
64:6,21 65:9
65:24 66:6
67:11,25 68:10
68:21 69:6,13
69:20 70:13,22
71:20 72:5,20
73:6 74:7
76:25 77:6,17
77:24 78:5,20
79:6,21 81:10
81:18 82:15
83:14 84:2,20
85:8,19 86:7
87:7,12 88:5
88:14 89:1,6
89:21 90:12
92:13,22 94:1
95:21 96:8
97:1,16 98:5
98:15 99:10,11
100:14,22
101:2,16 104:2
104:12,13,23
105:5,11,22
106:17 107:4

**[objection - paragraph]**

107:13,23
108:8,15 109:8
109:24 110:7
110:18 111:9
112:18 113:6
113:18,25
114:9 115:8
116:16 117:7
117:20 118:2,9
118:22 119:23
120:3,14
**objections**   10:2
25:7 33:10,22
34:6,8,11,18
42:8,23 57:2
57:11 59:14
61:24 74:24
83:13 86:15
105:17
**objective**   22:10
**observational**
36:9 37:19
38:1,16 97:12
**obtain**   67:5
**obtaining**
68:14
**obviously**   8:20
11:23
**occur**   50:5
**occurs**   67:9
**offered**   91:18
**offering**   8:22
10:16,24
**office**   2:15,16
5:21 6:1,1,25

51:10 72:23
73:8 82:25
**official**   1:7
**officials**   116:4
**oh**   43:1 53:17
83:11
**okay**   7:9 12:25
16:10 40:13,21
49:8,21 57:5
62:25 67:20
71:11 74:22
75:11 76:14,18
79:1 80:23
91:12,16 93:22
94:15,22,23
95:2,12 99:2
100:1 103:9,17
111:16,24
112:11 121:3,7
121:25
**oklahoma**   62:9
84:19
**old**   56:22 57:17
58:20 59:18,22
85:24,24
**older**   66:3
**olson**   3:2
**once**   116:2
**ones**   50:19
57:17 106:3
**open**   25:13
26:6,7,9,20
27:16 28:11,23
39:13

**opine**   46:12
**opining**   10:22
13:16,21 14:7
14:25 15:17
16:3,6
**opinion**   9:10
11:9 13:5,12
13:23 14:13,20
14:21 15:11,21
18:14 86:6,12
89:4,7
**opinions**   8:11
8:15,22 9:3
10:10,15,20
11:12,16,17,24
12:8,8,17,17,21
13:3 16:13,25
17:14 18:6,23
**opportunity**
58:2 60:9
**opposed**   27:16
**order**   70:1,15
87:1
**organization**
11:10 44:5
101:7
**organizations**
44:22 46:20,22
64:12 116:10
**organs**   41:9
**orientation**
74:18
**original**   119:20
**originally**
119:12

**othered**   92:6
**outcome**   56:15
57:8 60:12
**outcomes**   53:15
**outdated**   59:5
**outs**   90:24
**outset**   81:8
**outweigh**
107:21 109:6
110:12
**overarching**
48:1
**overlap**   23:22
**oversight**
107:17
**own**   100:10
120:24

**p**

**p**   5:1
**paek**   2:21 6:7,7
**page**   4:3,8 12:3
12:4 80:13
95:6,10 106:7
112:23
**pages**   4:10,12
4:14,16,18
123:9
**paper**   117:5
**paragraph**
10:5,8 13:4
25:12 39:19,24
40:17 41:3,22
41:25 43:19
44:25 45:4
46:25 47:20,25

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[paragraph - point]**

47:25 48:5
62:22 63:1,14
63:18 66:18,21
67:21 68:2,6
68:13,16 80:22
91:9,13 95:9
99:24 100:4
101:5 106:7
**paragraphs**
66:15 116:1
**parcel** 117:14
**part** 12:16 14:9
14:14 23:18
36:4 47:4
50:23 63:25
80:19 91:7
95:16 97:22
100:19 114:25
114:25 117:13
117:14
**participants**
80:13,25 81:15
81:22 82:12
**particular** 7:12
11:9,10 15:18
18:2,21 20:25
21:8 23:23
25:19,24 26:18
26:20,24 27:14
28:11 31:11
40:3 43:18
44:10 45:4
46:11 63:18,24
65:16 82:8
104:18,18

106:4,5 108:17
108:24 110:6
114:24 115:13
**patient** 120:12
**patients** 50:2
53:10 54:20
55:17 57:20
58:12 59:24,25
61:2 65:21
66:2 120:9
**paul** 3:3 6:6
**paul.martin**
3:6
**pause** 73:20
74:23 75:2
**paused** 66:13
**pay** 116:7
**pdf** 95:6 112:24
**pediatrics**
102:16 103:19
103:22
**peers** 91:24
92:3
**people** 11:18
20:23 21:4
25:23 40:4
43:15 47:1
51:16 52:25
55:3 58:25
68:15,19 70:10
70:11,24 71:3
71:25 78:15
79:3,12 81:7
89:15 97:12
98:16,22 105:6

105:16 112:21
114:15,20
119:12,15
**people's** 117:12
119:16
**percent** 80:14
80:15 81:1,2
**percentage**
51:2,4
**performed**
65:14
**period** 42:6
79:24
**persistence**
88:11
**persisters**
80:14 81:1
**person** 72:23
91:23
**person's** 40:1
51:19
**personally**
11:13
**persons** 14:16
14:22,23 15:8
15:19
**perspective**
90:15
**peter** 2:22 6:3
**ph.d.** 1:14 2:1,4
4:3,9 6:11 31:6
123:5,19
**phenomena**
11:18

