Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Christina S. Paek*
cpaek@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†mailing address only
(213) 382-7600 (T) | (213) 402-2537 (F)

*Admitted pro hac vice

Attorneys for Plaintiffs

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DEBBIE CRITCHFIELD, et al., <br><br> *Defendants*. | Case No. 1:23-cv-00315-DCN <br><br> **Plaintiffs' Reply in Support of Motion for Preliminary Injunction [Dkt. 15] and Opposition to Defendant's Motion to Dismiss [Dkt. 47]** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.     Plaintiffs Are Likely to Succeed on Their Equal Protection Claim...................3

      A.     S.B. 1100 Discriminates Against Transgender People, Because Only
            Transgender People Are Denied Facilities Matching Their Gender Identity. .........3

      B.     Defendants Fail to Meet Their Heavy Burden of Proving a Substantial
            Relationship Between S.B. 1100 and Protecting Privacy and Safety. .....................7

      C.     Dr. Cantor Fails to Rebut the Wide Range of Harms Inflicted by S.B. 1100,
            and His Fringe Views on Medical Treatment Are Irrelevant Here......................14

II.    Plaintiffs Are Likely to Succeed on Their Title IX Claim.................................18

III.   Defendants Fail to Respond to Plaintiffs' Privacy Claim.................................23

IV.   Defendants Fail to Rebut Plaintiffs' Undisputed Evidence of Irreparable Harm,
      and the Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor. .........24

CONCLUSION..................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*A.C. v. Metropolitan Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023).................................................................................*passim*

*A.M. by E.M. v. Indianapolis Pub. Sch.*,
  617 F. Supp. 3d 950 (S.D. Ind. 2022) ........................................................... 16

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022)............................................................................*passim*

*B.P.J. v. W. Va. State Bd. of Educ.*,
  550 F. Supp. 3d 347 (S.D.W. Va. 2021) ........................................................ 16

*Bennett v. Kentucky Dep't of Educ.*,
  470 U.S. 656 (1985)............................................................................................... 22

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004)......................................................................... 22

*Bostock v. Clayton Cnty., Ga.*,
  140 S. Ct. 1731 (2020) ...................................................................................... 4, 5

*Byrd v. Maricopa Cnty. Sheriff's Dep't*,
  629 F.3d 1135 (9th Cir. 2011)........................................................................... 13

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999).............................................................................................. 22

*Dodds v. United States Dep't of Educ.*,
  845 F.3d 217 (6th Cir. 2016).............................................................................. 18

*Doe v. Boyertown Area School Dist.*,
  897 F.3d 518 (3d Cir. 2018)......................................................................... 12, 18

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019)............................................................................. 17

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018).......................................................... 17

*Grabowski v. Arizona Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023)................................................................ 13, 18, 21

*Grimm v. Gloucester Cnty. Sch. Bd.*,
302 F. Supp. 3d 730 (E.D. Va. 2018) ........................................................ 9

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ........................................................ *passim*

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020) ........................................................ 1, 5

*Hecox v. Little*,
-- F.4th --, 2023 WL 5283127 (9th Cir. 2023) ........................................................ *passim*

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003) ........................................................ 22

*Idaho AIDS Foundation, Inc. v. Idaho Housing and Finance Ass'n*,
422 F. Supp. 2d 1193 (D. Idaho 2006) ........................................................ 24

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ........................................................ 22

*Johnson v. California*,
543 U.S. 499 (2005) ........................................................ 7

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ........................................................ 5, 13, 17, 24

*Koe v. Noggle*,
No. 1:23-CV-2904-SEG, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) ........................................................ 15

*Latta v. Otter*,
771 F.3d 456 (9th Cir. 2014) ........................................................ 9, 14, 16

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
286 F. Supp. 3d 704 (D. Md. 2018) ........................................................ 9

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
No. 2:223-cv-01595, 2023 WL 4848509 (S.D. Ohio July 28, 2023) ........................................................ 21

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ........................................................ *passim*

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ........................................................ 21

*Romer v. Evans*,
   517 U.S. 620 (1996) ........................................................................................ 12

*Tennessee v. United States Dep't of Educ.*,
   615 F. Supp. 3d 807 (E.D. Tenn. 2022) .......................................................... 22, 23

*United States v. Flores-Garcia*,
   198 F.3d 1119 (9th Cir. 2000) ........................................................................ 21

*United States v. Pacheco*,
   977 F.3d 764 (9th Cir. 2020) .......................................................................... 19

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ..................................................................... *passim*

**Statutes and Regulations and Bills**

20 U.S.C. § 1682 .................................................................................................. 18, 20, 22

20 U.S.C. § 1686 .............................................................................................. 18, 20, 21, 22

34 C.F.R. § 106.32 ................................................................................................ 18, 20, 21

34 C.F.R. § 106.33 ............................................................................................. 18, 20, 21, 22

H.B. 71 ................................................................................................................. 2, 16

S.B. 1100 ............................................................................................................. *passim*

**INTRODUCTION**

The question presented by Plaintiffs' motion is narrow: whether this Court should continue to preliminarily enjoin S.B. 1100's statewide mandate of categorical discrimination against all transgender students across all Idaho schools—which will dramatically alter a longstanding status quo—or whether Defendants, based on the factual record now before this Court, have supported their contention that privacy and safety will be imperiled, and in ways that less intrusive means cannot address, without the law's immediate enforcement.

Defendants fail to tailor their opposition to that fact-and-statute-bound question. Most importantly, they offer no factual support whatsoever to substantiate their privacy and safety defense. That itself is fatal under heightened scrutiny because Defendants bear the burden of demonstrating an exceedingly persuasive justification, which they fail to do in opposing the preliminary injunction and cannot do on a motion to dismiss. Defendants have not shown how the longstanding status quo in Idaho—i.e., the absence of any statewide mandate of categorical discrimination—has caused any of their claimed harms. The record here is thus materially indistinguishable from this Court's ruling in *Hecox*, recently affirmed by the Ninth Circuit. *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd*, -- F.4th --, 2023 WL 5283127, at *20 (9th Cir. 2023) ("A preliminary injunction does not appear to inflict any comparable harm to [Idaho], as the injunction expressly maintained the status quo.").

Indeed, the factual vacuum here is even starker than in *Hecox* because, for years, many Idaho schools have had inclusive policies expressly allowing transgender students to access facilities matching their gender identity. While nothing about the injunction would require any school to adopt such a policy, the absence of any evidence of harm from schools that have chosen to do so is akin to a smoking gun against Defendants' factual defense.

