Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Christina S. Paek*
cpaek@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†mailing address only
(213) 382-7600 (T) | (213) 402-2537 (F)

*Admitted pro hac vice

Attorneys for Plaintiffs

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEBBIE CRITCHFIELD, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-00315-DCN<br><br>**EXPERT REBUTTAL DECLARATION OF STEPHANIE L. BUDGE, PH.D.** |

### EXPERT REBUTTAL DECLARATION OF STEPHANIE L. BUDGE, PH.D.

I, Dr. Stephanie L. Budge, Ph.D., hereby declare as follows:

1.      I submit this expert declaration based on my personal knowledge.

2.      If called to testify in this matter, I would testify truthfully based on my expert opinion.

3.      In preparing this declaration, I reviewed the expert declaration submitted by Dr. James Cantor, Ph.D., in support of the Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. As with my prior expert declaration in this matter, I also relied on my scientific education and training, my research experience, and my knowledge of the scientific literature in the pertinent fields.

4.      The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on these subjects. I may wish to supplement these opinions or the bases for them as the result of new scientific research or publications in response to statements and issues that may arise in my area of expertise.

5.      My understanding is that this case is a legal challenge to SB 1100, which prohibits transgender youth from using school-based sex-separated facilities that align with their gender identity.

**A.      Dr. James Cantor does not have the level of expertise required to provide expert opinions regarding the issues raised in my initial declaration**

6.      There are several reasons why Dr. Cantor does not have the level of expertise to provide expert opinions regarding the issues discussed in my declaration. As part of his introduction, Dr. Cantor mentions his prior association with academic journals and as a member of the American Psychological Association. Dr. Cantor has never been on a review board or an editor of a journal that specializes in transgender health, but instead journals that focus on sexuality, sexual behavior, and sexual abuse; it is also notable that he is no longer even in these

positions.[1] Dr. Cantor also mentions his experience being the chair for the Committee for

Science Issues for the American Psychological Association's (APA) LGBT Division but fails to

mention that this was 20 years ago (2002-2003), while the field of transgender science has

developed significantly since then.[2] I have been a member of the LGBT Division of APA since

2006 and I have never heard anyone in the division or in the APA generally indicating Dr.

Cantor's expertise related to transgender issues. As a scholar in the field, I regularly attend

transgender-focused academic conferences and larger conferences relating to mental health

issues (such as the American Psychological Association convention). I have never seen Dr.

Cantor present at those conferences on any issues relating to transgender health nor have I seen

his name listed regarding transgender health on any of the scientific programming at any

conference I have attended. In fact, his conference presentations and journal publications

primarily focus on pedophilia, sex offenders, and hypersexuality; the articles that do focus on

transgender people include one peer reviewed original research article, two commentaries, and

two versions of the same book chapter. Only one of his publications has been an original

research article about transgender people.[3]

      7.     Dr. Cantor downplays the importance of clinical expertise in his declaration, yet

he opines on the role that psychotherapy can play in addressing gender dysphoria. It is notable

---

[1] In contrast, I am an associate editor for the *Psychology of Sexual Orientation and Gender Diversity* and on the editorial board of two transgender-centered academic journals (*International Journal of Transgender Health* and *LGBTQ+ Family: An Interdisciplinary Journal*).

[2] In contrast, I was the co-chair of the same committee from 2011-2021 and am a current member of the committee.

[3] In comparison, I have published 54 peer-reviewed journal articles regarding transgender people, 12 book chapters regarding transgender people, and have provided more than 100 international and national peer-reviewed presentations on transgender-related issues.

that there is no mention in Dr. Cantor's declaration that he has ever treated a minor with gender

dysphoria. Additionally, when mentioning his professional expertise, he does not provide any

information that he has ever diagnosed a child or adolescent with gender dysphoria, nor does it

seem that he has ever monitored or supervised any minor patient receiving gender affirming

treatment.

8.      At no point in his declaration does Dr. Cantor mention facilities or restrooms and

how his conclusions in his declaration relate to this specific case at hand. However, in a "Bill of

Transsexual Rights" that he has drafted and posted on his personal website, he notes that

"[t]ranssexual individuals have the right, during transition, to access sex-specific public facilities

in which their contrary genital status would not be evident. For example, for the great majority of

instances, a presurgical male-to-female transsexual presenting as female can use a female-

designated restroom unobtrusively. (Cantor, nd)" *See* http://www.jamescantor.org/bill-of-

rights.html. Therefore, in his own work Dr. Cantor recognizes the importance of transgender

people's access to the sex-separated facility that matches their gender identity. He also states that

"one does not choose to be dysphoric about the sex they were born into," that people "have the

right to be free from undue pressure . . . not to transition," and that transgender people "have the

right to be recognized in their new gender by . . . local and federal governments."

**B.      Dr. Cantor's Criticisms of the Standards of Care for Treatment of Gender
        Dysphoria Are Not Well-Founded**

9.      Dr. Cantor spends much of his declaration criticizing the well-established

international standards of care for transgender youth, which have been promulgated both by the

World Professional Association for Transgender Health ("WPATH") and the Endocrine Society.

Below, I offer the ways in which Dr. Cantor's criticisms are lacking and embody an outlier view

that is not supported by medical science or best practices in the provision of medical care.

