# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| REBECCA ROE, by and through her parents and next friends Rachel and Ryan Roe, SEXUALITY AND GENDER ALLIANCE, an association,<br><br>    Plaintiffs,<br><br>v.<br><br>DEBBIE CRITCHFIELD, in her official capacity as Idaho State Superintendent of Public Instruction, et. al.,<br><br>    Defendants. | Case No. 1:23-cv-00315-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiffs Rebecca Roe, Rachel and Ryan Roe, and Sexuality and Gender Alliance's (collectively "Plaintiffs") Motion for Preliminary Injunction ("PI Motion"). Dkt. 15. Defendants Debbie Critchfield et al. (collectively "Defendants") oppose the motion. Dkt. 48. Defendants have also moved to dismiss all of Plaintiffs claims in their entirety. *Id*. The Court held oral argument on September 13, 2023, and took both motions under advisement.

Upon review, and for the reasons set forth below, the Court DENIES Plaintiffs' PI Motion and DENIES Defendants' Motion to Dismiss. There will be no preliminary injunction and Idaho's statute will soon take effect because Plaintiffs have not met their burden for an injunction. That said, the case will move forward because Defendants have

MEMORANDUM DECISION AND ORDER – 1

not met their burden for dismissal either.

## II. OVERVIEW

This is a difficult case. Each of the parties before the Court seek to protect important individual rights. The critical question, however, is what happens when individuals' rights converge and those rights struggle to co-exist? As the Court has explained before, "much can be said about the intersection, and overlapping nature, of these rights and the degree to which one right impacts another." *Perlot v. Green*, 609 F. Supp. 3d 1106, 1111 (D. Idaho 2022). Today, the Court is again faced with "tackling the difficult interplay between various [] rights." *Id*. In doing so, it is ever "cognizant of the fact that in enforcing or protecting certain rights, other rights may be impinged." *Id*.

The outcome of cases such as this are celebrated by some and lamented by others. Regardless of the Court's ruling today, someone will feel left out. In a pluralistic society, however, everyone cannot win every time. There must be reasonable give and take and sensible people on all sides of the issue should work together in a collaborative effort.

The present task is particularly difficult considering the communities on both sides of the debate are some of Idaho's most vulnerable: children and youth. Although it likely comes as little solace to Idaho's transgender students who, as a result of the Court's decision today, may have to change their routines, or who, regrettably, may face other societal hardships, the Court must stay within its lane. Its duty is to interpret the law; it is not a policy-making body. As such, the Court cannot say which approach is best. It can only decide whether the approach chosen by the Idaho Legislature is legal. And, in the context of a preliminary injunction such as this, the question is even more nuanced since

the Court's analysis is *preliminary*. Today, the Court reviews the challenged law and asks this simple question: have Plaintiffs convinced the Court the law is likely unconstitutional? The answer is no.

The Court, of course, does not assess this simple question in a vacuum. It is mindful that its "technical" legal decisions have real-world consequences. However, when the Court runs too far afield and starts to "write" the law or suggest what the law should be to achieve certain societal goals, it has overstepped.

For the reasons explained herein, the Court finds Plaintiffs have not met their burden to obtain a preliminary injunction at this stage of the proceedings. As such, the law Plaintiffs challenge may go into effect. Additionally, the Court finds Defendants have not met their burden under Federal Rule of Civil Procedure 12(b)(6) and will not dismiss Plaintiffs' claims in their entirety.

### III. BACKGROUND

On March 22, 2023, the Idaho Legislature adopted Idaho Senate Bill 1100 ("S.B. 1100" or "the Bill"). On July 1, 2023, S.B. 1100 went into effect. S.B. 1100 requires, among other things, that students in Idaho public schools use the bathroom or locker room that corresponds with their biological sex. Similar regulations apply to overnight accommodations. Before S.B. 1100, school districts were free to regulate these issues as each deemed fit. Roughly 25% of school districts in Idaho had policies that allowed individuals to use facilities and accommodations consistent with their gender identity. Dkt.

39-1, at 2. The other 75% of school districts did not have regulations one way or the other.[1]

On July 6, 2023, Plaintiffs filed this lawsuit challenging S.B. 1100 as unconstitutional.

Plaintiff Rebecca Roe is a twelve-year-old transgender girl[2] who has attended school within the Boise School District since kindergarten. She began her social transition in the fifth grade and desires to use the restroom, and changing facilities, that coincides with her gender identity. Roe alleges that excluding her from those facilities will jeopardize her social transition, imperil her mental and physical health, and violate her right to privacy by "outing" her to her peers. Dkt. 15-1, at 13.

Plaintiff Sexuality and Gender Alliance ("SAGA") is a student organization focused on supporting, uplifting, and representing lesbian, gay, bisexual, transgender, and queer (LGBTQ) students at Boise High School. One of SAGA's members, A.J. is a transgender

---

[1] This data comes from the Declaration of Greg Wilson, Chief of Staff for Defendant Debbie Critchfield, Superintendent of the Idaho State Department of Education, and was filed as part of Defendants' opposition to Plaintiffs' Motion for Temporary Restraining Order. Dkt. 39-1, at 2. Therein, Wilson states: "To the best of the State Education Department's estimation, even before the enactment of SB 1100, the vast majority of Idaho public school districts (approximately three-quarters of school districts) maintained sex-separated restrooms, changing facilities, and overnight accommodations and did not have any policy that would permit the relief that Plaintiffs seek here." *Id*. Consistent with these representations, the Court previously stated that prior to S.B. 1100, 75% of school districts in Idaho had sex-separate regulations. Dkt. 44, at 4. The parties clarified at the hearing, however, that while 25% of school districts had inclusive policies before S.B. 1100, 75% of school districts simply had no policy either way. Neither side was aware of any school that affirmatively had a sex-separate policy. Wilson's declaration is, therefore, somewhat misleading, if not wholly false. While it is true that 75% of school districts did not have a "policy that would permit the relief Plaintiffs seek" (i.e. they did not have a sex-inclusive policy), this is not the same thing as affirmatively "maintain[ing] sex-separated [facilities]." Although this information is not overly relevant to the Court's decision today, Defendants are reminded to be completely accurate in all representations before the Court to ensure just and fair results.

[2] Roe was born a biological male but identifies as female.

MEMORANDUM DECISION AND ORDER – 4

boy.[3] Like Roe, he wishes to use the restroom associated with his gender identity and asserts casting him out of those facilities will cause irreparable injuries.

Defendant Debbie Critchfield is Superintendent of Public Instruction in Idaho. The Superintendent of Public Instruction is responsible for carrying out policies, procedures, and duties authorized by law regarding educational matters. Idaho Code § 33-125. The other Defendants are the State Board of Education and the members of that Board, as well as the Boise School District, its superintendent, and board members. All are responsible for implementing, and governing, laws related to public education in Idaho.

In conjunction with their Complaint, Plaintiffs filed a Motion to Proceed Anonymously (Dkt. 13)[4] and the instant PI Motion. Dkt. 15. Defendants swiftly filed a Motion for Extension of Time (Dkt. 21) requesting an approximately 60-day extension to respond to Plaintiffs' PI Motion. The Court partially granted Defendants' request, extended the briefing deadlines, and set the PI Motion for a hearing on September 13, 2023. Dkt. 31.

