Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†*mailing address only*
(213) 382-7600 (T) | (213) 402-2537 (F)

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

Katherine M. Forster*
katherine.forster@mto.com
Robyn K. Bacon*
robyn.bacon@mto.com
Nicholas R. Sidney*
nick.sidney@mto.com
Paul Martin*
paul.martin@mto.com
Avery P. Hitchcock*
avery.hitchcock@mto.com
Jimmy P. Biblarz*
jimmy.biblarz@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| REBECCA ROE, et al.,<br><br>   *Plaintiffs*,<br><br> v.<br><br>DEBBIE CRITCHFIELD, et al.,<br><br>   *Defendants*. | Case No. 1:23-cv-00315-DCN<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL AND FOR EXPEDITED RULING** |

   Plaintiffs respectfully submit this memorandum in support of their Motion for Injunction Pending Appeal and for Expedited Ruling.

1

## INTRODUCTION

On October 12, 2023, this Court issued an Order ("Order") denying Plaintiffs' Motion for Preliminary Injunction and providing that the temporary restraining order, which had previously enjoined enforcement of Idaho Senate Bill 1100 ("S.B. 1100") and preserved the status quo, would end in twenty-one days. Plaintiffs filed an appeal of the Order on October 16, 2023, and now request that this Court issue an injunction pending appeal under Rule 62(d), Fed. R. Civ. P.

Because the Order allows S.B. 1100 to go into effect on November 2, 2023, and because Plaintiffs also plan to seek emergency relief in the Ninth Circuit for the same relief, as needed, Plaintiffs respectfully request that this Court rule on this Motion as soon as practicable. Plaintiffs intend to file their request for emergency relief with the Ninth Circuit Court of Appeals today, October 16, 2023, asking for relief to be granted by November 1, 2023.[1]

Although the Court stated at oral argument that a stay of its decision pending appeal would essentially grant the same relief requested in their Motion for Preliminary Injunction, Plaintiffs' current request is much more narrow. Rather than asking this Court to enjoin S.B. 1100 during the pendency of the lawsuit—a request this Court has already denied—the current Motion asks the Court to maintain the status quo for a significantly shorter period of time, until the Ninth Circuit has had an opportunity to address the legal issues central to this litigation. Plaintiffs need not suffer irreparable harm in the interim.

---

[1] Rule 8, Fed. R. App. P., does not require that Plaintiffs move for a stay before this Court prior to seeking that relief from the Ninth Circuit in this case. See Fed. R. App. P. 8(a)(2)(A) (no need to do so where it "would be impracticable"). Nevertheless, Plaintiffs have simultaneously filed this Motion before this Court. Should this Court grant the requested relief, it would moot Plaintiffs' pending request to the Ninth Circuit.

## STANDARD

The factors that guide the court's discretion in deciding whether to issue an injunction pending appeal are: (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent the requested relief; (3) whether an injunction will "substantially injure" other parties interested in the proceeding; and (4) "where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). The third and fourth factors merge when the government opposes the injunction. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

Plaintiffs need not show that "it is more likely than not that they will win on the merits"; rather, it is enough to show that there is a "substantial case for relief on the merits." *Lair*, 697 F.3d at 1204 (internal quotations omitted). Many formulations of this standard are "largely interchangeable," including "reasonable probability," "fair prospect," and "serious legal questions . . . raised." *Id.* (internal quotations omitted). And Plaintiffs need only show "a probability" of irreparable harm if an injunction pending appeal is not granted. *Id.* at 1214.

## ARGUMENT

This Court should maintain the pre-S.B. 1100 status quo during the pendency of Plaintiffs' interlocutory appeal to the Ninth Circuit. At a minimum, Plaintiffs have raised "serious questions" on the merits, and an injunction pending appeal is warranted because the balance of hardships—including the irreversible outing of transgender students and their exposure to daily discrimination and stigmatization while the Ninth Circuit considers the legal questions at the heart of this case—tips sharply in Plaintiffs' favor.

