No. 23-2807

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

REBECCA ROE, by and through her
parents and next friends, Rachel and Ryan Roe, *et al.*,

*Plaintiffs-Appellees*,

v.

DEBBIE CRITCHFIELD, in her official capacity as
Idaho State Superintendent of Public Instruction, *et al.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court for the District of Idaho
No. 1:23-cv-00315-DCN

---

# APPELLANTS' EMERGENCY MOTION
# UNDER CIRCUIT RULE 27-3 FOR
# INJUNCTION PENDING APPEAL

# RELIEF REQUESTED BY NOVEMBER 1, 2023

---

Peter Renn
Kell Olson[†]
Tara L. Borelli[†]
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd, Suite 280
Los Angeles, CA 90010 | (213) 382-7600
[†]*Mailing address only*

Samuel L. Linnet
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333 | (208) 788-6688

Katherine M. Forster
Robyn K. Bacon
Nicholas R. Sidney
Paul Martin
Avery P. Hitchcock
Jimmy P. Biblarz
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071 | (213) 683-9100

J. Max Rosen
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105 | (415) 512-4000

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................1

BACKGROUND ........................................................................5

    A.   Plaintiffs ........................................................................5

    B.   Status Quo Before S.B. 1100 ........................................5

    C.   Enactment of S.B. 1100 ................................................6

    D.   Proceedings Below ........................................................8

STANDARD ..............................................................................8

ARGUMENT ..............................................................................9

    I.   Plaintiffs Are Likely to Succeed on Their Equal Protection Claim. .............10

        A.   S.B. 1100 Requires Heightened Scrutiny. ............................10

        B.   Defendants Failed to Show a Substantial Relationship Between a Statewide Categorical Ban and Protecting Privacy or Safety...............12

    II.   Plaintiffs Are Likely to Prevail on Their Title IX Claim.. ...........................16

        A.   Under Ninth Circuit Precedent, S.B. 1100 Violates Title IX's Prohibition on Sex-Based Discrimination.. ...........................................16

        B.   Provisions Under Title IX Allowing Sex-Separated Facilities Do Not Sanction Discrimination Against Transgender People... ......................17

    III.   Plaintiffs Are Likely to Prevail on Their Privacy Claim..............................19

    IV.   The Remaining Factors Strongly Favor an Injunction Pending Appeal... .....21

CONCLUSION ..........................................................................23

CERTIFICATE OF COMPLIANCE ........................................24

CERTIFICATE OF SERVICE ..................................................24

# INTRODUCTION

Prior to the enactment of Idaho Senate Bill 1100 ("S.B. 1100") this year, there were no state or local policies in Idaho schools that categorically excluded transgender students from using restrooms and other facilities consistent with their gender identity. If allowed to take effect, S.B. 1100 will impose a statewide ban that requires every Idaho school to exclude every transgender person from restrooms and other facilities consistent with their gender identity. As the majority of federal appellate and district courts have held—and as the Ninth Circuit has all but held in related decisions—discriminatory policies like S.B. 1100 violate the U.S. Constitution and Title IX and cause irreparable harm to transgender people.

To prevent S.B. 1100 from going into effect, Plaintiffs—transgender students in Idaho—sought a preliminary injunction. Because S.B. 1100 would radically transform the status quo in Idaho, the district court granted a temporary restraining order ("TRO") before the start of the school year pending disposition of the preliminary injunction motion. On October 12, 2023, the district court denied Plaintiffs' motion for a preliminary injunction, wrongly holding that S.B. 1100 is fully consistent with the U.S. Constitution and Title IX. Because S.B. 1100 will take effect on November 2, 2023 under the terms of the district court order, Plaintiffs respectfully request that this Court grant an injunction pending appeal of that denial by November 1, 2023.

If S.B. 1100 takes effect, the stigmatizing exclusion of transgender youth from facilities matching their gender identity will inflict profound daily psychological and physical harms, including depression, anxiety, and suicidality. It will also cause the irreversible disclosure of their transgender status—which is a bell that cannot be unrung even if a merits panel subsequently reverses the denial of the preliminary injunction. Indeed, a significant reason why the district court granted a TRO—to preserve the status quo pending a more fulsome determination on the preliminary injunction—equally supports why this Court should also grant an injunction pending appeal.

