Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
111 N 1st Avenue, Suite 2I
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Pelecanos*†
pelecanos@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†mailing address only
(213) 382-7600 (T) | (213) 402-2537 (F)

*admitted pro hac vice or forthcoming

Attorneys for Plaintiff

Katherine M. Forster*
katherine.forster@mto.com
Paul E. Martin*
paul.martin@mto.com
Elizabeth Anastasi*
elizabeth.anastasi@mto.com
Abigail K. Bessler*
abigail.bessler@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SEXUALITY AND GENDER ALLIANCE,<br><br>*Plaintiff*,<br><br>v.<br><br>DEBBIE CRITCHFIELD, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-00315-DCN<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER**<br><br>**(Relief Requested by August 11, 2025)** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND..............................................................................................2

I.   BARRING TRANSGENDER MEMBERS OF SAGA FROM RESTROOMS
     THAT ALIGN WITH THEIR GENDER IDENTITY CAUSES THEM SERIOUS
     HARM...............................................................................................................2

II.  FOR YEARS, BOISE SCHOOLS HAVE PERMITTED TRANSGENDER
     STUDENTS TO USE RESTROOMS MATCHING THEIR GENDER
     IDENTITY........................................................................................................3

III. S.B. 1100 PROHIBITS TRANSGENDER STUDENTS FROM USING SEX-
     DESIGNATED FACILITIES THAT MATCH THEIR GENDER IDENTITY. ...............4

IV.  IDAHO HAS NEVER PRODUCED EVIDENCE TO SUBSTANTIATE AN
     INTEREST IN APPLYING S.B. 1100 TO RESTROOMS. ..................................5

V.   S.B. 1100 WILL IRREPARABLY HARM MEMBERS OF PLAINTIFF SAGA. ...........6

PROCEDURAL BACKGROUND.......................................................................................7

STANDARD.......................................................................................................................10

ARGUMENT .....................................................................................................................10

I.   PLAINTIFF IS LIKELY TO SUCCEED ON ITS EQUAL PROTECTION
     CLAIM AS APPLIED TO RESTROOMS........................................................10

     A.   S.B. 1100 Triggers Heightened Scrutiny Because It Discriminates Against
          Transgender People Based on Transgender Status and Sex. ................................11

     B.   Applying S.B. 1100 To Bar Transgender Students In Boise High School
          From Using Restrooms Aligned With Their Gender Identity Is Not
          Substantially Related to an Important Government Interest...................................12

II.  PLAINTIFF IS LIKELY TO SUCCEED ON ITS TITLE IX CLAIM. ...........................15

III. THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION. ................18

     A.   Enforcing S.B. 1100's Restroom Exclusion Will Cause Irreparable Harm..........18

     B.   The Balance of Hardships and Public Interest Favor the Narrow
          Injunction. ..........................................................................................................19

IV.  THE COURT SHOULD GRANT RELIEF (OR A TRO) BY AUGUST 11...................20

CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023) ................................................................16

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ...........................................................8, 10

*In re Amy,*
    714 F.3d 1165 (9th Cir. 2013) ...............................................................12

*Dodds v. United States Dep't of Educ.,*
    845 F.3d 217 (6th Cir. 2016) .................................................................18

*Doe v. Horne,*
    683 F. Supp. 3d 950 (9th Cir. 2024) .....................................................18

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 1092 (9th Cir. 2014) .................................................10, 19

*F.V. v. Barron,*
    286 F. Supp. 3d 1131 (D. Idaho 2018) .................................................19

*Gonzales v. Carhart,*
    550 U.S. 124 ..........................................................................................12

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ....................................................11, 14, 16

*Hecox v. Little,*
    79 F.4th 1009 (9th Cir. 2024) ................................................................14

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) .................................................................18

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .................................................................................6

*Int'l Franchise Ass'n, Inc. v. City of Seattle,*
    803 F.3d 389 (9th Cir. 2015) .................................................................10

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) ...............................................................11

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) .............................................................19

*Lair v. Bullock,*
    697 F.3d 1200 (9th Cir. 2012) .............................................................................12

*Latta v. Otter,*
    19 F. Supp. 3d 1054 (D. Idaho 2014) ...................................................................11

*Latta v. Otter,*
    771 F.3d 456 (9th Cir. 2014) .........................................................................11, 12

*Loper Bright Enters. U. Raimondo,*
    603 U.S. 369, 371 (2024) .....................................................................................16

*Parents for Priv. v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) .............................................................................13

*Planned Parenthood Arizona, Inc. v. Humble,*
    753 F.3d 905 (9th Cir. 2014) ...............................................................................18

*Powell v. Schriver,*
    175 F.3d 107 (2d Cir. 1999) ................................................................................19

*Regents of Univ. of California v. Am. Broad. Cos. Inc.,*
    747 F.2d 511 (9th Cir. 1984) ...............................................................................10

*Roe v. Critchfield,*
    131 F.4th 975 (9th Cir. 2025) ...........................................................................9, 17

*Roe v. Critchfield,*
    137 F.4th 912 (9th Cir. 2025) ...................................................................... 6, passim

*Roe v. Critchfield,*
    2023 WL 6690596 (D. Idaho Oct. 12, 2023) ............................................... 7, passim

*Silvester v. Harris,*
    2014 WL 6611592 (E.D. Cal. Nov. 20, 2014) .....................................................19

*United States v. Skrmetti,*
    605 U.S. ___, 145 S. Ct. 1816 (2025) .................................................................12

*United States v. Virginia,*
    518 U.S. 515 (1996) .......................................................................................11, 12

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ..........................................................9, 13, 14, 18

**FEDERAL STATUTES**

20 U.S.C. § 1681 ....................................................................................... 9, passim

20 U.S.C. § 1686 ........................................................................................... 9, passim

**STATE STATUTES**

Idaho Code Ann. §§ 33-6701 *et seq* ......................................................................... 7

**FEDERAL REGULATIONS**

34 C.F.R. § 106.33 ..................................................................................... 15, 16, 17

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XIV ............................................................................... 11

**OTHER AUTHORITIES**

*Webster's Third New International Dictionary* (1968) ................................................ 17

## INTRODUCTION

In 2023, Idaho passed S.B. 1100, which prohibits transgender students from using various facilities aligned with their gender identity—including locker rooms, overnight facilities, and restrooms. S.B. 1100 upends the status quo across Idaho, and in particular at Boise High School, where transgender students have long had access to facilities matching their gender identity.

