RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

DAVID J. MYERS, ISB #6528
Deputy Attorney General
GADER WREN, ISB# 12108
Assistant Solicitor General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
david.myers@ag.idaho.gov
gader.wren@ag.idaho.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SEXUALITY AND GENDER ALLIANCE, | Case No. 1:23-cv-00315-DCN |
| *Plaintiff*, | **DECLARATION OF DR. GEETA NANGIA** |
| v. | |
| DEBBIE CRITCHFIELD, *et al.*, | |
| *Defendants.* | |

I, Geeta Nangia, M.D., hereby declare and swear as follows:

1.      I have been asked by counsel for the Defendants to provide my opinion on the psychological effect of differing bathroom policies on children, particularly as it pertains to policies involving children and adolescents who have gender incongruence and/or gender dysphoria. I've also been asked to provide my opinion regarding the evaluation and treatment of adolescents dealing with gender identity issues, including the appropriate accommodations that should be provided in the educational setting.

2.      I am over the age of 18. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

**Background and Qualifications**

3.      I am a Board-Certified Child and Adolescent Psychiatrist, and Board-Certified Adult Psychiatrist. A true and accurate copy of my curriculum vitae is attached as Exhibit A.

4.      I have worked in the field of Child and Adolescent Psychiatry as a community psychiatrist in a wide range of settings, providing comprehensive psychiatric services for children and families. I chose to work as a community psychiatrist because I desired to evaluate and treat a wide range of mental health disorders and wanted to see young people in the context of their families and community "systems" (e.g., schools, extracurriculars, and local supports). This provides me with the ability to have a more complete perspective on their development and the interventions that produce the best outcomes for their overall wellbeing.

5.      I have worked in rural, urban, and suburban areas, and in outpatient, inpatient, partial, as well as residential care settings. I have served as a part of multiple interdisciplinary

DECLARATION OF DR. GEETA NANGIA —1

teams. Much of my focus has been on providing access to mental health care for youths who are underfunded and lack services due to barriers of access and cost.

6.    I have been very active in school consultations and advocating on a community level for mental health accommodations for youths in school since 2007. I have always encouraged assessment of needs that drive behaviors in the classroom, and a focus on addressing those needs to change behavioral and educational outcomes. In 2014-2015, I taught kindergarten at a local school for the academic year to gain practical insight into classroom management and how school-based accommodations affect students and teachers. This was invaluable to my understanding of how schools function internally and how I could better support my patients with school-related difficulties. Simultaneously, I provided mental health consultation in a school district wherein children were struggling to be maintained in their classroom and needed emotional and behavioral assistance.

7.    Much of my career has also been spent educating, equipping, and supporting families of children who struggle with depression, anxiety, and other mental health issues by stressing the importance of attachment between parents and children. In 2021, as a response to the pandemic-related mental health crisis, I was one of the founders and CEO of Known and Loved, a non-profit organization created alongside a group of physicians to improve mental health outcomes in children by supporting parent-child attachment in Upstate South Carolina. Our work centered upon the knowledge that connection and secure attachment to safe caregivers forms the foundation for healthy childhood development, allowing a child to successfully progress through the developmental trajectory toward identity consolidation.

8.      Today, as part of my continued role with Known and Loved, I provide training

for foster and adoptive parents to help them understand trauma and the effects of trauma on

a child's ability to form secure attachment. I continue to provide community mental health

care through my private practice, with a focus on more complex cases and trauma. I am also

involved as an expert witness in several cases involving the care of minors with gender

incongruence and gender dysphoria.

9.      Given that I have extensive experience treating a wide range of psychiatric

disorders, I have evaluated and treated a significant number of children and adolescents with

gender incongruence and gender dysphoria. The number of youths with gender dysphoria has

dramatically increased in my work over the last several years. This has led to my involvement

in the above captioned litigation as well as the litigation discussed in this declaration and

accompanying report.