**phenomenon**
23:24 105:3,4
**phrase** 11:15
**pi** 11:22
**picking** 20:19
21:4
**picture** 112:20
**piece** 84:5
**pieces** 22:9
43:4,18 44:12
51:13 86:21
**pin** 62:20
**place** 36:15
66:12 71:6
99:17 124:13
**places** 98:3,7
98:10,20,21
**plaintiff** 11:5
11:10,10
**plaintiff's** 8:12
75:17,23
**plaintiffs** 1:4
2:20 3:2 5:24
6:3,4,5,6,8 10:9
11:5 12:11,14
12:20 121:14
**play** 103:12
**please** 5:18
6:10,19 14:19
18:11 25:2
60:23 81:13
86:10 105:14
105:19 114:3
**point** 8:24 9:8
9:25 56:1 84:4

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[point - public]**

| | | | |
|---|---|---|---|
| 121:16 | prenn 2:25 | problem 34:21 | prove 22:11,12 |
| poorly 121:20 | present 3:10 | procedure | provide 10:10 |
| position 75:17 | 55:22,25 56:17 | 22:24 42:12,13 | 37:6 45:5 |
| 75:19,23 76:2 | 56:24 58:18 | procedures | 46:10 47:24 |
| 76:4 77:20 | 59:11 60:6,17 | 69:10 85:25 | 64:7 86:20,24 |
| 101:8 104:9 | 60:22 61:10,10 | 104:15 | 86:24 96:6 |
| 106:15 | 61:15 | process 16:22 | provides 88:19 |
| positions 75:14 | presented | 17:9,18 18:1 | providing |
| 76:13 | 120:11 | 18:23 19:2 | 65:18 86:16 |
| possible 30:8 | preserve 33:24 | 23:3 25:21 | 95:13 |
| 33:16 53:16,19 | 34:8,13,15 | 27:3 28:14 | psychiatric |
| 71:2 85:11 | preserved | 31:7,15 35:22 | 66:22,25 |
| 99:1 107:21 | 34:10 76:12 | 36:4 45:14 | 104:25 |
| 109:7 115:21 | preserving | 51:16,18 52:11 | psychiatry 59:9 |
| post 2:16 | 35:7 | 52:12,13 53:11 | psychological |
| potential 115:5 | pretty 65:12 | 54:6 64:16 | 11:17 17:3 |
| potentially | 69:21 | 65:16,19 73:1 | 40:2 44:5,6,22 |
| 81:25 | previous 27:6 | 91:3 97:22,23 | 46:20 63:3 |
| practice 9:22 | 29:8 50:18 | 111:3 114:13 | 64:8,14 65:19 |
| 51:2 70:25 | 78:11 85:12 | processes 17:3 | 67:7 92:5 |
| 87:2 104:7 | previously | 20:11 30:22 | psychology |
| 115:1 120:15 | 58:13 85:11 | 35:14 36:15,17 | 12:10 31:5,6 |
| practices 86:1 | 102:24,25 | 52:2 53:14 | 40:1 |
| predict 79:23 | 110:1 | 54:8 59:4 73:9 | psychotherapy |
| 80:3 | price 93:7 95:7 | 73:11 80:9 | 25:25 26:1 |
| prefer 94:19 | 99:15 | 115:2 | 27:1 28:8,9 |
| preferred | primarily | progress 35:2 | 63:4 73:10 |
| 26:15,15 28:24 | 67:21 69:11 | pronouns 47:6 | puberty 101:11 |
| 29:14 | primary 64:15 | proper 9:24 | 103:24 106:9 |
| preliminaries | 74:24 | 33:22 34:20 | 107:2,19 109:5 |
| 7:4 | prior 19:22 | properly 96:24 | 109:11 110:12 |
| preliminary | 26:19 77:13,15 | proportion | public 1:7 2:7 |
| 8:12 10:17 | 124:8 | 30:21 | 123:24 124:6 |
| 12:2 | probably 54:15 | propounded | 124:24 |
| | 71:6 | 123:12 | |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[published - recognize]**

| published 64:9 | 61:25 62:6 | **r** | reading 81:21 |
|---|---|---|---|
| 81:21 85:15 | 78:25 80:1 | **r** 5:1 57:3,4 | 104:6 |
| 100:21 101:1,3 | 81:12 82:10,19 | **rafael** 2:16 5:25 | **really** 12:7 |
| 119:6,21 | 86:9 88:17 | **rafael.droz** | 27:21 28:17 |
| **publishing** | 92:12 97:25 | 2:19 | 29:18,18 31:9 |
| 86:23 | 98:6 99:19 | **randomize** | 83:2 94:16 |
| **put** 62:19 66:10 | 105:10,13,19 | 28:10 | **reason** 61:14 |
| 114:18 | 107:25 112:8 | **randomized** | 87:6,9 |
| | 117:3 118:8 | 26:19,22 27:5 | **reasonable** |
| **q** | 120:7 | 28:6,22 29:13 | 61:17 |
| **qualifications** | **questioning** | 36:18 37:5,11 | **reassignment** |
| 16:17,19 | 55:21 | 37:14 | 116:8 |
| **qualitative** | **questions** 18:19 | **rare** 65:12 | **rebecca** 1:3,25 |
| 30:15 31:8 | 22:4 23:17,22 | **rather** 49:12 | 2:6 124:5,23 |
| 33:12,14,14 | 26:21,23 27:4 | **reach** 16:13,24 | **rebuttal** 8:21 |
| 39:1,2,6,7,12 | 27:7,9,21 28:4 | **reached** 110:16 | 62:11 84:19 |
| **quality** 36:9 | 28:19 30:4,15 | **read** 13:9 14:5 | **rebutting** 87:4 |
| 37:18 109:14 | 30:19 32:8,21 | 14:10 40:10 | **recall** 62:14 |
| **quantitative** | 36:14,17 37:10 | 41:14 47:17 | 84:16 85:10 |
| 30:12 31:8,13 | 37:23 38:8 | 59:16 63:12 | **receive** 54:1 |
| 33:2 35:11 | 39:13,16 41:24 | 67:10,14,17 | 55:10 70:1,15 |
| 36:2 | 43:6 56:18 | 72:8,12 74:19 | 70:19 108:20 |
| **question** 7:14 | 57:18,25 58:4 | 80:17 81:4,5 | 109:20 111:2 |
| 13:2 14:6,19 | 60:5,7 61:7 | 82:2,20 84:14 | **received** 8:2 |
| 18:10 23:4,5,7 | 75:4 86:17 | 84:17 85:13 | 54:3 56:8 |
| 23:13,20 25:1 | 114:21 117:19 | 92:8,23 95:18 | 73:20,25 93:9 |
| 25:9 28:3,18 | 120:19,24 | 101:14 105:23 | 93:10 102:5,9 |
| 28:21 29:10,12 | 121:15 123:11 | 105:25 106:13 | 112:3,4,10 |
| 29:19,20 30:8 | 123:12 | 106:19 107:22 | **recent** 102:15 |
| 32:6,14 36:21 | **quick** 66:17 | 109:1 110:20 | **recess** 40:23 |
| 37:5,16,25 | **quite** 19:21 | 113:4,14 | 71:13 76:17 |
| 38:4,23 43:2,9 | **quote** 113:16 | 116:11 119:17 | 95:1 111:18 |
| 43:20 50:24 | 115:13 | 121:16,24 | 121:10 |
| 56:1,4 58:14 | | 123:10 | **recognize** 40:7 |
| 60:1,13,18 | | | 112:14 |
| 61:1,3,12,19,24 | | | |