Defendants respond with only red herrings.  They proffer the astounding notion that perhaps S.B. 1100 did not actually intend to exclude transgender people from facilities matching their gender identity, but merely tolerated that outcome as an unwanted side effect, despite the statute's language, the context leading to its passage, and the understanding of legislators. Likewise, Defendants spill pages of ink in support of their contention that sex-separated facilities can be important.  But Plaintiffs do not challenge the permissibility of designating separate facilities for males and females.  A preliminary injunction will not alter the ability of schools to bar cisgender students from using the facilities of another gender.  This case presents only the question whether S.B. 1100 may categorically require every Idaho school, full stop, to ban all transgender people, full stop, from using facilities matching their gender identity.

Finally, Defendants inexplicably try to transform this case—about school facilities—into a case about gender-affirming care.  There is a separate vehicle for the latter dispute.  *Poe v. Labrador*, No. 1:23-cv-269-BLW (D. Idaho) (challenging H.B. 71).  It is not this case. Legislators may well disapprove of the fact that transgender youth like Rebecca Roe and A.J. are, with the support of their parents, living their lives consistent with their gender identity; but nothing about S.B. 1100 will change that fact.  Instead, what S.B. 1100 will do is deprive them of the basic ability to go about their everyday business, stigmatize them as unwanted outsiders, and infringe their right to privacy—irreparable harms that only a preliminary injunction can prevent.

## FACTUAL BACKGROUND

As this Court's TRO recognized, it is Plaintiffs who seek to maintain the status quo, which has never categorically mandated discrimination against transgender students at all Idaho schools, and Defendants who seek to disrupt it.  Plaintiffs begin by clarifying at the outset what precisely constitutes the status quo, as it illuminates the true scope of what S.B. 1100 will do.

2

In opposing a TRO, Defendants proffered a carefully worded declaration stating that "before the enactment of SB 1100," approximately three-quarters of Idaho public school districts did not have any policy that would "permit" the relief sought by Plaintiffs. Decl. of Greg Wilson, Dkt. 39-1, ¶ 6.[1] A review of those policies confirms that this statement can only mean that such districts did not have written policies that expressly *allowed* transgender students to use facilities matching their gender identity. There is no evidence that 75 percent of Idaho's schools *banned* transgender students from such facilities.[2] In fact, before S.B. 1100, either all or virtually all districts in Idaho did not have a written policy excluding transgender students from facilities matching their gender identity.[3] Biblarz Supp. Decl. ¶¶ 3-7.

If not preliminarily enjoined, S.B. 1100 will thus enact a greater statewide sea change—and disruption to the status quo—than Defendants have suggested, causing all or virtually all schools across Idaho to swing from having no written policy affirmatively excluding transgender students from facilities matching their gender identity to necessarily having such a policy.

## ARGUMENT

I.    **Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

    A.    **S.B. 1100 Discriminates Against Transgender People, Because Only Transgender People Are Denied Facilities Matching Their Gender Identity.**

Both sides agree that S.B. 1100 demands heightened scrutiny, and, as noted below,

---

[1] Mr. Wilson does not address charter schools, which are also covered by S.B. 1100. *See* Supp. Decl. of Jimmy Biblarz ¶ 2.

[2] By analogy, if only 25% of employers expressly included veteran status in their written nondiscrimination policies, that does not mean that the remaining 75% refuse to hire veterans.

[3] The mere fact that schools maintain "sex-separate" facilities—which simply means that there are male-designated facilities and female-designated facilities—does not mean that transgender students are thereby excluded from facilities matching their gender identity. *Cf.* TRO at 4. Boise School District illustrates the point. Decl. of A.J., Dkt. 15-4, ¶ 8. Nor does allowing transgender students to use facilities matching their gender identity thereby make those facilities "sex-inclusive" (as distinct from making them transgender-inclusive). *Cf.* TRO at 6.

Defendants completely fail to meet their burden of justifying the law at this preliminary stage. That alone shows Plaintiffs are likely to succeed.  Nevertheless, Plaintiffs and Defendants do disagree as to one important issue: whether heightened scrutiny applies solely because S.B. 1100 discriminates on the basis of sex, or whether it is also required because S.B. 1100 discriminates against transgender people.  Defendants insist that S.B. 1100 "discriminates" against everyone based on sex and thus is neutral as to transgender people.  That argument ignores not only the purpose and text of S.B. 1100, but the obvious fact that Idaho passed it specifically to do what it does: mandate that schools ban *transgender* people from using facilities aligned with their gender identity.  By seeking to downplay the fact that S.B. 1100, in purpose and design, discriminates specifically against transgender people, Defendants attempt to obscure the nature of the discrimination at issue and the harm that it inflicts.

It defies reason—not to mention the legislative record—to suggest that S.B. 1100 does not discriminate against transgender people.  Discrimination requires not merely differential treatment but differential treatment plus injury.  *See, e.g.*, *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1740 (2020) ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated.")*.*  Both before and after S.B. 1100, cisgender students have access to facilities matching their gender identity and thus have suffered no injury from the law.  A cisgender girl who has access to the restroom that matches her gender identity, for instance, is not treated worse than a cisgender boy when she cannot access the boys' restroom.  In contrast, S.B. 1100 discriminates against transgender people, because it deprives them—and only them—of facilities matching their gender identity.  A transgender girl who is excluded from the restroom that matches her gender identity has been treated worse than a cisgender girl who is not excluded from the restroom that matches her gender identity.

That was precisely this Court's analysis in *Hecox*, which the Ninth Circuit has affirmed. This Court held that the law there "discriminates between cisgender athletes, who may compete on athletic teams consistent with their gender identity, and transgender women athletes, who may not compete on athletic teams consistent with their gender identity." *Hecox*, 479 F. Supp. 3d at 975. Replacing "athletes" with "students," and replacing "compete on athletic teams" with "access facilities," confirms that S.B. 1100 follows an indistinguishable path of discrimination. That is, S.B. 1100 discriminates between cisgender students, who may access facilities consistent with their gender identity, and transgender students, who may not. *Hecox* answers the question of whom S.B. 1100 discriminates against.

Defendants' contrary argument "is like saying that racially segregated bathrooms treated everyone equally, because everyone was prohibited from using the bathroom of a different race." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 609 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). Indeed, by that reasoning, every instance of discrimination against transgender people could be recast as simply treating everyone according to their sex assigned at birth. For example, an employer's requirement that all workers must present at work consistent with their assigned sex or be fired also would not discriminate against transgender people. *Cf. Karnoski v. Trump*, 926 F.3d 1180, 1201 & n.18 (9th Cir. 2019) (holding that military policy that purported to allow transgender individuals to serve "'in their biological sex'" discriminated based on transgender status, independent of provisions concerning gender dysphoria). *Bostock* makes clear that the equal application of discriminatory treatment (e.g., injuring both transgender men and transgender women) does not change the character of the discrimination. 140 S. Ct. at 1742.