10.     Contrary to Dr. Cantor's unsupported claim that these standards lack a sufficient evidentiary basis, both WPATH and the Endocrine Society have developed standards for treating gender dysphoria in minors using the same evidence-based approach used to develop standards of care and practice guidelines for the treatment of many other medical conditions. For example, "[r]ecommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus on the final recommendations was attained using the Delphi process that included all members of the guidelines committee and required that recommendation statements were approved by at least 75% of members (p.8) (Coleman et al., 2022)." In addition, each recommendation is labeled according to a modified version of the Grading of Recommendations, Assessment, Development and Evaluations ("GRADE") framework, which helps clarify the quality of the evidence supporting the recommendation, among other things.

11.     Similarly, the Endocrine Society's "evidence-based guideline" for hormone therapy treatment is based in part on two systematic reviews commissioned to help develop the guideline and used the best available evidence from other published systematic reviews and individual studies (Hembree et al. 2017). These recommendations were also developed using the GRADE approach to describe the strength of recommendations and the quality of evidence. Dr. Cantor suggests that the efficacy of this care has been called into doubt by reports from several international health care systems. But none of the countries Dr. Cantor discusses—the United Kingdom, Sweden, Finland, Norway, and France—ban either puberty blockers or hormones for transgender adolescents. Similarly, none of the international reports that Dr. Cantor cites is a clinical practice guideline, and none recommend banning medical care for transgender youth. The primary focus of concern in these countries is *improving* the delivery of services and quality

of care, including ensuring that providers follow the standards of care and provide medical treatments only after careful evaluation and assessment.

12.     For example, Dr. Cantor cites a report by Dr. Hilary Cass (2022), which reviewed the delivery of care to transgender youth in England and identified problems related to the centralization of care in a single facility. Dr. Cantor fails to note that this report concludes by recommending that England create *more* centers for providing this care and that providers follow the Endocrine Society Guidelines when providing hormone therapy.

**C.     Dr. Cantor's View that Transgender Youth Are Mentally Ill and Should Not be Given Supportive Medical Care or Permitted to Transition Is Not Well-Founded**

13.     Dr. Cantor does not explain how his criticisms of the standards of care for treating gender dysphoria in youth are relevant to my understanding of the central issue in this case: whether transgender youth should be able to use sex-separated facilities that align with their gender identity. Although it is not entirely clear, Dr. Cantor appears to believe that minors who are diagnosed with gender dysphoria should be required to live in accordance with their sex assigned at birth and should not be permitted to transition either socially or through medications. Instead, Dr. Cantor appears to believe these minor patients should be given counseling to prevent them from identifying as transgender, based on his view that gender dysphoria in minors is a manifestation of some other mental health condition, such as borderline personality disorder. Cantor Dec. ¶ 93.

14.     Dr. Cantor's views on this topic have no scientific basis and contradict the medical consensus that gender dysphoria in minors is a real and distinct medical condition, and not a manifestation of "gender identity confusion" caused by other "mental health issues." Cantor Dec. ¶ 93. Dr. Cantor's claim that patients who have borderline personality disorder are regularly being misdiagnosed with gender dysphoria has no scientific or clinical basis. None of

the studies he cites for this proposition involve transgender youth, and there are no studies that

support Dr. Cantor's claims regarding this association.

15.     Dr. Cantor's views also contradict the medical consensus that trying to encourage

or compel transgender youth to live in accordance with their sex assigned at birth is ineffective,

unethical, and harmful. For example, the WPATH standards of care explicitly state that

conversion therapy (also referred to as "reparative therapy" and "gender identity change efforts"

("GICE")) not only does not result in changes in gender identity, but also is associated with

increases in clinical distress (Coleman et al., 2022). The American Psychological Association

(2023) also notes in its resolution on GICE "that scientific evidence and clinical experience

indicate that GICE put individuals at significant risk of harm" and that the organization opposes

any of these practices based on the evidence base. Similarly, the American Academy of Child

and Adolescent Psychiatry (2018) has noted that there "lack[s] scientific credibility and clinical

utility" for conversion therapy and "there is evidence that such interventions are harmful. As a

result, 'conversion therapies' should not be part of any behavioral health treatment of children

and adolescents. However, this in no way detracts from the standard of care which requires that

clinicians facilitate the developmentally appropriate, open exploration of sexual orientation,

gender identity, and/or gender expression, without any pre-determined outcome."

16.     It is also my clinical experience that psychotherapy is not effective as the sole

treatment for individuals who need to socially transition and who need medical changes to their

bodies to reduce gender dysphoria. I have often worked with individuals diagnosed with gender

dysphoria who have financial barriers that do not allow them to receive medical treatments. I

have also provided psychotherapy to transgender adolescents who experienced interpersonal

barriers to social and medical transition. While psychotherapy can assist these patients with

coping on a day-to-day basis, many of these patients experience significant distress from delays in social and medical transition, and psychotherapy alone does not alleviate their dysphoria. Clinically, I see extremely high rates of suicidal ideation and suicidal intent with patients who have barriers to social and medical transitioning. I have assisted several of these patients with obtaining inpatient care to ensure that they do not die by suicide (that inpatient care, however, is costly and usually only provides a short-term solution to their immediate distress). As noted in my previous declaration, delaying the transition process can be detrimental for transgender youth, with early recommendations noting the importance of not delaying a gender dysphoria diagnosis and treatments (including social transition) that are most appropriate for the youth (Edwards-Leeper et al., 2012) and more recent articles noting the immense harms from delaying treatment (de Vries et al., 2021). In sum, Dr. Cantor's view that minors with gender dysphoria should not be permitted to transition and should be counseled to live in their sex assigned at birth contradicts a long-standing and well-established consensus opposing such practices as ineffective and harmful.