As part of their opposition to Defendants' Motion for Extension, Plaintiffs argued the Court could grant the extension, but if it did so, it should also take other actions to protect Plaintiffs' rights in the interim—such as sua sponte issuing a Temporary Restraining Order ("TRO"). Dkt. 25, at 3–4. In its July 20, 2023 Decision on Defendants' Motion for Extension, the Court noted that while it *could* take other action, it would not do so on its own. Dkt. 31, at 4 (explaining it would not take any further action "sua sponte").

---

[3] A.J. was born a biological female but identifies as male.

[4] Defendants did not respond to this motion, and the Court subsequently granted the request. Dkt. 38.

On July 28, 2023, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO Motion") asking the Court to do what they previously suggested the Court could do sua sponte: issue a TRO until the Court's scheduled hearing and decision on the PI Motion. Dkt. 34. Defendants opposed the Motion. Dkt. 39.

On August 10, 2023, the Court issued a decision granting Plaintiffs' TRO Motion. Dkt. 44. In that decision, the Court explained that, because there is already a circuit split regarding the constitutionality of bills such as S.B. 1100, the factors it was required to weigh in reaching its decision were "roughly even" between the parties. Accordingly, the Court chose to focus almost entirely on the concept of preserving the status quo. *See generally id* at 3–7. Said another way, the Court sought to maintain the landscape as it existed prior to S.B. 1100 pending a more complete review of the issues. The Court determined the situation in Idaho before S.B. 1100 was inconsistent. Some schools and school districts had "inclusive" policies while others had no policy whatsoever. Thus, the Court "put[] a pause on S.B. 1100" and returned things to the way they were before: without codified regulations either way. *Id*. at 8. The Court specifically noted it was not finding S.B. 1100 constitutional or unconstitutional. *Id*. at 8–9. Instead, it simply held S.B. 1100 in abeyance. *Id*. The Court's decision today dives deeper into the substantive issues.

Defendants then filed their response brief to Plaintiffs' PI Motion. Dkt. 48. In addition to opposing the motion, Defendants asked the Court to affirmatively dismiss all of Plaintiffs' claims. *Id*. Because this filing was a combined response (to the PI Motion)

and new motion (to dismiss), the Court adjusted some of the briefing. *See* Dkt. 49.[5]

Briefing concluded and the Court held a hearing on September 13, 2023. Dkt. 53.

### IV. LEGAL STANDARD

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id*. at 20. Where, as here, "the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### V. ANALYSIS

The Court begins by reviewing the text of S.B. 1100.

S.B. 1100 requires that "every public school restroom or changing facility accessible by multiple persons at the same time must be: (a) Designated for use by male persons only or female persons only; and (b) Used only by members of that sex." Idaho Code Ann. § 33-6603(1)(a)–(b). The Bill also requires that "no person shall enter a multi-occupancy restroom or changing facility that is designated for one sex unless such person is a member of that sex." Idaho Code Ann. § 33-6603(2).

S.B. 1100 defines "sex" as "the immutable biological and physiological

---

[5] The Court notes the United States exercised its right under 28 U.S.C. § 517 and submitted a Statement of Interest during this timeframe. Dkt. 41.

characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." Idaho Code Ann. § 33-6602(3).

In addition to restrooms and changing facilities, S.B. 1100 requires that "during any school authorized activity or event where persons share overnight lodging, school personnel must provide separate sleeping quarters for members of each sex. No person shall share sleeping quarters, a restroom, or a changing facility with a person of the opposite sex, unless the persons are members of the same family." Idaho Code Ann. § 33-6603(4).

S.B. 1100 carves out certain exemptions to these requirements, such as for cleaning staff, medical personnel, coaching staff during athletic events, and in times of natural disasters and emergencies. *See generally* Idaho Code Ann. § 33-6604(1)–(8).

The Bill also requires that schools provide, upon written request, a "reasonable accommodation" to any student who, "for any reason, is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex and located within a public school building, or multi-occupancy sleeping quarters while attending a public school-sponsored activity." Idaho Code Ann. § 33-6605(1)(a).

Finally, S.B. 1100 provides a civil cause of action against the school for any student who encounters a person of the opposite sex in a restroom, changing facility, or sleeping quarters and it is determined the school gave that person permission to use the facilities of the opposite sex or failed to prohibit the person from using facilities of the opposite sex. Idaho Code Ann. § 33-6606(1)(a)–(b). The student, if successful, can recover $5,000, attorney's fees, and other monetary damages.

Plaintiffs allege S.B. 1100 is unconstitutional and violates: (1) the Equal Protection Clause, (2) Title IX, and (3) their right to privacy. Dkt. 1, at 30–37. Against the backdrop of the *Winter* factors, the Court addresses these claims in turn.

## A. Success on the Merits

The Court previously observed—in deciding the TRO Motion—that it could not make a well-reasoned decision on this critical first factor because it had only received Plaintiffs' briefing at that juncture. Dkt. 44, at 7–8. Noting the current circuit split on relevant matters, the Court stated it would give this issue a more "complete review" later. *Id*. Today is that time, and with the benefit of full briefing and oral argument, the Court delves into these substantive issues.

### 1. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The state may not discriminate against classes of people in an "arbitrary or irrational" way or with the "bare . . . desire to harm a politically unpopular group." *Id.* at 446–47. As the Court noted at the outset, however, this aspirational promise must coexist with the practical reality that laws often draw lines between groups of people, and those lines may naturally prove advantageous to some groups while disadvantaging others. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

When considering an equal protection claim, the Court must first determine what

level of scrutiny to apply and then decide whether the policy at issue survives that level of scrutiny.

There are three levels of review: strict scrutiny, intermediate scrutiny, and rational basis review. Laws are subject to strict scrutiny when they discriminate against a suspect class, such as a racial group, *e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), or when they discriminate based on any classification but impact a fundamental right, such as the right to vote. *E.g., Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Laws are subject to intermediate scrutiny when they discriminate based on certain other suspect classifications, such as gender. *Miss. Univ. for Women v. Hogan,* 458 U.S. 718, 723 (1982). When no suspect class is involved and no fundamental right is burdened, courts apply a rational basis test to determine the legitimacy of the classification. *Olagues v. Russoniello,* 770 F.2d 791, 802 (9th Cir.1985).

In this case, the parties agree the Court must apply intermediate, or heightened, scrutiny.[6] But they disagree on *why* the Court uses this level of review. Because the parties agree, the Court is reluctant to say more, but feels compelled to clearly state why it is applying intermediate scrutiny in this case because the distinction bears on various conclusions throughout this decision.

Plaintiffs assert that, consistent with Ninth Circuit precedent, intermediate scrutiny applies because transgender persons represent a quasi-suspect class. *See Karnoski v.*

---

[6] *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 463–465 (1988) (referring to intermediate scrutiny as "heightened scrutiny" in the equal protection context, which similarly distinguishes between three levels of scrutiny— strict, heightened, and rational basis).