## I.     Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

Laws that discriminate against a quasi-suspect class must satisfy heightened scrutiny under equal protection. *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). First, the court must presume that the law is unconstitutional, and the government bears the heavy burden of proving otherwise. *United States v. Virginia*, 518 U.S. 515, 533 (1996). To do that, the government must show an "exceedingly persuasive justification" in which there is a substantial relationship between the discriminatory means employed and the achievement of important government interests. *Id.* at 534. Furthermore, where less intrusive means can substantially achieve those interests without discrimination, the law fails heightened scrutiny. *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *Karnoski*, 926 F.3d at 1200.

Plaintiffs are likely to succeed because (1) S.B. 1100 discriminates based on transgender status and sex; and (2) S.B. 1100 fails to satisfy heightened scrutiny.

### A.     S.B. 1100 Requires Heightened Scrutiny.

Defendants concede, and this Court agreed, that S.B. 1100 requires heightened scrutiny, at the very least because (a) the law differentiates on the basis of so-called "biological sex," Dkt. 60 at 11, and (b) that differential treatment causes injury to transgender students because they are denied access to facilities consistent with their gender identity. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1740 (2020) (explaining that discrimination requires both differential treatment plus injury). Accordingly, Defendants bear the burden of proving that S.B. 1100's categorical exclusion of transgender students like Plaintiffs from facilities matching their gender identity is substantially related to an important government interest, which less intrusive means cannot achieve.

This Court's holding that S.B. 1100 does not discriminate against transgender people does not lower the level of scrutiny that S.B. 1100 must survive given that the law requires heightened scrutiny in any event. To be clear, however, S.B. 1100 also discriminates against transgender people because, on the face of the law, they—and they alone—are deprived of facilities matching their gender identity. That is the precise harm at issue. Both before and after S.B. 1100, cisgender students have access to facilities matching their gender identity; the only change the law seeks to accomplish is with respect to transgender students.

The "text, structure, purpose, and effect" of S.B. 1100 "all demonstrate that the Act categorically bans transgender [people]" from facilities "that correspond with their gender identity." *Hecox v. Little*, 79 F.4th 1009, 1022 (9th Cir. 2023) (upholding preliminary injunction against law barring transgender females from women's student athletics). The law's stated purpose is to separate facilities by "biological sex"—which is expressly defined so that transgender females are treated as males, and transgender males are treated as females—and thus the exclusion of transgender people from facilities matching their gender identity is precisely what the law seeks to accomplish.[2] Furthermore, Defendants conceded at oral argument that "[i]t was because districts were making policies" that allowed students to access facilities based on gender identity "that the legislature passed S.B. 1100." Dkt. 59 at 52. As one lead proponent of S.B. 1100 explained: "We hear a lot of talk about how the transgender are, it's their right to use the bathroom," but "[w]e believe biological gender to be an essential characteristic of a child's identity and purpose" and "strongly oppose any . . . attempts to confuse minors regarding their

---

[2] This Court distinguished *Hecox* by noting that the law there discriminated in two ways—both against all female athletes, who were subject to sex verification, and against transgender female athletes, who were excluded from girls' athletics—but it is the latter aspect that is relevant here. And as to that relevant portion, S.B. 1100 discriminates against transgender people in a materially indistinguishable manner.

5

bio gender." Dkt. 15-9, Decl. of Jimmy Biblarz, at ¶ 13; *cf. Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1048 (7th Cir. 2017) ("a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth").

For heightened scrutiny based on transgender status to apply, Plaintiffs need only show that S.B. 1100 intended to exclude transgender people from facilities matching their gender identity—not that it was motivated by animus nor any intent to harm transgender people, and regardless of whether that exclusion ultimately *survives* scrutiny. This Court questioned whether transgender people constitute a quasi-suspect class under *Karnoski*, but the Ninth Circuit was clear in holding that the district court in *Karnoski* had "reasonably applied the factors ordinarily used to determine whether a classification affects a suspect or quasi-suspect class." 926 F.3d at 1200. And *Hecox* has confirmed that was *Karnoski*'s holding. *Hecox*, 69 F.3th at 1026. Thus, S.B. 1100 is subject to heightened scrutiny on the independent ground that it discriminates against transgender people.

### B. Defendants Failed to Show a Substantial Relationship Between a Statewide Categorical Ban and Protecting Privacy or Safety.