S.B. 1100 is a quintessential solution in search of a problem. For at least *seven years*, numerous schools across Idaho, like others nationwide, have adopted inclusive policies and practices that allow transgender students to access facilities consistent with their gender identity—without any evidence of harm. And *all* schools in Idaho have always functioned without the categorical ban that S.B. 1100 would mandate for them. An injunction pending appeal would merely preserve that long-standing status quo while the merits of the appeal are resolved. The record unambiguously supports Plaintiffs' likelihood of success on the merits, because Defendants failed to introduce a single piece of evidence to substantiate their privacy and safety justifications for the law. That silence is deafening.

The overwhelming majority of federal courts, including the Fourth, Sixth,

and Seventh Circuits, have all found similar policies to be unlawful discrimination
at even the local level, let alone on a mandated statewide basis.  *See, e.g.*, *Grimm v.
Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608-14 (4th Cir. 2020), *cert. denied,* 141
S. Ct. 2878 (2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1
Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Dodds v. United States Dep't of
Educ.*, 845 F.3d 217, 220-22 (6th Cir. 2016); ECF 15-1 at 16 (collecting cases).[1]

The crux of the district court's decision—that S.B. 1100 survives heightened
scrutiny based on a specific privacy rationale asserted by the government—also
contravenes Ninth Circuit precedent.  The district court admitted that physical
barriers, such as restroom stall doors, already address any conceivable interest in
visual privacy.  Nevertheless, the court held that there was a cognizable privacy
right for students objecting to the *mere presence* of transgender students in shared
spaces, which purportedly competed with, and ultimately prevailed over, Plaintiffs'
right to be free of discrimination.  But this Court, in *Parents for Privacy v. Barr,*
949 F.3d 1210 (9th Cir. 2020), rejected that exact proposition in a challenge to an
inclusive school policy brought by students claiming that the mere presence of
transgender students violated their right to privacy.  It held that cisgender students
do not possess "a constitutional privacy right not to share restrooms or locker

---

[1] ECF citations are to the district court docket and any ECF pagination.

3

rooms with transgender students whose sex assigned at birth is different than theirs." *Id.* at 1222. Thus, there is no "competing right" at issue—only the right of transgender people to free from discrimination. This Court also explained: "Plaintiffs allegedly feel harassed by the mere presence of transgender students in locker and bathroom facilities. This cannot be enough." *Id.* at 1228-29.

An injunction pending appeal is necessary to prevent the irreparable injuries caused by S.B. 1100's violation of equal protection, Title IX, and the right to informational privacy. If this Court denies an injunction pending appeal, seventh-grade student Rebecca Roe faces being irreversibly outed to peers as transgender and ejected from the girls' restroom that she has been able to use under the TRO. Similarly, high school senior A.J., who is president of Plaintiff Sexuality and Gender Alliance at Boise High School ("SAGA"), will be ousted from the boys' restroom that he has used for more than a year now without harming anyone. Without an injunction pending appeal, he may very well graduate from high school with S.B. 1100 in force, and that experience of discrimination is how he will remember high school for the rest of his life.

Notably, the injunction pending appeal would not mandate that any schools adopt any policies, inclusive or otherwise. As with the TRO, it would merely halt the statewide mandate that S.B. 1100 seeks to impose, leaving schools to craft local policies, if any, for their own communities.

## BACKGROUND

### A.    Plaintiffs

Rebecca Roe is a transgender seventh grader who has attended school within Boise School District since kindergarten.  A.54, 60.[2]  Before she began her social transition in fifth grade, Rebecca exhibited signs of depression, struggled socially, and fell behind academically; afterwards, her mental health improved.  A.60-61. As she entered junior high, Rebecca wished to use the girls' restroom, like other girls.  Abruptly terminating her access to those facilities will imperil her mental and physical health; jeopardize her social transition, which is critical to adequately treating gender dysphoria; and violate her right to privacy.  A.56-57, 92-93, 95-96.