In October 2023, this Court denied Plaintiff Boise High School Sexuality and Gender Alliance's ("SAGA" or "Plaintiff")[1] motion for a broad preliminary injunction that would have prohibited application of S.B. 1100 as to all regulated facilities with respect to all transgender students in Idaho. On May 23, 2025, the Ninth Circuit affirmed. It held that Idaho may have a governmental interest in privacy for S.B. 1100's application to some of the facilities S.B. 1100 covers, such as locker rooms, and thus Plaintiffs were not entitled to the facial injunction they sought. But the Court expressly declined to hold that applying S.B. 1100 to *restrooms* specifically would survive intermediate scrutiny. Instead, the Court acknowledged that restrooms do not present the same privacy concerns as in locker rooms or communal showers and quoted favorably from decisions in other circuits approving injunctions of similar laws or policies as applied to restrooms.

Plaintiff now seeks a narrow preliminary injunction as this case proceeds. Plaintiff asks the Court to enjoin S.B. 1100's enforcement in restrooms at Boise High School, which SAGA's members attend. The injunction would not apply to other spaces regulated by S.B. 1100, including locker rooms, communal showers, and overnight trips. Nor would it apply to other schools across the state where Plaintiff does not have members. Such a narrow injunction is consistent with—and indeed, compelled by—the logic of the Ninth Circuit's opinion.

---

[1] Plaintiff Rebecca Roe was voluntarily dismissed on July 29, 2024. Dkt. No. 77.

Boise High School will begin its 2025-2026 school year on August 12. **Plaintiff thus specifically requests that the Court grant the requested preliminary injunction on or before August 11. Alternatively, Plaintiff asks that the Court grant a temporary restraining order to preserve the status quo as to restrooms at Boise High pending resolution of this motion.**

## FACTUAL BACKGROUND

I.   **BARRING TRANSGENDER MEMBERS OF SAGA FROM RESTROOMS THAT ALIGN WITH THEIR GENDER IDENTITY CAUSES THEM SERIOUS HARM.**

As Plaintiff explained in its original motion, people are typically assigned a sex designation at birth based on the appearance of external genitalia—often called their "sex assigned at birth." Decl. of Stephanie Budge, Ph.D. ¶¶ 19, 22. Gender identity, in turn, refers to a person's internal or psychological sense of having a particular gender. *Id.* ¶ 17. Most people are "cisgender," meaning their gender identity aligns with their sex assigned at birth. But some people are transgender, meaning their gender identity differs from their sex assigned at birth. *Id.* ¶ 19. Like cisgender people, transgender people experience a consistent, persistent, and insistent sense of being their gender. *Id.* ¶ 20.

Excluding transgender students from restrooms that match their gender identity harms their health in many ways. *See generally id.* It inflicts profound psychological damage—causing students to feel rejected, stigmatized, and shamed, and leads to increased depression, anxiety, and suicidal ideation. *Id.* ¶ 53. As one SAGA member explains, it feels "alienating, like I'm an outsider." Decl. of Jane Doe ¶ 13 ("J.D. Decl."). That harm is amplified, rather than cured, by forcing transgender students to use single-user facilities. J.D. Decl. ¶ 13; Budge Decl. ¶ 45. Some individuals who experienced misgendering or discrimination have described it as "like a visceral, violating, physical manifestation of psychological pain for me" and "each of those [misgenderings] is a knife." Budge Decl. ¶¶ 32–33. In research where transgender youth were

prevented or discouraged from using restrooms matching their gender identity, 60% seriously considered suicide. *Id.* ¶ 51.

There are other harms as well. Excluding transgender students from restrooms consistent with their gender identity leads to avoidance of restrooms, including restricting fluid intake, which may harm a student's health and impair their ability to learn. Budge Decl. ¶¶ 62–63. It can also exacerbate the distress that transgender youth experience from the mismatch between their gender identity and assigned sex. *Id.* ¶¶ 24–26, 58. Additionally, it can expose these students to external threats. Transgender people regularly face harassment and victimization in restrooms when they are perceived not to belong. *Id.* ¶ 50. For instance, in situations where a transgender boy needs to use a multi-user restroom, including when a gender-neutral facility is unavailable or inaccessible, he would be perceived by his peers to be using the *wrong* restroom, because the law assigns him to the girl's restroom even though his gender expression is male. *Id.*