10.     My full medical opinion in this case is based upon my training and clinical

experience as a child and adolescent psychiatrist, my experience working with approximately

200 children and adolescents with active gender incongruence and gender dysphoria over my

career, my experience working with schools to address mental health needs that affect

education, my knowledge of child development, and review of the literature on this subject. I

may wish to supplement my opinions or the basis for them as new research is published or in

response to statements made in my area of expertise.

11.     A true and correct copy of my full report, including bibliography, is attached as

Exhibit B. Please see that report for a more complete description of my qualifications and

experience, including my clinical experience with providing mental health consultations to schools, educational plan reviews, and recommendations for accommodations. *Id.* ¶¶15-26.

**Bathroom Policies Generally**

12.     Bathroom policies impact education because all students need to use the bathroom to learn effectively. Being able to toilet and engage in personal self-care (i.e., change menstrual products, address private bodily functions, and wash hands) allows a student to focus on learning and not on physical discomfort.

13.     Interestingly, many children avoid the bathroom in school. Students who avoid the bathroom can end up struggling with bowel or bladder problems, including lower urinary tract symptoms. Adolescents may avoid toileting environments that they perceive as unacceptable.  Facility attributes such as ease of access, privacy, safety, and cleanliness are important to adolescents, just as they are to adults.  A poor school toilet environment may lead adolescents to engage in unhealthy compensatory behaviors such as avoiding fluids during school hours or even using physical maneuvers to actively withhold voiding. *Id.* ¶ 28.

14.     A study using qualitative interviews with 21 high school students was conducted and analyzed using content analysis. The data revealed that school toilets were considered insecure and unpleasant, and students felt exposed. Students reported refraining from drinking during school hours and remained in constant movement or jumped up and down to withhold urine and stool. "Holding" or not voiding all day can also contribute to disruptions to cognitive function, and hence, the learning process. *Id.* ¶ 29.

15.     It is for these reasons that research has underscored the need for schools to have policies and procedures that ensure that all students have the right to safely access

bathrooms and school facilities. Because bathroom avoidance can present such a profound problem for the mental and physical wellbeing of all students, studies are increasingly assessing the bathroom needs of students and evaluating potential solutions.

16.     In my experience, given the sheer number of students in most schools, policies must first respond to the universal bathroom needs of children and adolescents and challenges to those needs. Additionally, policies must govern timing and access to bathroom facilities to maintain order while considering classroom schedules and resource allocation. Accommodation(s), as part of educational plans, must address specific bathroom needs that arise for children and adolescents who are more vulnerable.

17.     For a more complete description of the universal bathroom needs of all students, common challenges to universal bathroom needs, and when accommodations are necessary to meet challenges to bathroom needs, see Ex. B ¶¶ 32-38.

**Schools Should Exercise Caution in Assessing Bathroom Accommodations for Gender Incongruent Youths**

18.     In light of these considerations, schools must be cautious when addressing the need for bathroom accommodation amongst vulnerable students with gender incongruence and gender dysphoria.

19.     First, these diagnoses are not well understood. The best practices for evaluation and treatment of minors with these conditions are hotly contested based upon a lack of evidence base, making a holistic and cautious approach advisable at this time per the largest review done to date. Bathroom use consistent with gender identity is viewed as being part of social transition, and the risks of social transition are widely debated currently. *Id.* ¶¶ 39-47.

20.     Second, gender, unlike sex, is mutable. A person's internal sense of who they are can shift, making universal accommodations for an entire "group" of people difficult, because whether they are part of that group, or not, can change over time. Gender is also not determinate of sex and is a separate and distinct consideration. One can be biologically male by sex (determined by genetics) but identify as a female gender. Therefore, it is prudent for school administration to consider that shared bathrooms have historically been designated by sex because sex classification does not change. *Id.* ¶¶ 48-54.

21.     Third, current research shows that social transition in children may lead to continued gender incongruence whereas watchful waiting and a lack of social transition may lead to desistance and realignment with natal sex. Hence, social transition may be seen as an active intervention which affects a child's developmental trajectory. Schools should have an appreciation of this when assessing bathroom accommodations because their decisions may foster social transition and thereby facilitate the transition pathway and developmental trajectory at large for students. *Id.* ¶¶ 55-59.