**[recognizing - reporting]**

recognizing 93:20

recollection 92:24

recommend 51:5

recommended 51:8

record 5:5,7,19 6:20,23 7:16 8:23 10:2 33:24 40:22 41:1 71:9,12 71:16 75:9,13 76:11,13,16,20 94:19,21,25 95:4 103:4,15 111:15,17,21 120:9,22 121:9 121:13 122:4 124:16

recorded 5:15

recording 5:4 40:25 71:15 76:19 95:3 111:20 121:12

recruiting 119:14

reduce 47:3 118:16

reduced 124:14

refer 25:13 75:15

reference 12:19 19:6 104:20

references 18:7 18:15

referral 84:5

referred 38:25 45:6 63:6 74:16 83:25 84:8 103:20

referring 40:1 49:16 55:23 75:25 76:2 84:25 92:11 98:1 100:2

refers 102:15

refusal 116:7

refusing 60:21 60:22

regard 13:14 74:17

regarding 17:8 20:9 27:7 37:7 38:4 43:10 50:12 53:12,25 65:19 73:10 77:10 79:10 86:1 88:10 90:20 92:17 97:5 99:20 100:17 105:15 106:20,23 109:11 117:11

regardless 22:23

relate 12:14

related 9:8,21 10:24,25 11:12

11:24 13:17 14:2 23:6 24:8 38:6 43:4,7,11 48:1 65:15 67:5 68:24 70:6 78:24 79:8 97:23 110:11 114:17

relates 11:22 89:11

relating 9:10 67:21

relation 8:12 10:16

relationships 20:8,10

relevant 8:16 17:23 18:17,19 18:20 22:6,6,7 58:14 60:1,12 61:3,20 62:1

reliability 29:22 30:2,13 30:22 31:2,11 31:18,25 32:6 32:16 33:4,13 35:7

reliable 30:8 85:18

relied 9:2

relying 9:20

remained 53:1

remaining 75:21 80:15 81:2

remains 29:17 55:12

remembered 2:3

remote 1:14 2:1 2:3 5:7

remotely 2:13 5:14 124:9

renn 2:22 6:3,3

reparative 63:7 64:11

repeat 14:19 25:1 82:9 86:9

rephrase 49:5 53:18 100:24

report 16:22 17:10,24 18:7 46:7 57:14 62:12,15,18,23 76:5,7 84:19 84:22,23,24,25 87:4,14 88:10 91:9 99:5,24 108:19,19 110:2,4 111:7

reported 1:24 5:16 55:4

reporter 2:7 6:9 7:16 94:11 94:14 124:5

reporter's 124:1

reporting 2:6 5:16 33:17

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com    208-343-4004

**[reports - samuel]**

| | | | |
|---|---|---|---|
| **reports** 74:15 84:7 87:17 108:21,24 110:21,22,25 | 36:21,22 37:5 37:10,16,23,25 38:8,23 39:6 39:13,13 41:24 | **restrooms** 47:9 90:10 92:21,25 98:4,11 99:6 | 109:11 111:19 112:8,21 114:23 116:15 120:25 121:6 |

**reports** 74:15
84:7 87:17
108:21,24
110:21,22,25
**representing**
5:21
**reproductive**
41:9
**request** 56:17
58:1,18 59:11
61:17
**requested** 61:9
122:8
**require** 34:22
91:19
**required** 34:13
92:17 96:1
99:16
**requires** 21:14
**research** 4:16
20:20 21:24
22:4 23:4,5,7
23:13,17,20,22
26:21,23 27:3
27:4,21 28:3
28:18,19,21
29:9,10,12,19
30:3,4,15,15,18
30:21 31:8,10
31:13,16,19,25
32:8,17,21,21
32:23 33:6,12
33:14,14 35:7
35:11,16,21,25
36:3,14,16,19

36:21,22 37:5
37:10,16,23,25
38:8,23 39:6
39:13,13 41:24
74:4 86:17
90:14 91:7
92:4 97:23
99:19 100:7
109:16 112:25
112:25 113:3
113:11 114:17
114:20 115:3
115:24 116:1
**researcher** 86:4
86:11
**researchers**
27:15,20 30:7
53:6 86:16
115:19 116:5
**researching**
18:1 53:6
**residing** 123:24
**respected**
47:13
**response**
101:18
**restate** 18:10
56:16 105:18
**restating** 42:23
**restrict** 106:9
**restricted**
96:14
**restroom** 88:22
88:23 91:20,22
91:24