The foregoing is a sufficient basis to conclude that S.B. 1100 discriminates against transgender people; but that conclusion also follows from the "text, structure, purpose, and

effect" of S.B. 1100," which "all demonstrate that the Act categorically bans transgender [people]" from facilities "that correspond with their gender identity." *Hecox*, 2023 WL 5283127, at *8. It is absurd to claim that S.B. 1100 was not about transgender people. First, its stated purpose is to separate facilities by "biological sex"—which is expressly defined so that transgender females are treated as males, and transgender males are treated as females—and thus the exclusion of transgender people from facilities matching their gender identity is precisely what the law seeks to accomplish, not a mere byproduct. Idaho Code § 33-6601 [33-6701].[4]

Second, the context and legislative history of S.B. 1100 make clear that the purpose of the law was not, generally, to have separate facilities for males and females but, specifically, to exclude transgender people from facilities matching their gender identity. The animating backdrop for S.B. 1100 was Caldwell School District's consideration of a policy expressly permitting transgender students to use sex-separated facilities consistent with their gender identity. Decl. of Jimmy Biblarz, Dkt. 15-9, Ex. 5. Senator Carlson believed such policies "indoctrinate" students with "garbage," which belies Defendants' claim that transgender students' facilities usage was not what motivated S.B. 1100. *Id.*, Ex. 6. The hearings on S.B. 1100 reflected this purpose. For instance, Senator Trakel said, "We hear a lot of talk about how the transgender are, it's their right to use the bathroom." *Id.* ¶ 13. And he explained, "[w]e believe biological gender to be an essential characteristic of a child's identity and purpose," and "[w]e strongly oppose any . . . attempts to confuse minors regarding their bio gender." *Id.* This

---

[4] As *Hecox* makes clear, it is no response that the law does not use the word "transgender," because, as here, terms such as "biological sex" can be specifically written to exclude transgender females from the definition of female, and transgender males from the definition of male. 2023 WL 5283127, at *10. Laws that excluded same-sex couples from marriage also did not need to use the words "sexual orientation" for courts to recognize that they discriminated based on sexual orientation. *Id.* Discrimination by proxy is facial discrimination. *Id.*

discussion of transgender people, and what legislators believed was appropriate for them, was not some "[s]tray remark[]."  Opp. at 14 n.4.  To the contrary, "transgender" or "trans" was referenced at least 75 times in committee hearings alone.[5]  Supp. Decl. of Jimmy Biblarz ¶ #.

Third, the only change that S.B. 1100 would accomplish in Idaho concerns transgender people.[6]  There is no evidence that cisgender students were using facilities designated for another sex, including in districts with inclusive policies and practices, and in fact such usage was already barred before S.B. 1100.  Decl. of Morgan Ballis, Dkt. 15-8, ¶ 28.  Nor is there evidence that schools were not providing separate facilities for males and females at all.  As in *Hecox*, 2023 WL 5283127, at *10, the record here is unlike that in *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022), where the court found no evidence that the local school board at issue intended to discriminate against transgender students.[7]

## B. Defendants Fail to Meet Their Heavy Burden of Proving a Substantial Relationship Between S.B. 1100 and Protecting Privacy and Safety.

Defendants do not dispute that, under heightened scrutiny, they must demonstrate an exceedingly persuasive justification; that the law must address an actual and not hypothetical or speculative problem; that the law must be specifically tailored to the problem; that there cannot

---

[5] Members of the public shared legislators' understanding that the purpose of S.B. 1100 was to exclude transgender people from facilities matching their gender identity.  *See, e.g.*, Biblarz Decl. ¶ 13(vi) (asserting that cisgender people should not share facilities with "boys who think they wanna be girls and girls who think they wanna be boys"), (ii) ("Socially transitioning these kids in schools is feeding their mental disorder"), Ex. 10 ("If a human truly believes he or she is a horse, that belief does not make it true.  That belief demonstrates a serious mental problem in the individual – and the same for a male who believes he is a female (and vice versa)").

[6] *Hecox* rejects any defense premised on a purported "lack of identity" between the quasi-suspect class at issue and the group discriminated against by the law.  Opp. at 13.  And, in fact, there is such identity here because 100% of cisgender people are permitted to access facilities matching their gender identity, whereas 0% of transgender people are permitted to do so under S.B. 1100.

[7] To be clear, Plaintiffs need not show animus, nor an intent to cause harm, to show intentional discrimination under equal protection.  *E.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005).

be less intrusive means of addressing the problem; and that the law's interests must be sufficient to overcome the indignity, stigma, and message of second-class status it inflicts.  Mot. at 10.

Given this well-established law, Defendants' response misses the mark for several reasons at the outset.  First, Defendants ignore that this lawsuit does not challenge the permissibility of having separate facilities for males and females as a general matter but, rather, the permissibility of excluding transgender people from facilities aligned with their gender identity.  Defendants' arguments, including cites to Justices Marshall and Ginsburg, attack a straw man.  Plainly, nothing about the injunction here requires the demolition of male and female restrooms.  Second, Defendants' burden is particularly heavy here: unlike the local policies at issue in other cases, including *Adams*, S.B. 1100 imposes a statewide categorical ban, which not only mandates discrimination across hundreds of Idaho schools but also divests schools and administrators of any ability to adopt or tailor transgender-inclusive policies.  The law's overbroad scope makes it particularly indefensible.  Third, Defendants ignore that this challenge is to S.B. 1100—a specific, statewide piece of legislation with a specific legislative history and findings—that must be defended on the actual record leading to its enactment, not on the basis of "specula[tion] and … conjecture," *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1039 (7th Cir. 2017), or the record of a local school board policy developed elsewhere (e.g., the one in *Adams*).  These mounting challenges for Defendants—a narrow question presented, a sweepingly overbroad law, and an anemic legislative record—are insurmountable under heightened scrutiny.

As an initial matter, despite their suggestion to the contrary, Defendants must substantiate their justification with factual support under heightened scrutiny.  *Hecox* illustrates the point: the Ninth Circuit relied upon this Court's finding "that there was scientifically 'no evidence to

suggest a categorical bar against a transgender female athlete's participation'" and that the studies relied upon by the Idaho legislature failed to provide adequate support for the law.  2023 WL 5283127, at *15-16.  Similarly, the Ninth Circuit held in *Latta* that the fear that different-sex couples might marry less frequently if same-sex couples were permitted to do so was inadequate, because the government "failed to produce any support for that prediction."  *Latta v. Otter*, 771 F.3d 456, 471 (9th Cir. 2014).  Unsupported legislative predictions that implicate constitutional rights "have not been afforded deference" by courts.  *Hecox*, 2023 WL 5283127, at *17 (quotes omitted); *see also Whitaker*, 858 F.3d at 1052.  And Defendants' demand for deference so as not to discourage "serious, thoughtful debates" backfires here.  Opp. at 3.  Rather than allow local school districts to craft policies for their own communities as Boise did, S.B. 1100 categorically blocks all schools across the state from doing so, including even "more narrowly drawn policies."  *Cf. Hecox*, 2023 WL 5283127, at *22.  As in *Hecox*, the law's "sweeping prohibition . . . is too overbroad to satisfy heightened scrutiny."  *Id.* at *15.