17.     Dr. Cantor also expresses concern that the process of diagnosing gender dysphoria fails to account for "differential diagnoses" (other diagnoses that might explain the patient's symptoms), Cantor Dec. ¶ 115, but this misunderstands both my testimony and the required assessment process for gender dysphoria. In my clinical experience working with transgender youth, all clinical intakes and assessments have included a DSM-5-TR diagnostic interview, with a process of assessing *all* possible psychiatric diagnoses. It is possible for transgender people to be diagnosed with co-occurring psychiatric disorders along with gender dysphoria, and indeed assessing for such diagnoses is one of the goals of assessing the patient.

18.     Dr. Cantor's suggestion that treatment for gender dysphoria involves "transition-on-demand" further underscores his lack of familiarity with the standards of care in this field. Cantor Dec. ¶ 66. Under the WPATH standards of care for working with transgender youth and standard clinical practice in the field, clinicians engage in extensive assessments of informed assent and consent with transgender youth.

**D.     Gender Identity and Sex Assigned at Birth**

19.     Dr. Cantor similarly disputes that "gender identity is well-established in psychology and medicine"—pointing to a statement taken out of context in the DSM-5-TR. Cantor Dec. ¶ 111. In fact, as noted in my prior declaration, gender identity is a well-established term in psychology and medicine that has been in use for decades. It is defined in the DSM-5-TR, which explains: "Gender identity is a category of social identity and refers to an individual's identification as male, female," or another category. It is a central component of gender dysphoria, which is the distress caused when a person's gender identity diverges from their assigned sex at birth. Gender identity is also discussed at length in the WPATH Standards of Care, the Endocrine Society Practice Guidelines, and a large body of medical literature.

20.     Dr. Cantor uses outdated, inaccurate, and narrow definitions of sex. Dr. Cantor mentions that sex can only be determined either by "visual inspection" or "chromosomes." There are several significant flaws to this outdated argument, the first being that major medical and psychological associations agree that sex is multifaceted, comprising of chromosomes, hormones, internal and external genitalia, secondary sex characteristics, and gender identity (e.g., American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018).

21.     To be more specific, American Medical Association Board member Dr. William Kobler has explained: "Sex and gender are more complex than previously assumed. It is essential to acknowledge that an individual's gender identity may not align with the sex assigned to them at birth. A narrow limit on the definition of sex would have public health consequences for the transgender population and individuals born with differences in sexual differentiation, also known as intersex traits" (AMA, 2018). The second is that visual inspection is inherently flawed regarding determination—for example, if a cisgender man sustains injuries to his genitals to make them unrecognizable, that would mean that his sex is undeterminable. Similarly, in the past, babies with intersex conditions that influence their genitals typically had medical providers decide the sex of the baby, usually deciding female since those genitals were easier to reconstruct—but such surgeries on babies often had disastrous effects when the assigned sex did not match the person's gender identity (Carpenter 2016). Chromosomes are not limited to XX and XY and thus cannot also be deemed as the only major way to determine one's sex. Given that there are biological changes that occur with hormone therapy and gender affirming surgeries, relying solely on one aspect of sex determined in utero is outdated.

22.     In his report, Dr. Cantor contends that the terminology "sex assigned at birth" should not be used. His arguments are grounded in a false and narrow definition of sex, and further illustrate that his views are outside the consensus of experts and practitioners in the field. "Sex assigned at birth" is the terminology that is used by the major medical and psychological organizations when referring to infants being labeled as male or female at birth (see American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018). In addition to this terminology being the primary terminology that is used by

these organizations, this is also reflected in the field in academic publications and presentations. For example, in March 2023, in the *Journal of Adolescent Health*, Tabb and colleagues (2023) published an article titled "The Role of Caregiver Acceptance and Sex Assigned at Birth on Depression Among Gender-diverse Youth." A Google Scholar search conducted on August 25, 2023 of the terms "sex assigned at birth" OR "assigned sex at birth" elicited 3,950 results for articles published in 2023 alone.

23.     Dr. Cantor also incorrectly claims that gender identity is not innate and has no biological foundation. Cantor Dec. ¶ 76. This is false. There is consensus among professional organizations that one's gender identity cannot be voluntarily changed and it is a "deeply felt, inherent sense" (e.g., American Psychological Association, 2021). Furthermore, as the Endocrine Society Clinical Practice Guidelines for Endocrine Treatment of Gender-Dysphoric Persons (2017) explain: "although there is much that is still unknown with respect to gender identity and its expression, compelling studies support the concept that biologic factors, in addition to environmental factors, contribute to this fundamental aspect of human development" (p. 3875).