MEMORANDUM DECISION AND ORDER – 10

*Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). The Court does not disagree with this assertion but notes the circuit in *Karnoski* did not explicitly hold transgender individuals constitute a quasi-suspect class; only that intermediate scrutiny applies if a law or policy treats transgender persons in a less favorable way than all others. Notably, Courts within the District of Idaho, including this court, *have* held that transgender individuals qualify as a quasi-suspect class. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1143–1145 (2018); *Hecox v. Little*, 479 F. Supp. 3d 930, 973 (D. Idaho 2020) ("*Hecox*").

Defendants, on the other hand, argue S.B. 1100 does not classify students based upon their sexual orientation or gender identity, but on their biological sex—male and female—and that, consistent with Supreme Court precedent, classifications based on sex are subject to intermediate scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Court agrees with Defendants.[7] The classification that is drawn by S.B. 1100 is based upon sex, not gender identity.

The Court will discuss this concept in greater detail later, but notes here that the definition of sex (in S.B. 1100 and in the legal community as a whole) does not include gender identity as Plaintiffs seem to suggest. The Supreme Court has never defined sex to include gender identity.[8] Even in *Bostock v. Clayton Cnty., Ga*—a recent landmark decision

---

[7] The Court recognizes the Ninth Circuit's recent holding that gender identity is "at least a quasi-suspect class." *Hecox v. Little,* 79 F.4th 1009, 1026 (9th Cir. Aug. 17, 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)). Again, the Court does not disagree. But that is not the issue. The issue is whether gender identity is the distinction drawn by S.B. 1100. The Court finds it is not.

[8] In fact, the Court cannot locate a single case where a court at any level defined the term "sex" to include "gender identity" or "transgender status." To be sure, this is, no doubt, partially because until recently the term "gender" and "sex" were synonymous. And, as noted, courts have found that discrimination based on transgender status or gender identity can be equated to sex discrimination. This line of reasoning is likely

about discrimination against transgender individuals in employment—the United States Supreme Court did not disturb the parties' agreed-upon definition that sex referred to the "biological distinctions between male and female" and that "homosexuality and transgender status are distinct concepts from sex." 140 S. Ct. 1731, 1739, 1746–47 (2020). Now, the *Bostock* Court ultimately held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex" in the context of Title VII, but the Court did not change the underlying definition of "sex." *Id.*

Turning closer to home, this Court, in *Hecox*—another case that will be discussed in more detail below—held that the definition of "sex" was "the anatomical and physiological processes that lead to or denote male or female. Typically, sex is determined at birth based on the appearance of external genitalia." 479 F. Supp. 3d at 945. On appeal, the Ninth Circuit did not formally define sex. While it called out the challenged Act's definition of sex as "an oversimplification of the complicated biological reality of sex and gender" it did not define the term itself, nor did it disturb this Court's definition. *Hecox v. Little*, 79 F.4th 1009, 1024 (9th Cir. Aug. 17, 2023).[9] To be sure, the Ninth Circuit found that the definition of sex in the law Hecox challenged functioned as a "form of [p]roxy discrimination," but, like *Bostock*, it did not redefine the term "sex" itself. *Id.* at 1024.

---

why Plaintiffs contend that the definition of sex is not dispositive of their claims in this case and that, regardless of how sex is defined, S.B. 1100 discriminates against transgender individuals. As will be explained, however, simply because a certain group is left out of the classification drawn by a particular law does not mean that law is "targeted" at that group. Terms must be given definitions. And those definitions must mean something. Here, S.B. 1100 defines "sex" based on biology. No court presented with this same issue has defined the term otherwise.

[9] Defendants in *Hecox* recently asked for a hearing before the full Ninth Circuit (en banc). Ninth Cir. Case No. 20-35815, Dkt. 219.

The Court will return to these cases, and concepts, throughout this decision. But because the definition of sex—in S.B. 1100 and in cases before this district, the circuit, and the Supreme Court—does not include gender identity, S.B. 1100 does not draw a line based upon gender identity, but on sex.[10] And because any regulation based upon sex warrants intermediate scrutiny, that is the level of scrutiny the Court will use here today.[11]

Under intermediate scrutiny, "a party seeking to uphold government action based on sex must establish an exceedingly persuasive justification for the classification." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (cleaned up).

Here, Plaintiffs contend S.B. 1100 does not withstand intermediate scrutiny, and that they have a likelihood of success on their equal protection claim, because Defendants cannot show the Bill is tailored to the Defendants' stated interests of privacy and safety.

Naturally, Defendants disagree, asserting that separating bathrooms for privacy is "common sense" and dates to time immemorial. Defendants' comments, and overall arguments, echo the sentiments articulated in the Eleventh Circuit's en banc opinion in *Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) ("*Adams*"). Because Defendants rely heavily on this case, and because the Court finds that Court's analysis persuasive, it will briefly review *Adams*.

---

[10] Definitions aside, even if the Court found S.B. 1100 discriminated based on transgender status, it would still apply intermediate scrutiny. Thus, the Court does not depart from its prior finding that transgender individuals qualify as a quasi-suspect class; it simply finds that is not the distinction at issue in S.B. 1100.

[11] And while S.B. 1100 is based on sex, it does not include any of the hallmarks of sex discrimination. It does not prefer one sex over the other; include one sex and exclude the other; provide benefits to one sex and not the other; or apply one rule to one sex and not the other. It distinguishes between the two sexes, but it does not advantage, or disadvantage, either. *Bostock's* holding about the interplay between discrimination based up on transgender status and sex does not change that fact.

In *Adams,* the Eleventh Circuit upheld a lower court order rejecting an equal protection challenge to a K-12 school policy that provided female, male, and sex-neutral bathrooms, and required male students to use the male-designated bathrooms, female students to use the female-designated bathrooms, and accommodated transgender students with sex-neutral bathrooms. *See id.* at 797. The policy at issue in that case defined "male" and "female" as the gender identified on a student's birth certificate. *See id.* The Eleventh Circuit rejected plaintiffs' argument that the policy unconstitutionally discriminated based on transgender status and found that it was "substantially related" to the school district's important interest in securing its pupils' privacy and welfare. *See id.* at 811. That court specifically held the challenged policy was not targeted at transgender students—at most, it had a disparate impact upon them which did not rise to the level of a constitutional violation because no animus was shown. *Id.*[12]

The Court also briefly previews the other circuit cases dealing with these issues that constitute the "circuit split" it has referred to.

In 2020, the Fourth Circuit upheld a challenge, brought by a transgender male student, against a school district policy that required students to use bathrooms based on

---

[12] There are, of course, differences between *Adams* and the present case. For one, the district court in *Adams* reached its conclusion after a three-day bench trial. That decision was obviously overturned, but the procedure there was slightly different than that before the Court today. Relatedly, the bench trial in *Adams* highlighted the fact that the school district had studied these issues extensively and involved members of the LGBTQ community in enacting its policies. The Court is not saying this factor was dispositive of any merits-based issue (at the district or appellate level), but there is no evidence in the present record to suggest the Idaho legislature involved members of the LGBTQ community in crafting S.B. 1100. Such an effort may have yielded fruit. Finally, it goes without saying, but the dispute in *Adams* revolved around a school district policy, while the challenge today is to a state-wide law. Regardless of the procedural differences between *Adams* and this case, the Court finds the *Adams* decision persuasive for the reasons outlined herein.