Defendants' proffered justifications for S.B. 1100 fail many times over to meet their burden. Most importantly, Defendants provided no factual support—not a single witness or document—to substantiate their privacy and safety defenses. That itself is fatal under heightened scrutiny because Defendants bear the burden of proving an exceedingly persuasive justification. Defendants did not show how the longstanding status quo in Idaho—i.e., the absence of any statewide mandate of categorical discrimination—has caused any of their claimed harms. Merely asserting these harms is not enough. Unsupported legislative predictions that implicate constitutional rights "have not been afforded deference" by courts. *Latta*, 771 F.3d at 469. And that absence of evidence is particularly striking given that a significant number of Idaho schools

have had, for many years, the converse of S.B. 1100: policies and practices expressly permitting transgender students to access facilities matching their gender identity. Nevertheless, Defendants could not show how that status quo in Idaho has caused any harms.

Indeed, this Court acknowledged that Defendants' asserted privacy interest—which imagined that some cisgender students might object to seeing or being seen by transgender students—was already addressed through physical barriers such as doors on restroom stalls. Dkt. 60 at 18 ("*often* people in the restroom would never know the gender identity of the person going into the stall next to them"). This indicates that there is not a sufficient basis for the wholesale denial of a preliminary injunction, where the law sweeps so broadly.[3] As the Fourth Circuit explained, the government "ignores the reality of how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). Defendants also failed to prove why less intrusive means—including options for anyone desiring greater privacy—cannot substantially achieve their interests, without also imposing a categorical ban on transgender students. *Cf. Hecox*, 69 F.3th at 1033 ("We must 'reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn.'"). Privacy and equality are not in a zero-sum game.

---

[3] This Court opined that changing facilities and overnight accommodations were different; but there, too, physical barriers can address objections. For instance, a cisgender student who objects to changing clothes in front others for any reason can do so in a restroom, whether in a locker room or overnight accommodation. Moreover, the only actual evidence in the record shows that schools have successfully implemented inclusive policies without issue, and the hypothetical scenarios imagined by some "did not play out in reality." Dkt. 15-6, Decl. of Diana Bruce, at ¶ 16.

Nevertheless, this Court hypothesized that cisgender students—from whom no evidence exists in the record—might object the mere presence of a transgender student in a shared facility, even without visual exposure. It then held that these hypothetical students' right to privacy would be violated, relying heavily on the Eleventh Circuit's decision in *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022). Not only is that decision an outlier, and factually and procedurally distinguishable, but it is, more importantly, directly at odds with the reasoning of Ninth Circuit precedent. In *Parents for Privacy v. Barr*, the Ninth Circuit rejected the proposition that the right to privacy encompasses the *specific* "right" for a cisgender student "not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs." 949 F.3d 1210, 1222 (9th Cir. 2020). So too did it affirm that the "mere presence" of transgender students does *not* violate the rights of cisgender students: "Plaintiffs allegedly feel harassed by the mere presence of transgender students in locker and bathroom facilities. This cannot be enough." 949 F.3d at 1228-29. Other circuits are in accord. *Grimm*, 972 F.3d at 620 (finding that board was motivated by plaintiff's "mere presence—a special kind of discrimination against a child that he will no doubt carry with him for life"); *Whitaker*, 858 F.3d at 1052.

The Court's decision also erred in concluding that *Parents for Privacy* was dependent upon the fact that the school policy at issue provided accommodations to an objecting student. Dkt. 60 at 17. While the opinion mentioned those accommodations as reinforcing its ultimate conclusion, it only did so *after* making clear that the right to privacy did not include avoiding "any risk of bodily exposure to a transgender student in school facilities." 949 F.3d at 1225.

Furthermore, all of the unrebutted record evidence confirms that a preliminary injunction enjoining S.B. 1100's statewide categorical ban will not imperil privacy or safety. That evidence

8

includes expert testimony from Idaho law enforcement showing that, even at schools with policies expressly allowing transgender students to use facilities matching their gender identity, there has been no evidence of any safety or privacy harms. Dkt. 15-8, Decl. of Morgan Ballis, at ¶¶ 22-33. It also includes the testimony of school administrators who have significant experience with inclusive policies and confirms that such policies do not cause any harms. Dkt. 15-6, Decl. of Diana Bruce, and Dkt. 15-7, Decl. of Foster Jones. And it includes the testimony of Boise High School senior A.J., who used the boys' facilities matching his gender identity for his junior year, without any incident or harm to others. Dkt. 15-4, Decl. of A.J., at ¶ 8. Many courts have relied upon transgender students' prior use of facilities matching their gender identity without incident as evidence disproving the government's claimed justifications. *See, e.g.*, *Grimm*, 972 F.3d at 614 (seven weeks of use); *Whitaker*, 858 F.3d at 1052 (six months of use). Defendants' justifications rest on speculation and conjecture that are empirically disproven by real-world experiences.