Plaintiff SAGA is a student organization that supports LGBTQ students at Boise High School.  A.65.  S.B. 1100 similarly threatens its members, including its president A.J.  Pursuant to district practice in place since at least 2016, transgender students like A.J. have been able to use facilities matching their gender identity. A. 69-71, 172-73.  A.J. used the boys' restroom at school without incident during his junior year, and has continued to do so during his senior year.  A.66.

### B.    Status Quo Before S.B. 1100

In 2015, the Idaho School Boards Association (ISBA) created a model

---

[2] Citations to "A." are to Plaintiffs' Addendum.

policy specifying that students should be permitted "to use the restrooms and

locker rooms that correspond to the gender identity they consistently assert at

school." A.144. Since its issuance, approximately 60 school districts and charter

schools in Idaho have adopted it or similar practices. A.130-131, 151-171.

There is no record evidence that the adoption of inclusive policies and

practices across Idaho schools has caused any harm. ISBA confirmed that schools

adopting inclusive policies have had no reported incidents as a result. A.130-131,

147-150. Experts who work in Idaho schools agree. The President of the Idaho

Association of School Resource Officers testified that he has not seen any evidence

that the inclusive policy adopted in the school district he supports as a School

Resource Officer, nor those adopted in other school districts statewide, have

harmed the privacy or safety of any cisgender student. A.124-125.

The record also included unrebutted testimony from school administrators in

D.C. and Kentucky who have implemented inclusive policies without any privacy

or safety issues. A.101-113.

## C. Enactment of S.B. 1100

S.B. 1100 took shape after a fight in early 2023 about whether Caldwell

School District in Idaho should join the numerous other schools in Idaho that have

adopted inclusive policies. A.151-171. Shortly thereafter, S.B. 1100 was

introduced. In attempting to justify the law, legislators cited hypothetical concerns

about safety and privacy, while simultaneously conceding that there were no "documented cases of trans person violence on non-trans people."  A.132-136.

In order to achieve its objective, S.B. 1100 defines "sex" based solely on chromosomes and reproductive anatomy so that transgender males are regarded as females and transgender females are regarded as males.  Idaho Code § 33-6602 [33-6702].  Based on this definition, S.B. 1100 requires that every public school multiple-occupancy restroom or changing facility must be designated by sex and used only by members of that "sex."  Idaho Code § 33-6603(1) [33-6703].  S.B. 1100 also applies to school-sponsored events with overnight lodging, thus requiring transgender students to "stay in different overnight accommodations." Idaho Code § 33-6603(4) [33-6703]; A.32.

In addition to this statewide mandate, S.B. 1100 creates a private right of action that places a "bounty" on the heads of transgender students.  Any student who encounters someone of the "opposite sex" in covered facilities may obtain statutory damages of at least $5,000.  Idaho Code § 33-6606 [33-6706].

S.B. 1100 requires that schools provide "reasonable accommodations" to anyone who is "unwilling or unable" to use the facilities designated for the person's "sex," but this does not include access to facilities "designated for use by members of the opposite sex."  Idaho Code § 33-6605 [33-6705].

### D.      Proceedings Below

Plaintiffs filed the underlying action and a motion for a preliminary injunction on July 5, 2023.  Plaintiffs also filed a motion for a TRO to preserve the status quo before the start of the school year, which the district court granted.  The court agreed the injunction would merely "preserve[] the status quo" and explained that the TRO was "not mandating or requiring that school districts in Idaho do anything—including adopt policies that would allow students to use restrooms that coincide with their gender identity."  A.43.

The district court subsequently denied a preliminary injunction, holding that Plaintiffs were unlikely to prevail on the merits.  It ordered that the TRO would end, "and S.B. 1100 will take effect, 21 days from the date of this order," which is November 2, 2023.  A.37.

### STANDARD

This Court may "grant[] an injunction while an appeal is pending."  Fed. R. App. P. 8.  The standards for an injunction pending appeal and for a preliminary injunction are the same.  *S.E. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006).  Thus, an injunction pending appeal is warranted where a party has shown (1) a likelihood of success on the merits, (2) likely irreparable harm absent relief, (3) the balance of hardships tips in its favor, and (4) an injunction serves the public interest.  *Humane Soc'y of the U.S. v.*

*Gutierrez*, 523 F.3d 990, 991-92 (9th Cir. 2008).