## II.   FOR YEARS, BOISE SCHOOLS HAVE PERMITTED TRANSGENDER STUDENTS TO USE RESTROOMS MATCHING THEIR GENDER IDENTITY.

Before S.B. 1100 was passed, many schools in Idaho had inclusive policies and practices that allowed transgender students to use restrooms corresponding to their gender identity, and no school had adopted a policy excluding transgender students from using restrooms aligned with their gender identity. Decl. of Jimmy Biblarz (Dkt. No. 15-9) ("Biblarz Decl.") ¶ 7, Ex. 5. In 2015, the Idaho School Boards Association (ISBA) created Policy 3281, which specified that students should be permitted "to use," *inter alia*, restrooms "that correspond to the gender identity they consistently assert at school." *Id.*, Ex. 2. Since Policy 3281 was issued, a significant number of school districts adopted it or implemented practices that align with it. *Id.* ¶ 7, Ex. 5. Boise School District implemented a practice in 2016 under which transgender students can develop a gender support plan confirming their use of the restroom matching their gender

identity. *Id.*, Ex. 7; Decl. of A.J. (Dkt. No. 15-4) ("A.J. Decl."), Ex. A. As a result of injunctions

from this Court and the Ninth Circuit, which issued its mandate on June 2, 2025, S.B. 1100 has

never been legally applied to transgender people in Boise High School during the school year.

There is no evidence that inclusive policies and practices across Idaho schools,

generally, or in Boise, specifically, have caused any harm to any student. That was true at the

time S.B. 1100 was passed; it was true when SAGA first moved for a preliminary injunction; and

it remains true today. ISBA itself has confirmed that schools adopting inclusive policies have

had no reported incidents as a result. Biblarz Decl., Ex. 4; *see also* A.J. Decl. ¶ 8 (noting that

former Boise High student A.J. used the restroom matching his gender identity without incident).

### III.  S.B. 1100 PROHIBITS TRANSGENDER STUDENTS FROM USING SEX-DESIGNATED FACILITIES THAT MATCH THEIR GENDER IDENTITY.

On February 23, 2023, Idaho passed S.B. 1100. This Court is well-versed in its

provisions, but Plaintiff summarizes them for completeness. S.B. 1100 permits students in Idaho

public schools to use only multi-occupancy restrooms and "changing facilities" designated for

their "biological sex." 33-6703; 73-114(2)(n).[2] "Biological sex" is defined solely based on

chromosomes and reproductive anatomy at birth. 73-114(2)(e), (g). The definition does not allow

schools to account for a student's gender expression, present-day sex characteristics, or how the

student is perceived in the school community. "Changing facilities" is defined to include locker

rooms, changing rooms, and shower rooms. 33-6702(1). The same prohibition applies to

overnight lodging during school-authorized activities. 33-6703(4).

In addition to this statewide mandate, S.B. 1100 also creates a private right of action that

places a "bounty" on the heads of transgender students. Any student who encounters someone of

---

[2] Citations to S.B. 1100, and cross-referenced provisions, are to the Idaho Code.

the "opposite sex" in a school restroom may obtain statutory damages of at least $5,000. 33-6706. S.B. 1100 also requires that schools provide "reasonable accommodations" to anyone who is "unwilling or unable" to use the facilities designated for the person's "sex," but this does not include access to facilities "designated for use by members of the opposite sex while persons of the opposite sex are present or could be present." 33-6705.[3]

## IV.    IDAHO HAS NEVER PRODUCED EVIDENCE TO SUBSTANTIATE AN INTEREST IN APPLYING S.B. 1100 TO RESTROOMS.

Idaho has never produced any evidence that applying S.B. 1100 to bar transgender students from using restrooms aligned with their gender identity is substantially related to any governmental interest. No such evidence appears in the legislative history of S.B. 1100. That bill took shape shortly after a public fight in Idaho in early 2023 about whether Caldwell School District should join the other schools in Idaho that have adopted an inclusive policy with respect to transgender students. Biblarz Decl., Ex. 5. At a school board meeting, Senator Chris Trakel asserted that such a policy would jeopardize children's "moral health." Biblarz Decl. ¶ 6. Senator Cindy Carlson sent a public letter to Superintendent of Public Instruction Debbie Critchfield, urging Critchfield to take action against enforcement of inclusive policies, and declaring, "[w]e need to send the message" about kids not being "indoctrinate[d]" with "this garbage." *Id.*, Ex. 6.

Shortly thereafter, S.B. 1100 was introduced in the Senate, racing through the Legislature in a month. Senator Trakel stated that "[w]e believe biological gender to be an essential characteristic of a child's identity and purpose." *Id.* ¶ 13. One supporter testified that "God made man and woman . . . and eventually men and women made men's and women's bathrooms for men and women," and that "We either have Part A or Part B. Let's keep it simple." *Id.*

---

[3] S.B. 1100 also lays out various exemptions, including for workers cleaning a restroom and for coaching staff during athletic events. 33-6704. None provides transgender students with equal access to restrooms matching their gender identity. 33-6704; Biblarz Decl. ¶ 13.

S.B. 1100 includes legislative "findings" that allowing transgender students to use facilities matching their gender identity would "increas[e] the likelihood of sexual assault, molestation, rape, voyeurism, and exhibitionism" and cause "potential embarrassment, shame, and psychological injury to students." 33-6701(2-5). In attempting to justify the law, legislators cited hypothetical concerns about safety. But these same Legislators conceded that were no "documented cases of trans person violence on non-trans people." Dkt. 15-9 at 9.

When Plaintiff first moved for a preliminary injunction in this case in 2023, Idaho produced no evidence that S.B. 1100 bears any relationship to safety concerns. The Ninth Circuit agreed: it found no evidence in the record to substantiate S.B. 1100's purported safety justifications. *Roe v. Critchfield*, 137 F.4th 912, 924 n.8 (9th Cir. 2025).