22.     Lastly, adolescents undergo tremendous change as they undergo identity exploration and psychosexual maturation. Their values shift and their decision making is often heavily influenced by reward and by peers. This vulnerable period of growth is characterized by rapid change and their identities are not solidified until adulthood. The beauty of this stage is that the adolescent is free to explore, learn, change, and evolve. School faculty should be respectful of this stage of development by validating how adolescents feel and observe their own futures but should simultaneously exhibit caution in attributing any sense of permanency

to adolescents' internal sense of identity, long term ambitions, romantic interests, and value

systems. *Id.* ¶¶ 60-64.

**Assessing the Best Bathroom Accommodation for Vulnerable Minors with Gender Incongruence or Gender Dysphoria**

23.     Having established that caution should be observed, it is now important to

discuss how schools can be strategic in helping vulnerable students with gender incongruence

or gender dysphoria to have optimal mental health outcomes by providing them with

bathroom accommodations that will serve their bathroom needs while considering the above

issues.

24.     First, it is important that children with gender incongruence and gender

dysphoria, like all other students, have "felt safety" through access to safe toileting spaces.

Children and adolescents with gender dysphoria are more prone to bullying, inappropriate

teasing, privacy concerns, and may have unique physical needs. With a higher likelihood of

depression, generalized anxiety, social anxiety, and a history of trauma, their vulnerability is

only heightened when placed in situations wherein they may be more at risk of negative peer

encounters.

25.     Second, for youth with gender dysphoria and gender incongruence, privacy is

essential. A lack of access to safe bathroom spaces can lead these students to experience added

anxiety about toileting, exposure, and unkind comments from peers. This can also lead to

worsening comorbid disorders (i.e., depression) and gender dysphoria. *Id.* ¶ 68.

26.     Third, these youth, like all their peers, need to be able to toilet undisturbed.

27.     Fourth, they need the ability to regroup and provide self-care in an environment

that affords them that opportunity.

**Multi-Occupancy Bathrooms Consistent with Gender Identity Do Not Meet Universal Bathroom Needs for Students with Gender Incongruence and Gender Dysphoria**

28.     These needs are not met by allowing gender incongruent students access to the multioccupancy bathroom consistent with their gender identity. For most students, multi-occupancy bathrooms, regardless of being a male or female designation, heighten exposure to peers who may engage in bullying behavior, lower privacy, increase potential disturbances, and decrease the ability of the students to engage in self-care without the threat of peers who may engage in unkind behavior. Currently, I am not aware of any research that assesses the impact of bullying and negative peer contact in multi-occupancy bathrooms that are consistent with gender identity for gender incongruent students. As a clinician, it is a reasonable assumption that gender incongruent students will be at heightened risk of experiencing these issues in any multi-occupancy bathroom, including the one consistent with their gender identity. Furthermore, the child or adolescent who identifies as non-binary or gender fluid may not feel comfortable in either male or female designated multi-occupancy bathroom.

29.     It is also pertinent to note that research has shown that 90 percent of individuals with gender dysphoria have experienced one trauma, and 56 percent have experienced four or more traumas. Survivors of trauma often experience hypervigilance, avoidance, and "re-experiencing" phenomena. For them, multi-individual bathrooms can be a place where trauma symptoms are heightened. *Id.* ¶ 72.

30.     For now, given what knowledge is available and the research that is lacking, my clinical opinion is that shared bathroom spaces create far more potential risk for students with gender incongruence and fail to address their bathroom needs.