**restrooms** 47:9
90:10 92:21,25
98:4,11 99:6
**results** 86:23
89:17
**retained** 10:9
**retrospective**
98:2
**review** 4:16
55:23 58:2
60:10 74:25
75:1 90:16
91:3,4,6 96:21
97:4 100:6,11
101:4 102:22
103:1,3,23
104:5,8,10,14
107:19 117:17
**reviewed** 17:12
18:6,13,17
109:19 110:10
**reviewing** 17:4
**reviews** 100:17
100:25 104:17
111:6
**revision** 66:25
**right** 7:24
40:24 50:20
58:22 70:6
71:9,14 73:25
75:6 79:7,23
80:3 82:5
84:10 89:20
94:13 96:4
104:22 107:12

109:11 111:19
112:8,21
114:23 116:15
120:25 121:6
121:11
**rights** 117:12
**rigor** 30:17
31:10,15 64:16
**rigorous** 33:15
72:9 114:25
115:20
**risks** 38:17
107:19 109:4
110:13
**robust** 90:5
92:11 107:8
**rodeo** 7:2
**roe** 1:3 5:9
**role** 35:8,17,24
36:25 57:9
**room** 115:16
**rosen** 3:3 6:4,4
**routinely**
106:12 107:2
**rpr** 1:25 124:23
**rules** 75:17

| s |
|---|

**s** 4:6 5:1
**safety** 106:11
107:1
**sam** 3:9 6:5
**sample** 74:16
84:8
**samuel** 3:7

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com 208-343-4004

**[san - sex]**

| | | | |
|---|---|---|---|
| **san** 3:4 | 21:25 22:8 | 79:18 80:4 | 74:14 80:20 |
| **saying** 14:13 | 24:20 33:18 | 81:25 84:21 | 84:6 91:15 |
| 29:11 31:23 | 35:16,25 37:19 | 87:8 88:16 | 95:13 100:3 |
| 34:2,18 83:6 | 42:11,12 44:6 | 89:19 95:9 | 110:3 |
| 98:19 | 44:6 45:14 | 99:7,14 114:15 | **sentences** |
| **says** 10:8 13:4 | 50:9,11,25 | 114:23 | 108:17 |
| 14:7 39:24 | 53:5 72:11 | **seeing** 61:22 | **separate** 10:13 |
| 41:5 47:1 | 117:11 | **seem** 61:14 | 43:20 91:19 |
| 56:12 63:1 | **scientifically** | **seems** 9:24 | **separated** 13:7 |
| 64:2,23 65:1 | 24:19 | 43:21 66:9 | 14:8,14,21 |
| 66:21 68:2 | **scientist** 21:14 | 72:10 93:20 | 92:2 97:14 |
| 74:14 83:17,25 | 24:11 | **seen** 49:22 | 98:4,11 |
| 91:14,17 95:13 | **scientists** 21:19 | 54:21 72:8 | **serious** 67:6 |
| 96:23 100:3 | 22:3 24:15 | 74:11 83:24 | **served** 62:11 |
| 101:6 106:8 | 31:14 115:19 | 85:11,12 | 87:5 |
| 107:14,16 | 116:20,22,25 | 102:24,25 | **serves** 76:5 |
| 109:23 110:15 | **scope** 12:1 | 120:10,16 | **service** 106:8 |
| 112:24 113:8 | 17:20 24:16 | **segregated** | 106:16 108:6 |
| 113:13 115:25 | 87:1 | 13:18 15:4,12 | 111:7 |
| 116:8 118:20 | **seal** 124:19 | 98:21 | **service's** |
| 119:11 | **search** 18:4 | **selectively** | 108:13 |
| **scale** 53:8 | **searching** | 24:11 | **sessions** 119:13 |
| **scenario** 99:21 | 17:19,22 | **self** 67:9 | 119:16 |
| **school** 47:15 | **second** 12:16 | **senate** 88:19 | **set** 26:3 79:3 |
| 91:21 | 44:15 91:10 | **send** 101:24 | **seven** 75:18,22 |
| **science** 12:9 | 94:21 95:6 | 111:24 | 76:6,8 |
| 19:11,13,19 | 101:22 106:7 | **sending** 91:21 | **several** 61:9 |
| 22:9,22 48:2 | **secondary** | 93:3 | 101:9 |
| 114:17 115:20 | 41:10 | **sense** 7:22,23 | **sex** 13:7,18 |
| 115:20 | **see** 11:15 12:6 | 16:8 40:2,17 | 14:8,14,21 |
| **scientific** 17:3,8 | 19:12 22:25 | **sensitive** 93:23 | 15:3,12 41:5 |
| 17:19,20 18:2 | 52:25 58:5,6,8 | **sent** 8:3 73:12 | 41:10 43:23,25 |
| 18:4,12,22 | 59:15,15 60:16 | 93:4 112:14 | 44:17 45:7,12 |
| 19:1,3,7 20:7 | 60:19 62:5,17 | **sentence** 42:2,3 | 45:20,24 46:4 |
| 20:20 21:14,15 | 72:23 73:13 | 42:9 60:24 | 46:14,18 47:8 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

**[sex - state]**

49:15 63:5
67:21,22 72:19
83:9 88:24
89:12 97:14
98:4,11,13,21
99:6,18
**sexual** 74:18
**shape** 50:15
113:11,20
**share** 41:23
42:18,20 94:13
**shared** 44:13
**short** 40:18
103:7
**shorthand**
124:5,13
**showed** 58:12
**showing** 61:1
**shy** 113:1
118:20 120:1
**sign** 121:16,24
**signature** 87:22
122:8 124:22
**significant**
89:19 110:15
**similar** 20:11
73:9
**similarly**
107:18
**simple** 23:19
93:20
**simply** 34:9,24
**singh** 59:7 74:9
80:11 85:2
88:3,7