The need for evidence to substantiate an exceedingly persuasive justification also underscores why Defendants' motion to dismiss is inappropriate.  In the Complaint, Plaintiffs alleged facts that show why S.B. 1100's categorical ban is not substantially related to privacy or safety.  Compl. ¶¶ 97-101.  Defendants do not explain how their motion can be granted given that these factual allegations must be accepted as true at the pleading stage.  Indeed, Defendants do not cite to a single paragraph of the complaint in their motion at all, nor do they even move to dismiss all of Plaintiffs' claims (ignoring, as noted below, the privacy claim).  The motion must be denied.  *See M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 724 (D. Md. 2018) (denying motion to dismiss because factual allegations showed that transgender student's exclusion from school facilities was not substantially related to privacy justification); *Grimm v.*

*Gloucester Cnty. Sch. Bd.*, 302 F. Supp. 3d 730, 751-52 (E.D. Va. 2018) (denying motion to dismiss given plaintiff's prior use of boys' bathroom for weeks without incident, and privacy could be promoted through non-discriminatory means).

On the preliminary injunction, Defendants wholly fail to meet their burden of substantiating S.B. 1100's purported legislative findings on safety and privacy, Idaho Code § 33-6601 [33-6701], which they all but ignore.  They have not introduced any evidence whatsoever of problems from Idaho schools not having a statewide categorical ban excluding transgender students from facilities matching their gender identity, which has always been the status quo before S.B. 1100.  And that absence of evidence is particularly striking given that a significant number of Idaho schools have had, for many years, the converse of S.B. 1100: policies and practices expressly permitting transgender students to access facilities matching their gender identity.  Biblarz Decl. ¶¶ 7, 9.  If the absence of a statewide categorical ban were substantially related to preventing the harms claimed by Defendants, there would doubtless be plentiful evidence of such harms in those schools, given that thousands of students have attended them with transgender-inclusive policies and practices in place.

Instead, Defendants try to satisfy their factual burden with non-facts.  First, Defendants' attempt to substitute an appeal to "common-sense" for actual evidence fails.  Opp. at 7.  S.B. 1100 is premised upon specific findings—including that Idaho will see an "increas[e] in the likelihood of sexual assault, molestation, [and] rape" without the law.  Defendants offer no evidence to substantiate those findings, which are plainly disproven by Plaintiffs' evidence. Ballis Decl. ¶¶ 22-33.  Next, Defendants attempt to avoid their burden by labeling the facts they must prove legislative rather than adjudicative facts. Opp. at 9 n.3. But the problem is that Defendants fail to point to *any* facts at all to substantiate their justifications.  Vaguely gesturing

toward "the authorities set forth in this brief"—which, at best, attempts to rely on the factual

records developed by local school boards in other states—and without even specifying what facts

Defendants hope to rely upon in those other records, does not satisfy their burden.  *Id.*  It reduces

to nothing more than "sheer conjecture and abstraction," which fails under heightened scrutiny.

*Whitaker*, 858 F.3d at 1052; *Grimm*, 972 F.3d at 614.  Finally, Defendants engage in rank

speculation that *cisgender* students could pretend to be transgender to gain access to facilities,

but they have not shown this to be an actual problem.  *Cf. Hecox*, 2023 WL 5283127, at *19

("The record is devoid of evidence that any boy attempted to join a girls' team").  Legislators

supporting S.B. 1100 similarly resorted to such speculation.  Biblarz Decl. ¶ 13; *cf. Hecox*, 2023

WL 5283127, at *3 (noting that legislator "had no evidence" of prior dispute of athlete's gender).

And Defendants fail to show why other tools, or "more narrowly drawn" measures, to directly

address such a problem are inadequate.  *Hecox*, 2023 WL 5283127, at *22; Ballis Decl. ¶¶ 28-29.

Second, Defendants do not even try to rebut Plaintiffs' evidence that preliminarily

enjoining S.B. 1100's statewide categorical ban will not imperil privacy or safety.  They do not

address the expert testimony of Officer Morgan Ballis, who serves as President of the Idaho

Association of School Resource Officers.  Officer Ballis showed that, even at schools with

policies expressly allowing transgender students to use facilities matching their gender identity,

there has been no evidence of any problems, including safety or privacy harms.  Ballis Decl. ¶¶

22-33.  They also do not rebut the testimony of Diana Bruce and Foster Jones, school

administrators who have deep experience with such policies and confirm that they do not cause

any harms.  Dkt. 15-6 & 15-7; *see Grimm*, 972 F.3d at 614.  And Defendants do not rebut the

testimony of Boise High School senior A.J., who used the boys' facilities matching his gender

identity for his junior year, without any incident or harm to others.  A.J. Decl. ¶ 8.  Many courts

have relied upon transgender students' prior use of facilities matching their gender identity

without incident as evidence disproving the government's claimed justifications.  *See, e.g.*,

*Grimm*, 972 F.3d at 614 (seven weeks of use); *Whitaker*, 858 F.3d at 1052 (six months of use).

Third, Defendants fail to show how S.B. 1100 prevents "one's unclothed figure from

being seen by the opposite sex" (as they define sex) that less intrusive means cannot.  Opp. at 1.

Defendants cannot articulate how this goal is implicated given that people enter restroom stalls

and close the door behind them.  *Grimm*, 972 F.3d at 613-14.  And schools can make that same

option available in locker rooms as well, among a wide range of options at the disposal of

schools, for anyone who may prefer greater privacy.  *See Parents for Privacy v. Barr*, 949 F.3d

1210, 1225 (9th Cir. 2020); *Doe v. Boyertown Area School Dist.*, 897 F.3d 518, 530-31 (3d Cir.

2018).  Defendants fail to prove why these less intrusive means cannot substantially achieve their

interests, without also imposing a categorical ban on transgender students, who already have

particular reason to safeguard their own privacy and avoid actions that could exacerbate their

distress or compromise their safety.  Decl. of Stephanie Budge, Dkt. 15-5, ¶ 68.  As in *Romer v.

Evans*, 517 U.S. 620, 632 (1996), the overbreadth of S.B. 1100 illustrates its lack of tailoring.

Courts "must reject measures that classify unnecessarily and overbroadly by gender when more

accurate and impartial lines can be drawn."  *Hecox*, 2023 WL 5283127, at *18 (quotes omitted).