**E.     The Evidence Does Not Support Dr. Cantor's Theories Regarding Desistence and "Rapid Onset" of Gender Dysphoria**

24.     To support his view that minors should not be permitted to transition, Dr. Cantor claims that "among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty." Cantor Dec. ¶ 57. He relies on "11 cohort studies showing these [desistence] outcomes in children," which come from a commentary he wrote of the American Academy of Pediatrics (2018) statement supporting gender-affirming care—not from his own research or a systematic review of the research.[4] The generally decades-

---

[4] At least two things are noteworthy about the commentary Dr. Cantor cites. First, even though Dr. Cantor mentions multiple times how important systematic reviews are in his declaration,

old studies that are cited to promote this argument: a) are often misunderstood, and b) have significant flaws in their design.

25.     First, *all* 11 studies collected data on youth prior to the changes in 2013 to the Diagnostic and Statistical Manual of Mental Disorders promulgated by the American Psychiatric Association. These changes resulted in an updating of the prior diagnosis of "gender identity disorder" to a more accurate and less stigmatizing diagnosis called "gender dysphoria." Because Dr. Cantor's 11 studies collected data under prior versions of the DSM, with less precise criteria for the diagnosis, these studies often included children merely because they exhibited gender-nonconforming behaviors, but who did not have gender dysphoria, and did not identify as transgender. Therefore, the concept of gender dysphoria being "outgrown" does not make sense for the vast majority of these children since they did not have gender dysphoria to begin with. All of these studies used criteria for inclusion that were not specific enough to distinguish those with gender dysphoria from cisgender children. The current DSM-5-TR (American Psychiatric Association, 2022) gender dysphoria criteria are more precise in requiring that children/adolescents identify with a gender that is different from their assigned gender for at least six months, which was not the case for the older studies upon which Dr. Cantor relies.

26.     In fact, the sample out of the 11 that has the most recent data collection was the Steensma et al. (2013) article, with data was collected between 2000-2008. Steensma & Cohen-

---

these 11 articles are not the product of such a review. He has never conducted a systematic review focused on transgender people or youth specifically.

Second, Dr. Cantor claims this "commentary" is his most-cited paper relating to gender dysphoria, and "illustrates the expertise" for which he is recognized. Cantor Dec. ¶ 13. But the fact that this is his "most-cited" paper does not mean it is widely cited nor that it is accepted as authoritative. According to Google Scholar this paper only has 37 citations; in contrast, my most cited paper regarding the process of discrimination and transitioning in relationship to mental health for transgender people has 930 citations.

Kettinis (2018) agree that their data have been cited incorrectly to support the purportedly low persistence rates and have stated that their "studies cannot be used to support" low persistence estimations, in that they never calculated or reported rates of persistence/desistence. They also note that the negative social climate for transgender children and adolescents should be taken into account when reading the data, since that may account for reluctance to live openly as transgender. They further state that their data did not actually reflect *gender dysphoria* in children and "expect that future follow up studies using the new diagnostic criteria may find higher persistence rates." Finally, they indicate that the terms "desistence" and "persistence" have been misused; they state that when they were researching youth, there were many youth who may have been "hesitating, searching, fluctuating, or exploring" and that those youth have been "misclassified as desisting." Dr. Cantor even cites this article as one that he agrees with in paragraph 67, when he states: "Multiple accomplished international researchers studying outcomes of gender dysphoric children responded . . . [including] Steensma & Cohen-Kettinis, 2018."

27.     Temple Newhook et al. (2018) provide a comprehensive review of the data in the articles Dr. Cantor cites, explaining these flaws in further detail. Dr. Cantor spends a great deal of time specifically critiquing the Temple Newhook et al. (2018) article in his declaration, but his comments simply underscore the weakness in his own testimony. His first critique is that the authors did not conduct a systematic review for their article; but Dr. Cantor never provided information about conducting his own systematic review of the 11 articles he so often cites. It should be noted that systematic reviews have very specific processes that should be used, such as using the Preferred Reporting Items for Systematic reviews and Meta-Analyses (PRISMA), of which I did not see Dr. Cantor reporting in the papers he published. Temple Newhook's critiques

were focused on publications that were more recently published because the terminology of persistence/desistence did not exist for the earlier studies cited by Cantor (2020); however, many of the critiques remain applicable to the earlier studies.

28.     Dr. Cantor also cites the Singh et al. (2021) study among his 11 articles to demonstrate his argument regarding desistence, but this reliance shares the same flaws as above. First, the data were collected from 1975-2009 with follow-ups up to 2011—all before the adoption of more precise criteria for gender dysphoria in the DSM-5 issued in 2013.  In the method section, there are descriptions of many different ways that data were collected between 1975-2011, thus the methodological rigor of how follow-ups were completed is low. As well, they state: "Due to lack of study resources and time constraints, contact with 162 other eligible participants was not attempted (p.4)." Note that the number of people they did not attempt to contact was higher than the overall sample size for the entire study (N = 139). As mentioned above, DSM-III and DSM-IV diagnoses did not require insistence and persistence of identity for at least six months in the diagnosis and the diagnosis could be provided without persistence of identity and could instead rely on stereotyped behaviors, thus is it possible that the 88 participants who were diagnosed with gender identity disorder were simply displaying gender atypical (for the time period) behavior (note: the other 51 youth in the sample did not meet criteria for *any* of the previous DSM diagnoses). Finally, these data were collected by the Gender Identity Service, Child, Youth, and Family Program at the Centre for Addiction and Mental Health (CAMH) in Toronto, Ontario. The program was shut down in in 2015 "after an external review found its approach was out of step with accepted clinical practice" (The Canadian Press, 2015)—thus all data were collected during a time period when the clinic was not meeting the needs of the youth who were referred to care.