MEMORANDUM DECISION AND ORDER – 14

their biological sex. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020). There, the Circuit found that the school's refusal to amend the student's records to reflect his gender identity violated the Equal Protection Clause and constituted discrimination on the basis of sex in violation of Title IX. *See generally id.*

In 2017, the Seventh Circuit similarly affirmed a district court's decision to enter a preliminary injunction against a school district's unwritten policy that barred a transgender male student from using the boys' bathroom after he started his female-to-male transition. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017). There, the Circuit determined the school board's decision violated Title IX and the Equal Protection Clause. *See generally id.*

More recently, the Seventh Circuit noted the existing circuit split, reaffirmed *Whitaker*, and declined to give credence to *Adams* in upholding two preliminary injunctions entered by district courts enjoining school districts from restricting transgender students from using restrooms and locker rooms of their choice. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023).[13]

The Court adds its voice to this divided landscape.

Privacy is a legitimate interest supporting the constitutionality of S.B. 1100. The

---

[13] After oral argument, Defendants filed a Motion for Leave to File Supplemental Authority. Dkt. 55. Plaintiffs oppose the motion. Dkt. 56. In their motion, Defendants bring a recent decision from the Sixth Circuit, *L.W. v. Skrmetti*, 2023 WL 6321688 (6th Cir. Sept. 28, 2023), to the Court's attention. In *Skrmetti*, the Sixth Circuit reversed injunctions against state laws that restricted certain medical treatments for minors with gender dysphoria. Although the subject matter of that case is different, the Circuit there grappled with some of the same issues before the Court today. The Court is aware of the *Skrmetti* decision and, like all cases, will give it the weight it deems appropriate. Defendants could have brought this decision to the Court via a Notice of Supplemental Authority, but insofar as they did so via Motion, the Court will grant the same.

Ninth Circuit has, on numerous occasions, reiterated its "longstanding recognition that the desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (cleaned up) (collecting cases). Other circuits agree. *See, e.g., Adams*, 57 F.4th at 806 ("[I]t is well established that individuals enjoy protection of their privacy interests in the bathroom, so concerns about privacy in the bathroom are legitimate concerns."); *Faulkner v. Jones,* 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns"); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing a "constitutional right to bodily privacy because most people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating" (cleaned up)).

But it does not take a court to acknowledge what most people inherently recognize: a desire for bodily *privacy* in restrooms (and like spaces) is rational because one's body is *private*. That individuals generally desire privacy is based upon the inherent differences between male and female bodies. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women [] are enduring: The two sexes are not fungible; a community made up exclusively of one sex is different from a community composed of both." (cleaned up)). This appreciation is even more relevant considering school-age children are still developing—mentally, physically, emotionally, and socially— and asking them to expose their bodies to students of the opposite sex (or to be exposed to

MEMORANDUM DECISION AND ORDER – 16

the bodies of the opposite sex) brings heightened levels of stress.

There is no doubt S.B. 1100 is substantially related to the Government's legitimate interest in said privacy. Restrooms, changing facilities, and overnight accommodations are, without question, spaces in school (and out of school as the case may be) where bodily exposure is most likely to occur. That S.B. 1100 restricts access to who will interact in those circumstances based upon sex furthers the goal of privacy.

The Court next turns to Plaintiffs' counterarguments and why each is unavailing in calling into question Defendant's legitimate interest in privacy.

Plaintiffs first argue that the Ninth Circuit has already definitely answered whether privacy can justify sex-separation in bathrooms. In *Parents for Privacy v. Barr*, the Ninth Circuit rejected a challenge to a policy that allowed transgender students to use restrooms, locker rooms, and showers that matched their gender identity, rather than their biological sex assigned at birth. 949 F.3d 1210 (9th Cir. 2020). There, the Circuit found the school district's policy did not infringe on the privacy rights of petitioners because accommodations were available for any student who did not want to share facilities with a transgender student. Plaintiffs in this case assert the outcome in *Parents for Privacy* means the Ninth Circuit would reject Defendants' privacy justification today. The Court is not so sure.

To begin, while somewhat perplexing to say aloud, it appears gender-inclusive policies are constitutional *and* sex-separate policies are constitutional. That is to say, *Parents for Privacy's* holding that the Constitution does not *require* sex-separate facilities is not the same as a holding that the Constitution *forbids* sex-separate facilities. More

importantly, the Ninth Circuit recently noted that "bathrooms by their very nature implicate important privacy interest" because, unquestionably "the functions of the bathroom are intended to be private." *Hecox*, 79 F.4th at 1025 n.10. Thus, whether privacy is a legitimate interest for sex-based distinctions is still an open question. The Ninth Circuit has not, however, foreclosed Defendants' arguments as Plaintiffs suggest.

Plaintiffs next contend Defendants' privacy justification ignores the fact that most transgender students use individual stalls in bathrooms so there is no reason a cisgender students' "privacy" will even be impacted. Dkt. 15-1 (citing *Grimm*, 972 F.3d at 613). The Court understands Plaintiffs' argument. Not to be unduly technical, but transgender girls would use individual stalls because female restrooms do not contain urinals. And transgender boys cannot physically use urinals and would, therefore, also use individual stalls. Thus, an argument could be made that *often* people in the restroom would never know the gender identity of the person going into the stall next to them. But this argument discounts the other provisions of S.B. 1100 dealing with changing facilities and overnight accommodations. While privacy *may* not be as much of a concern in restrooms where stalls are widely used, the same cannot be clearly said of shared changing facilities and overnight accommodations.

Third, Plaintiffs assert S.B. 1100 is a solution in search of a problem. They aver there is no evidence of transgender students engaging in behaviors that infringe upon the privacy of others. Defendants do not dispute this. Neither does the Court. But this argument misses the mark. The issue is not whether any transgender student has affirmatively done anything—good, bad, or otherwise—to another student. The issue is whether a student

must, against his or her wishes, be forced to change (or undertake other private duties) in the presence of someone of the opposite sex[14]—even if the person of the opposite sex is doing nothing invasive, dangerous, or threatening. The Court will circle back to this momentarily when discussing *Hecox*, but S.B. 1100 essentially boils down to this issue. The Bill is not based upon animus towards those who identify as transgender, nor was it passed to relegate transgender students to the fringes of society. S.B. 1100 was enacted to protect the privacy of the sexes. A policy or statute can lawfully classify based on biological sex without unlawfully discriminating based on transgender status.

Relatedly, Plaintiffs' assert it is transgender students who will suffer the real invasion of privacy if S.B. 1100 is allowed to go into effect. As explained in the Court's discussion on their privacy claim, Plaintiffs here are referring more to informational privacy in their gender identity and biological sex as opposed to privacy in the sense the Court has been using the word thus far, i.e. being free from interference and intrusion when engaged in private physical activities like changing or using the restroom. And while Plaintiffs do not explicitly make the argument, the Court recognizes transgender students may feel an invasion of their privacy (in the context of taking care of their physical needs) in having to *comply* with S.B. 1100 and use restrooms or facilities that do *not* match their gender identity.[15] The Court understands the concerns and recognizes the reality that in

---

[14] This issue is complicated by the fact that individuals transition differently. Some choose to alter certain physical characteristics; others do not. Not to mention the fact that individuals could conceivably change their gender identity from one school year to the next (or even during the year). Without a clear demarcation—some objective "line in the sand" so to speak—there would be no regulations at all and thus no expectation of privacy for anyone at any time in any circumstance.