Finally, any justification based solely on safety fares no better than one based on privacy. There is no evidence that inclusive policies in Idaho have led to cisgender students pretending to be transgender to gain access to facilities designated for another sex. Dkt. 15-8, Decl. of Morgan Ballis, at ¶ 31; *cf. Hecox*, 79 F.4th at 1035 ("The record is devoid of evidence that any boy attempted to join a girls' team"). And law enforcement already possesses the tools to respond to any student misconduct. Dkt. 15-8 at ¶¶ 28-29. In fact, it is transgender students, rather than their cisgender peers, who are at higher risk of harassment and violence as a result of discrimination. Dkt. 15-8 at ¶ 27; Dkt. 15-5, Decl. of Stephanie Budge, at ¶¶ 46-47. Excluding transgender students from facilities matching their gender identity can disclose to others that the student is transgender, increasing the likelihood of the transgender student becoming targeted for

discrimination. Dkt. 15-8 at ¶ 27; Dkt. 15-5 at ¶ 67. That is one reason, among many, why forcing transgender students to use only "alternative" facilities is uniquely damaging and stigmatizing.[4]

## II. Plaintiffs Are Likely to Succeed on Their Title IX Claim.

This Court held Plaintiffs are unlikely to succeed in showing S.B. 1100 violates Title IX's prohibition on discrimination "on the basis of sex." 20 U.S.C. § 1681. That conclusion is at odds with the majority of federal circuits, irreconcilable with Ninth Circuit precedent, and rests on an interpretation of Title IX that would sanction unprecedented discrimination against transgender people.

### A. Under Ninth Circuit Precedent, S.B. 1100 Violates Title IX's Prohibition on Sex-Based Discrimination.

Four sister circuits (the Third, Fourth, Sixth, and Seventh) have held or acknowledged that excluding transgender students from facilities matching their gender identity also violates Title IX. *See Grimm*, 972 F.3d at 619; *Whitaker*, 858 F.3d at 1050; *A.C.*, 75 F.4th at 770; *Doe v. Boyertown Area School Dist.*, 897 F.3d 518, 533 (3d Cir. 2018) ("barring transgender students from restrooms that align with their gender identity would itself pose a potential Title IX violation"); *Dodds*, 845 F.3d at 221 (transgender girl likely to show exclusion from girl's restroom unlawful under Title IX). Only the Eleventh has disagreed. *See Adams*, 57 F.4th at 811-12.

The Ninth Circuit has not decided this specific issue. But, citing *Grimm*, it has held that *Bostock*'s analysis—holding that discrimination against transgender people is a form of sex

---

[4] The unrebutted harms from that exclusion—including heightened suicidality for transgender youth, Dkt. 15-5 at ¶ 56—are incomparable to the potentially "less convenient" additional facilities made available to cisgender students objecting to the mere presence of transgender students in *Parents for Privacy*. 949 F.3d at 1225.

10

discrimination—applies to Title IX. *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 & n.1 (9th Cir. 2023) (citing *Grimm*, 972 F.3d at 616); *accord Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII. … While the language in Title VII is 'because of sex' and the language in Title IX is 'on the basis of sex,' *Bostock* used those phrases interchangeably").

That holding will be dispositive on appeal. Every Circuit to hold that Title IX prohibits discrimination against transgender people has recognized that transgender-exclusive facilities policies violate Title IX. *Adams*, by contrast, declined to hold that *Bostock* applies to Title IX at all. 57 F.4th at 811-14; A.C., 75 F.4th at 775 (Easterbrook, J., concurring) ("My colleagues express confidence that Title VII and Title IX use 'sex' in the same way. . . . The majority in *Adams* was equally confident of the opposite proposition.") That route is foreclosed in this Circuit.