Alternately, an injunction is appropriate when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

This Court reviews the denial of a preliminary injunction for abuse of discretion, but legal conclusions are reviewed *de novo*. *Aircraft Serv. Int'l, Inc. v. Int'l Bhd. Of Teamsters*, 779 F.3d 1069, 1072 (9th Cir. 2015).

## ARGUMENT

This Court should maintain the pre-S.B. 1100 status quo by granting an injunction pending appeal of the district court's denial of a preliminary injunction, rather than categorically oust all transgender students across the entire State of Idaho from the facilities matching their gender identity, particularly in the middle of the school year. Plaintiffs are likely to succeed on the merits of their appeal, including because the central reasoning of the district court's decision is based on a privacy rationale rejected by circuit precedent as a matter of law. At a minimum, Plaintiffs have raised "serious questions" on the merits, and an injunction pending appeal is warranted because the balance of hardships—including the irreversible outing of transgender students and their exposure to daily discrimination and stigmatization—tips sharply in Plaintiffs' favor.

# I.     Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

Laws that discriminate against a quasi-suspect class must satisfy heightened scrutiny under equal protection. *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019). The court must presume that the law is unconstitutional, and the government bears the heavy burden of proving otherwise. *United States v. Virginia*, 518 U.S. 515, 533 (1996). To do so, the government must show an "exceedingly persuasive justification" in which there is a substantial relationship between the discriminatory means employed and the achievement of important government interests. *Id.* at 534. Where less intrusive means can substantially achieve those interests without discrimination, the law fails heightened scrutiny. *Karnoski*, 926 F.3d at 1200; *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014).

Plaintiffs are likely to succeed because (1) S.B. 1100 discriminates based on transgender status and sex; and (2) S.B. 1100 fails to satisfy heightened scrutiny.

## A.     S.B. 1100 Requires Heightened Scrutiny.

Defendants concede, and the district court agreed, that S.B. 1100 requires heightened scrutiny, at the very least because (a) the law differentiates on the basis of so-called "biological sex," A.11, and (b) that differential treatment causes injury to transgender students because they are denied access to facilities consistent with their gender identity. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1740 (2020) (discrimination requires differential treatment plus injury). Accordingly,

Defendants bear the burden of justifying S.B. 1100.

The district court wrongly held, however, that S.B. 1100 does not discriminate against transgender people. That holding does not lower the level of scrutiny that S.B. 1100 must survive given that the law indisputably requires heightened scrutiny in any event. But it underscores the district court's errors in this case, and the degree to which its decision cannot be reconciled with binding Ninth Circuit precedent.

S.B. 1100 discriminates against transgender people, and thus triggers heightened scrutiny for that reason alone, *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023), because, on the face of the law, they—and they alone—are deprived of facilities matching their gender identity. Both before and after S.B. 1100, cisgender students have access to facilities matching their gender identity; the only change the law seeks to accomplish is with respect to transgender students.

Furthermore, the "text, structure, purpose, and effect" of S.B. 1100 "all demonstrate that the Act categorically bans transgender [people]" from facilities "that correspond with their gender identity." *Hecox*, 79 F.4th at 1022 (upholding preliminary injunction against law barring transgender females from women's student athletics). The law's stated purpose is to separate facilities by "biological sex"—which is expressly defined so that transgender females are treated as males, and transgender males are treated as females. Moreover, Defendants conceded at

oral argument that "[i]t was because districts were making policies" that allowed

students to access facilities based on gender identity "that the legislature passed

S.B. 1100." A.51. As one lead proponent of S.B. 1100 explained: "We hear a lot

of talk about how the transgender are, it's their right to use the bathroom," but

"[w]e believe biological gender to be an essential characteristic of a child's identity

and purpose." A.132-136; *cf. Whitaker*, 858 F.3d at 1048.

S.B. 1100 is thus subject to heightened scrutiny on the independent grounds

that it discriminates against transgender people.