## V.     S.B. 1100 WILL IRREPARABLY HARM MEMBERS OF PLAINTIFF SAGA.

Plaintiff SAGA is a student organization focused on supporting, uplifting, and representing lesbian, gay, bisexual, transgender, and queer (LGBTQ) students at Boise High School. J.D. Decl. ¶ 2; *see also* Dkt. 15-4 (A.J. Decl. ¶ 2). One of SAGA's goals is to ensure that LGBTQ students are safe and welcome at school. There are transgender members of SAGA, including current member Jane Doe.[4]

Jane Doe is a 16-year-old transgender girl who attends Boise High School and will be starting her junior year in the fall. J.D. Decl. ¶ 2. Jane lives as female, has long hair, and has received gender-affirming hormone therapy. J.D. Decl. ¶ 11. Jane wishes to have access to the girl's restroom at school. When she was early in her transition, Jane would avoid using the school restroom during the school day. J.D. Decl. ¶ 12. When she did use the boy's restroom, it

---

[4] SAGA has standing to seek relief because of the injuries that S.B. 1100 inflicts on the organization, including its transgender members who are excluded from facilities matching their gender identity. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 341–42 (1977).

was a "terrible experience" because it was "scary" to risk someone seeing her and also "made [her] feel dysphoric." J.D. Decl. ¶ 12. Boise High has a gender-neutral restroom in a nurse's office and in one building that requires a code for access, but having to use only these facilities can not only make Jane late for class because they are further away, but also alienates her from her peers and makes her stand out as a transgender student. J.D. Decl. ¶ 13. Jane is worried about a lack of privacy and about harassment from male students, and believes it would cause male students to feel uncomfortable, should Jane—who lives as a girl and has feminine features—use the boy's restroom. J.D. Decl. ¶ 14.[5]

## **PROCEDURAL BACKGROUND**

Plaintiff filed the operative complaint on July 7, 2023. Dkt. No. 1. Before the start of the 2023–24 school year, Plaintiff moved for a preliminary injunction to preserve the pre-S.B. 1100 status quo statewide, seeking relief with respect to every school, student, and covered facility. Dkt. No. 15. Plaintiff's facial challenge to S.B. 1100 encompassed the law's application to locker rooms, changing facilities, and overnight accommodations. *See* Idaho Code Ann. §§ 33-6701 *et seq*. This Court granted a temporary restraining order but denied Plaintiff's motion for preliminary injunction and also denied Defendants' motion to dismiss. Dkt. No. 60.

In its preliminary injunction order, the Court held that S.B. 1100 did not discriminate on the basis of transgender status, but it applied heightened scrutiny because of the law's basis in "sex." *Roe v. Critchfield*, 2023 WL 6690596, at *6 (D. Idaho Oct. 12, 2023). Applying intermediate scrutiny, the Court noted that restrooms might not present significant privacy

---

[5] Plaintiff previously submitted the declaration of A.J., a transgender boy and member of SAGA, who used the boys' restroom without incident, and who described the harms he would face if prohibited from using the boy's restrooms. *See* Dkt. 15-4 at ¶¶ 9-10. A.J. has since graduated, but his experience remains relevant to show relief is warranted.

concerns because of the widespread use of stalls, but that "the same cannot be clearly said of shared changing facilities and overnight accommodations." *Id.* at 9. Accordingly, the Court found that some applications of S.B. 1100 were substantially related to the governmental objective of protecting student privacy. The Court also reasoned that applying S.B. 1100 to transgender students did not violate Title IX. *Id.* at 15.

Plaintiff secured an injunction pending appeal, which remained in effect through the end of the 2024-25 school year. Dkt. No. 74 (injunction); Dkt. No. 82 (mandate). On May 23, 2025, the Ninth Circuit (in an amended opinion) affirmed. *Critchfield*, 137 F.4th at 919.

The Ninth Circuit first held that S.B. 1100 indeed discriminates on the basis of both transgender status and sex, triggering heightened scrutiny under each framework. *Critchfield*, 137 F.4th at 922–23. Applying heightened scrutiny, the Court interpreted Plaintiff's motion to present a facial challenge to S.B. 1100. That meant that, to prevail, "SAGA must show that S.B. 1100's mandated sex-segregation of *all* covered facilities is unconstitutional; its equal protection claim fails if S.B. 1100's application to *any* of the covered facilities survives intermediate scrutiny." *Id.* at 924–25 (emphasis added). The Ninth Circuit framed narrowly the pertinent governmental interest in enforcing S.B. 1100 as "privacy," finding "no evidence in the record" to support a "safety" rationale as to any of the law's applications. *Id.* at 924 n.8. The Court defined that privacy interest as shielding students from exposure to the unclothed bodies of the opposite sex, concluding that that interest is "most strongly implicated" in "locker rooms and communal shower rooms that lack curtains or stalls," where such exposure is likely. *Id.* at 925. Because it "[saw] no argument at this stage" that S.B. 1100 was not substantially related to this interest in those unpartitioned spaces, Plaintiff was not entitled to a facial injunction. *Id.*

The Court clarified that its holding did not apply to restrooms, specifically. The Court did

"not presume that S.B. 1100's application to each type of facility will be substantially related to the State's objective of protecting student privacy." *Id.* at 924. The Court "acknowledged, as the district court did, that the use of restrooms, locker rooms, shower rooms, and overnight accommodations do not present uniform risks of bodily exposure." *Id.* And the Court quoted with approval the Seventh Circuit's observation that "the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Id.* at 924 (quoting *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017).