**Shared Multi-Occupancy Bathrooms May Create Negative Outcomes for Gender Congruent Students**

31.    I am not aware of any studies to date that assess the impact of the use of multioccupancy bathrooms that align with the gender identity of children with gender incongruence on gender congruent students. Without this research, creating shared bathroom spaces would create the risk of negative mental health outcomes for the larger student body. Studies are yet needed which assess how shared bathrooms affect: a) the potential for inappropriate teasing between sexes that can negatively impact evolving self-concept, b) premature exposure and awareness of the opposite sex that can negatively affect interplay between sexes and felt safety and privacy, and c) violations of personal boundaries for each sex as emotional and physical changes are occurring during a fragile period of growth and development. As stated earlier, sex specific bathrooms have long been a societal safeguard, a natural paradigm for young people by which they understand personal boundaries as they engage with the opposite sex. They learn that personal space is important to respect in relationships and that choice is important. Given that knowledge of childhood development has informed this societal separation of youth by natal sex in private spaces, it is imperative that such research be done to inform any potential policy changes.

32.    Schools must provide the best remedies they can for all students. Far more is yet to be understood about the effects of shared bathrooms spaces on the entirety of the student body, not just one subset.

33.    Among my own patients, I have been told by several gender congruent students that they feel uncomfortable sharing bathrooms with gender incongruent students because of developmental concerns (i.e., menses and associated self -care, body changes), histories of

sexual trauma, general discomfort with feeling exposed in spaces with the opposite sex, and faith-based beliefs that bathrooms should be sex specific. None of these students had any negative feelings toward transgender peers nor displayed any signs of prejudice.

34.    For now, given what knowledge is available and what research is lacking, my clinical opinion is that shared bathroom spaces may create significant negative outcomes for gender congruent students and may fail to meet their bathroom needs.

**Single Occupancy Gender Neutral Bathrooms are the Best Choice for Vulnerable Students with Gender Incongruence and Gender Dysphoria**

35.    Single occupancy gender neutral bathrooms provide a place where the child or adolescent with gender incongruence can experience an environment free from other students who may place the child at risk of being bullied or encountering negative interactions. Access to gender neutral bathrooms shows positive outcomes for youth with gender incongruence. *Id.* ¶ 77.

36.    For those who have a history of trauma, the single occupancy gender neutral bathroom provides a sense of safety as no one else is present. Additionally, it provides privacy and establishes a protected place that can be utilized for toileting, self-care, and to emotionally regroup. This accommodation provides the most compassionate approach to the care of students with gender incongruence and affords them the ability to return to class and feel ready to learn.

37.    Single occupancy gender neutral bathrooms also validate the fact that youth with gender incongruence feel vulnerable and deserve care, while simultaneously considering that gender incongruence deserves more research and fostering social transition may carry risk.

38.     Single occupancy gender neutral bathrooms also provide a better solution for people of some faiths versus multi-occupancy shared bathrooms. Francis et al. state that, "multi-stall toilets may not accommodate the needs of religious or cultural minority groups. Study participants noted that mixing students of different genders may not be acceptable to people from Australian Indigenous cultures or Muslim and Islamic faiths. Other researchers have also noted that Islamic, Hindu, and Orthodox Jewish religions often do not permit females to share public toilets with male strangers, particularly when menstruating." *Id.* ¶ 80.

39.     Additionally, the accommodation of a single occupancy gender neutral bathroom for gender incongruent students allows the school to provide a solution that also takes into consideration the lack of present knowledge on how shared bathrooms would impact the broader student population. Potential risks are averted until further understanding is obtained.

40.     Within my own patient population, I have worked with gender incongruent students who have felt vulnerable using the multi-occupancy bathroom consistent with their natal sex. I have received positive feedback from students who have had access to a single occupancy bathroom. It has allowed them to have the privacy they need and to feel safe toileting and engaging in self-care.

**Assessment of Dr. Stephanie Budge's Expert Declaration**

41.     I have reviewed the declaration of Dr. Stephanie Budge (Dkt. 86-3).

42.     Dr. Budge's declaration relies heavily on the WPATH guidelines, about which conscientious medical professionals have marked concerns, as set out most prominently in The Cass Report. *Id.* ¶¶ 83-89.