**single** 88:22
89:18 90:10
91:24 92:20,25
93:24 94:4
97:8 99:6,17
**sit** 99:3
**situation** 29:12
110:20
**skip** 7:3
**slow** 73:21
93:16
**small** 40:10
66:1 71:3
**smart** 69:22
78:22,24
**social** 14:9,15
15:1 47:1,4,13
48:2,21 51:5,7
51:22,25 52:5
52:10,18,20
55:11 56:8
69:9 80:9
120:12,18
**society** 101:10
**somebody**
48:19 69:2
**somebody's**
43:5
**someone's** 43:8
67:22 72:17
89:11
**sooner** 121:4
**sorry** 19:20
43:1 45:23
50:1 53:17

58:7 65:3
67:14 73:21
85:1 87:19
91:15 101:19
102:13,19
104:12 107:23
112:6 119:7,8
121:18
**sort** 7:18,19
11:16 33:21
34:8 76:10
98:1 116:13
**sound** 21:14
24:19 92:16
**sounds** 120:25
**sources** 64:15
**spaces** 15:4
16:9
**speak** 7:13
**speaking** 33:22
34:6,25 61:24
**speaks** 68:11
101:16
**special** 7:13
**specific** 11:18
12:11,20 27:1
28:13 31:9
35:20 38:1
43:13 52:1,1
63:21 65:16
77:1,11 78:2
78:13 83:4
105:14
**specifically**
48:4 78:12

92:20 93:2
95:13 99:5
106:1
**speculation**
26:17 29:16
30:11,25 32:13
32:19 37:21
38:12,21 41:20
42:15,24 45:16
48:9 62:3
65:10 66:7
79:22 86:8
89:22 90:13
**speculative**
29:2
**spent** 75:22
**square** 2:22
**ss** 123:3 124:3
**stage** 76:5
**stall** 94:4 97:8
99:17
**standard** 7:4
104:7
**standards**
33:17 100:2,4
100:12
**start** 80:23
83:19
**started** 119:14
**starts** 48:20,21
51:11
**state** 1:7 2:8
5:18 6:19
16:13 66:13
76:2 83:22

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[state - surrounding]**

94:15 116:6
123:2 124:2,6
124:24
**stated** 8:16 9:3
10:20 18:23
119:12
**statement** 8:10
10:23 19:18
22:17 30:1
41:17 42:3,7
42:11,21 44:25
64:10 95:20,23
109:4 114:5,24
120:1
**statements**
44:5 47:20
104:9 106:20
106:21
**states** 1:1 5:12
63:11 64:19,24
65:2 66:5,10
80:12 98:20
101:7
**stating** 34:9
**statistical**
35:13 66:23
**statistically**
36:7 89:19
**staying** 33:25
**ste** 2:22
**stephanie** 1:14
2:1,4 4:3,9 5:8
6:11,21 122:1
123:5,19

**stipulations**
5:19
**street** 3:4,8
**strict** 76:24
**strong** 107:8
**student** 91:21
**students** 13:6
13:18,22 14:3
90:3
**studied** 28:22
29:13 37:14
38:24 99:5
105:21
**studies** 17:23
24:11 30:7,13
33:2 36:9
37:19 38:16
44:9 47:19
53:24 54:2,3
54:10,18,20
55:2,9,14,22
56:2 57:16
58:20,23 59:2
62:15 63:23
88:10 89:24
90:6 92:4,15
92:20 93:1
**study** 4:11
27:14 29:21,22
30:8 38:1,2,23
52:23,24 53:17
53:19 54:5
55:22 56:4,6
56:11,14,17,22
56:24 57:7,12

57:19,22 58:4
58:10,12,19
59:7,7,11,18,18
59:22,23 60:1
61:1,10,22
63:22 72:12
73:13 74:13
75:3 80:11
81:21,22 82:20
84:7,15,17
85:2,2 88:3,8
89:15,16 90:10
93:8,8 96:17
96:22,23 97:5
97:12 98:2
116:20 119:15
**studying** 25:17
**subject** 117:5
120:20
**submitted**
11:22 119:4
**subscribed**
123:20
**subsection** 13:4
14:5,7,20
**subset** 79:1
**substance** 61:8
67:8,13,13
**substantive**
60:4
**sued** 116:6
**sufficient** 33:23
**suicidal** 67:8
**suit** 64:13

**super** 76:3
**superintendent**
1:7
**supplying** 9:24
**support** 21:24
44:25 46:14
47:20 63:14,24
95:17 105:25
106:2,11,21
107:1 110:23
**supporting**
111:4
**supportive**
24:12 46:11
51:16 52:14
63:21 73:3
86:21
**suppose** 29:11
**supposed** 72:11
**supposing**
28:20
**sure** 7:17 8:23
10:1 11:25
33:24 34:9,23
54:15 71:10
75:14,15 78:14
83:13 84:10
102:22
**surgeries** 65:12
**surgery** 65:14
66:2 116:8
**surgical** 65:6
**surrounding**
91:4

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[surveys - theory]**

surveys   37:18
38:9,13,15
39:2,5,15
susan   74:9
suspect   24:24
25:6 73:23
swear   6:10
sweden   108:6
109:23 111:7
sweden's
107:17 108:12
sworn   6:12
123:5,20 124:9
symptoms   47:3
67:4
system   116:7
systematic
100:6,10,17,25
101:3 103:23
104:10,17
107:19 111:6
117:17

**t**

t   4:2,6
table   113:13
tainting   113:9
113:23 114:6
take   7:12 9:15
10:4 21:20
25:12 36:15
40:17 42:2
46:24 62:22
66:14,17 75:6
75:9,10 91:8
95:5 99:24