Fourth, Defendants fail to rebut Plaintiffs' showing that S.B. 1100 actually undermines

any privacy interest.  The law robs transgender youth of control over the disclosure of private

information.  *Infra* III.  Defendants also do not deny the stigma that the law imposes on them—

and the "unmistakable message" it sends that they are not suitable to be among their peers,

Budge Decl. ¶ 63—which courts must "carefully consider" under heightened scrutiny.  *Hecox*,

2023 WL 5283127, at *13.  And Defendants do not explain how having a transgender boy—

whose gender identity and expression is male, and is known as a boy to his peers—use the girls' facilities will promote any subjective feelings of comfort on the part of cisgender girls.

Defendants' arguments rely on inapposite out-of-circuit authorities.  To begin, the reasoning of those authorities—that there is a privacy right to use facilities "away from" the transgender students at issue because a privacy interest attaches once a restroom door swings open—is foreclosed by *Parents for Privacy*, which held that the "mere presence" of transgender students does *not* violate the privacy of cisgender students.  *Compare Adams*, 57 F.4th at 806 ("The privacy interests hinge on using the bathroom away from the opposite sex"), *with Parents for Privacy*, 949 F.3d at 1228-29 ("Plaintiffs allegedly feel harassed by the mere presence of transgender students in locker and bathroom facilities.  This cannot be enough.").  Thus, while there may be a split between other circuits, that does not mean this Court is writing on a clean slate, because *Parents for Privacy* rejected the precise aspect of *Adams* that Defendants rely upon here.[8]  *See also Whitaker*, 858 F.3d at 1052 (rejecting that "mere presence" of transgender student violates cisgender students' privacy).  Indeed, the existing gulf between the Ninth and Eleventh Circuits is striking: *Adams* pointedly did not hold that transgender people are a quasi-suspect class, *Adams*, 57 F.4th at 803 n.5 ("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class"), and refused to hold even that Title IX protects transgender people.  The Ninth Circuit has squarely embraced both propositions.  *Karnoski*, 926 F.3d at 1187 n.1; *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).  In any event, S.B. 1100 is distinguishable from the policy in *Adams*, including through S.B. 1100's sheer breadth, its absence of factual support for its specific findings, its record of animus, and its

---

[8] Similarly, *Parents for Privacy*, 949 F.3d at 1223, rejected the argument that *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135 (9th Cir. 2011), a Fourth Amendment strip search case, created any privacy right to use facilities away from transgender students.

exceptions that forfeit any important government interest for half-time pep talks.  Mot. at 15 n.7.

Finally, Defendants' insistence that Plaintiffs seek to alter practices dating back to "ancient times" is wrong in several respects.  First and foremost, Plaintiffs do not seek to abolish sex-separated facilities as explained above.  Second, Defendants' reliance on *Dobbs* conflates the relevance of history for due process as opposed to equal protection.  *Hecox*, 2023 WL 5283127, at *9 n.8.  Defendants do not even address the Ninth Circuit's rejection in *Hecox* of identical arguments they made in that appeal.  Third, there is no ancient tradition of excluding transgender people from facilities matching their gender identity; laws like S.B. 1100 are a distinctly modern invention.  Finally, even if there were such a tradition, "neither history nor tradition [can] save [the laws] from constitutional attack."  *Latta*, 771 F.3d at 476.  Otherwise, maintaining discrimination would become a purpose unto itself, and that is not the law.

### C.   Dr. Cantor Fails to Rebut the Wide Range of Harms Inflicted by S.B. 1100, and His Fringe Views on Medical Treatment Are Irrelevant Here.

After requesting and receiving almost seven weeks to prepare their opposition, the *only* evidence Defendants managed to produce is the declaration of Dr. James Cantor.  That declaration wholly fails to meet Defendants' burden under heightened scrutiny.  On its own terms, Dr. Cantor's declaration fails to rebut the vast majority of Dr. Budge's testimony.  More broadly, Dr. Cantor's declaration fails to address the actual issue in this case: the consequences of excluding transgender people from facilities matching their gender identity.[9]

First, Dr. Cantor fails to rebut the wide range of harms caused by S.B. 1100.  Dr. Budge's declaration provided background on gender identity, gender dysphoria, and discrimination (Budge Decl. §§ II-III) before showing six separate harms caused by discriminatory policies like

---

[9] Again, Defendants' attempt to turn this case into a battle of experts, while ultimately unavailing, further makes clear that their motion to dismiss is meritless and must be denied.

S.B. 1100 (*id.* § IV).  Interference with one aspect of treatment for gender dysphoria (social

transition) is one of those harms—but by no means the only one.  Excluding transgender youth

from facilities matching their gender identity also subjects them to (1) psychological harm

including shame, stigmatization, and fear of violence (*id.* ¶¶ 53-57); (2) disclosure of one's

transgender status (*id.* ¶¶ 61-62); (3) harassment, bullying, and violence (*id.* ¶¶ 63-64); (4) health

consequences from avoiding use of facilities (*id.* ¶ 65); and (5) a reduction in their ability to

concentrate and learn (*id.* ¶ 66).  Defendants do not dispute those five categories of harm.

Second, in the one category of harm Dr. Cantor discusses—interference with social

transition—he stops short of addressing the relevant issue: the harm of excluding transgender

students from facilities matching their gender identity.  In fact, he makes no mention of facilities

at all.  The disconnect between his general opinions about transgender people and the specific

issue of facilities illustrated by the fact that, in other public statements that Dr. Cantor does not

address, and Defendants ignore, he *supports* the right of transgender people to use restrooms

matching their gender identity.  Budge Rebuttal ("Reb.") Decl. ¶ 8.  Dr. Cantor also does not and

cannot rebut the harms caused by S.B. 1100 in interfering with transition, as he lacks the relevant

clinical experience to do so, in contrast to Dr. Budge.[10]  Budge Reb. Decl. ¶¶ 6-7, 16; *Whitaker*,

858 F.3d at 1045 (relying on Dr. Budge's clinical expertise).  While he critiques Dr. Budge for

not anticipatorily rebutting his other views in advance, no expert needs to preemptively rebut

purported evidence that is unreliable, irrelevant, or mischaracterized.[11]

_____

[10] Even in cases where bans on medical treatment are directly at issue, courts have noted the
limited usefulness of Dr. Cantor's testimony given his lack of relevant experience.  *E.g.*, *Koe v.
Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *21 n.28, *23 n.34 (N.D. Ga. Aug. 20,
2023) (emphasizing that Dr. Cantor has "no experience treating gender dysphoria in youth").
[11] Defendants also attack Dr. Budge by pointing to an article that describes her lab's "advocacy
and activism" against discrimination and her acknowledgement that all scientists should be as