29.     Also, the grouping of 11 articles provided by Dr. Cantor does not correspond to the language provided in the articles—none of the articles identify any of the youth as transgender. Dr. Cantor makes a point to contend that researchers should not cherry-pick their data, and yet it appears that is exactly what he is doing in this instance.

30.     Today, based on current scientific knowledge and clinical practice, researchers and clinicians are much better equipped to differentiate transgender from cisgender children and adolescents. As the Endocrine Society Practice Guidelines (2017) explain: "It may be that children who only showed some gender nonconforming characteristics have been included in the follow-up studies, because the DSM-IV text revision criteria for a diagnosis were rather broad . . . . With the newer, stricter criteria of the DSM-5-TR, persistence rates may well be different in future studies (p. 3876)."

31.     Dr. Cantor does not dispute that minors whose transgender identification persists into adolescence are likely to continue to identify as transgender as adults. Indeed, Dr. Cantor has written that "the majority of kids who continue to feel trans after puberty rarely cease." (Cantor 2020). While the age varies for each individual, adolescence often begins around age 10 (UNICEF, 2023). As recent studies have shown, for "transgender adolescents who, following careful assessment, receive medical necessary gender-affirming medical treatment," "rates of reported regret . . . are low." (Coleman et al., 2022). As noted above, Dr. Cantor does not explain the relevance of his testimony to excluding any transgender youth from facilities that match their gender identity; but that absence of explanation is especially striking as to transgender adolescents in particular, whose gender identity even Dr. Cantor does not dispute is unlikely to become aligned with their sex assigned at birth.

32.     In addition, Dr. Cantor mentions the concept of "rapid onset gender dysphoria" ("ROGD"), which has been debunked in the scientific community and is not a valid diagnostic term. In 2018, Lisa Littman conducted a study which has been heavily critiqued for its methodological flaws (see Ashley, 2020 and Restar, 2020 for examples). While there are many flaws in the study Littman conducted, the major ones are: 1) the consent form noted that Littman felt that transgender identity in youth was influenced by social contagion, which would likely lead to a self-selection bias of the respondents who would choose to participate in the study, 2) Littman included only *parents* of gender nonconforming or transgender youth and not youth themselves, 3) Littman used unvalidated measures of diagnostic criteria and asked parents to provide diagnostic impressions of their children and also did not provide any psychometric information regarding any measures used, 4) Littman asked parents to comment on their own perceptions of whether or not their child's gender identity had a "rapid onset" (with rapid onset not being defined), 5) 77% of the parents believed their child's transgender identification "was not correct," and 6) recruitment relied significantly on three websites known to have parents who were vocal about promoting the concept of ROGD.

33.     Beyond the flaws in the article, scientific evidence also demonstrates that ROGD does not have validity. For example, Bauer et al. (2022) evaluated clinical data from 10 gender clinics across Canada to analyze data focused on youth's report of "recent gender knowledge." The authors analyzed several research questions using their large clinic-based dataset to better understand the claims made by Littman. They indicate: "We did not find support within a clinical population for a new etiologic phenomenon of rapid onset gender dysphoria during adolescence. Among adolescents under age 16 years seen in specialized gender clinics, associations between more recent gender knowledge and factors hypothesized to be involved in rapid onset gender

dysphoria were either not statistically significant or were in the opposite direction to what would be hypothesized" (p. 225).

34.    In paragraph 62, Dr. Cantor states that "social transition itself represents an active intervention, such that social transition may cause the persistence of gender dysphoria when it would have otherwise resolved." The argument that Dr. Cantor is making does not make sense— this is akin to supporting a gay person's sexual orientation and then saying that the support caused the person to be gay.  Dr. Cantor does not provide any evidence to support his statement. Instead, longitudinal research indicates that transgender youth who have been able to socially transition report similar depression and self-worth and marginally higher anxiety when compared to matched controlled peers, likely because youth who transition and are known to be transgender are subject to greater rates of stigma (Durwood et al. 2017). Conversely, research demonstrates that delaying social transition does not change a young person's gender identity, and instead can cause distress for transgender youth (Horton, 2022). It should also be noted that for many youth, social transition is not enough to improve mental health without also engaging in medical interventions, and therefore assessing social transition on its own often does not provide the full picture for what transgender youth may need. As explained above, however while social transition is often insufficient on its own, it is no less necessary for this fact.

F.    **Research Design in this Area Should Be Based on Hypotheses and Research Questions**

35.    In his declaration, Dr. Cantor provides an overview of the Pyramid of Evidence, regarding how to assess the quality of studies. Dr. Cantor's claim rests on false or misleading assumptions.  For example, he notes that a randomized controlled trial ("RCT") provides the strongest evidence of safety and efficacy. While randomized controlled trials provide the highest quality of evidence in many contexts, management of gender dysphoria in minors is not ethically

amenable to randomized controlled trials. Because there is already substantial evidence that

puberty blockers and hormone therapy benefit transgender minors, it would be unethical to

propose a study randomly assigning some patients to these treatments and some to a placebo.