[15] As with the Court's example about restroom stall usage, it does not mean to point out the obvious or minimize any student's experience by relegating it to an example. Traversing school for young people is

protecting the privacy of some students, the privacy of others decreases. The reality, however, is that neither the Court, nor the law, can fairly accommodate all interests. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 678 (9th Cir. 1988) (noting that, when dealing with privacy concerns, it is often difficult to accommodate competing interests).

Speaking of accommodations, Plaintiffs complain the carve-out in S.B. 1100 is not a sufficient accommodation. Their only argument, however, is that allowing transgender students to use "other" facilities is stigmatizing and damaging. Dkt. 15-1, at 12. The Court will touch on this more when discussing harm below but returns to the Ninth Circuit's holding in *Parents for Privacy*. As a reminder, that case was the inverse of this case: Plaintiffs challenged an *inclusive* policy the school district had enacted. Part of the reason the Circuit found the challenged policy did not violate the Fourteenth Amendment was because there were accommodations offered to those who did not want to share facilities with transgendered students. 949 F.3d at 1225. And it made this finding "even though those alternative options admittedly appear inferior and less convenient." *Id*. So too in this case. S.B. 1100 provides options for transgender students—actually for *any* students—who do not wish to use the bathroom that corresponds with their biological sex. The convenience

---

difficult enough without having to worry about "legal" questions surrounding daily bodily functions such as using the restroom and changing. The Court recognizes that in upholding S.B. 1100, it is now those transgender students who will be using the restroom (or changing facility) that does not match his or her gender identity who may face privacy concerns. S.B. 1100 could make that transgender student uncomfortable. It could make others in those facilities uncomfortable as well. While a transgender girl may make a cisgender girl uncomfortable, she may also make a cisgender boy uncomfortable. And both cisgender girls and cisgender boys could make a transgender boy uncomfortable. Thus, any regulation (or even no regulation at all) could, conceivably, cause some students to feel uncomfortable.

MEMORANDUM DECISION AND ORDER – 20

and desirability of those options, however, is not an overly relevant part of the equation. But if "compelling" cisgender students to use alternate facilities is a reasonable accommodation, there is no reason to suggest asking transgender students to do the same would bring a different result.

Lastly, the Court returns to *Hecox*. Plaintiffs assert the Court's original decision in *Hecox* (and the Circuit's affirmance of that decision) is instructive and urge the Court to follow the rulings in that case because the legal issues in this case are the same. Not quite.

In *Hecox*, the Plaintiffs brought a constitutional challenge to Idaho's Fairness in Women's Sports Act (the "Act") which prohibited transgender athletes from participating in women's sports. The Court granted Plaintiffs' Motion for Preliminary Injunction and enjoined the law from going into effect. Among other things, the Court found the Defendants' justifications for the Act's categorical exclusion of transgender women from women's sports—promoting sex equality for cisgender women in sports and protecting scholarships for women—were not legitimate government interests because there were other ways to achieve those goals. Defendants appealed and the Circuit affirmed. Plaintiffs in this case cite heavily from both decisions, particularly in support of the notion that S.B. 1100 discriminates based upon transgender status.

The Court begins by reiterating that Defendants in *Hecox* have asked for en banc review. Resolution of that case is thus, still an open matter. More importantly, there is a small, but important difference between the Act and S.B. 1100 that renders Plaintiffs' discrimination argument less persuasive in the present dispute.

In *Hecox*, the Defendants argued, much as they do here, that the Act did not

discriminate on the basis of transgender status because it classified individuals based upon biological sex. 79 F.4th at 1025. The Circuit explained, however, that this argument appeared pretextual because it was only transgender female athletes who were excluded under the law; the Act *allowed* transgender male athletes the opportunity to compete on male sports teams. What's more, the act subjected only female (cisgender or transgender) athletes to a verification process but did not mandate the same for male (cisgender or transgender) athletes. Noting that "a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others," the Circuit rejected Defendants' argument. *Id*. Because the Act excluded only transgender females and mandated certain requirements just for females (cisgender and transgender) the Ninth Circuit agreed Plaintiffs could likely show it discriminated on the basis of transgender status *and* on the basis of sex. Simply put, Defendants could not fairly say the act differentiated based on sex when one biological sex was treated better than the other and the law had requirements that only affected one quasi-suspect class of people.[16]

S.B. 1100 is different. It does not prohibit only transgender girls from using facilities consistent with their gender identity; it "prohibits" both transgender girls *and* transgender

---

[16] The Ninth Circuit significantly hedged its decision in *Hecox*. It specifically noted it was not deciding the "larger question of whether any restriction on transgender participation in sports violates equal protection." 79 F.4th at 1039. *See also id*. at 1052 ("In my understanding, nothing in today's decision, or in the district court's decision, precludes policymakers from adopting appropriate regulations in this field—regulations that are substantially related to important governmental interests.") (Christen J., concurring in part and dissenting in part). The Circuit explained its ruling was "narrow" and only answered the question of whether the district court abused its discretion. *Id*. at 1016, 1020, 1021, 1039, 1050. It also observed that, in the time since the district court issued its opinion, some of the world's leading athletic organizations—including some the district court relied on in reaching its original decision—had revisited their guidance concerning transgender athletes. *Id*. at 1051.

boys from using those facilities. And both sides of the classification at issue—biological males and biological females—includes transgender students. Thus, to say S.B. 1100 singles out transgender students mischaracterizes how the law operates. The Court is not implying that because the law "discriminates" equally it is lawful, but rather because S.B. 1100 does not differentiate between transgender boys and transgender girls—even though it does differentiate amongst the biological sexes—the conclusion from *Hecox* does not apply here. To repeat, S.B. 1100 is not based upon sexual orientation or gender identity; it is based on sex. And that basis is equal between the sexes and between transgender students who belong to both sexes. That other groupings of individuals are left out is, therefore, not discrimination against those groups, but rather a natural consequence of setting parameters. *Romer*, 517 U.S. at 631.[17]

A final word on discrimination. The term "discrimination" has become quite the buzzword over the past twenty years. And it is typically used in a very derogatory manner. To be sure, one definition of discrimination is a "prejudiced or prejudicial outlook, action, or treatment." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/discrimination (last visited October 12, 2023). Another definition, however, is "the act of making or perceiving a difference." *Id*. The Court does not mean to get into semantics, but the prevalent idea in society today that simply because a person supports one position necessarily means he or she "discriminates" against the other position

---

[17] Additionally, as outlined above, unlike the Court's findings in *Hecox*, it has determined the disparate treatment S.B. 1100 mandates in this case is substantially related to the government's stated interest of privacy and safety.