Notwithstanding this precedent, the Order first explains that *Grabowski* was wrongly decided. Dkt. 60 at 27 n.22. Then, although this Court acknowledged *Grabowski* as binding precedent, it did not follow *Grabowski*'s reasoning and holding. The Court held that fundamental differences between "Title VII" and "Title IX" was one of "two problems with Plaintiffs' reliance on *Bostock*." Dkt. 60 at 26. *Grabowski*, however, states that the Ninth Circuit "construe[s] Title VII and Title IX protections consistently." *Grabowski*, 69 F.4th at 1116.[5] The Ninth Circuit is likely to follow the majority of federal courts of appeal to hold that S.B. 1100 violates Title IX.

---

[5] The Court suggested that *Grabowski* might be distinguishable because it dealt with "sexual orientation," not "gender identity." Dkt. 60 at 27 & n.23. But *Grabowski* is on point, especially considering that Grabowski cited Grimm as support. Grabowski, 69 F.4th at 1116 n.1

11

### B.   Provisions Under Title IX Allowing Sex-Separated Facilities Do Not Sanction Discrimination Against Transgender People.

Even if S.B. 1100 were sex discrimination under Title IX, this Court held that three provisions nevertheless authorize it: 20 U.S.C. § 1686 (schools may "separate living facilities for the different sexes"), 34 C.F.R. § 106.33 (schools may "provide separate toilet, locker room, and shower facilities on the basis of sex"), and 34 C.F.R. § 106.32(b) (schools may "provide separate housing on the basis of sex").  That conclusion, too, is at odds with the majority of federal circuits and untenable in the Ninth Circuit.

As the Fourth and Seventh Circuits have held, these provisions are "broad statement[s]" "that the act of creating sex-separated restrooms in and of itself is not discriminatory." *Grimm*, 972 F.3d at 618.  They do not authorize "schools [to] act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities." *Id.* at 618 n.16; *A.C.*, 75 F.4th at 770. Although the Ninth Circuit has not directly answered this question, it has endorsed *Grimm* and *A.C.*'s reasoning.

As the Seventh Circuit explained, Title IX does not define "sex," let alone state that "sex" must be understood to allow excluding transgender students from facilities aligned with their gender identity. *See A.C.*, 75 F.4th at 770 ("[T]he question [here] is different: who counts as a 'boy' for the boys' rooms, and who counts as a 'girl' for the girls' rooms—essentially, how do we sort by gender?  The statute says nothing on this topic.") *Adams* held the opposite: that Title IX "must" be read to allow separation based only on "biological sex."  57 F.4th at 815.

 The Ninth Circuit's understanding of this text accords with *A.C.*, not *Adams*.  In *Parents for Privacy*, the plaintiff relied on the same statutory and regulatory provisions.  949 F.3d at 1227.  The court first observed that these regulations at most allow a school to do something, not require it.  But it also went further, explaining that "[j]ust because Title IX authorizes sex-

12

segregated facilities does not mean that they are required, *let alone that they must be segregated based only on biological sex and cannot accommodate gender identity*." *Id.* (emphasis added). This statement acknowledged, in line with the Fourth and Seventh Circuits, that "sex" in the applicable provisions need not be read as "biological sex" so as to fail to "accommodate gender identity." *Id.*

Beyond the meanings of isolated words, the Ninth Circuit also looks to, *inter alia*, "the broader context of [a] statute as a whole" to interpret it. *United States v. Pacheco*, 977 F.3d 764, 767-68 (9th Cir. 2020). Interpreting the provisions Defendants cited not just to allow sex-separated facilities, but to specifically sanction "segregat[ion] based only on biological sex," *Parents for Privacy*, 949 F.3d at 1227, places them in direct conflict with Title IX's anti-discrimination mandate. *See Grimm*, 972 F.3d at 618. If the Court is right that §§ 1686, 106.32(b), and 106.33 dissolve Title IX's protection of transgender people whenever, *inter alia*, schools segregate "toilet" facilities by sex assigned at birth, Title IX would permit even a version of S.B. 1100 *without* any option for single-occupancy restrooms—forcing students like Rebecca and A.J. to use restrooms inconsistent with their gender identity or forego using restrooms at all. Such a reading of Title IX would make it at war with itself: an anti-discrimination statute that sanctions egregious discriminatory harm.