### B. Defendants Failed to Show a Substantial Relationship Between a Statewide Categorical Ban and Protecting Privacy or Safety.

Defendants' proffered justifications for S.B. 1100 fail to satisfy their burden.

Most importantly, they provided no factual support—not a single witness or

document—to substantiate their privacy and safety defenses. Unsupported

legislative predictions that implicate constitutional rights "have not been afforded

deference" by courts. *Latta*, 771 F.3d at 469. And that absence of evidence is

particularly striking given that a significant number of Idaho schools have had, for

many years, inclusive policies and practices. Nevertheless, Defendants could not

show how that status quo in Idaho has caused any harms.

Indeed, the district court admitted that Defendants' asserted privacy

interest—which imagined that some cisgender students might object to seeing or

being seen by transgender students—was already addressed through physical

barriers such as doors on restroom stalls. A.18 ("*often* people in the restroom

would never know the gender identity of the person going into the stall next to

them").  On its own terms, then, the district court's decision fails to justify the

wholesale denial of a preliminary injunction.[3]  As the Fourth Circuit explained, the

government "ignores the reality of how a transgender child uses the bathroom: 'by

entering a stall and closing the door.'"  *Grimm*, 972 F.3d at 613.  Defendants also

failed to prove why less intrusive means—including options for anyone desiring

greater privacy—cannot substantially achieve their interests, without also imposing

a categorical ban on transgender students.  *Cf. Hecox*, 69 F.3th at 1033.  Privacy

and equality are not in a zero-sum game.

　　　　Nevertheless, the district court imagined that cisgender students—no

evidence from whom exists in the record—might object to the mere presence of a

transgender student in a shared facility, even without visual exposure.  It then held

that these hypothetical students' right to privacy would be violated, relying heavily

on the Eleventh Circuit's decision in *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th

791 (11th Cir. 2022).

　　　　This mode of analysis is irreconcilable with Ninth Circuit precedent.  In

---

[3] The district court opined that changing facilities and overnight accommodations were different; but a cisgender student who objects to changing clothes in front others can do so in a restroom, whether in a locker room or overnight accommodation.  Moreover, the only actual evidence in the record shows that schools have successfully implemented inclusive policies without issue.  A.105.

*Parents for Privacy*, this Court rejected the proposition that the right to privacy

encompasses a cognizable right for a cisgender student "not to share restrooms or

locker rooms with transgender students whose sex assigned at birth is different

than theirs." 949 F.3d at 1222. And it held that the "mere presence" of

transgender students does *not* violate the rights of cisgender students. 949 F.3d at

1228-29. Other circuits are in accord. *Grimm*, 972 F.3d at 620 (finding that board

was motivated by plaintiff's "mere presence—a special kind of discrimination

against a child that he will no doubt carry with him for life"); *Whitaker*, 858 F.3d

at 1052. The district court decision cannot be reconciled with *Parents for Privacy*.

     To avoid that fundamental problem, the district court incorrectly described

the holding of *Parents for Privacy*. A.17. The court stated that, in that case, "the

school district's policy did not infringe on the privacy rights of petitioners because

accommodations were available for any student who did not want to share facilities

with a transgender student." A.17. But while *Parents for Privacy* mentioned those

accommodations as reinforcing its ultimate conclusion, it only did so *after* making

clear that the right to privacy itself did not include avoiding "any risk of bodily

exposure to a transgender student in school facilities." 949 F.3d at 1225.

     Furthermore, all of the unrebutted record evidence confirms that a

preliminary injunction enjoining S.B. 1100's statewide categorical ban will not

imperil privacy or safety. That evidence includes testimony from Idaho law

enforcement and other school administrators who have significant experience with inclusive policies and who confirm they do not cause any harms. A.101-113, 121-126. It also includes the testimony of A.J., who used the boys' facilities matching his gender identity for his junior year, without incident. A.66; *cf. Grimm*, 972 F.3d at 614. Defendants' justifications rest on speculation and conjecture that are empirically disproven by real-world experiences.