The Ninth Circuit separately held that Plaintiff had not shown that all of S.B. 1100's applications to transgender people likely violated Title IX. The Court agreed that S.B. 1100 constituted sex-based discrimination under *Bostock* and Title IX. *Id.* at 928. But in the Court's estimation, 20 U.S.C. § 1686 operates as a statutory carve-out from § 1681(a)'s prohibition on sex-based discrimination. 137 F.4th at 930; 20 U.S.C. § 1686 ("[N]othing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate *living facilities* for the different sexes." (emphasis added)). The Court initially, in a since-amended opinion, stated that § 1686's carve-out might extend to "restrooms, changing rooms, and communal showers." *Roe v. Critchfield*, 131 F.4th 975, 993 (9th Cir. 2025). On April 10, 2025, Plaintiff narrowly petitioned for panel rehearing, arguing that restrooms are not "living facilities" under the plain text of that term; that § 1686 does not reach any facilities other than "living facilities"; and that the Court had no need to suggest otherwise to deny the facial injunction. *Critchfield*, No. 23-2807, Dkt. 115. On May 23, 2025, the panel amended its opinion to remove the cited text. The amended opinion states only that "living facilities" are not unambiguously limited to "dormitories" (and thus could encompass overnight lodging on school

trips). *Critchfield*, 137 F.4th at 918–19. It no longer suggests restrooms are covered by § 1686.

## STANDARD

A preliminary injunction is warranted where a party has shown that "(1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of hardships tips in its favor, and (4) a preliminary injunction is in the public interest." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 1092 (9th Cir. 2014).

Alternately, a preliminary injunction is also appropriate when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," combined with a likelihood of irreparable injury and a showing that the injunction serves the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

A plaintiff may seek a preliminary injunction narrower than the total relief requested in the complaint, as the Plaintiff does here.[6] *See, e.g.*, *Regents of Univ. of California v. Am. Broad. Cos. Inc.*, 747 F.2d 511, 512–13 (9th Cir. 1984) (affirming, in a challenge to a sports broadcasting contract, a "narrow preliminary injunction" that applied to one game).

## ARGUMENT

**I.    PLAINTIFF IS LIKELY TO SUCCEED ON ITS EQUAL PROTECTION CLAIM AS APPLIED TO RESTROOMS.**

The Equal Protection Clause guards against state action that singles out vulnerable groups for unequal treatment, promising that no person shall be denied "the equal protection of the

---

[6] Plaintiff does not believe an amendment to the complaint is necessary to pursue this tailored injunction, which falls within the scope of the claims already pleaded and is narrower than them. Complaint ¶¶ 103, 124 (seeking as applied and facial relief). Should this Court conclude otherwise, Plaintiff respectfully requests leave to amend as needed.

laws." U.S. Const. amend. XIV. When a statute discriminates based on a quasi-suspect

classification—for example, sex or transgender status—heightened scrutiny applies. Courts treat

such a law as presumptively invalid, and the government bears the burden of justification. *United

States v. Virginia*, 518 U.S. 515, 531–33 (1996); *Karnoski v. Trump*, 926 F.3d 1180, 1200–01

(9th Cir. 2019). To overcome heightened scrutiny, the government's justification must be

"exceedingly persuasive," and it must show that the challenged classification serves an important

governmental objective and that the discriminatory means are "substantially related" to

achieving that goal. *Critchfield*, 137 F.4th at 922 (quoting *Virginia*, 518 U.S. at 533); *see also

Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014). Even a substantial interest cannot support a

classification if it fails to "overcome the injury and indignity inflicted" on the disfavored class.

*Latta v. Otter*, 19 F. Supp. 3d 1054, 1077 (D. Idaho 2014).

Plaintiff is likely to show that applying S.B. 1100 to bar Plaintiff's members from using

restrooms that align with their gender identity violates the Equal Protection Clause.

A.    **S.B. 1100 Triggers Heightened Scrutiny Because It Discriminates Against
Transgender People Based on Transgender Status and Sex.**

***Transgender status.*** The Ninth Circuit confirmed that "under [its] precedent and the

precedent of other circuits, S.B. 1100 discriminates on the basis of transgender status."

*Critchfield*, 137 F.4th at 922–23 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–

16 (4th Cir. 2020)); *compare Critchfield*, 2023 WL 6690596, at *6 (holding S.B. 1100 did *not*

discriminate based on transgender status, only sex, and explaining that "why" the Court "[was]

applying intermediate scrutiny . . . bears on various conclusions throughout this decision").

***Sex.*** The Ninth Circuit also held that S.B. 1100 discriminates on the basis of sex,

regardless of how that term is defined. *See Critchfield*, 137 F.4th at 922. Under S.B. 1100, a

transgender girl may not use the girls' restroom, whereas a cisgender girl, by virtue of her sex

assigned at birth, can. This disparate treatment is sex discrimination.[7] S.B. 1100 also seeks to reinforce the gender stereotype that people should embrace their sex assigned at birth.

    **B.**    **Applying S.B. 1100 To Bar Transgender Students In Boise High School From Using Restrooms Aligned With Their Gender Identity Is Not Substantially Related to an Important Government Interest.**

To satisfy heightened scrutiny, Idaho must demonstrate an "exceedingly persuasive justification" that the law substantially furthers an important governmental objective. *Virginia*, 518 U.S. at 533. As the Ninth Circuit explained, Idaho has purported to justify S.B. 1100 on the basis that inclusive policies "undermine[] the State's privacy and safety objectives." *Critchfield*, 137 F.4th at 923. Neither justification supports applying S.B. 1100 to restrooms.

*Safety*. The Ninth Circuit found "no evidence in the record supporting the conclusion" that S.B. 1100 was substantially related to "student safety." *Critchfield*, 137 F.4th at 924 n.8; *see also id.* at 921 ("[T]he Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." (citing *Gonzales v. Carhart*, 550 U.S. 124, 165, 127)); *see also Latta*, 771 F.3d at 469 ("Unsupported legislative conclusions as to whether particular policies will have societal effects" are not afforded deference).