43.    In addition, the WPATH files that have been subpoenaed in litigation or leaked reveal questionable practices that, as Justice Thomas has written, "provide even stronger bases for treating supposed authorities in this area with skepticism." *Id.* ¶¶ 90-97.

44.    Dr. Budge also:

- Presents misinformation regarding gender dysphoria and suicide. *Id.* ¶¶ 98-99;

- Does not consider the evidence that social transition can alter the course of a child's development. *Id.* ¶¶ 100-101;

- Makes assertions that appear to be discriminatory against gender congruent students. *Id.* ¶¶ 102-105;

- Presents no data to show gender incongruent youth experience less bullying in multi-occupancy bathrooms consistent with their gender identity. *Id.* ¶¶ 106-108;

- Does not address how students who detransition will be affected by using multi-occupancy bathrooms consistent with their gender identity. *Id.* ¶¶ 109-11;

- Objects to the accommodation of single-occupancy gender neutral bathrooms despite literature recommending gender neutral bathrooms. *Id.* ¶¶ 112-13; and

- Is unable to provide any evidence to support her argument that single-occupancy gender neutral bathrooms are not a reasonable accommodation for youth with gender incongruence. *Id.* ¶¶ 114-15.

**S.B. 1120 Reasonably and Compassionately Addresses the Bathroom Needs of All Students**

45.     It is my clinical opinion that the matter of whether access to multi-occupancy bathrooms consistent with gender identity should be permitted for gender incongruent students is not, and should not be, a political or divisive issue. Rather, the priority of educators, policy makers, and health providers should be to assess current evidence and ensure that the needs of all students are addressed, regardless of gender. Minors with gender incongruence and gender dysphoria deserve to have their bathroom needs met, no differently than students whose gender is consistent with their natal sex.

46.     Idaho's S.B. 1100 requires that all Idaho school districts must designate multi-occupancy restrooms and changing facilities for use only by members of one sex and prohibits students of the opposite sex from using the same bathroom or changing facilities. The law also requires that schools provide a "reasonable accommodation" to any student who, for any reason, is unwilling or unable to use a school's multi-occupancy restroom designated for the person's sex.

47.     Dr. Watts, the Boise High School Principal, stated in her declaration that, "Any student uncomfortable with using a multi-occupancy restroom may obtain access to the single-occupancy restroom for any reason." She reported that there are also three single-occupancy restrooms available within the school and that not all students who access these have gender dysphoria.

48.     In light of the lack of evidence assessing the bullying and harassment risk to gender incongruent students in the multi-occupancy bathroom corresponding to their gender identity, the high likelihood based on my clinical experience that bullying and harassment would present a serious risk in any multi-occupancy bathroom, and the lack of evidence

DECLARATION OF DR. GEETA NANGIA —13

assessing impact of shared bathrooms on gender congruent students, my clinical opinion is that school policies that allow access to gender neutral single occupancy bathrooms are appropriate and provide a reasonable and compassionate solution to the bathroom needs of both gender congruent and gender incongruent students.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I reserve the right to modify and expand the testimony in this declaration and attached report as the facts are developed in this case.

DATED:   July 21, 2025

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

/s/
DR. GEETA NANGIA

DECLARATION OF DR. GEETA NANGIA —14

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on July 21, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Samuel L. Linnet
sam@alturaslawgroup.com

Peter C. Renn*
prenn@lambdalegal.org

Kell L. Olson*
kolson@lambdalegal.org

Tara L. Borelli
tborelli@lambdalegal.org

Pelecanos*
belecanos@lambdalegal.org

*Attorney for Plaintiff*

Katherine M. Forster*
katherine.forster@mto.com

Paul E. Martin*
paul.martin@mto.com

Abigail K. Bessler*
abigail.bessler@mto.com

Elizabeth Anastasi*
elizabeth.anastasi@mto.com

J. Max Rosen*
max.rosen@mto.com

*\*Admitted pro hac vice or forthcoming*

/s/ *James E. M. Craig*
James E. M. Craig

DECLARATION OF DR. GEETA NANGIA —15