102:20 103:8
120:21,22
taken   2:4 5:9
9:25 40:23
71:13 76:17
95:1 101:8
106:16 108:18
111:18 115:22
121:10 123:8
124:12
talk   42:20
46:18 50:21
58:21,24 82:2
82:4 84:11
86:18 87:1
96:11 114:16
talked   50:11
66:16 106:4
108:22
talking   11:23
11:25 14:1
21:4 59:3,4
80:11 106:1
115:10
tara   2:21 5:23
33:20 71:8
93:15 94:5
102:1,6 103:9
112:8 120:20
tara's   67:16
tborelli   2:24
tebbe   101:4
117:17
techniques
73:2,10

telephone   2:17
2:23 3:5,9
tell   6:12 8:5,9
25:15 49:7
54:13 69:25
ten   56:25 121:1
121:2
tend   24:23 25:5
59:3
term   20:19
33:13 39:24
49:7 94:2
terminology
20:23
terms   17:4
19:10 22:22
26:25 49:6
51:18 58:25
64:16 65:17
72:15 73:2
77:13 108:22
test   22:11,12,15
23:3,24 26:4
26:10 27:22
38:10,14 41:17
42:10,17 43:5
43:25 45:11,18
45:19,22,25
tested   29:19
testified   6:14
testify   124:10
testimony
11:22 15:10
17:16 19:23
29:1,8 30:11

31:21 32:2
33:1 39:4 44:2
44:16,19,20
65:10 68:1,11
68:22 69:14
72:6,21 78:6
81:11,19 82:16
83:14 85:9
97:2 99:11
100:23 107:5
108:16 109:25
110:8 118:10
120:4
testing   19:12
22:18,22 25:24
25:25 26:25
27:2,10 28:12
28:13 43:8
86:19
text   66:24
67:17
thank   6:22 7:24
9:14 16:11
17:11 27:11
73:17,25
101:21 102:8,9
121:14,22,23
thanks   11:2
12:5 26:11
39:17 94:22
theories   86:19
theory   22:6,7
24:22,23 25:4
25:5 86:19

**[therapies - transparent]**

therapies  64:19
64:24 65:7
68:18 72:17
therapy  48:23
63:7 64:12
65:23 119:13
thereof  123:11
thing  7:11,20
12:1 20:17
23:10 24:2,8
34:15 78:17
80:4,6 81:24
111:23 116:18
things  7:15
10:22 34:3
43:22,22,24
47:5 52:14
68:19 70:9
72:2,2 80:2
91:1 93:20
97:18
think  7:11 9:23
10:3 16:10
21:3,19 24:9
24:15 25:8
31:1,13 33:22
33:23 34:11
35:2,19 36:13
43:20 54:14
67:12 69:22
71:6 74:21
76:12 78:21
80:2 86:3
87:10 93:22
98:19 99:2

108:23 111:14
113:10 115:9
115:18 117:4,8
thinking  19:10
27:12 50:25
third  112:23
thousands
57:16
three  112:21
time  2:10 5:6,6
9:8 10:16,19
40:21,22,25,25
52:25 53:1,20
55:5,12,16
71:11,12,15,15
75:1,7,8,10,18
75:20,21,22
76:3,14,15,19
76:19,23 77:4
79:20,24 84:16
87:16 93:23
94:23,24 95:3
95:3 108:6
111:12,16,20
111:20 121:7,8
121:12,12
122:2,3 124:13
times  61:9
102:11
titled  59:7
today  7:1 75:22
76:8 84:14
85:7 99:3
today's  5:5

told  87:3 91:23
91:25 97:5,20
tolles  3:2
took  45:11
tools  36:24
top  95:7 112:21
topic  40:17
topics  10:12
total  75:18,20
75:21
tr  66:25
trained  31:4
training  17:7
27:1 116:9
trajectory  54:7
trans  48:20
57:22 58:13
61:2 73:1
90:25 98:22
112:25
transcript  7:21
124:15
transgender
4:14 13:6,18
13:22 14:3,16
14:22 15:2,13
15:19 16:6
25:22 37:12
40:7 43:16
47:1,14 48:12
48:16 50:13,15
50:17,23 51:10
51:17,25 52:10
52:17,23 53:6
53:9,13,17,25

54:7 55:9 56:7
56:11 66:11
69:16,18 70:2
70:10,12,17,19
70:25 71:3,25
72:22,24 73:7
73:9 78:15
79:11,12 82:1
82:6,21,22,24
83:1,4,5,10,18
83:23 84:13
85:21 86:1
90:3,18 91:18
91:22 96:12
99:16 100:5,7
100:18 105:6
105:16 106:2,2
106:22 108:19
109:10,15,20
110:23 111:1,4
116:9 120:16
transition  14:9
14:15 15:1
47:2,4,13 48:2
48:22,23 51:5
51:8,22,25
52:5,10,19
55:11 56:8,9
69:9,10 120:13
120:18
transitioning
53:11
transparent
114:13

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[treated - used]**

| treated  48:25 | 124:11 | **u** | understood |
|---|---|---|---|

treated  48:25
49:2 69:5,8
81:8,16 82:13
treating  103:25
treatment  27:8
28:5,5,13 47:2
54:2,4 56:9
65:13 67:6
68:15 72:14
83:4 106:12
107:3,20 109:6
109:12,21
111:2
treatments
4:16 37:8 38:5
68:7,18 89:25
101:13 110:12
trial  25:14,16
25:20 26:3,6,7
26:9,19,20,22
27:5,24 28:6
28:12,23,23,24
29:14 36:18
37:15
trials  26:14
27:16,16 36:10
36:24 37:6,11
106:10
true  12:18
22:12 23:25
41:17 43:25
70:9 113:22
123:14 124:15
truth  6:13,13
6:13 124:10,10