Dr. Cantor mostly voices his disagreement with the provision of gender-affirming care in the first instance.[12]  For example, Dr. Cantor believes that, without social transition, there would be high rates of "desistance" in children who showed gender nonconformity before puberty, implying that *some* youth may not ultimately need treatment.  Cantor Decl. ¶ 57; *but see* Budge Reb. Decl. ¶¶ 24-31 (rebutting desistance claims).  But S.B. 1100 does not bar transition, whether medical or social, and "what is or should be the default treatment for transgender youth is not the question before the court."[13]  *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 351 n.4 (S.D.W. Va. 2021) (rejecting similar attempt to transform case about discrete issue, like schools' treatment of transgender students, into larger dispute about gender-affirming care); *A.M. by E.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950, 958 (S.D. Ind. 2022) (finding Dr. Cantor's opinions immaterial).  And even considering that impermissible *post hoc* justification, there is no evidence or logical nexus that excluding transgender youth from school facilities will cause them not to transition or to voluntarily change their gender identity, which they cannot do. Budge Reb. Decl. ¶¶ 15, 23-34.  Instead, S.B. 1100 merely penalizes students who do transition and communicates disapproval, which is not a legitimate state interest.  *Latta*, 771 F.3d at 471.

Defendants' argument about the mental health impact of single-user facilities—a subject they notably discuss despite complete silence from Dr. Cantor on the subject—also misses the mark.  Defendants misconstrue one article cited by Dr. Budge that offering a gender-neutral option is not, in itself, harmful.  Opp. at 25.  But the article does not remotely suggest that doing

---

transparent as possible about bias.  Opp. at 19; Budge Dep., Dkt. 47-3, 112:1-119:2.  In other words, they fault Dr. Budge for being *too* honest in explaining that everyone has bias "in some way, shape, or form . . . because we're human" and that this recognition in no way undermines but rather helps to ensure the rigor of scientific research.  Budge Dep. 113:19-21, 114:12-115:3.
[12] Indeed, his declaration here is largely recycled from those he has filed in challenges to gender-affirming care bans.  *See, e.g.*, *L.W. v. Skrmetti*, No. 3:23-cv-376, Dkt. 113-3 (M.D. Tenn.).
[13] Notably, H.B. 71, at issue in *Poe v. Labrador*, also does not ban social transition.

so *ameliorates* the harm of excluding youth from facilities aligned with their gender identity.  To the contrary, the evidence shows that relegating transgender youth to these single-user facilities as their only option is harmful.[14]  *See* Budge Decl. ¶ 56 (citing multiple studies).  Defendants also do not rebut the harms for transgender youth like Rebecca Roe and A.J. who wish to use the same sex-designated facilities as their peers and are prevented from doing so.[15]

Third, although not directly relevant for the reasons discussed, Dr. Cantor's view that the WPATH Standards of Care are wrong is a fringe view that has been repeatedly rejected.  This Court and the Ninth Circuit have repeatedly relied upon the Standards of Care, which are recognized by all mainstream medical organizations in America, and have also acknowledged the basic importance of transition for transgender people.  *E.g.*, *Karnoski*, 926 F.3d at 1187 n.1 ("Living in a manner consistent with one's gender identity is a key aspect of treatment for gender dysphoria."); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1143 n.12 (D. Idaho 2018).  Idaho itself previously conceded the validity of those standards—a concession Defendants do not address.  *Edmo*, 935 F.3d at 767 (stating "[b]oth sides," including Idaho, "and their medical experts agree[d]").  And other courts have recognized "the consensus approach of the medical and mental health community."  *Grimm*, 972 F.3d at 595 (discussing *Edmo*, 935 F.3d at 769)); *Whitaker*, 858 F.3d at 1040.  Defendants cannot

---

[14] The cited article shows psychological harm flowing directly from being "prevented or discouraged from using a bathroom that corresponds to . . . gender identity."  Doc. 47-6 at 2, 4; *id.* at 5 (schools should "support the right of students to use a bathroom that matches their identity *and* efforts to establish gender-neutral facilities") (emphasis added); *see also* Budge Dep. 95-96 (clarifying that a measure is not "affirming care" unless it is desired by the patient).
[15] Decl. of Rebecca Roe, Dkt. 15-2, ¶ 14 ("I ultimately did not feel comfortable using the nurse's restroom, because it felt stigmatizing and isolating to use in comparison to the other girls at my school, who were not limited to using only that single-stall facility.  It was also in a less accessible location than the restrooms used by my female classmates."), ¶ 15 (describing mental, physical, and academic harms when Rebecca avoided using the nurse's restroom).

show Plaintiffs are unlikely to prevail by putting in dispute basic facts the Ninth Circuit—and Idaho itself—have repeatedly accepted.  *See also* Budge Reb. Decl. ¶¶ 9-12.

## II.      Plaintiffs Are Likely to Succeed on Their Title IX Claim.

In *Grabowski*, 69 F.4th at 1116, the Ninth Circuit applied *Bostock*'s analysis of discrimination based on "sex" to Title IX.  Given that holding, Defendants do not dispute that Title IX's anti-discrimination provision, 20 U.S.C. § 1682, prohibits discrimination against transgender people.  Opp. at 16-18.  Instead, they argue that other provisions effectively operate as a carve-out to that mandate: 20 U.S.C. § 1686 (schools may "separate living facilities for the different sexes"), 34 C.F.R. § 106.33 (schools may "provide separate toilet, locker room, and shower facilities on the basis of sex"), and 34 C.F.R. § 106.32(b)(1) (schools may "provide separate housing on the basis of sex").

Defendants are mistaken.  As every federal Court of Appeal to address this question other than the Eleventh has held, these provisions are merely "broad statement[s]" "that the act of creating sex-separated restrooms in and of itself is not discriminatory."  *Grimm*, 972 F.3d at 618 & n.16.  They do not state that "schools may act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities."  *Id.*; *accord A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023) ("Though [Section 1686] certainly permits the maintenance of sex-segregated facilities, we stress again that … the plaintiffs in these cases have [no] quarrel with that rule.").[16]  To conclude otherwise would undermine Title IX's promise of equal treatment for transgender people and be irreconcilable with Ninth Circuit authority.

---

[16] *See also Doe*, 897 F.3d at 533 (agreeing "that barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation"); *Dodds v. United States Dep't of Educ.,* 845 F.3d 217, 221 (6th Cir. 2016) (district failed to show "likelihood of success" in reversing Title IX holding in favor of transgender plaintiff).

As an initial matter, the text of these provisions does not, contrary to Defendants'
argument, afford them a blanket license to discriminate.  In contrast to S.B. 1100, Title IX does
not define "sex," let alone state that it must be defined to prohibit transgender students from
using sex-separated facilities aligned with their gender identity.  *See, e.g.*, *A.C.*, 75 F.4th at 770
("[T]he question [here] is different: who counts as a 'boy' for the boys' rooms, and who counts
as a 'girl' for the girls' rooms—essentially, how do we sort by gender?  The statute says nothing
on this topic").  Further, permitting transgender students to use such facilities in no way
jeopardizes the practice these provisions allow, i.e., sex-separated facilities.  *See id.* (rejecting
"that separate facilities for the sexes forecloses access policies based on gender identity").