Deutsch et al., (2016) state that randomizing transgender people to receive or not receive

hormone therapy or surgery violates the principle of equipoise (true scientific uncertainty about

whether an intervention will help the individual); there are ethical ways to conduct RCTs with

transgender youth and adults, however, these studies would be focused on schedules and delivery

modes of treatment, and not on whether or not the treatment is effective. Cisgender youth receive

pubertal suppression treatments and hormone therapy treatments for a host of medical disorders,

and such treatments are considered safe and effective (albeit with side effects, as medical

treatments typically have). Given the ethical considerations and bodies of existing evidence,

researchers in this field must rely on other types of study design, such as longitudinal cohort

studies, which monitor change in symptoms over the course of treatment (de Vries et al., 2014)

or cross-sectional studies comparing treated and untreated persons (Turban et al., 2022).

  36. Regarding the questions at hand in this particular case, Dr. Cantor ignores that

this is a case that focuses on the harm that is caused to transgender youth if they are forced to use

a sex-separated facility that does not align with their gender identity. Randomized controlled

trials are conducted when there are questions regarding if one particular form of treatment

demonstrates efficacy when compared to placebo or no treatment or demonstrates effectiveness

when two treatments are compared to one another. Directors of the National Health Services

Research and Development Centre for Evidence-Based Medicine in the UK and Center for the

Evaluative Clinical Sciences in the US (Sackett & Wennberg, 1997) indicated: "Our thesis is

short: the question being asked determines the appropriate research architecture, strategy, and

tactics to be used—not tradition, authority, experts, paradigms, or schools of thought." Medical

and psychological research methods texts (which are updated regularly) note that the research

design should be based on what types of research questions are being asked and which

hypotheses are being tested (e.g., Browner et al. 2022; Hammond et al., 2015; Schweigert, 2021).

In fact, in clinical research, Bragge (2010) notes that the hierarchy of evidence further

extrapolates a within-hierarchy of evidence, meaning that the research question must be the

determining factor of what type of research design is appropriate for the following categories:

interventions, diagnostic tests, prognosis, and anticipating complications. In sum, if the research

question is not appropriate for or does not apply to a randomized controlled design, an RCT

design should not be considered in the hierarchy of evidence.

      37.     Thus, in situations where researchers are asking—1) if there is an impact (in any

direction) on transgender youth who are required to use sex-separated facilities that do not align

with their gender identity, 2) what the extent of the impact is, and 3) what factors are associated

with the impact—the research design is not intervention-focused and thus a randomized

controlled trial is not appropriate or ethical. These would likely best fit the "prognosis" category

outlined above, where clinical courses are estimated and complications are anticipated. Bragge

(2010) states explicitly: "if the central clinical issue is 'prognosis,' a Prospective Cohort Study –

not an RCT – is the highest ranked primary study design for this research category. (p.5)" For an

example of a prospective cohort study focused on the harm caused by legislation focused on sex-

separated spaces, see Horne et al. 2022.  In addition, for research questions that focus on the

amount or prevalence of a concern, best practices in research design include observational cross-

sectional or longitudinal designs (Mann, 2003; 2012). The studies described in my declaration

regarding the type of harms and the amount of harms caused by transgender youth experiencing

stigma and discrimination are considered observational designs.

38.　　Given Dr. Cantor's fixation on the importance of using RCTs without any

attention to understanding how research design decisions are implemented, it appears he does not

understand how research design decisions can and should occur. As well, from my read of his

CV, Dr. Cantor has never conducted a clinical trial, whereas I have conducted two separate

clinical trials with transgender patients, which lends to a more authoritative understanding of

conducting intervention research.

**G.　　Reducing Stigma for Transgender Youth Reduces Suicidality and Suicide**

39.　　Dr. Cantor cites Dhejne (2011) for the proposition that undergoing sex-

reassignment surgery does not decrease suicidality among transgender adults.  First, this study is

not relevant to this specific case at hand as it does not focus on transgender youth or sex-

separated facilities. Regardless, Dr. Cantor's claim misrepresents the data from Dr. Dhejne's

study, which found that suicide rates are higher among transgender people than the general

population. The study did not compare treated versus untreated transgender women, as Dr.

Cantor incorrectly suggests. Dr. Dhejne compared morbidity and mortality statistics from a

national database of transgender people with those in the general Swedish population, and only

made comparisons between cisgender and transgender groups, not before and after surgery, or

transgender women with surgery and without surgery. Given entrenched societal stigma towards

transgender people, it is not surprising that transgender people experience higher rates of

suicidality. The study itself warns against drawing any conclusions regarding the effectiveness of

surgery as a treatment for gender dysphoria: "For the purpose of evaluating whether sex

reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported

gender dysphoria pre and post treatment. Such studies have been conducted either prospectively

or retrospectively and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria." (Dhenje et al., 2011) Since the study was published, Dr. Dhejne has cautioned that interpretations like Dr. Cantor's are incorrect (Dhejne, 2017).