(or against a person who supports the opposite position) is short-sighted.[18] Reasonable people can support one position and not have any animus or ill-intent for the other position. The Court is not implying that some supporters of S.B. 1100 are basing their support on completely altruistic feelings. But it is not implying they are basing their support on animus or hatred either. The Court receives enough "hate mail" and "hate calls" to know there are people on both sides of the equation who do not have respect for the other side. But Plaintiffs' repeated arguments that the proponents of S.B. 1100 all demonstrated blatant discriminatory animus against transgender students during the legislative history falls flat when those statements are read in context. *See* Dkt. 15-1.

Lastly, the Court wishes to address the concept of "safety." Besides asserting Defendants cannot meet their burden that S.B. 1100 is related to privacy, Plaintiffs also contend Defendants cannot show S.B. 1100 is substantially related to any legitimate concerns surrounding "safety." The difficult part of this argument is that Defendants combine the two concepts. They couch their support of S. B. 1100 in terms of "safety and privacy." And, to a large degree, Plaintiffs do as well. Thus, the Court finds it need not make a separate determination as to "safety." For the most part, the Court agrees that, in this context, the concepts are substantially related. Furthermore, because the Court has already determined Defendants have shown the nexus between S.B. 1100 and privacy, even were the Court to construe the term "safety" separately, it would still not carry the day for

---

[18] Those who attempt to force some type of ideological purity on others, or who reject as bigoted and discriminatory any opinion that differs with their own, would be wise to remember that the refusal to listen to the other side of a debate swiftly leads to less collaboration, less protection, and ultimately less freedom. In a pluralistic society, the exploration—not acceptance, but also not facial rejection—of a variety of ideas is what makes this Country great.

Plaintiffs in achieving a preliminary injunction. As the Supreme Court has observed, "in a public school environment[,] . . . the State is responsible for maintaining discipline, health, and *safety*." *Bd. of Educ. v. Earls*, 536 U.S. 822, 830 (2002) (emphasis added).

In sum, the Court finds Plaintiffs have not met their burden in showing they are likely to succeed on the merits of their Equal Protection claim. S.B. 1100 distinguishes based upon sex, not gender identity.[19] Moreover, S.B. 1100 is substantially related to the Government's important interest in protecting the privacy and safety of students from those of the opposite sex while they are engaged in personal and private functions.

### 2. Title IX

Plaintiffs contend they are likely to succeed on their Title IX claim for the "same reasons" they are likely to succeed on their equal protection claim. Dkt. 15-1, at 22. Insofar as the Court has found Plaintiffs are *not* likely to succeed on their equal protection claim, it will not repeat that analysis here. Still, the Court must discuss Title IX separately to highlight relevant nuances.

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

The threshold problem is, again, whether S.B. 1100 is based on sex. Plaintiffs

---

[19] But as already noted, even if the Court found the classification drawn by S.B. 1100 *was* based on transgender status, it would still find Plaintiffs have not met their burden because privacy is a legitimate government interest regardless of which suspect class is at issue.

contend S.B. 1100 discriminates based upon transgender status and that, consistent with the Supreme Court's holding in *Bostock* that discrimination against transgender people constitutes discrimination based on sex, the Court should apply that same reasoning here and strike the Bill down. 140 S. Ct. 1731 (2020). There are two problems with Plaintiffs' reliance on *Bostock.* First, that case dealt with Title VII; this case deals with Title IX. Second, as outlined, S.B. 1100 is a law based upon sex, not sexual orientation or gender identity.

There is no doubt the Supreme Court held in *Bostock* that discrimination "because of" sexual orientation is a form of sex discrimination under Title VII. 140 S. Ct. at 1743. But the *Bostock* Court also made it painstakingly clear that its holding did not "sweep beyond Title VII to other federal or state laws" or "address bathrooms, locker rooms, or anything else of the kind." *Id*. at 1753.[20] Moreover, the fact that the *Bostock* court held that classifications based on gender identity are necessarily classifications based on sex does not mean that classifications based on sex (as here) are necessarily classifications based on gender identity.[21]

Notably, there is a circuit split on whether *Bostock*'s Title VII analysis applies in the Title IX context. The Sixth Circuit has held that "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether*

---

[20] In fact, Justice Alito, in his dissent, specifically pointed to *Hecox* (which at the time was just a newly filed lawsuit), and his concerns about how the Supreme Court's decision would be read in cases where Title IX was at issue. 140 S. Ct. at 1780, 1783 (Alito, J. dissenting).

[21] And in *Bostock*, the employers fired adult employees because their behavior was perceived as inconsistent with gender stereotypes. Here, the law is directed at children and does not depend on how a student acts or identifies; it only depends on the student's sex. Those factual distinctions are relevant as well.

*v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). The Eleventh Circuit in *Adams* likewise held that the interpretation of the word "sex" set forth in *Bostock* does not apply to Title IX. 57 F.4th at 811–14. And, while the Fifth Circuit has held "transgender discrimination is a form of sex discrimination under Title VII," it has not held as much with respect to Title IX. *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 603 (5th Cir. 2021).

Conversely, in *Grimm,* the Fourth Circuit held that "although Bostock interprets Title VII of the Civil Rights Act of 1964 . . . it guides our evaluation of claims under Title IX." (cleaned up). 972 F.3d at 616. In like manner, the Ninth Circuit recently held that "discrimination on the basis of sexual orientation is a form of sex-based discrimination under Title IX." *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).[22]

Plaintiffs rely on *Grabowski* and assert they prevail on their Title IX claim outright. Again, however, S.B. 1100 is based on sex, not sexual orientation[23] or gender identity. More importantly, Title IX already allows the practice of sex-separate facilities. Again, while odd to say, the legal landscape is such that discrimination based on sexual orientation (and *maybe* gender identity) appears barred under Title IX, *but* Title IX also allows for sex-

---

[22] For its part, the Court is of the opinion that Title VII and Title IX should be treated differently. The two Titles have differing language, implicate different legal liability structures, and serve different purposes. For example, Title IX talks about discrimination "on the basis of sex" whereas Title VII talks in terms of "because of sex." These phrases are different, and the Court must give full effect to the difference in word choice. Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in* Benchmarks 224 (1967) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things."). By failing to acknowledge the different phrases Title VII and Title IX employ, the Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives." *Bostock*, 140 S. Ct. at 1738. Because Title IX prohibits "on the basis of sex," the Court is hesitant to reflexively adopt *Bostock's* "because of sex" causation analysis.

[23] *Grabowski* dealt with sexual orientation, not gender identity, in the context of Title IX. Whether that difference is material is debatable, but the Court's point is that case is not on "all fours" with this case as Plaintiffs suggest.

separated facilities. Thus, unless and until Congress amends Title IX, the concept of separating facilities based on sex is *not* a form of discrimination actionable under Title IX.

While prohibiting discrimination based upon sex, the regulations in Title IX specifically outline that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. And the corresponding code sections implementing Title IX outline that educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex [are] comparable to [the] facilities provided for students of the other sex." 34 C.F.R. § 106.33.

The United States, in its statement of interest, references these exceptions but asserts they do not apply when a student is transgender. Dkt. 41, at 10.[24] It reaches this conclusion based upon the idea that "excluding a student from a particular single-sex restroom or locker room facility designated for another sex, as a general rule, does not cause that student harm." *Id*. But, because the students here are transgender, and excluding them *could* cause harm, the United States (and Plaintiffs) aver the Court can simply ignore these implementing regulations. The Court cannot agree.