In light of that obvious tension, no Court of Appeal has held *both* that Title IX protects transgender people from discrimination *and* that these statutory and regulatory provisions nevertheless authorize laws like S.B. 1100. The Eleventh Circuit had no need to address this tension, because, as noted, it did not hold Title IX prohibits transgender discrimination at all. Grabowski indicates that the Ninth Circuit will side with *A.C.* and *Grimm* over *Adams*.

Finally, the Order does not grapple with key arguments made in the United States' Statement of Interest, that (1) Section 1686's reference to "living facilities" does not include restrooms and locker rooms; and (2) 34 C.F.R. § 106.33, which does, is an implementing regulation of Section 1682 (rather than Section 1686) that cannot be read to authorize discrimination prohibited by that provision.  Dkt. 41, at 11-12.  The Fourth Circuit held the same in *Grimm*.  972 F.3d at 618; *see also A.C.*, 75 F.4th at 770.

### III.     Plaintiffs Are Likely to Succeed on Their Privacy Claim.

By excluding transgender people from facilities matching their gender identity, and consigning them to other facilities that can reveal their sex assigned at birth, S.B. 1100 exposes their transgender status to others in violation of their constitutional right to privacy.  When a transgender girl is forced to use the boys' restroom because that is the only facility she can reach in the five minutes between classes, or when she cannot go with her female friends into the girls' restroom, the disclosure of her transgender status is compelled.  Dkt. 15-5 at ¶¶ 61-64; Dkt. 15-2, Decl. of Rebecca Roe, at ¶ 16.  This Court agreed:  "It is true this may occur."  Dkt. 60 at 30.  Indeed, it also agreed Plaintiffs' legal "argument makes sense" because information about one's gender identity "is personal and private."  Dkt. 60 at 31.

This Court found that Plaintiffs were unlikely to prevail on their privacy claim because it believed that there was not a fundamental liberty interest at stake.  Dkt. 60 at 31.  Plaintiffs respectfully disagree.  "Ninth Circuit cases have uniformly recognized a constitutional right to informational privacy."  *Doe v. Cnty. of San Diego*, 576 F. Supp. 3d 721, 733 (S.D. Cal. 2021); *see, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004); *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1269-70 (9th Cir. 1998) (information relating to one's health and medical status is entitled to privacy protection).

14

Furthermore, virtually every federal court to consider the issue has also held that one's transgender status is entitled to constitutional privacy protection. "The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). That is why courts have held that government actions that can involuntarily disclose that status—such as saddling transgender people with identity documents reflecting their sex assigned at birth—violate transgender people's constitutional right to privacy. *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925, 931-32 (S.D. Ohio 2020); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015). The only case cited in this Court's discussion on the issue, *Mirabelli v. Olson*, 2023 WL 5976992, at *10 (S.D. Cal. Sept. 14, 2023), concerned whether there was a *state* constitutional privacy right in one's gender identity (which the court simply stated had not arisen in state appellate cases to its knowledge) and in the specific context of whether a *parent* has an overriding right to know that information. Dkt. 60 at 31.

The disclosure of one's transgender status, particularly in circumstances where one would otherwise keep that information private, can provoke intense "hostility and intolerance from others." *Powell*, 175 F.3d at 111. Given the seriousness of these harms—and the irreversible nature of a privacy violation that occurs even during the length of an interlocutory appeal—an injunction pending appeal is uniquely warranted here.

**IV.     The Remaining Factors Strongly Favor An Injunction Pending Appeal.**

This Court held that both parties had shown in equal measure that "harm may result" from its decision; and that Plaintiffs' evidence was "specula[tive]." Dkt. 60 at 32. Both conclusions are erroneous.

Plaintiffs provided unrebutted evidence of irreparable harm—specifically that, should S.B. 1100 take effect, they face outing, stigma, and bullying; severe mental health risks; and impaired academic performance. *See generally* Dkt. 15-5, Decl. of Stephanie Budge. Like the Third, Fourth, Sixth, and Seventh Circuits, the Ninth Circuit has acknowledged these harms. *See Parents for Privacy*, 949 F.3d at 1217 ("Defendants and many amici highlight the importance of the policy for creating a safe, non-discriminatory school environment for transgender students that avoids the detrimental physical and mental health effects" that result from exclusionary policies).