Finally, any justification based solely on safety fares no better than one based on privacy. There is no evidence that inclusive policies in Idaho have led to cisgender students pretending to be transgender to gain access to facilities designated for another sex. A.124-125; *cf. Hecox*, 79 F.4th at 1035. And law enforcement already possess the tools to respond to any student misconduct. A.123-124. In fact, it is transgender students, rather than their cisgender peers, who are at higher risk of harassment and violence as a result of discrimination. A.88-90, 122-123. Excluding transgender students from facilities matching their gender identity can disclose to others that the student is transgender. A.98, 122-123. That is one reason, among many, why forcing transgender students to use only "alternative" facilities is uniquely damaging and stigmatizing.[4]

---

[4] The unrebutted harms from that exclusion—including heightened suicidality for transgender youth, A.94—are incomparable to the potentially "less convenient" additional facilities made available to cisgender students objecting to the mere presence of transgender students in *Parents for Privacy*. 949 F.3d at 1225.

## II.    Plaintiffs Are Likely to Prevail on Their Title IX Claim.

The district court held Plaintiffs are unlikely to succeed in showing S.B.

1100 violates Title IX's prohibition on discrimination "on the basis of sex."  20

U.S.C. § 1681.  That conclusion is at odds with the majority of federal circuits,

irreconcilable with Ninth Circuit precedent, and rests on an interpretation of Title

IX that would sanction unprecedented discrimination against transgender people.

### A.    Under Ninth Circuit Precedent, S.B. 1100 Violates Title IX's Prohibition on Sex-Based Discrimination.

Four sister circuits (the Third, Fourth, Sixth, and Seventh) have held or

acknowledged that excluding transgender students from facilities matching their

gender identity also violates Title IX.  *See Grimm*, 972 F.3d at 619; *Whitaker*, 858

F.3d at 1050; *A.C.*, 75 F.4th at 770; *Doe v. Boyertown Area School Dist*, 897 F.3d

518, 533 (3d Cir. 2018); *Dodds*, 845 F.3d at 221.  Only the Eleventh has disagreed.

*See Adams*, 57 F.4th 811-12.

The Ninth Circuit has not decided this specific issue.  But, citing *Grimm*, it

has held that *Bostock*'s analysis—holding that discrimination against transgender

people is a form of sex discrimination—applies to Title IX.  *See Grabowski v. Ariz.*

*Bd. of Regents*, 69 F.4th 1110, 1116 & n.1 (9th Cir. 2023); *accord Doe v. Snyder*,

28 F.4th 103, 114 (9th Cir. 2022).

That holding largely resolves this appeal.  Every Circuit to hold that Title IX

prohibits discrimination against transgender people has recognized that

transgender-exclusive facilities policies violate Title IX. *Adams*, by contrast,

declined to hold that *Bostock* applies to Title IX at all. 57 F.4th at 811-14; *A.C.*, 75

F.4th at 775 (Easterbrook, J., concurring) ("My colleagues express confidence that

Title VII and Title IX use 'sex' in the same way. . . . The majority in *Adams* was

equally confident of the opposite proposition.") That route is foreclosed in this

Circuit. The Ninth Circuit should follow the majority of federal courts of appeal to

hold that S.B. 1100 violates Title IX.

### B. Provisions Under Title IX Allowing Sex-Separated Facilities Do Not Sanction Discrimination Against Transgender People.

Even if S.B. 1100 were sex discrimination under Title IX, the District Court

held that three provisions nevertheless authorize it: 20 U.S.C. § 1686 (schools may

"separate living facilities for the different sexes"), 34 C.F.R. § 106.33 (schools

may "provide separate toilet, locker room, and shower facilities on the basis of

sex"), and 34 C.F.R. § 106.32(b) (schools may "provide separate housing on the

basis of sex"). That conclusion, too, is at odds with the majority of federal circuits

and untenable in the Ninth Circuit.

As the Fourth and Seventh Circuits have held, these provisions are "broad

statement[s]" "that the act of creating sex-separated restrooms in and of itself is not

discriminatory." *Grimm*, 972 F.3d at 618 n.16. They do not authorize "schools

[to] act in an arbitrary or discriminatory manner when dividing students into those

sex-separated facilities." *Id.; A.C.*, 75 F.4th at 770.