*Privacy*. The only important interest the Ninth Circuit found S.B. 1100 arguably serves is

---

[7] The Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816 (2025), does not affect this case, but Plaintiff addresses it briefly. *Skrmetti* upheld Tennessee's restrictions on gender-affirming medical care for minors under rational-basis review because, the Court held, those restrictions discriminated neither on the basis of sex nor transgender status, but only made distinctions based on a medical condition. The Supreme Court explicitly declined to address whether *Bostock*-style reasoning can establish sex-based discrimination under the Equal Protection Clause or whether transgender-status discrimination constitutes a quasi-suspect classification. *Id.* at 1834. The Ninth Circuit, in this case, held that S.B. 1100—which does not regulate a medical condition—discriminates on the basis of both sex and transgender status, triggering heightened scrutiny under either theory. 137 F.4th at 928. Published opinions of the Ninth Circuit are binding authority unless "clearly irreconcilable" with higher authority, and nothing in *Critchfield* is irreconcilable, let alone clearly so, with *Skrmetti*. *In re Amy*, 714 F.3d 1165, 1167 (9th Cir. 2013); *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012).

protecting student privacy. Specifically, the panel agreed that Idaho has an interest in "(1) not exposing students to the unclothed bodies of students of the opposite sex; and (2) protecting students from having to expose their own unclothed bodies to students of the opposite sex." *Critchfield*, 137 F.4th at 925. The Court agreed that Idaho would have no interest in preventing the "mere presence of transgender students in facilities matching their gender identity." *Id.* at 923 n.6; *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1222–23 (9th Cir. 2020).

As the Ninth Circuit observed, the goal of preventing bodily exposure is not uniformly implicated across all school facilities. Applying S.B. 1100 to bar transgender students from using restrooms that align with their gender identity bears no substantial relationship to the privacy interest articulated by the Ninth Circuit. *First*, restrooms are structurally different from locker rooms and communal showers—as the Ninth Circuit decision acknowledges. Restrooms have stalls with locking doors. Those eliminate any risk of unwanted visual exposure that forms the basis of any cognizable privacy interest in enforcing S.B. 1100. Nor do students ordinarily change in restrooms, in the way that they would in locker rooms, or take off all of their clothes (as they might in a shower). Should they do so, they again can and would use stalls.

The Ninth Circuit acknowledged exactly that. The Court stressed that "[i]n considering the different types of facilities covered by S.B. 1100, it is plain that the privacy interest in avoiding bodily exposure is most strongly implicated in *locker rooms* and *communal shower rooms* that *lack curtains or stalls*." *Critchfield*, 137 F.4th at 925 (emphases added). Addressing restrooms, by contrast, the Court quoted a critical passage from *Whitaker*: "Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall." *Id.* (quoting *Whitaker*, 858 F.3d at 1052.). And the Court cited "[o]ther circuits that have considered and

invalidated laws or policies *limited to transgender students' use of restrooms*" in identifying the relevant privacy interest. *Id.* at 924 (emphasis added). That is just the relief Plaintiff seeks here.

The panel also concluded that, although the Equal Protection Clause did not *require* Defendants to adopt specific alternative measures in locker rooms to meet any privacy interest without exclusion, "commonsense alternatives like installing privacy partitions in changing facilities" would amount to "reasonable measures" that "could accommodate the State's privacy concern." *Id.* at 926. If partitions in locker rooms are sufficient to alleviate the State's privacy concerns, then the stalls *already* present in restrooms are as well.[8] *See also Grimm*, 972 F.3d at 613 (enjoining restroom policy that "ignores the reality of how a transgender child uses the bathroom: 'by entering a stall and closing the door.'"); *accord Whitaker*, 858 F.3d at 1052–53.

This Court, in its initial preliminary injunction order, also recognized this reality. It acknowledged that "transgender girls would use individual stalls because female restrooms do not contain urinals," and that transgender boys would likewise use stalls. *Critchfield*, 2023 WL 6690596, at *9. Compared to facilities where visual exposure to unclothed bodies is likely, this Court observed that privacy interests may be less strongly implicated "in restrooms where stalls are widely used." *Id.* . The Court declined to give that distinction decisive weight only because, in its view, this argument "discount[ed]" the statute's application to "changing facilities and overnight accommodations." *Id.* Those facilities are no longer at issue in this motion.

No evidence in the record contradicts this conclusion. The multi-occupancy restrooms in Boise High School have stalls, and Jane Doe uses the stalls when she uses multi-occupancy

---

[8] The footnote language from the Ninth Circuit's *Hecox* decision that this Court referenced in its prior order—suggesting "bathrooms by their very nature implicate important privacy interests"— was deleted by the Ninth Circuit via amendment while that court was considering Plaintiff's appeal in this case. *See Hecox v. Little*, 79 F.4th 1009, 1025 n.10 (9th Cir. 2024) (cert granted).

restrooms, where she has not been exposed to others' unclothed bodies nor exposed her own unclothed body to others. J.D. Decl. ¶ 15. Legislative proceedings revealed no evidence of transgender students in Idaho engaging in behaviors that infringe upon the privacy of others in restrooms, despite years of experience with inclusive policies in numerous schools. *See* Biblarz Decl., Exs. 3, 5. To the contrary, transgender students avoid exposure not only to avoid the risk of bullying and harassment, but also to avoid disclosure of physical features that exacerbate the painful experience of gender dysphoria. Budge Decl. ¶ 68; *see also, e.g.*, J.D. Decl. ¶ 15. And the experiences of other school officials—who have first-hand experience with inclusive policies and practices, which have governed the welfare of thousands of students—reinforce that equality and privacy are compatible. *See generally* Decl. of Diana Bruce (Dkt. No. 15-6) (D.C. Public Schools); Decl. of Foster Jones (Dkt. No. 7) (Atherton High School in Kentucky).