124:11
try  63:4 78:23
94:10 98:8
trying  11:14
12:7,15 22:17
23:3 27:22
28:4,7 67:20
68:17 70:4
two  70:9 87:17
92:24 97:15
108:5 110:15
116:5
type  22:20
25:24 27:1
28:7,8,13
32:20 36:21
37:4 48:22
79:13 90:9
115:21
types  20:10
23:17 27:4,9
35:20 37:8
41:23 45:18
63:21
typewriting
124:14
typical  65:13
86:18 87:2
typically  22:3
39:5 47:5,7
55:13 86:22
115:5

**u**

u  57:3,4
uh  7:19 24:5
ultimately
58:13 83:7
under  10:12
79:2,5 81:6,14
82:11 107:21
109:6 124:14
underlying
65:19
understand
11:2 15:24
22:6 24:9,16
24:17 25:8
34:2 35:12,21
36:5 40:5
46:23 58:22
59:1 67:20
68:17 69:1
75:16 78:10,25
114:16,20
understanding
12:9 17:20
20:19,22 24:19
25:21 39:11
45:17 48:2
50:9 54:25
55:8 66:9 79:9
80:10 82:5
88:25 89:2
104:3,16
118:14
understandings
85:25

understood
46:21 63:2
114:21 115:23
unethical  63:10
64:11 97:22
unfortunately
73:20 93:12
94:7
united  1:1 5:11
98:20 101:7
unsafe  107:9
unusual  113:2
upload  93:17
urine  90:23
use  9:21 16:20
17:3,9,12,23
24:18 27:16,20
30:16 33:13
43:12 47:5,8
50:19 63:4,10
64:15 65:1
67:13 73:9
76:7 78:8
88:22 90:1,4
90:18,24,25
91:19,24 92:17
94:3,4,9,13
95:14,25 96:2
97:8,10 98:12
98:17,22 99:16
104:24 106:9
115:1
used  7:9 16:12
16:24 17:2,18
18:2 19:1

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

**[used - way]**

20:20 36:22
38:3,6,9,14
44:4 50:18
105:2
**user** 88:22
89:18 90:10
91:24 92:20,25
93:24
**using** 13:6 31:2
44:11 49:18
73:2 88:23
89:24 96:15
97:6,20
**usually** 39:16
40:4 65:12
91:20 94:3
105:1
**utero** 45:11,12
**uw** 112:17,24
116:6,6

**v**

**vague** 12:12,22
13:15,24 14:17
14:24 15:20
16:5,15 17:1
17:25 18:9,25
19:8 20:6,15
20:21 21:9,17
22:1,13 23:1,9
23:15 24:14,25
25:18 27:17
28:1,25 29:24
30:11,24 32:4
32:13,19 33:7
35:10,18 36:1

36:11 37:2,20
38:11,19 39:3
39:9 41:19
42:5,14,24
44:2,19 45:2
45:15 46:1,8
47:22 48:8,17
49:19,25 50:6
51:6 52:7 53:2
53:22 54:11,23
55:6,18 58:16
59:10 62:16
63:16 65:24
68:21 69:6,14
69:20 70:13,22
71:20 72:5,20
73:6 74:7
76:25 77:7,17
78:5,20 79:6
79:21 81:11,18
82:15 83:14
84:2 85:19
86:7 89:1,6,21
90:12 92:22
94:1 95:21
96:8 97:1,16
98:5,15 100:14
100:23 104:2
104:23 105:5
105:22 108:2,9
108:15 109:8
109:24 110:7
110:18 111:9
112:18 113:18
113:25 115:8

117:7,20 118:4
118:22 119:23
120:3,14
**vagueness** 56:3
**variability** 36:7
**variables** 36:4
36:6
**variation** 40:6
**variations**
20:10
**venn** 69:17
78:16
**verbal** 7:17
**verbatim**
124:16
**verification**
123:1
**veritext** 2:6
5:17 94:12
**version** 119:21
**versus** 5:10
**video** 2:6 5:17
7:6 122:1
**videoconfere...**
2:5 5:14
**videographer**
3:10 5:4 6:9
40:21,24 71:11
71:14 76:14,18
94:23 95:2
111:16,19
121:7,11,25
**videotaped**
1:14 2:1,3 5:8
5:13,14

**view** 69:19
113:10,24
114:6 120:13
**viewed** 95:16
96:5,24
**visibility** 79:10
79:14 80:9
**vs** 1:5

**w**

**wait** 7:13
**waiting** 94:5
112:9
**want** 8:23 9:17
11:20,25 33:24
34:23 60:19
61:14 74:23
75:7,13 76:3
96:14 102:22
108:25 120:8
**wanted** 41:16
42:10 52:22
89:14
**wanting** 42:1
**wants** 94:12
**waste** 76:3
**way** 11:15 31:4
33:16 50:15
57:15 58:22,24
59:3,5 72:9,9
82:22 93:18
96:11 104:20
113:11,19
114:16,20
115:2,12,21

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

[ways - witness]