 The Ninth Circuit recognized as much in *Parents for Privacy*.  There, the plaintiff argued
that an inclusive policy violated Title IX on the basis of the same statutory and regulatory
provisions that Defendants cite.  949 F.3d at 1227.  In rejecting the argument, the court did first
observe that these regulations, at most, *allow* a school to do something, not require it.  But it then
went further: it explained that the term "sex-segregated facilities" did not mean "biological sex-
segregated facilities."  "[J]ust because Title IX authorizes sex-segregated facilities does not mean
that they are required, *let alone that they must be segregated based only on biological sex and
cannot accommodate gender identity*."  *Id.* (emphasis added).  This understanding of "sex-
segregated facilities" accords with *Grimm* and *A.C.* and is irreconcilable with *Adams*.  *Adams*, 57
F.4th at 815 (court "must" "read 'sex' in Title IX to mean 'biological sex.'").

In any event, "in the context of statutory interpretation, whether a term is ambiguous does
not turn solely on dictionary definitions of its component words."  *United States v. Pacheco*, 977
F.3d 764, 767-68 (9th Cir. 2020) (quotes omitted).  Instead, courts look "to the language itself,
the specific context in which that language is used, and the broader context of the statute as a

whole." *Id.* (quotes omitted).  As courts have recognized, that context is particularly crucial when interpreting Title IX's provisions at issue here.  *See A.C.*, 75 F.4th at 770 (citing dictionary definitions of the word "sex" that supported transgender plaintiff's claim, but concluding that "[n]arrow definitions of sex do not account for the complexity of the necessary inquiry").

As noted, Title IX's central provision is an anti-discrimination mandate, which applies, inclusively, to transgender people.  Interpreting Sections 1686, 106.33, and 106.32(b) to simply permit sex-separated facilities, as the Fourth and Seventh Circuits held, effectuates the purpose of these provisions without creating any conflict with Title IX's anti-discrimination mandate.  A claim of discrimination under Title IX requires both a showing that a student was treated differently based on a protected characteristic and that that treatment caused harm.  *See Grimm*, 972 F.3d at 618.  Requiring a cisgender boy to use the boy's bathroom does not harm him.  *See id.* ("[T]he act of creating sex-separated restrooms in and of itself is not discriminatory.").

Reading these provisions to allow "segregat[ion] based only on biological sex," *Parents for Privacy*, 949 F.3d at 1227 would place them squarely in conflict with Section 1682(a)'s anti-discrimination provision.  Excluding a transgender boy from using the boy's restroom harms him, for he "alone [cannot] use the restroom corresponding with his gender." *Grimm*, 972 F.3d at 618.  Nothing in Sections 1686, 106.33, and 106.32(b) suggests they were intended to create a vast loophole in Title IX's anti-discrimination provision, allowing "arbitrary or discriminatory" treatment of transgender persons in every area covered by these provisions.  *Id.* at n.16.

Indeed, Defendants themselves fail to reckon with the scope of their argument.  Like the majority in *Adams*, Defendants observe that S.B. 1100 allows transgender people to use "unisex, single-occupancy bathroom[s]," suggesting that that measure makes the law more reasonable. *E.g.*, Opp. at 25; *Adams*, 57 F.4th at 798.  But if Defendants are right, then Title IX—even as it

20

purports to protect transgender students—not only permits schools to exclude them from facilities consistent with their gender identity, but also to refuse to provide them the option of a single-occupancy bathroom.  Even Defendants do not condone such egregious discrimination.  A reading of Title IX that would so denigrate its anti-discrimination mandate with regard to transgender people cannot be reconciled with the purpose and text of that statute.

A closer analysis of *Adams* underscores this conclusion.  The Eleventh Circuit had no need to address this central conflict in Defendants' reading of Sections 1686, 106.33, and 106.32(b), because *Adams* nowhere held that *Bostock* applies to Title IX *at all*.  *See Adams*, 47 F.4th 791, 801, 811-14; *A.C.*, 75 F.4th at 775 (Easterbrook, J., concurring) ("My colleagues express confidence that Title VII [] and Title IX use 'sex' in the same way. . . .  The majority in *Adams* was equally confident of the opposite proposition."); *accord Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:223-cv-01595, 2023 WL 4848509, at *7 (S.D. Ohio July 28, 2023).  The Ninth Circuit *has* expressly applied *Bostock* to Title IX.  *Grabowski*, 69 F.4th at 1116.  No appellate court that has held that Title IX prohibits discrimination against transgender people has *also* held that the provisions Defendants cite allow schools to exclude transgender people from gender-aligned facilities.  The Ninth Circuit will not be the first.

Defendants' spending clause argument fares no better.  Citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), Defendants argue that Title IX is at most unclear as to whether it permits S.B. 1100, and must be construed in Defendants' favor.  Opp. at 18.  But, as noted, there is no ambiguity: the mere lack of a definition of the word "sex" does not create one. *Cf. United States v. Flores-Garcia*, 198 F.3d 1119, 1123 n.5 (9th Cir. 2000) (court would not apply rule of lenity unless statute was ambiguous "after resort to the language and structure, legislative history, and motivating policies of the statute").  Further, *Pennhurst* does not require

Congress to "prospectively resolve every possible ambiguity concerning particular applications" of a statute. *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985). With regard to anti-discrimination legislation, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Here, funding recipients have notice that Title IX encompasses all forms of sex discrimination, including against transgender people. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 175, 182-83 (2005); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638-39 (1999); *Grimm*, 972 F.3d at 619 n.18 ("*Bostock* forecloses that 'on the basis of sex' is ambiguous as to discrimination against transgender persons."). "[A] State that accepts funds under [a statute with an implied cause of action] does so with the knowledge that the rules for . . . liability will be subject to judicial determination." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003). "[T]he Pennhurst notice problem does not arise in a case . . . in which intentional discrimination is alleged." *Jackson*, 544 U.S. at 182-83 (alterations incorporated). In any event, Defendants' argument could not affect "the scope of the behavior that Title IX proscribes," the only issue presented by the preliminary injunction, but merely the availability of "money damages." *Davis*, 526 U.S. at 639.