40.     Dr. Cantor further opines that McNeil, et al. (2017) does not show that transition reduces suicidality among transgender youth (Cantor, paragraph 87). In fact, the study concluded that "[d]iscrimination emerged as strongly related to suicidal ideation and attempts, whereas positive social interactions and timely access to interventions appeared protective." Bauer, et al. (2015), which Dr. Cantor erroneously cites for the proposition that social support is associated with increased suicide attempts, further supports that conclusion: "Our findings support a strong effect for social exclusion, discrimination and lack of medical transition (for those needing it) on suicide ideation and attempts, and potentially on the survival of trans persons." The WPATH Standards of Care cite Bauer's study as evidence that "[a]ccess to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt." (Coleman et al., 2022).

41.     Dr. Cantor also cites Canetto, et al. (2021) in support of his implausible claim that providing social support to transgender youth is associated with increased suicidal attempts. The Canetto study did not include or address transgender youth and does not support Dr. Cantor's claim.

42.     The harms caused by suicidal ideation are themselves very serious. In a recent systematic review of the impact of suicidal ideation, the harms directly associated with suicidal thoughts are clear: a sense of loss of the self, lack of self-worth, low self-esteem, loss of meaning in life, self-hatred, feelings of worthlessness, increased guilt, and increased shame (Søndergaard et al., 2023). These experiences are incredibly painful. Even if suicidal ideation and suicide were

not related, which they are, preventing suicidality alone would be a compelling reason to provide medically needed care to transgender adolescents.

43.     Because suicide attempts and suicide are interrelated, reducing stigma and implementing treatment that reduces attempts and completed suicide is essential, even if current research designs cannot quantify that impact precisely (Jones et al., 2022). Dr. Cantor claims that youth in general are experiencing more suicidal ideation and attempts (specifically in relation to social media use) but ignores the disparity that exists between cisgender and transgender youth, accounting instead for only factors that would impact all youth, such as social media. For example, a recent study found that transgender teens were 7.6 times as likely to attempt suicide as their cisgender peers (Kingsbury et al., 2022). As well, transgender youth's suicide risk was statistically significantly higher in every category (felt sad/hopeless, considered attempting suicide, made a suicide plan, attempted suicide, and had a suicide attempted treated by a doctor or nurse) when compared to cisgender boys and girls (Johns et al., 2019).

44.     In summary, Dr. Cantor's declaration does not address any components of this particular case directly as he does not opine on the harm directly related to transgender youth who are banned from using sex-separated facilities that align with their gender identity. He does not dispute that stigma directed toward transgender youth is harmful and that being barred from using a facility that matches one's gender identity causes greater stigma and harm. In fact, Dr. Cantor notes that it is important for transgender people to use facilities that are aligned with their gender identity. Additionally, Dr. Cantor appears to misunderstand fundamental research design, failing to appreciate that the research question and hypothesis must match the research design. Contrary to Dr. Cantor's critiques, it is clear that that RCTs would be inappropriate or unethical to test regarding the questions at hand in this particular case. His critique of the evidence base in

this area is thus misplaced and fails to show any scientific disagreement with the peer-reviewed research literature showing that discriminating against transgender youth in school facilities is harmful to them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed this _31_ day of ____August_2023.    _____
Stephanie L. Budge, Ph.D.

## Appendix A

## Supplemental Bibliography of Stephanie L. Budge, Ph.D.

American Academy of Pediatrics (2018) cited via Rafferty, J., Yogman, M., Baum, R., Gambon, T. B., Lavin, A., Mattson, G., ... & Committee on Psychosocial Aspects of Child and Family Health. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*, *142*(4).

American Academy of Child and Adolescent Psychiatry (2018), Conversion Therapy. Retrieved from https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx. on August 29, 2023.

American Medical Association (2018). AMA *Adopts New Policies at 2018 Meeting*. Retrieved from https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-2018- interim-meeting on November 29, 2022.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association (2017). *Definitions of Gender, Sex, Sexual Orientation, and Pronoun Useage*. https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and- gender-nonconforming-patients/definitions-and-pronoun-usage

American Psychological Association. (2014). *Answers to your questions about transgender people, gender identity, and gender expression*. Retrieved from http://www.apa.org/topics/ lgbt/transgender.aspx on November 29, 2022.

American Psychological Association (2021). *APA Resolution on Gender Identity Change Efforts.* Retrieved from https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf on November 29, 2022.

Ashley, F. (2020). A critical commentary on 'rapid-onset gender dysphoria'. *The Sociological Review*, *68*(4), 779-799.

Bauer, G. R., Lawson, M. L., Metzger, D. L., & Trans Youth CAN! Research Team. (2022). Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?. *The Journal of pediatrics*, *243*, 224-227.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health, 15,* 525.

Bragge, P. (2010). Asking good clinical research questions and choosing the right study design. Injury, 41, S3-S6.

Browner et al., (2023). Designing clinical research (5th ed). Philadelphia, PA: Wolters Kluwer Health.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). Suicidal as normal: A lesbian, gay, and bisexual youth script? *Crisis, 42,* 292–300.

Cantor, J. (2020).  When is a "TERF" not a TERF?  *Sexology Today!*  Retrieved from http://www.sexologytoday.org/2020/07/when-is-terf-not-terf.html on August 29, 2023.