---

[24] Defendants argue the United States is barred from making this argument because of an injunction in another case where the state of Idaho is a plaintiff. Specifically, in *Tennessee v. United States Dep't of Educ.,* a federal district court enjoined the United States from arguing a specific letter explaining how Title IX applied to transgender individuals was formal Department of Education guidance because the letter had not gone through the notice and comment process under the Administrative Procedures Act. 615 F. Supp. 3d 807 (E.D. Tenn. 2022). While the Court agrees with Defendants that the United States cannot argue there is *official* guidance on how Title IX should be interpreted in cases such as this, that is not what the United States does here. It simply states its position. Such is acceptable and does not run afoul of the injunction in *Tennessee*.

Again, S.B. 1100 is a regulation based upon sex. And while Title IX itself does not define sex,[25] even the authorities Plaintiffs cite in support of their position do not go as far as they would like. Enter again *Parents for Privacy*. Plaintiffs once more cite to *Parents for Privacy* and argue the Ninth Circuit has foreclosed Defendants' argument today because inclusive facilities have been upheld and any type of contrary regulation is discriminatory. But to repeat: just because inclusive facilities are constitutional does not mean sex-separate facilities are unconstitutional. Because *Parents for Privacy* was the inverse of this case, it takes some mental gymnastics to determine how the Ninth Circuit's holdings there may affect matters here. In rejecting those plaintiffs' challenge that the school's *inclusive* policy violated Title IX, the Ninth Circuit in *Parents for Privacy* found "just because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity." 949 F.3d at 1227. Thus, while the Ninth Circuit ruled that inclusive policies were allowed, it also *clearly* stated that Title IX authorizes exactly what S.B. 1100 has done here: create sex-separate facilities. The bottom line is that Title IX may not preclude regulations based on, or incorporating, gender identity, but it does not require them either.

---

[25] The Fourth and Seventh Circuits—in *Grimm* and *A.C.*—essentially determined that, in the context of Title IX, the term "sex" should be read to include gender identity. Although neither court explicitly states this, the outcome of both cases makes clear those courts viewed gender identity as included under the "sex" umbrella of Title IX. The Eleventh Circuit (in *Adams*) held that "sex" means biological sex in the context of Title IX based upon the legislative history and understanding of the term "sex" when Title IX was enacted. The Court will not undertake a separate review of the history of Title IX at this time but notes its agreement with the *Adams* majority (and Judge Niemeyer's dissent in *Grimm* and Judge Easterbrook's dissent in *A.C.*) that Title IX is not ambiguous and—consistent with its findings above regarding the general legal definition of "sex,"—the definition of "sex" in Title IX does not include gender identity.

Ultimately, the Court finds Plaintiffs have not shown they are likely to succeed on the merits of their Title IX claim because Title IX allows the structure S.B. 1100 mandates. Furthermore, while Title VII and Title IX are related in certain aspects—thus rendering *Bostock* and other cases helpful—they differ materially in other respects and those differences are crucial in this case. Ultimately the Court finds Plaintiffs have not met their burden of establishing a likelihood of success on their Title IX claim.

### 3. *Privacy*

Finally, Plaintiffs argue they are likely to succeed on their privacy claims because forcing them to use certain facilities could expose their gender identity and doing so would be a violation of their privacy. As noted, the specific privacy interest Plaintiffs advocate here is slightly different than the privacy referenced above. Plaintiffs are not talking so much about physical privacy in shielding their bodies from others in restrooms, changing facilities, and overnight accommodations, but rather they are talking about informational privacy in their gender identity and whether others know their gender identity and/or biological sex.[26]

For their part, Defendants largely did not discuss this argument in their opposition.

---

[26] Some transgender students are open about their gender identity. Others are not. Plaintiffs' privacy claim is largely directed at those students who are transgender, but who have not disclosed that information to others (i.e. Roe's friends do not know she is a biological male; they only know her as female). Plaintiffs assert this "outing" of a transgender student's status could happen in a variety of ways once S.B. 1100 takes effect. For example, if a student has been using one sex-specific restroom and now must use the other sex-specific restroom (or an alternate restroom altogether), other students may realize the student is transgender. It is true this may occur. To be sure, however, that same phenomenon of students discovering another's gender identity may currently be happening as transgender students use facilities that coincide with their gender identity, but not their biological sex. Thus, to an extent, Plaintiffs' privacy claim *is* related to physical privacy because physical privacy could help prevent the inadvertent disclosure of one's transgender status. But again, the privacy claim here is more broadly directed at the information itself, not how it may be disclosed.

This led Plaintiffs to assert any opposition was waived. Defendants did discuss privacy more in their final sur-reply, but only to emphasize that Plaintiffs have not put forth enough to support this claim. Defendants also went one step further and contended that even if Plaintiffs could show a specific injury in the disclosure of their gender identity, due process does not protect against that disclosure when competing interests are at stake. With little argument (and even less applicable caselaw) on this claim, the Court is left wanting. Nonetheless, it finds Plaintiffs have, again, not met their initial burden of establishing a likelihood of success on this privacy claim.

A federal district court in California was recently faced with deciding whether children have a privacy interest in their gender identity for purposes of determining if teachers had to disclose any changes in gender identity to the children's parents. Because the challenged law was couched in terms of a state privacy right, the court looked to California *state* court decisions for guidance. It found that none "recogniz[ed] a child's right to quasi-privacy about their gender identity expressions[.]" *Mirabelli v. Olson*, 2023 WL 5976992, at *10 (S.D. Cal. Sept. 14, 2023). The present case is, obviously, different, but like the *Mirabelli* Court, the Court is not aware of any relevant and binding caselaw—in Idaho state or federal court—providing a true "privacy" interest in one's gender identity.

Plaintiffs' argument makes sense. Information about one's sex, sexual orientation, and/or gender identity is personal and private. But that does not mean the disclosure of this information is a violation of due process because it does not implicate a fundamental liberty interest. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). The Court finds Plaintiffs unlikely to succeed on their privacy claim.

### B. Irreparable Harm

While the merits-based prong is typically viewed as the most important element of a preliminary injunction, *see Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017), the issue of irreparable harm in this case is also important.

As the Court has already discussed, harm may result irrespective of how it rules on Plaintiffs' PI Motion today. Plaintiffs assert harm will befall transgender students because they will be "outed" to their peers when they are forced to travel to different restrooms in their schools, change in different facilities, and stay in different overnight accommodations. Defendants, on the other hand, assert these accommodations are sufficient and that failing to uphold S.B. 1100 could result in harm to those who do not identify as transgender because they will be forced to share spaces, and expose their bodies, to persons of the opposite sex. The problem is both sides can only speculate on this front. At the hearing, neither party was able to identify any *specific* instances of harm befalling transgender, or cisgender, students in Idaho. The Court is sensitive to both side's concerns; however, it cannot base its decision on what some students may subjectively feel or the speculation of potential future harm.