Plaintiffs also produced unrebutted evidence that single-occupancy restrooms do not ameliorate these harms. *See, e.g.*, Dkt. 15-2 Decl. of Rebecca Roe at ¶ 14 (explaining that use of nurse's restroom "felt stigmatizing and isolating"); *id.* ¶ 16 ("I am afraid that any of my classmates … could find out that I am transgender"); *see also* Dkt. 15-4, Decl. of A.J., at ¶¶ 4, 9; Dkt. 15-5 at ¶¶ 53-64. Courts agree. *See Whitaker*, 858 F.3d at 1045; *Grimm*, 972 F.3d at 617-18.

Although many Idaho schools have long had inclusive policies and practices, Defendants produced no evidence that they have harmed cisgender students. Plaintiffs produced unrebutted expert testimony from a leading Idaho school policing official that inclusive policies in Idaho have caused no problems and "are important to protect the safety of transgender youth." Dkt. 15-8 at ¶ 26.

This Court's findings in the Order are irreconcilable with this record. While the Court stated "neither party was able to identify any *specific* instances of harm befalling transgender, or cisgender, students in Idaho," Dkt. 60 at 32, Plaintiffs clearly showed that Rebecca and A.J. *will* face immediate harm from S.B. 1100. The fact that they have not *yet* suffered that harm is the

point: S.B. 1100 will *end* long-standing inclusive policies and practices if not enjoined. It is only Defendants' failure to identify evidence that existing policies and practices have caused harm that is dispositive.

At most, Defendants questioned only one aspect of one of these harms—whether *all* transgender students have a need to socially transition—on the purported grounds that gender dysphoria may desist for some. But there was no dispute among the experts that transgender youth whose gender dysphoria persists have a need to transition and that interference with doing so causes serious harm. Moreover, the Ninth Circuit has acknowledged that "[l]iving in a manner consistent with one's gender identity is a key aspect of treatment for gender dysphoria." *Karnoski*, 926 F.3d at 1187 n.1; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (relying upon standards of care for treatment of gender dysphoria). This Court's wholesale rejection of Plaintiffs' evidence is irreconcilable with these cases.

Finally, the Court erroneously concluded that Defendants face comparable harm if S.B. 1100 is enjoined. But the bare assertion that the presence of transgender people in facilities aligned with their gender identity constitutes harm is factually and legally untenable. *Parents for Privacy*, 949 F.3d at 1228-29; *Whitaker*, 858 F.3d at 1052-53. Instead, as in *Hecox*, an injunction here does "not appear to inflict any comparable harm" because it "expressly maintain[s] the status quo." 79 F.4th at 1036.

## REQUEST FOR EXPEDITED RULING

Because S.B. 1100 is set to go into effect, under the Court's current Order, on November 2, 2023, Plaintiffs plan to file their request for relief with the Ninth Circuit Court of Appeals later today. Plaintiffs request an expedited ruling from this Court. Dist. Idaho Loc. Div. R. 6.1

(district court, for cause shown, may shorten time for action). Plaintiffs will provide the Ninth Circuit with this Court's ruling on Plaintiffs' Motion when it issues.

For the reasons stated above, Plaintiffs respectfully request that this Court enter an injunction holding the provisions of S.B. 1100 in abeyance until the Ninth Circuit Court of Appeals provides a ruling on Plaintiffs' interlocutory appeal of the Court's Order dated October 12, 2023.

Dated: October 16, 2023                                    Respectfully Submitted

| | |
|---|---|
| Katherine M. Forster | /s/ Kell L. Olson |
| Robyn K. Bacon | Peter C. Renn |
| J. Max Rosen | Kell L. Olson |
| Nicholas R. Sidney | Tara L. Borelli |
| Paul Martin | LAMBDA LEGAL DEFENSE & EDUCATION FUND |
| Avery P. Hitchcock | |
| Jimmy P. Biblarz | Samuel L. Linnet |
| MUNGER TOLLES & OLSON LLP | ALTURAS LAW GROUP, PLLC |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of October, 2023, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

James Edward Monroe Craig
james.craig@ag.idaho.gov

Rafael John Droz
rafael.droz@ag.idaho.gov

/s/ Kell L. Olson
Kell L. Olson