Although the Ninth Circuit has not directly answered this question, it has endorsed *Grimm* and *A.C's* reasoning.

As the Seventh Circuit explained, Title IX does not define "sex," let alone state that "sex" must be understood to allow excluding transgender students from facilities aligned with their gender identity. *See A.C.*, 75 F.4th at 770 ("[T]he question [here] is different: who counts as a 'boy' for the boys' rooms, and who counts as a 'girl' for the girls' rooms—essentially, how do we sort by gender? The statute says nothing on this topic.") *Adams* held the opposite: that Title IX "must" be read to allow separation based only on "biological sex." 57 F.4th at 815.

The Ninth Circuit's understanding of this text accords with *A.C.*, not *Adams*. In *Parents for Privacy*, the plaintiff relied on the same statutory and regulatory provisions. 949 F.3d at 1227. This Court first observed that these regulations at most *allow* a school to do something, not require it. But it also went further, explaining that "[j]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, *let alone that they must be segregated based only on biological sex and cannot accommodate gender identity*." *Id.* (emphasis added). This statement acknowledged, in line with the Fourth and Seventh Circuits, that "sex" in the applicable provisions need not be read as "biological sex" so as to fail to "accommodate gender identity." *Id.*

Beyond the meanings of isolated words, this Court also looks to, *inter alia*,

18

"the broader context of [a] statute as a whole" to interpret it. *United States v. Pacheco*, 977 F.3d 764, 767-68 (9th Cir. 2020). Interpreting the provisions the district court cited not just to allow sex-separated facilities, but to specifically sanction "segregat[ion] based only on biological sex," *Parents for Privacy*, 949 F.3d at 1227, places them in direct conflict with Title IX's anti-discrimination mandate, because it would authorize sex-based harm against transgender people. *See Grimm*, 972 F.3d at 618. In light of that obvious tension, no circuit court has held *both* that Title IX protects transgender people from discrimination *and* that these statutory and regulatory provisions nevertheless authorize policies like S.B. 1100.

Finally, the district court did not grapple with key arguments made in the United States' Statement of Interest, that (1) Section 1686's reference to "living facilities" does not include restrooms and locker rooms; and (2) 34 C.F.R. § 106.33, which does, is an implementing regulation of Section 1682 (rather than Section 1686) that cannot be read to authorize discrimination prohibited by that provision. A.187-88.

## III. Plaintiffs Are Likely to Succeed on Their Privacy Claim.

By excluding transgender people from facilities matching their gender identity, and consigning them to other facilities that can reveal their sex assigned at birth, S.B. 1100 exposes their transgender status to others in violation of their

constitutional right to privacy.  The district court agreed:  "It is true this may

occur."  A.30.  Indeed, it also agreed Plaintiffs' legal "argument makes sense"

because information about one's gender identity "is personal and private."  A.31.

The *only* reason that the district court found that Plaintiffs were unlikely to

prevail on their privacy claim is because it believed that there was not a

fundamental liberty interest at stake.  A.31.  That is incorrect.  "Ninth Circuit cases

have uniformly recognized a constitutional right to informational privacy."  *Doe v.*

*Cnty. of San Diego*, 576 F. Supp. 3d 721, 733 (S.D. Cal. 2021); *see, e.g.*, *Tucson*

*Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004).

Furthermore, virtually every federal court to consider the issue has also held

that one's transgender status is entitled to constitutional privacy protection.  "The

excruciatingly private and intimate nature of transsexualism, for persons who wish

to preserve privacy in the matter, is really beyond debate."  *Powell v. Schriver*, 175

F.3d 107, 111 (2d Cir. 1999).  That is why courts have held that government

actions that can involuntarily disclose that status violate transgender people's

constitutional right to privacy.  *See, e.g.*, *Ray v. McCloud*, 507 F. Supp. 3d 925,

931-32 (S.D. Ohio 2020); ECF 15-1 at 18 (collecting cases).  The only case cited

by the district court concerned whether there was a *state* constitutional privacy

right in one's gender identity.  A.31.