The State's privacy goals are not substantially served by applying S.B. 1100 to restrooms specifically. Plaintiff is therefore likely to succeed in its challenge as applied to restrooms.

## II.    PLAINTIFF IS LIKELY TO SUCCEED ON ITS TITLE IX CLAIM.

In addition to its equal protection claim, Plaintiff is independently likely to succeed in showing that applying S.B. 1100 to restrooms violates Title IX. A likelihood of success on either claim is sufficient for preliminary relief, and obviates the need for analysis on the other claim.

The Ninth Circuit's decision clarified how Title IX's interlocking provisions apply to S.B. 1100. The Court analyzed three statutory and regulatory provisions: 20 U.S.C. § 1681 (which prohibits discrimination based on sex); 34 C.F.R. § 106.33 (which implements § 1681 and mandates, *inter alia*, that separate toilets be comparable); and 20 U.S.C. § 1686 (a statutory carveout to § 1681 that allows schools to maintain sex-segregated "living facilities"). Under the Court's reading of these provisions, S.B. 1100's application to restrooms is insupportable.

First, excluding transgender students from using restrooms aligned with their gender is

discrimination on the basis of sex under § 1681. *Critchfield* acknowledged precisely that: the

Court held that "S.B. 1100 discriminates . . . on the basis of sex." *Critchfield*, 137 F.4th at 923;

*see also id.* at 928 (reaffirming that *Bostock* applies to Title IX).

Second, because applying S.B. 1100 to restrooms discriminates on the basis of sex under

§ 1681, the question is whether such application is allowed under a "carve[] out" to that section.

*See id.* at 926. Under the logic of the Ninth Circuit's opinion, some applications of S.B. 1100,

such as to overnight facilities, may be exempted from § 1681's reach. Restrooms are not.

As an initial matter, the Ninth Circuit confirmed that 34 C.F.R. § 106.33 does not operate

as a carve-out to § 1681. As Plaintiff previously argued to this Court and the Ninth Circuit, §

106.33 is an implementing regulation of § 1681, not § 1686, and it cannot be read to carve out

from § 1681 conduct that section itself would prohibit. *See* 34 C.F.R. § 106.33 (specifying

regulations issued under § 1681); *Grimm*, 972 F.3d at 618; *A.C. by M.C. v. Metro. Sch. Dist. of

Martinsville,* 75 F.4th 760, 770 (7th Cir. 2023). The Ninth Circuit agreed: Section 106.33,

entitled 'Comparable facilities,' requires that, if a recipient of federal funding provides separate

toilet, locker room, and shower facilities on the basis of sex, the facilities must be comparable."

*Critchfield,* 137 F. 4th at 931. "In this way," the Court concluded, "§ 106.33 extends § 1681's

protections against sex-based discrimination rather than expanding the scope of § 1686's carve-

out." *Id.* at 931. Even if § 106.33 purported to narrow the scope of its implementing statute, it

could not: a regulation cannot negate the application of the statute it implements. *See, e.g.*, *Loper

Bright Enters. U. Raimondo*, 603 U.S. 369, 371 (2024).

The Ninth Circuit instead held that 20 U.S.C. § 1686—a statutory provision co-equal

with § 1681—does operate as a carve out to § 1681. Section 1686 provides that educational

institutions may maintain "separate *living facilities* for the different sexes." 20 U.S.C. § 1686

(emphasis added). Contemporaneous dictionaries defined "living," in its relevant sense, as "appropriate, designed, or adequate for living," and to "live" as "to occupy a home: DWELL, RESIDE." *Webster's Third New International Dictionary* 1323–24 (1968). While overnight facilities are arguably living facilities, restrooms in a non-residential school building simply are not. To hold otherwise would make the term meaningless and nullify the adjective "living." Indeed, if "restrooms" in Boise High School are living facilities, is the cafeteria? The gymnasium? The classrooms? There would be no limiting principle.

The procedural history of the Ninth Circuit's decision reinforces this conclusion. In its initial opinion, the Ninth Circuit stated that § 1686 does not "unambiguously carve[] out *only* living facilities from Title IX's general mandate and not more intimate spaces such as restrooms, changing rooms, and communal showers." *Critchfield,* 131 F.4th at 993 (emphasis in original). Plaintiff then filed a Petition for Panel Rehearing addressing that language specifically. *Critchfield*, No. 23-2801, Dkt. 115 ("Petition for Panel Rehearing"). Plaintiff argued, *inter alia,* that restrooms were not "living facilities," and that the Ninth Circuit did not need to hold otherwise to affirm denial of the facial preliminary injunction. *Id.* at 19–20.

After considering Plaintiff's motion, the panel amended its opinion and removed the suggestion that § 1686 might reach "restrooms" or otherwise extend beyond "living facilities." *Critchfield*, 137 F.4th at 918–19.[9] Instead, the Court concluded only that "living facilities" is not

---

[9] The amending order reads in full (*Critchfield*, 137 F.4th at 918–19):

> On page 35, the sentence "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686 unambiguously carves out only living facilities from Title IX's general mandate and not more intimate spaces such as restrooms, changing rooms, and communal showers." is deleted and replaced with "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686's carve-out of living facilities from Title IX's general mandate is unambiguously limited to facilities such as dormitories."

confined solely to "dormitories." This suggests that facilities where students *live*, such as

dormitories and, at least temporarily, the overnight facilities implicated by Plaintiff's first

motion, could be exempted under § 1686. But it does not suggest § 1681 encompasses restrooms

at a non-residential school building.