| ways 22:14 | 38:9,15,25 | 93:3,7,14,22,24 | 26:18 27:19 |
|---|---|---|---|
| 31:9 42:17 | 39:7,17 40:13 | 94:5,8,12,15,20 | 28:2 29:17 |
| 92:6 118:14 | 40:15,19 41:2 | 95:5 96:4,17 | 30:1,12 31:1 |
| we've 6:23 61:6 | 42:1,6,10,19,25 | 97:11 98:1,8 | 31:22 32:5,14 |
| 66:19 75:14 | 44:14,24 45:6 | 98:25 99:23 | 32:20 33:2,11 |
| 76:12 | 45:21 46:6,13 | 100:20,24 | 33:25 34:7 |
| wednesday 2:8 | 46:24 48:6,14 | 101:5,20 102:6 | 35:11,19 36:2 |
| week 116:2 | 49:5,21 50:1 | 102:10 103:4,5 | 36:13 37:4,22 |
| west 2:22 | 51:1 52:3,22 | 103:9,14 104:8 | 38:13,22 39:5 |
| widespread | 53:16 54:9,17 | 104:19 105:3,8 | 39:10 41:21 |
| 44:17 | 55:2,14,25 | 105:15,20 | 42:9,16 44:3 |
| wilson 2:15 4:5 | 56:13,19,23 | 106:6,24 | 44:20 45:4,17 |
| 5:20,20 6:17 | 57:4,13 58:3,9 | 107:11,16 | 46:3,10,17 |
| 6:24 8:25 9:1 | 59:6,12,17,23 | 108:4,11 109:3 | 47:24 48:10,18 |
| 9:23 10:4 12:4 | 60:11,18,22,25 | 109:22 110:5 | 49:20 50:8 |
| 12:6,13,23 | 61:16,18,23,25 | 110:14 111:5 | 51:7 52:8 53:4 |
| 13:14,20,25 | 62:7,19 64:2 | 111:13,22 | 53:24 54:13,25 |
| 14:18 15:6,17 | 64:18,23 65:21 | 112:2,7,11,13 | 55:8 56:6,21 |
| 16:1,10,16 | 66:4,14 67:14 | 112:20 113:8 | 57:3,12,15 |
| 17:11,17 18:5 | 67:16 68:6,12 | 113:22 114:4 | 58:6,20 59:15 |
| 18:12 19:5,10 | 69:4,11,17,21 | 115:4,25 117:2 | 59:21 60:6,17 |
| 19:17,24 20:12 | 70:18 71:5,17 | 117:16,25 | 61:11,15 62:5 |
| 20:18 21:1,10 | 72:1,15 73:4 | 118:7,19 119:3 | 62:17 63:17 |
| 21:13,22 22:10 | 73:12,21 74:2 | 119:10,25 | 64:7 65:11 |
| 22:23 23:7,12 | 74:3,8,13 75:5 | 120:6,19,25 | 66:1,8 68:2,23 |
| 24:3,21 25:3 | 76:1,21 77:3 | 121:3,6,17,20 | 69:7,15 70:15 |
| 25:10 26:2,11 | 77:12,20 78:3 | witness 6:10,12 | 70:24 71:21 |
| 27:11,23 28:20 | 78:16,21 79:16 | 13:16 14:25 | 72:7,22 73:7 |
| 29:3,6,20 30:6 | 80:5 81:14 | 15:11,21 16:6 | 73:18 74:11 |
| 30:20 31:17,24 | 82:9 83:6,20 | 17:2 18:1,10 | 76:4 77:1,8,18 |
| 32:3,9,16,22 | 84:6,23 85:14 | 19:1,9 20:7,16 | 78:1,7 79:7,23 |
| 33:5,9,20 | 86:3,11 87:3,9 | 20:22 21:12,19 | 81:12,20 82:18 |
| 34:11 35:1,5,6 | 87:14 88:9,18 | 22:3,14 23:3 | 83:17 84:4,21 |
| 35:15,23 36:8 | 89:4,14 90:8 | 23:10,16 24:15 | 85:10,20 86:9 |
| 36:23 37:17 | 91:8 92:19 | 25:1,8,19 26:6 | 86:16 87:8,13 |

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Stephanie Budge, Ph.D. August 16, 2023

**[witness - zuger]**

88:7,16 89:2,7
89:23 90:14
92:15,23 94:2
95:23 96:10
97:3,18 98:6
98:16 99:14
100:15 101:3
101:18 102:5
102:25 104:3
104:14,24
105:6,13,18,23
106:19 107:6
107:14 108:3
108:10,17
109:10 110:1,9
110:20 111:11
112:19 113:19
114:2,12 115:9
116:18 117:8
117:22 118:5
118:12,24
119:24 120:5
120:15 123:7
124:8,19
**word**   78:8
**work**   47:16
53:9 112:25
113:9,23 114:6
114:14,19
117:1,9,11,14
118:12,16,24
**worked**   48:11
52:9,18
**working**   25:14

**works**   46:23
**worldwide**
105:1,4
**wpath**   100:2
101:9
**write**   116:3
117:5 119:1
**writing**   16:22
**written**   108:22
**wrong**   24:10
118:19
**wrote**   117:16

| **x** |
| --- |

**x**   4:1,2,6

| **y** |
| --- |

**yeah**   11:14
29:8 31:1
40:19 74:2
84:10 86:2
94:15,20 96:10
101:20 111:13
114:8 115:9
**year**   56:22
104:9 107:12
107:17
**years**   31:6
56:25 100:16
104:4,6,10
**york**   102:11
**young**   51:19
**youth**   4:14,15
15:23 51:17
54:3,4,18 55:9
65:17 66:11

90:18,21 95:25
96:1,12 97:5,9
97:19 99:16
107:9
**youths**   95:14

| **z** |
| --- |

**z**   57:3,4
**zoom**   5:14 94:9
**zucker**   57:3
74:3
**zuger**   56:24

Page 35

Idaho Rules of Civil
Procedure

Rule
30

(e) Review by the Witness; Changes.

(1) Unless waived by the deponent and the
parties, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which (A)
to review the transcript or recording; and
(B) if there are changes in form or
substance, to sign a statement listing the
changes and the reasons for making them. (2)
Changes indicated in the Officer's
Certificate. The officer must note in
the certificate prescribed by Rule 30
(f)(1) whether a review was requested
and, if so, must attach any changes the
deponent makes during the 30-day period.
(3) Witness Failure to Sign. (A) In
General, If the deposition is not signed
by the witness within the 30-day period,
the officer must sign it and state on
the record the fact of the waiver of
signature, or of the illness or absence

of the witness or the fact of the refusal to sign the deposition together with any reason given for not signing. (B) Use of Unsigned Deposition. The deposition may be used as if it were signed, unless pursuant to Rule 32 (d)(4) the court determines that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.