Finally, Defendants fail to even address the United States' additional arguments that (1) Section 1686's reference to "living facilities" does not include restrooms and locker rooms; and (2) 34 C.F.R. § 106.33, which does, is an implementing regulation of Section 1682 that cannot be read as authorizing discrimination prohibited by that provision. SOI at 11-12; *see also Grimm*, 972 F.3d at 618; *A.C.*, 75 F.4th at 770. Defendants make only an absurd procedural argument: that somehow the United States may not articulate an argument in this case based on statutory text and legislative history because of an injunction in *Tennessee v. United States Dep't of Educ.*,

615 F. Supp. 3d 807 (E.D. Tenn. 2022), and, presumably that this Court is somehow precluded from considering it.  That decision enjoined the United States from enforcing published administrative guidance on Title IX.  *See id.* at 817-18, 842.  The United States did not bring this case, and it does not cite to or rely on that guidance in its Statement of Interest—let alone argue, for instance, that the guidance is entitled to administrative deference.  The United States' brief presents a purely legal statutory interpretation argument that is now before this Court.

### III.   Defendants Fail to Respond to Plaintiffs' Privacy Claim.

Defendants fail to respond to Plaintiffs' privacy claim and have thus waived several issues.  First, Defendants concede that there is a constitutional right to privacy in one's transgender status.  Mot. at 18.  Second, even if the Court were to credit Defendants' fiction that S.B. 1100 does not discriminate against transgender people under equal protection or Title IX, Defendants must nevertheless justify the law's burden on the privacy rights of transgender people under the privacy claim.  But Defendants fail to rebut Plaintiffs' evidence that S.B. 1100 infringes upon transgender people's ability to exercise control over the disclosure of their transgender status.  While Defendants assert that transgender students can use alternate facilities, they fail to produce any evidence to rebut Plaintiffs' expert testimony that their exclusion from facilities matching their gender identity itself can disclose their status.  Budge Decl. ¶ 61; *accord* Budge Dep. 90:20-25.  And their relegation to "other" facilities, such as a faculty or nurse's restroom, does not cure the problem; indeed, it exacerbates the disclosure by drawing unwanted attention to the students at issue.  Budge Decl. ¶ 52; Rebecca Roe Decl. ¶ 16 ("If I am only allowed to use either the boys' restroom or a single-stall restroom, I am afraid that any of my classmates at my new school could find out that I am transgender, and I want to have control over my private information.").  Last, Defendants fail to demonstrate any government interests

that can justify the law's privacy intrusions, including the absence of "less intrusive means of achieving the same government objectives." *Idaho AIDS Foundation, Inc. v. Idaho Housing and Finance Ass'n*, 422 F. Supp. 2d 1193, 1199 (D. Idaho 2006); *supra* I.B.

## IV. Defendants Fail to Rebut Plaintiffs' Undisputed Evidence of Irreparable Harm, and the Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor.

Defendants concede that this Court can enjoin S.B. 1100 either based on a showing that Plaintiffs are likely to succeed on the merits or under the Ninth Circuit's serious questions standard. Opp. at 24. Here, Plaintiffs are entitled to an injunction under either standard.

First, the balance of hardships "tips sharply in plaintiff's favor." *Karnoski*, 926 F.3d at 1198 n.4. Plaintiffs introduced evidence that, if S.B. 1100 excludes transgender youth from facilities matching their gender identity, they will experience stigma; increased risk of depression, anxiety, and self-harm; interference with social transition; and the loss of control over their privacy. Mot. at 2-4, 8-9, 19-20. As in *Hecox*, these are "deeply personal, irreparable harms without injunctive relief." *Hecox*, 2023 WL 5283127, at \*20. Defendants have only one response: these harms cease if transgender people may use "unisex, single-occupancy bathroom[s]." Opp. at 25. But Plaintiffs showed that using a single-occupancy restroom, when even feasible, fails to ameliorate S.B. 1100's stigmatic, psychological, medical, and privacy-related harms. *See* Rebecca Roe Decl. ¶¶ 14-16; A.J. Decl. ¶¶ 4, 9; Budge Decl. ¶¶ 53-64. Courts agree. *See Whitaker*, 858 F.3d at 1045-46 (district "actually exacerbated the harm, when it dismissed [transgender student] to a separate bathroom where he was the only student who had access," "invit[ing] more scrutiny and attention from [] peers" and "intensif[ying] his depression and anxiety"); *accord Grimm*, 972 F.3d at 617-18. Incredibly, with such high stakes for transgender people, Defendants do not even try to rebut this evidence. They rest their response on a misreading of Dr. Budge's declaration, again wrongly asserting that *permitting* students to

24

use gender-neutral, single-occupancy facilities is the same as *forcing* them to do so.  *Supra* I.C.

Defendants also fail to identify any comparable harm if S.B. 1100 is preliminarily enjoined.  They assert that enjoining S.B. 1100 will somehow "leave [the] safety and privacy interests wholly unprotected for the majority of students who do not have gender dysphoria." Opp. at 24.  But Defendants cite no evidence for this proposition, much less that less intrusive means are unavailable.  To the contrary, as the Ninth Circuit held in *Hecox*, a preliminary injunction here would "not appear to inflict any comparable harm to [defendants], as the injunction expressly maintain[s] the status quo"—a status quo that undisputedly includes schools that have long expressly allowed transgender students to use restrooms matching their gender identity without incident.  *Hecox*, 2023 WL 5283127, at *20.  As noted above, *supra* I.B, Plaintiffs' evidence shows that Idaho's longstanding practice of permitting schools to adopt inclusive policies and practices has not led to any evidence of privacy or safety harms, and Defendants put in no evidence that S.B. 1100 is necessary to address any such problems. Defendants' bare assertions that the mere presence of transgender people in facilities aligned with their gender identity necessarily creates any privacy or safety problem is factually and legally untenable.  *Parents for Privacy*, 949 F.3d at 1228-29; *Whitaker*, 858 F.3d at 1052-53.

An injunction here will not require any school to adopt any practice or policy it has not yet adopted.  But it will prevent S.B. 1100 from effecting a dramatic change to Idaho law, including the eradication of inclusive policies and practices that have, in many places, existed for years.  These equities tip sharply for Plaintiffs and justify an injunction under any standard.

## CONCLUSION

Plaintiffs respectfully request the Court grant their motion and deny Defendants' motion.

Dated: September 6, 2023                              Respectfully Submitted,

Katherine M. Forster

Robyn K. Bacon

J. Max Rosen

Nicholas R. Sidney

Paul Martin

Avery P. Hitchcock

Jimmy P. Biblarz

MUNGER TOLLES & OLSON LLP

/s/ Peter C. Renn

Peter C. Renn

Kell L. Olson

Tara L. Borelli

Christina S. Paek

LAMBDA LEGAL DEFENSE & EDUCATION FUND

Samuel L. Linnet

ALTURAS LAW GROUP, PLLC

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 6th day of September, 2023, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Lincoln Davis Wilson
lincoln.wilson@ag.idaho.gov

Rafael John Droz
rafael.droz@ag.idaho.gov

/s/ Peter C. Renn
Peter C. Renn

27