Carpenter, M. (2016). The human rights of intersex people: Addressing harmful practices and rhetoric of change. *Reproductive Health Matters*, *24*(47), 74-84.

Cass, H. (2022). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK.

Coleman, E., Radix, A. E., Bouman, W. P., et al. (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health*, 23:sup1, S1-S259.

de Vries, A. L. C., Richards, C., Tishelman, A. C., Motmans, J., Hannema, S. E., Green, J., & Rosenthal, S. M. (2021). Bell v Tavistock and Portman NHS Foundation Trust [2020] EWHC 3274: Weighing current knowledge and uncertainties in decisions about gender-related treatment for transgender adolescents. *International Journal of Transgender Health*, 22, 217-224.

de Vries, A. L., McGuire, J. K., Steensma, T. D., Wagenaar, E. C., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. Pediatrics, 134(4), 696-704.

Deutsch, M. B., Radix, A., & Reisner, S. (2016). What's in a guideline? Developing collaborative and sound research designs that substantiate best practice recommendations for transgender health care. AMA journal of ethics, 18(11), 1098.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PloS one, 6(2), e16885.

Dhejne, C. (2017). Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything! Winnower 10:e150124.46274.

Durwood, L., Eisner, L., Fladeboe, K., Ji, C. G., Barney, S., McLaughlin, K. A., & Olson, K. R. (2021). Social support and internalizing psychopathology in transgender youth. Journal of youth and adolescence, 50(5), 841-854.

Edwards-Leeper, L., & Spack, N. P. (2012). Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service"(GeMS) in a major pediatric center. *Journal of Homosexuality*, *59*(3), 321-336.

Hammond et al., (2015). *Handbook for clinical research: Design, statistics, and implementation.* New York, NY: Demos Medical Publishing.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., ... & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. The Journal of Clinical Endocrinology & Metabolism, 102(11), 3869-3903.

Horne, S. G., McGinley, M., Yel, N., & Maroney, M. R. (2022). The stench of bathroom bills and anti-transgender legislation: Anxiety and depression among transgender, nonbinary, and cisgender LGBQ people during a state referendum. Journal of Counseling Psychology, 69(1), 1-13.

Horton, C. (2022). "I Was Losing That Sense of Her Being Happy"—Trans Children and Delaying Social Transition. LGBTQ+ Family: An Interdisciplinary Journal, 1-17.

Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Demissie, Z., McManus, T., ... & Underwood, J. M. (2019). Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students—19 states and large urban school districts, 2017. *Morbidity and Mortality Weekly Report, 68*(3), 67-71.

Jones, S. E., Ethier, K. A., Hertz, M., DeGue, S., Le, V. D., Thornton, J., ... & Geda, S. (2022). Mental health, suicidality, and connectedness among high school students during the COVID-19 pandemic—Adolescent Behaviors and Experiences Survey, United States, January–June 2021. *Morbidity and Mortality Weekly Report supplements*, 71(3), 16-21.

Kingsbury, M., Hammond, N. G., Johnstone, F., & Colman, I. (2022). Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada. CMAJ, 194(22), E767-E774.

Littman, L. (2018). Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports. *PloS one*, *13*(8).

Mann, C. J. (2012). Observational research methods—Cohort studies, cross sectional studies, and case–control studies. African Journal of Emergency Medicine, 2(1), 38-46.

Mann, C. J. (2003). Observational research methods. Research design II: cohort, cross sectional, and case-control studies. Emergency medicine journal, 20(1), 54-60.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4,* 341–353.

Restar, A. J. (2020). Methodological critique of Littman's (2018) parental-respondents accounts of "rapid-onset gender dysphoria". *Archives of Sexual Behavior*, *49*(1), 61-66.

Sackett, D. L., & Wennberg, J. E. (1997). Choosing the best research design for each question: It's time to stop squabbling over the "best" methods. *Bmj*, *315*(7123), 1636.

Schweigert, W.A. (2021). *Research methods in psychology.* Long Grove, IL: Waveland Press.

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. Frontiers in Psychiatry, 12, 632784.

Søndergaard, R., Buus, N., Berring, L. L., Andersen, C. B., Grundahl, M., Stjernegaard, K., & Hybholt, L. (2023). Living with suicidal thoughts: A scoping review. Scandinavian journal of caring sciences, 37(1), 60-78.

Steensma, T. D., & Cohen-Kettenis, P. T. (2018). A critical commentary on follow-up studies and "desistence" theories about transgender and gender non-conforming children. *International Journal of Transgenderism*, *19*, 225-230.

Steensma, T. D., McGuire, J. K., Kreukels, B. P., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. Journal of the American Academy of Child & Adolescent Psychiatry, 52(6), 582-590.

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., ... & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, 19, 212-224.

The Canadian Press (2015). *CAMH to 'wind down' gender identity clinic after review of services.* Retrieved from https://www.cbc.ca/news/canada/toronto/camh-gender-identity-1.3366424 on August 29, 2023.

Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLos one*, *17*(1), e0261039.

UNICEF (2023). *Adolescents.* Retrieved from https://data.unicef.org/topic/adolescents/overview/#:~:text=Defined%20by%20the%20United %20Nations,the%20Rights%20of%20the%20Child on August 29, 2023.