Both sides spend a great deal of time discussing the science behind gender dysphoria and what S.B. 1100 *might* mean for transgender students. Plaintiffs' expert, Dr. Stephanie Budge, explains that transgender students may suffer depression, anxiety, or other psychological harms if they are not allowed to socially transition and use facilities matching their gender identity. On the other hand, Defendants' expert, Dr. James Cantor, explains the science actually demonstrates many of the concerns transgender individuals

face dissipate with time and the harms Dr. Budge asserts often do not come to pass.[27] Again, however, neither side has any conclusive information about *Idaho* and any specific harm students—transgender or cisgender—have, or will, suffer.

The Court understands why both sides focus much of their attention on their competing experts' opinions. Nevertheless, as the Sixth Circuit recently noted, "expert consensus, whether in the medical profession or elsewhere, is not the North Star of substantive due process, lest judges become spectators rather than referees in construing our Constitution." *Skrmetti*, 2023 WL 6321688, at *12. Even if the Court had consistent expert opinions in this case—which it does not—such would not mean it *had* to follow what the experts recommend. The Court's duty is legal in nature. And while science and society has much to say on these topics, the Court's focus is on the law.

To obtain a preliminary injunction, a possibility of irreparable harm is insufficient. Instead, Plaintiffs must establish that irreparable harm is likely, and not just possible, in the absence of an injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Because neither side does little more than speculate that harms will occur, the Court finds this factor roughly even. Plaintiffs may experience some harm, but Defendants (and those who support S.B.

---

[27] Defendants assert Dr. Budge's testimony is "biased" and should not be considered because she is a self-described activist on transgender issues. They also claim Dr. Budge wholly ignores relevant studies that contradict her own findings. In like manner, Plaintiffs take issue with some of Dr. Cantor's findings and his lack of experience treating individuals with gender dysphoria. Arguments regarding the sufficiency of expert testimony are better left for later in the case. Suffice it to say, the Court will not delve into either expert's testimony at this preliminary stage of the proceedings. It has, frankly, not relied on this testimony because the science in this area is constantly evolving. And while the law is evolving to some degree as well, the Court is an expert in the law, not science; thus, it has determined the most suitable outcome is to base its decision on the law. It has given both experts' testimony the weight it deems appropriate.

MEMORANDUM DECISION AND ORDER – 33

1100) may as well.

**C. Balance of Equities and Public Interest**

As explained, because the Government is a party in this suit, the last two *Winter*

factors merge. *See Jewell*, 747 F.3d at 1092.

As is typically the case, neither party discussed either of these factors (together or

separately) in any amount of detail. Both simply argue their side prevails on the third and

fourth prongs considering their success on the first prong.

There is no doubt the public has an interest in this issue. And the interest is

significant on both sides. Whether the equities tip one way or the other likewise depends

on which position one takes—for or against S.B. 1100.

For its part, the Court finds these factors are roughly even. Supporters and opponents

of S.B. 1100 both have a vested interest in the outcome of this case.

## VI. CONCLUSION

This is a difficult case. The Court previously prevented S.B. 1100 from taking effect

based upon the concept that maintaining the status quo—of no formal regulation—would

allow the parties more time to fully address the difficult issues involved in this case. And

while its decision today is still not a full adjudication on the merits, the Court finds that

Plaintiffs have not shown they are likely to succeed on the merits of their claims. The Court

is not implying Plaintiffs' arguments are meritless—after all, some courts have upheld

similar arguments to those Plaintiffs offer now. On the other hand, other courts have upheld

the arguments Defendants proffer. Indeed, this area of law (and societal policy) is evolving.

The Court, however, must stay in its lane. It cannot provide guidance on how elected

officials *should* navigate these difficult situations. It can only decide whether the action they have taken withstands constitutional scrutiny. As the Sixth Circuit aptly noted just a few weeks ago with respect to regulations about medical care for transgender minors: "[L]ife-tenured judges construing a difficult-to-amend Constitution should be humble and careful about announcing new substantive due process or equal protection rights that limit accountable elected officials from sorting out these medical, social, and policy challenges." *Skrmetti*, 2023 WL 6321688 at *23.

Ultimately, the Court is not convinced Plaintiffs can prevail on their equal protection claims because: 1) S.B. 1100 is based upon sex, not gender identity, and 2) privacy and safety are important government interests and separating these types of facilities on the basis of sex is "substantially related to the achievement of those objectives." *Hogan*, 458 U.S. at 724.[28] The state of Idaho has an interest in protecting the privacy and safety of its youth while at school. It has written a law to achieve that goal, while also mandating a reasonable accommodation for any student who feels he or she cannot follow the law. That not all people agree with the law is the reality of living in a pluralistic society where everyone cannot have everything they want according to how they see the world. *See Romer*, 517 U.S. at 631.

Plaintiffs likewise cannot show they are likely to prevail on the merits of their Title

---

[28] And the Court would reach this conclusion *even if* it were to assume, as Plaintiffs argue, that S.B. 1100 discriminates based on transgender status. That is, frankly, the whole point of this exercise. Under intermediate scrutiny, the government must show that it has a persuasive justification for the classification it has drawn. It has done so here *regardless* of which classification the Court uses—sex or transgender status. Thus, while there may be disagreement on the complicated, esoteric, and ever-evolving landscape of discrimination based on gender identity and whether that is the same as discrimination based on sex, it matters not because privacy is a legitimate interest either way.

MEMORANDUM DECISION AND ORDER – 35

IX claim because Title IX *specifically* allows for sex-separate facilities. S.B. 1100, therefore, does not violate Title IX, it adheres to it.

And finally, Plaintiffs have not shown they are likely to prevail on the merits of their privacy claim because they have not demonstrated they have a protectable liberty interest in the nondisclosure of their gender identity.

Thus, while the Court finds the remaining *Winter* factors roughly even, it finds Plaintiffs have not prevailed on the critical first prong required to obtain a preliminary injunction today.

That said, Defendants have not shown Plaintiffs' claims are entitled to full dismissal. While they move to dismiss all claims, Defendants do so in a perfunctory manner, with little explanation. The idea seems to be that Plaintiffs' claims are based on speculative science and cannot withstand muster. As noted, however, the Court will not be delving into the science behind the parties' positions today. But the fact that other courts have found merit in similar claims against the backdrop of regulations *similar* to S.B. 1100 weighs against finding that Plaintiffs' claims are wholly implausible. The Court will not dismiss Plaintiffs' claims at this time.

Because the Court's decision today will take time to implement, the Court will extend the TRO for 21 days. This should provide enough time for school districts to identify and designate restrooms, changing facilities, and overnight accommodations in a manner consistent with S.B. 1100. Once the 21 days have elapsed, S.B. 1100 will be in full force and effect.

## VII. ORDER

1.  Plaintiffs' Motion for Preliminary Injunction (Dkt. 15) is DENIED.

2.  Defendants' Motion to Dismiss (Dkt. 47) is DENIED.

3.  The Court's previously entered TRO will end, and S.B. 1100 will take effect, 21 days from the date of this order.

4.  Defendants' Motion for Leave to File Supplemental Authority (Dkt. 55) is GRANTED.

DATED: October 12, 2023

David C. Nye
Chief U.S. District Court Judge