The disclosure of one's transgender status, particularly in circumstances

where one would otherwise keep that information private, can provoke intense
"hostility and intolerance from others." *Powell*, 175 F.3d at 111. Given the
seriousness of these harms—and the irreversible nature of a privacy violation—an
injunction pending appeal is uniquely warranted here.

## IV.   The Remaining Factors Strongly Favor an Injunction Pending Appeal.

The district court held that both parties had shown in equal measure that
"harm may result" from its decision; and that Plaintiffs' evidence was
"specula[tive]." A.32. Both conclusions are demonstrably erroneous and an abuse
of discretion given the record evidence.

Plaintiffs provided unrebutted evidence of irreparable harm—specifically
that, should S.B. 1100 take effect, they face outing, stigma, and bullying; severe
mental health risks; and impaired academic performance. A.72-100. Like the
Third, Fourth, Sixth, and Seventh Circuits, this Court has acknowledged these
harms. *See Parents for Privacy*, 949 F.3d at 1217 ("Defendants and many *amici*
highlight the importance of the policy for creating a safe, non-discriminatory
school environment for transgender students that avoids the detrimental physical
and mental health effects" that result from exclusionary policies).

Plaintiffs also produced unrebutted evidence that single-occupancy
restrooms do not ameliorate these harms. *See, e.g.*, A.56 (explaining that use of
nurse's restroom "felt stigmatizing and isolating"); A.57; *see also* A.65, 67; A.92-

97.  Courts agree.  *See Whitaker*, 858 F.3d at 1045; *Grimm*, 972 F.3d at 617-18.

Although many Idaho schools have long had inclusive policies and practices, Defendants produced no evidence that they have harmed cisgender students. Plaintiffs produced unrebutted expert testimony from a leading Idaho school policing official that inclusive policies in Idaho have caused no problems and "are important to protect the safety of transgender youth."  A.122.

The district court's findings were irreconcilable with this record.  While the court stated "neither party was able to identify any *specific* instances of harm befalling transgender, or cisgender, students in Idaho," A.32, Plaintiffs clearly showed that Rebecca and A.J. *will* face immediate harm from S.B. 1100.

At most, Defendants questioned only one aspect of one of these harms— whether *all* transgender students have a need to socially transition—on the purported grounds that gender dysphoria may desist for *some*.  But there was no dispute among the experts that transgender youth whose gender dysphoria persists have a need to transition and that interference with doing so causes serious harm. Moreover, this Court has acknowledged that "[l]iving in a manner consistent with one's gender identity is a key aspect of treatment for gender dysphoria."  *Karnoski*, 926 F.3d at 1187 n.1; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (relying upon standards of care for treatment of gender dysphoria).  The district court's wholesale rejection of Plaintiffs' evidence was clearly erroneous

and irreconcilable with these cases.

Finally, the court erroneously concluded that Defendants face comparable

harm if S.B. 1100 is enjoined. But the notion that the mere presence of

transgender people in facilities constitutes harm is factually and legally untenable.

*Parents for Privacy*, 949 F.3d at 1228-29; *Whitaker*, 858 F.3d at 1052-53. Instead,

as in *Hecox*, an injunction here does "not appear to inflict any comparable harm"

because it "expressly maintain[s] the status quo." 79 F.4th at 1036.

## CONCLUSION

An injunction pending appeal should be entered to maintain the status quo.

Dated: October 16, 2023        Respectfully submitted,

/s/ Peter C. Renn
Peter C. Renn
Kell Olson[†]
Tara L. Borelli[†]
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
4221 Wilshire Blvd, Suite 280
Los Angeles, CA 90010
[†]*Mailing address only*
(213) 382-7600

Samuel L. Linnet
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Katherine M. Forster
Robyn K. Bacon
Nicholas R. Sidney
Paul Martin
Avery P. Hitchcock
Jimmy P. Biblarz
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071
(213) 683-9100

J. Max Rosen
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000

*Counsel for Plaintiffs-Appellants*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,200 words. This Motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

/s/ Peter C. Renn
Peter C. Renn

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on October 16, 2023, and that service will be accomplished by the appellate ACMS system on all registered participants.

/s/ Peter C. Renn
Peter C. Renn