Because applying S.B. 1100 to bar transgender students from using restrooms that align

with their gender identity (1) is discrimination on the basis of sex under § 1681; and (2) is not

carved out by § 1686's statutory exception for sex-separated living facilities, Plaintiff is likely to

succeed in showing S.B. 1100 violates Title IX as applied to restrooms.

## III.     THE REMAINING FACTORS FAVOR A PRELIMINARY INJUNCTION.

### A.     Enforcing S.B. 1100's Restroom Exclusion Will Cause Irreparable Harm.

S.B. 1100 will inflict severe and irreparable harm on Plaintiff and its transgender

members if not preliminarily enjoined. As an initial matter, violation of a constitutional right is

*per se* irreparable harm. *See Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911

(9th Cir. 2014). "A violation of Title IX also causes irreparable harm." *Doe v. Horne*, 683 F.

Supp. 3d 950, 975 (9th Cir. 2024). And "[i]t is well established that the deprivation of

constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872

F.3d 976, 994 (9th Cir. 2017).

There are other harms implicated by S.B. 1100's application to restrooms specifically.

Excluding transgender youth like Plaintiff's members from restrooms that align with their gender

identity harms their mental and physical health in multiple ways. It subjects them to profound

stigma and shame during pivotal developmental periods. Budge Decl. ¶¶ 53–64. Implementing

S.B. 1100 will increase their risk of depression, anxiety, and self-harm. *Id.* ¶¶ 53–64. Courts

have recognized these irreparable harms in affirming preliminary injunctions in similar contexts.

*See, e.g.*, *Whitaker*, 858 F.3d at 1055; *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222

(6th Cir. 2016). Because transgender students avoid using restrooms that do not align with their gender identity, S.B. 1100 will also lead to distraction and impaired academic performance, as transgender students focus on the physical pain and discomfort of avoiding the restroom. Budge Decl. ¶¶ 62–63.

Exclusionary restroom policies also risk disclosing transgender student's status—an irrevocable and dangerous consequence. When a transgender girl is forced to use the boys' restroom because that is the only facility she can reach in the five minutes between classes, or when she cannot go with her female friends into the girls' restroom, the government has similarly jeopardized the disclosure of her transgender status. *See* Budge Decl. ¶¶ 57, 61–64 (detailing different ways that disclosure can occur); J.D. Decl. ¶ 13 (noting that gender-neutral restrooms are further away from classes). The disclosure of one's transgender status, particularly where one would otherwise keep that information private, can provoke intense "hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). As this Court has observed, a "mismatch[]" between a transgender person's outward expression of gender identity and information reflecting their sex assigned at birth can incite harassment or even assault. *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1137 (D. Idaho 2018).

## B.      The Balance of Hardships and Public Interest Favor the Narrow Injunction.

The balance of hardships and public interest also favor an injunction. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co.*, 747 F.3d at 1092. The hardships that Plaintiff and its members will face are manifold. *See infra*, Factual Background, Section V. On the other side of the scale, "there is no interest in enforcing an unconstitutional law." *Silvester v. Harris*, 2014 WL 6611592, at *2 (E.D. Cal. Nov. 20, 2014); *accord KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

In its order on Plaintiff's initial motion for a preliminary injunction, the Court found the

equitable preliminary injunction factors "roughly even." *Critchfield*, 2023 WL 6690596, at *17. That conclusion rested on this Court's determination Plaintiff was not likely to succeed on the merits—which, as noted above, is not true as to restrooms. But even looking at the equities alone, the Court's conclusion does not apply to the narrower injunction sought here. Restrooms are precisely the facilities where the harms wrought by S.B. 1100 are most acute. Their use is a daily physiological necessity, and forcing transgender students to choose between using a restroom that negates their identity, using a restroom that exposes them to stigma and harassment, or simply "holding it" (and risking health consequences while enduring physical pain) constitutes a significant hardship. On the other side of the ledger, universal restroom stalls at Boise High School mitigate the State's privacy concerns. J.D. Decl. ¶ 15. Thus, in restrooms, the State's putative privacy concerns are at their most minimal just when the threatened indignities to transgender students are the most substantial. A preliminary injunction maintaining the status quo of equal restroom use for Plaintiff's members is in the public interest.

## IV.    THE COURT SHOULD GRANT RELIEF (OR A TRO) BY AUGUST 11.

Boise High School's first day in the 2025-26 year is August 12. Because of injunctions issued by this Court and the Ninth Circuit, S.B. 1100 has never been lawfully applied during the school year in Idaho—including at Boise High. Plaintiff respectfully requests that this Court issue its decision by August 11, 2025. In the alternative, Plaintiff requests that the Court issue a TRO by that date. Defendants will suffer no prejudice from a TRO, which will serve only to preserve the status quo as to restrooms at Boise High School that has existed for years.

## CONCLUSION

For the foregoing reasons, SAGA asks the Court to enter a preliminary injunction in its favor enjoining enforcement of S.B. 1100 in Boise High School restrooms and, if necessary to preserve the status quo, a TRO.

DATED:  July 3, 2025                  Respectfully Submitted


                                      By:    _/s/  J. Max Rosen_____

Samuel L. Linnet                             Katherine M. Forster
ALTURAS LAW GROUP, PLLC                      J. Max Rosen
                                             Paul Martin
Peter C. Renn                                Abigail K. Bessler
Kell L. Olson                                Elizabeth Anastasi
Tara L. Borelli                              MUNGER TOLLES & OLSON LLP
Pelecanos
LAMBDA LEGAL DEFENSE & EDUCATION FUND