UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SEXUALITY AND GENDER ALLIANCE, an association,<br><br>    Plaintiff,<br><br>    v.<br><br>DEBBIE CRITCHFIELD, in her official capacity as Idaho State Superintendent of Public Instruction, et. al.,<br><br>    Defendants. | Case No. 1:23-cv-00315-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiff Boise High School Sexuality and Gender Alliance's ("SAGA") Motion for Preliminary Injunction and, in the alternative, Temporary Restraining Order. Dkt. 86.[1] State Defendants, Debbie Critchfield et al. ("Defendants"), oppose the motion. Dkt. 90.[2]

Having reviewed the record and briefs, the Court finds the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, the Court

---

[1] SAGA also filed a Motion to Seal two declarations submitted alongside its reply memorandum. Dkt. 102. Defendants have not responded to this Motion. Good cause appearing, and having considered the standards set forth in *Ctr. for Auto Safety v. Chrysler Group*, LLC, 809 F.3d 1092, 1096-98 (9th Cir. 2016), the same is GRANTED. Dkts. 99 and 100 shall remain under seal. Redacted versions are already in the record. *See* Dkts. 102-2, 102-3.

[2] The Boise School District Defendants also oppose SAGA's Motion. Dkt. 92. Their brief, however, simply joins in Critchfield's brief, except as to anything related to the declaration of A.C. *See generally id.*

will decide the Motion without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). Upon review, and for the reasons outlined below, the Court DENIES SAGA's Motion.

## II. BACKGROUND

The background of this case has been outlined in various prior decisions before this Court and the Ninth Circuit and is generally known. *See, e.g.,* Dkts. 44; Dkt. 60; *Roe v. Critchfield*, 137 F.4th 912 (9th Cir. 2025). Thus, only a brief recitation will be given here.

On March 22, 2023, the Idaho Legislature adopted Idaho Senate Bill 1100 ("S.B. 1100") which requires that students in Idaho public schools use the restroom, changing room, and communal shower that corresponds with his or her biological sex. Similar regulations apply to overnight accommodations.

On July 6, 2023, Plaintiffs Rebecca Roe and SAGA[3] filed suit challenging S.B. 1100 as unconstitutional. Dkt. 1. Plaintiffs alleged S.B. 1100 violated: (1) the Equal Protection Clause, (2) Title IX, and (3) their right to privacy. *Id*. at 30–37.

Following early briefing and decisions due to the time-sensitive nature of the claims, the Court heard oral argument on Plaintiffs' Motion for Preliminary Injunction and Defendants' competing Motion to Dismiss. Dkt. 53.

The Court subsequently issued a decision denying both motions. Dkt. 60. As for Plaintiffs' motion, the Court found Roe and SAGA had not shown a likelihood of success on any of their claims because: (1) S.B. 1100 is based on sex and is related to the state of

---

[3] While this case was pending before the Ninth Circuit, the parties stipulated to Roe's dismissal. Dkt. 77. Thus, moving forward the Court will only reference SAGA as the sole remaining Plaintiff. However, insofar as Roe was part of the history of this case, the Court will refer to "Plaintiffs"—meaning Roe and SAGA—when addressing prior actions and decisions.

Idaho's substantial privacy interests; (2) S.B. 1100 does not violate Title IX; and (3) Plaintiffs failed to demonstrate they had a protectable liberty interest in the nondisclosure of their gender identity for privacy purposes. *Id*. at 35–36. However, the Court also held Defendants were not entitled to the full dismissal of Plaintiffs' claims. *Id*. at 36.

Plaintiffs appealed the Court's decision. Dkt. 61. Plaintiffs also sought and obtained a stay of the Court's order from the Ninth Circuit. Dkt. 74.

After briefing and oral argument, the Ninth Circuit affirmed the Court's denial of Plaintiffs' Motion for Preliminary Injunction on March 20, 2025. *Roe by & through Roe v. Critchfield*, 131 F.4th 975, 995 (9th Cir. 2025). On May 23, 2025, the Ninth Circuit issued an amended decision clarifying one of its holdings as to Title IX. *Roe*, 137 F.4th at 932.[4] As will be discussed in detail, the Ninth Circuit agreed Plaintiffs could not show a likelihood of success on their claims because S.B. 1100 is substantially related to Defendants' objective of protecting student privacy. *Roe*, 137 F.4th at 922–26. The Ninth Circuit also found Plaintiffs could not prevail on their Title IX claim, but for a different reason than the reason articulated by this Court. *Id*. at 926–31.

On July 3, 2025, SAGA filed another Motion for Preliminary Injunction and, in the alternative, Temporary Restraining Order. Dkt. 86. By way of this Motion, SAGA asks for a narrow injunction of S.B. 1100's enforcement as to restrooms at Boise High School— where SAGA's members attend. Dkt. 86-1, at 6. SAGA's request does not apply to any other spaces regulated by S.B. 1100, or to any other schools across the state. *Id*. Because

---

[4] This amended decision is the Ninth Circuit's operative opinion in this case and is referred to as "*Roe*, 137 F.4th at []" throughout this decision.

**MEMORANDUM DECISION AND ORDER – 3**

Boise High School starts fall classes on August 12, 2025, SAGA requested relief on or before August 11, 2025. *Id*. at 7.

Considering the timing of SAGA's request, the Court expedited briefing on the matter. Dkt. 87. Defendants responded in objection (Dkts. 90, 92) and SAGA replied (Dkt. 98). The matter is ripe for review.

### III. LEGAL STANDARD

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id*. at 20. Where, as here, "the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### IV. ANALYSIS

SAGA contends S.B. 1100's parameters, specifically as applied to restrooms, cause its members harm because it bars them from using restrooms that align with their chosen gender identity. SAGA further postures that Boise High School has permitted transgender students to use restrooms matching their gender identity "for years," and allowing this provision of S.B. 1100 to take effect would upend the status quo. Dkt. 86-1, at 8. It argues that under heightened scrutiny, S.B. 1100's restroom provision cannot survive.

Defendants argue SAGA cannot succeed on this argument because of the Ninth Circuit's decision in this case and a recent case from the United States Supreme Court—*United States v. Skrmetti*, 145 S. Ct. 1816 (2025). It argues the Court should apply rational basis review and continue to uphold S.B. 1100.

Before diving into the *Winter* factors, the Court must lay the groundwork for its analysis by explaining the breadth of its own decision, reviewing the Ninth Circuit's decision, and briefly commenting on the Supreme Court's *Skrmetti* decision.

### A. Background and Framework of Decisions

Plaintiffs' first Motion for Preliminary Injunction was based on the concept that S.B. 1100 is facially unconstitutional.[5] The Court held Plaintiffs were unlikely to succeed on this broad claim. *See generally* Dkt. 60. The Ninth Circuit concurred. Dkt. 81.

Now, SAGA takes a more targeted approach.[6] It alleges S.B. 1100 is unconstitutional as-applied to its members[7]—lesbian, gay, bisexual, transgender, and queer students at Boise High School—and their choice regarding which restroom to use.

---

[5] Facial challenges seek to have a statute declared unconstitutional "on its face." This standard presents an extremely high bar because a plaintiff must show that the statute is unconstitutional *in all* possible applications and situations. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.")

[6] Such is accepted because, in their Complaint, Plaintiffs challenged S.B. 1100's constitutionality "facially and as applied." Dkt. 1, at 31, 36. Thus, SAGA is not impermissibly arguing matters that have already been decided.

[7] As-applied challenges are narrower that facial challenges and argue that, even if a law is valid on its face, it may nonetheless be unconstitutional when applied in a particular case. *See Tsirelman v. Daines*, 19 F. Supp. 3d 438, 447–48 (E.D.N.Y. 2014), *aff'd*, 794 F.3d 310 (2d Cir. 2015).

In introducing its current request, SAGA recognizes the Court already denied its prior "broad" motion and that the Ninth Circuit affirmed this Court's decision. Dkt. 86-1, at 6. But in summarizing the Ninth Circuit's affirmance of the Court's decision, SAGA states the Ninth Circuit "held that Idaho *may* have a governmental interest in privacy for S.B. 1100's application to *some* of the facilities S.B. 1100 covers, such as locker rooms . . . ." *Id*. (emphasis added). SAGA goes on to allege the Ninth Circuit "expressly declined to hold that applying S.B. 1100 to *restrooms* specifically would survive intermediate scrutiny." *Id*. (emphasis in original). Concluding this thought, SAGA contends the Ninth Circuit "acknowledged that restrooms do not present the same privacy concerns as in locker rooms or communal showers and quoted favorably from decisions in other circuits approving injunctions of similar laws or policies as applied to restrooms." *Id*.

Not to put undue emphasis on SAGA's opening lines, but how they have framed the Ninth Circuit's decision and how that decision applies here concerns the Court.

To begin, the Ninth Circuit did not say the government "may" have an interest in protecting the privacy of students, it clearly held "the State's interest in protecting students' bodily privacy is an important objective for purposes of intermediate scrutiny." *Roe*, 137 F.4th at 924. As for SAGA's comment that the Ninth Circuit's holding only applied to "some" facilities and that the Ninth Circuit expressly "declined" to apply its holding to restrooms, such is simply false. The Ninth Circuit's opinion affirmed the Court in full and

applied its holding to all aspects of S.B. 1100 based on the type of challenge Plaintiffs brought (facial).[8]

Yet, the Court understands why SAGA is making the distinction it is. And the simplest way to understand the matter is simply to review the Ninth Circuit's decision itself, especially its comments about the types of facilities at issue in S.B. 1100.

After agreeing with the Court that the State of Idaho has an important interest in privacy, the Circuit turned to "whether the State chose permissible means to achieve that objective, i.e., whether S.B. 1100 is substantially related to the State's objective in protecting student privacy." *Id*. It then recognized "as the district court did, that the use of restrooms, locker rooms, shower rooms, and overnight accommodations do not present uniform risks of bodily exposure." *Id*. It then held:

> We do not presume that S.B. 1100's application to each type of facility will be substantially related to the State's objective of protecting student privacy. Rather, the outcome here is dictated by the type of challenge SAGA raises. To prevail on its facial challenge to S.B. 1100, SAGA must show that S.B. 1100's mandated sex-segregation of all covered facilities is unconstitutional; its equal protection claim fails if S.B. 1100's application to any of the covered facilities survives intermediate scrutiny.

*Id*. Continuing on, the Ninth Circuit observed that, "in considering the different types of facilities covered by S.B. 1100, it is plain that the privacy interest in avoiding bodily exposure is most strongly implicated in locker rooms and communal shower rooms that lack curtains or stalls." *Id*. at 925.

---

[8] The Court notes the Ninth Circuit disagreed with the Court on *why* intermediate scrutiny was the correct standard of review in this case. The Court held intermediate scrutiny applied because S.B. 1100 is based on sex, not transgender status. Dkt. 60, at 13. The Ninth Circuit, however, found that S.B. 1100 is based on sex *and* transgender status. *Roe*, 137 F.4th at 923. Again, however, under either interpretation the correct framework is intermediate scrutiny.

Concluding, the Ninth Circuit "[saw] no argument at this stage that S.B. 1100's mandatory segregation of these facilities on the basis of 'biological sex' is not substantially related to the State's interests in: (1) not exposing students to the unclothed bodies of students of the opposite sex; and (2) protecting students from having to expose their own unclothed bodies to students of the opposite sex." *Id*.

The Court takes the time to review the Ninth Circuit's opinion because, while the Ninth Circuit may not have "presumed" that S.B. 1100 would be applicable in all circumstances, and also found the State's privacy interest is "most strongly implicated" in certain facilities, it did not—as SAGA suggests—"decline" to hold S.B. 1100 was unconstitutional specifically as to restrooms. Dkt. 86-1, at 6. Just because something is "strongly implicated" in one context does not mean it is wholly inapplicable in another.

And finally, while the Ninth Circuit cited decisions where injunctions related to sex-segregated restrooms were upheld, it did so specifically for the proposition that privacy *is* an important governmental interest—even in restrooms. *See Roe*, 137 F.4th at 924.[9]

The Court next discusses the Supreme Court's recent decision in *Skrmetti* and the implication of this decision, if any, on the level of scrutiny that must be applied when reviewing SAGA's as-applied challenge in this case.

As the Court previously explained, there are three levels of review in constitutional cases such as this: strict scrutiny, intermediate scrutiny, and rational basis review. Laws

---

[9] SAGA claims these citations are favorable to its current argument because of how those cases turned out. Dkt. 86-1, at 6. But the opposite could also be true: the Ninth Circuit cited these cases to highlight just how deep privacy concerns run—even in cases where the outcome was different than here. Either way, the point and purpose of those citations was to illustrate that privacy is a legitimate government interest.

are subject to strict scrutiny when they discriminate against a suspect class, such as a racial group, *e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), or when they discriminate based on any classifications that impact a fundamental right, such as the right to vote, e.g., *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Laws are subject to intermediate (or heightened)[10] scrutiny when they discriminate based on certain other suspect classifications, such as gender. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 (1982). When no suspect class is involved and no fundamental right is burdened, courts apply a rational basis test to determine the legitimacy of the classification. *Olagues v. Russoniello*, 770 F.2d 791, 802 (9th Cir.1985).

SAGA contends that, consistent with the Ninth Circuit's holding in this case, heightened scrutiny applies to its challenge because S.B. 1100 discriminates based on a quasi-suspect classification: sex and/or transgender status. Dkt. 86-1, at 16.

For its part, the Government maintains rational basis review applies because the portion of the Ninth Circuit's opinion discussing the standard of review has been overruled by *Skrmetti*. The Court is not so sure.

*Skrmetti* dealt with a Tennessee statute that prohibited the use of puberty blockers and hormone therapy for treating gender dysphoria in minors, while allowing those same medications for other conditions, such as precocious puberty or a congenital defect. 145 S. Ct. at 1830–31. Ultimately, the Supreme Court held the statute did not violate the equal

---

[10] *See Clark v. Jeter,* 486 U.S. 456, 463–465 (1988) (referring to intermediate scrutiny as "heightened scrutiny" in the equal protection context, which similarly distinguishes between three levels of scrutiny— strict, heightened, and rational basis).

protection clause when reviewed under the rational basis standard. And it used the rational basis standard because it found age and medical necessity were the determining distinctions drawn by the Tennessee statute, not sex or transgender status.

The Government argues rational basis should apply here because the Ninth Circuit's holding that intermediate scrutiny applies in this case has been "abrogated," if not explicitly overruled, by *Skrmetti*.

The *Skrmetti* decision is extremely long (118 pages in total) and nuanced. The statute at issue there was different from the statute at issue here. The Court is not entirely sure the *Skrmetti* framework is a perfect fit for this case even though both cases involve transgender individuals. To be sure, the Court maintains its position that the distinction drawn by S.B. 1100 is based on sex, not transgender status. But the Ninth Circuit disagreed. While the Court understands why the Ninth Circuit so held, it all depends on how the issue is framed. Regardless, the Ninth Circuit concluded intermediate scrutiny was appropriate.

The Court is also cognizant that the Supreme Court specifically noted it "has not previously held that transgender individuals are a suspect or quasi-suspect class." *Skrmetti*, 145 S. Ct. at 1832. The various concurrences and dissents in that case make clear how specific justices would analyze whether transgender status represents a suspect class. Moreover, this Court is uniquely aware of the fact that the Supreme Court has granted certiorari in one of the undersigned's own cases—*Hecox v. Little*, 104 F.4th 1061, 1069 (9th Cir. 2024), as amended (June 14, 2024), cert. granted, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025*)*—and will, in all likelihood, address this question once and for all.

**MEMORANDUM DECISION AND ORDER – 10**

Thus, notwithstanding the Court's continued opinion that S.B. 1100 does not discriminate on transgender status *and* that the scrutiny appropriately applied to transgender status is rapidly changing, it will analyze SAGA's challenge using intermediate scrutiny, which is consistent with its prior decision and the Ninth Circuit's current precedent.[11]

### B. Likelihood of Success on the Merits

#### 1. Equal Protection

To review, SAGA claims S.B. 1100 violates the Fourteenth Amendment because it does not allow its members to use the restroom associated with their chosen gender identity. It argues it is likely to succeed on this claim because the Court's previous decision was broad, and this targeted approach focused on solely SAGA members should yield a different result. For their part, Defendants reiterate they have a strong interest in protecting the privacy and safety of children, and that S.B. 1100 serves this purpose.

The Court will address safety first. The Court previously highlighted how the parties in this case used the concept of safety in tandem with privacy. *See* Dkt. 60, at 24–25 (observing both sides consistently referred to "safety and privacy" together). The Court held the concepts were "substantially related" and that, as a result, it did not need to "make a separate determination as to 'safety.'" *Id*. at 24. Nevertheless, quoting the Supreme Court, the Court held that safety was an important interest and supported its conclusion that

---

[11] Published opinions of the Ninth Circuit are binding unless "clearly irreconcilable" with higher authority. *In re Amy*, 714 F.3d 1165, 1167 (9th Cir. 2013). As outlined, the Court is not confident the Ninth Circuit's opinion is "clearly irreconcilable" with *Skrmetti*.

Plaintiffs had not met their burden. *Id*. at 25 (quoting *Bd. of Educ. v. Earls* and its holding that "in a public school environment[,] . . . the State is responsible for maintaining discipline, health, and safety." 536 U.S. 822, 830 (2002)).

On appeal, the Ninth Circuit stated (in a footnote) that "the district court did not decide whether S.B. 1100's means are substantially related to the State's interest in protecting student safety, and we find no evidence in the record supporting that conclusion. Hence, we do not analyze this purported objective further." *Roe*, 137 F.4th at 924 n.8. As just explained, the Ninth Circuit's footnote is not entirely accurate. The Court made a finding that S.B. 1100 was related to safety. But it is true that holding was secondary to privacy and the Court only mentioned it in passing; it did not delve into S.B. 1100's language that one of its purposes was to prevent "sexual assault, molestation, rape, voyeurism, and exhibitionism." Idaho Code § 33-6701(4).

Defendants argue they have a strong interest in safety. Citing various cases where sex crimes were perpetrated against women in restrooms (generally, not by transgender individuals), Defendants conclude safety is an important interest related to S.B. 1100. Defendants next point to a case out of New Mexico where a young girl was raped by a transgender classmate in the girls restroom at school. *Id*. at 14–15. And turning closer to home, Defendants allege a teenage girl at Boise High School encountered a transgender girl masturbating in the restroom stall next to her.[12] Defendants rely on these examples to

---

[12] This situation is hotly contested. A.C.—a cisgender female—submitted a declaration claiming she was using the restroom when she heard grunting noises and assumed the person next to her was masturbating. Dkt. 90-4, at 2. A.C. confronted the individual (Daisy) who claimed to be transgender and "legally" allowed to use the women's restroom. *Id*. at 2. Daisy (and her mother) have now submitted declarations explaining that Daisy has autism and often uses self-stimulation—repetitive physical movements (such as slapping an

bolster their argument that S.B. 1100 is related to safety. These examples aside, Defendants also admit that "transgender individuals do not pose a categorical threat to public safety based only on their transgenderism." Dkt. 90, at 14.

Ensuring the safety of school-aged children is an important government interest. However, it is not entirely clear on the current record that S.B. 1100 serves this interest through its structure regarding restrooms. Defendants' examples in support of their arguments on this are unclear, exaggerated, or speculative. A more fully developed record *may* yield fruit for Defendants with this safety argument as applied to SAGA and Boise High School. But at the current juncture, the Court finds safety—standing alone—does not carry the day.

Turning next to privacy, much of the Court's prior analysis applies even though the challenge is no longer facial, but as-applied to SAGA. Dkt. 60, at 15–20.

SAGA does not dispute that privacy is an important government objective or that the Ninth Circuit has long supported that concept. *See Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (en banc) (noting the Ninth Circuit's "longstanding recognition that the desire to shield one's unclothed figure from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity" (cleaned up)).

---

arm or leg) or auditory vocalizations (such as grunting)—to express emotion or regulate sensory input and that she was not masturbating; rather, she was engaging in these self-regulatory behaviors during the incident in question. Dkts. 99, 100.

However, SAGA argues S.B. 1100 goes too far in seeking to protect privacy in restrooms because stalls are used in Boise High School's multi-occupancy restrooms. SAGA focuses on people *using* the restroom and notes that the stalls in Boise High School have doors that, when closed, do not allow a person to see into the stall. SAGA highlights the Court's prior comments that "privacy *may* not be as much of a concern in restrooms where stalls are widely used" and that "*often* people in the restroom would never know the identity of the person going into the stall next to them" because of the use of individual stalls. Dkt. 60, at 18 (emphasis in original).[13] SAGA also emphasizes that the Ninth Circuit framed the State's privacy interest as "(1) not exposing students to the unclothed bodies of students of the opposite sex; and (2) protecting students from having to expose their own unclothed bodies to students of the opposite sex," and argues that restrooms with stall doors protect these privacy interests. *Roe*, 137 F.4th at 925.[14]

The Court appreciates the nuances of this issue. As it outlined previously, all youth—cisgender boys and cisgender girls and transgender boys and transgender girls—could all feel equally awkward depending on the physical makeup of the restroom, and who else is in the restroom, when they undertake private duties. Dkt. 60, at 18, 19 n. 15.

---

[13] The Court's observation about not knowing the sex or gender identity of the person in the adjacent stall does not diminish Defendant's privacy interest simply because the physical setup of the restroom provides some level of anonymity.

[14] SAGA also hints at less intrusive means Defendants could employ to accomplish their goals. Dkt. 86-4, at 19. But the Ninth Circuit already rejected this line of thinking, holding that Plaintiff's argument regarding less intrusive means was unavailing because "intermediate scrutiny in the equal protection context requires only that the means are substantially related to the government's objective, not the least restrictive means or the means most narrowly tailored to achieve the government's interest." *Roe*, 137 F.4th at 926.

That said, privacy is not limited to individuals who are in the stalls because restrooms are not used simply to relieve oneself. Thus, SAGA's (and even this Court and the Ninth Circuit's) focus on bodily exposure within the context of "using" the restroom—meaning using the toilet—does not mean there are no other equally significant interests within the privacy umbrella supporting S.B. 1100's regulations. People often use the common areas of a restroom (as well as a stall) to change items of clothing or undertake other personal hygiene duties which implicate privacy concerns as well.

The Ninth Circuit previously held that "bathrooms by their very nature implicate important privacy interest" because, unquestionably "the functions of the bathroom are intended to be private." *Hecox v. Little*, 79 F.4th 1009, 1025 (9th Cir. 2023), *opinion withdrawn,* 99 F.4th 1127 (9th Cir. 2024). Curiously, during the pendency of the appeal in this case, the Ninth Circuit issued an amended decision in *Hecox* that did not include the aforementioned language. Notwithstanding that change, the Ninth Circuit noted *in this case* that the "State's privacy justification is easily corroborated by common experience and circuit precedent." *Roe*, 137 F.4th 925.

Privacy is not limited to obscuring the visual line of sight of others when a person is *relieving* themselves in a restroom stall. Thus, SAGA cannot defeat Defendant's privacy justification by claiming that restroom stalls only allow for a small viewing window when the door is closed and locked.[15] As Defendants point out, regardless of whether anyone else can *see* a person using the restroom—in a state of partial undress or not—there are more

---

[15] In fact, Defendants oppose this characterization, claiming some stalls at Boise High School have a "gap" that allows for a broader field of vision into a stall. Dkt. 90, at 13.

general privacy concerns at play. Dkt. 90, at 13. Other personal bodily functions and duties take place in restrooms and implicate privacy interests and the State's desire—via S.B. 1100—in protecting such broader concerns applies equally here. Further, as the Court (and Ninth Circuit) noted, all of these concerns are heightened here because of the target age group: K-12 children. Privacy is a worthy goal in and of itself, but even more so with respect to kids who are still developing. Dkt. 60, at 16–17; *Roe*, 137 F.4th at 924.

Separating restrooms by biological sex has been common for centuries. *See Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty*., 57 F.4th 791, 796 (11th Cir. 2022) (en banc) (noting separating school bathrooms based on biological sex is "unremarkable—and nearly universal . . ."). And for good reason—there are biological differences between men and women. *Id*. at 809. *See also United States v. Virginia,* 518 U.S. 515, 533, (1996) (noting that "physical differences between men and women [] are enduring" and "the two sexes are not fungible . . ." (cleaned up)). Those biological differences are deserving of privacy and S.B. 1100's segregation of restrooms based on sex is related to that interest.[16]

It is not the Court's role to determine whether S.B. 1100 is a perfect policy; the Court must only address whether it is "substantially related" to the State of Idaho's interest in protecting student's privacy. Because S.B. 1100 is substantially related to the State's

---

[16] Finally, the Court recognizes—as it did previously—that "in upholding S.B. 1100, it is now those transgender students who will be using the restroom . . . that does not match his or her gender identity who may face privacy concerns." Dkt. 60, at 19 n. 15. Importantly, however, S.B. 1100 requires schools to provide an accommodation to a student who for "*any* reason, is unwilling or unable to use a multi-occupancy restroom or changing facility designated for the person's sex." Idaho Code Ann. § 33-6705(1)(a). The Ninth Circuit has already held this alternative accommodation is valid and will not otherwise "out" a person as transgender. *Roe*, 137 F.4th at 925.

legitimate interest in privacy, the Court finds SAGA is unlikely to succeed on its Equal

Protection claim.

### 2. Title IX

Title IX prohibits educational institutions that receive federal funding from

discriminating against students "on the basis of sex." 20 U.S.C. § 1681(a). While Title IX

prohibits discrimination based upon sex, the regulations specifically explain that "nothing

contained herein shall be construed to prohibit any educational institution receiving funds

under this Act, from maintaining separate living facilities for the different sexes." 20

U.S.C. § 1686. This "carve-out" is the subject of much disagreement between the parties.[17]

---

[17] SAGA argues the carve-out is geared towards "living facilities," and because restrooms are not living facilities, the carve-out does not apply. It is true that 20 U.S.C. § 1686 discusses living facilities. But as this Court and the Ninth Circuit previously outlined, the implementing regulations—34 C.F.R. § 106.33—clearly include restrooms. SAGA emphasizes that § 106.33 cannot circumvent the general prohibition on discrimination under 20 U.S.C. § 1681—the broader Title IX code section. While true, the Ninth Circuit made clear that it "did not see a contradiction between Title IX and § 106.33." *Roe*, 137 F.4th at 930. In fact, this whole issue was the impetus for the Ninth Circuit amending its opinion two months after it originally ruled. As the Ninth Circuit explained:

> The opinion . . . is hereby amended as follows: On page 35, the sentence "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686 unambiguously carves out *only* living facilities from Title IX's general mandate and not more intimate spaces such as restrooms, changing rooms, and communal showers" is deleted and replaced with "Thus, though we agree with SAGA that § 106.33 implements § 1681, we do not conclude that § 1686's carve-out of living facilities from Title IX's general mandate is unambiguously limited to facilities such as dormitories.

*Roe*, 137 F.4th at 918–19. SAGA thinks this minor change helps them. The Court disagrees. SAGA's interpretation is that the Ninth Circuit "recanted any suggestion that Section 1686 extends beyond living facilities and removed its reference to restrooms while leaving open that it may apply to genuine living quarters regulated by S.B. 1100—e.g., temporary lodging on overnight trips—which was enough to dispose of Plaintiff's facial claim." Dkt. 98, at 10. This is incorrect. The Ninth Circuit's minor change may have narrowed language that felt like a more general carve-out, to a "facilities" only carve-out, but the footnote attached to that line is illuminating (and did not change with the amended opinion). In that footnote, the Ninth Circuit discussed the legal concept of *expressio unius est exclusio alterius,* or the notion that in statutory interpretation, omissions are exclusions. *Roe*, 137 F.4th at 930 n. 15. But the Ninth Circuit went on to say this legal maxim only applies when it is clear something was meant to be excluded and, in the 1970's, facilities such as restrooms, locker rooms, and shower rooms were likely not specifically mentioned

The corresponding code sections implementing Title IX also outline that educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex [are] comparable to [the] facilities provided for students of the other sex." 34 C.F.R. § 106.33.

The Court previously explained in detail the existing circuit split regarding the definition of "sex" in the Title IX context, and how the Supreme Court's decision in *Bostock v. Clayton Cnty., Ga*, 40 S. Ct. 1731 (2020) plays into that discussion. Dkt. 60, at 25–28. In the end, the Court held that "sex" as defined in Title IX does not include gender identity. Dkt. 60, at 29 n.25. It also found a difference between Title VII (which was at issue in *Bostock*) and Title IX, and highlighted Title IX allows for some sex-based distinctions. *Id*. at 27–28. The Court concluded by holding that "unless and until Congress amends Title IX, the concept of separating facilities based on sex is not a form of discrimination actionable under Title IX." *Id*. at 28. This includes the separation of restrooms. *Id*. at 29–30.

For its part, the Ninth Circuit punted this issue on appeal. After reviewing the same materials as the Court had in its decision—as well as its own cases on the subject—the Ninth Circuit affirmed the Court's holding that Plaintiffs "did not show a likelihood of success" on their Title IX claim. *Roe*, 137 F.4th at 927. But because its "reasoning

---

because "the separation of these facilities on the basis of sex was so assumed . . . ." *Id.* Thus, far from removing a reference to restrooms and suggesting temporary lodging on overnight trips is the only exception to which the carve-out applies, the Ninth Circuit seemed to emphasize that restrooms would fall under "facilities." At the very least, the Ninth Circuit did not foreclose such an interpretation of the carve-out as SAGA suggests.

differ[ed] from" the Court, the Ninth Circuit "d[id] not reach the question whether 'sex' as used in Title IX authorizes schools to limit students' use of facilities . . . on the basis of sex assigned at birth." *Roe*, 137 F.4th at 927–28. Instead, the Ninth Circuit hung its hat on Defendants' "alternate" theory regarding funding and the "clear-notice" rule.

Defendants repeat that theory here—in conjunction with their more substantive argument regarding the definition of "sex" as used in Title IX. The Court briefly touches on each argument.

SAGA continues to decry Defendants' (and the Court's) interpretation of "sex" as it applies to Title IX. However, the Court has made its holding clear, and the Ninth Circuit did not overturn that ruling.[18] This forecloses SAGA's Title IX claim.

Moreover, even if the Court were incorrect, the same rational the Ninth Circuit applied previously regarding Defendants' second argument about funding applies here. Specifically, Title IX funding is distributed to the states pursuant to the Spending Clause of the Constitution. *See* U.S. Const. art. I, § 8, cl. 1; *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640, (1999) ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause."). Because legislation enacted pursuant to the spending power is in the nature of a contract, recipients of federal funds must accept federally imposed conditions on funds voluntarily and knowingly. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296

---

[18] Again, the Ninth Circuit took pains to review its own caselaw and how it had previously applied *Bostock* to Title IX cases. *Roe*, 137 F.4th at 926–28. But it also recognized that *Bostock* had not addressed "bathrooms, locker rooms, or anything else of the kind." *Id.* at 28 (citing *Bostock*, 590 U.S. at 681). Then, instead of taking the opportunity to rule on the matter, it stated it "need not reach" the issue and pivoted to Defendants' other argument. *Id.*

(2006). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)).

The Ninth Circuit applied the clear-notice rule in this case and "agree[d] with the State that SAGA failed to establish that Defendants had adequate notice, when they accepted federal funding, that Title IX prohibits the exclusion of transgender students from *restrooms,* locker rooms, shower facilities, and overnight lodging corresponding to their gender identity." *Roe*, 137 F.4th at 929 (emphasis added). And, despite its hesitancy to engage in the definition of "sex" under Title IX and formally decide what that word includes, the Ninth Circuit recognized that "from the time of the enactment of Title IX and its implementing regulations, the scheme has authorized schools to maintain sex-segregated facilities, and contemporary dictionary definitions commonly defined 'sex' in terms that refer to students' sex assigned at birth." *Id*.

The Ninth Circuit accordingly concluded: "SAGA failed to meet its burden to show that the State had clear notice at the time it accepted federal funding that Title IX prohibits segregated access to the facilities covered by S.B. 1100 on the basis of transgender status." *Roe*, 137 F.4th at 931. This conclusion applies with equal force to SAGA's as-applied challenge. Accordingly, the Court finds SAGA is unlikely to succeed on its Title IX claim.

## C. Remaining *Winter* Factors

As is typically the case, the parties focused the bulk of their arguments on the first factor—likelihood of success. And for good reason. As the Ninth Circuit has outlined, likelihood of success is the most important factor. *See, e.g., Disney Enters., Inc. v.*

*VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017) ("Likelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors . . . ." (cleaned up)); *Conservation Cong. v. U.S. Forest Serv*., 720 F.3d 1048, 1058 (9th Cir. 2013) (affirming district court's denial of a preliminary injunction based only on review of the lack of a likelihood of success on the merits).

Having concluded SAGA has not shown a likelihood of success on its Equal Protection or Title IX claim, the Court only briefly mentions the remaining *Winter* factors.

Each side argues it would suffer irreparable harm if the Court does not act in the way that party wishes, and that the public interest and balance of equities tips in its favor considering its success on the first factor. Having found SAGA deficient as to factor one, the Court likewise finds it deficient on the remaining factors as well. To be sure, there is some minor harm that SAGA members may suffer as a result of S.B. 1100's regulations regarding restrooms. But such harm is not irreparable because the law requires an alternative accommodation which SAGA members may use (as can any student who desires a private restroom). Further, while the public has an interest in preventing discrimination, the public also has an interest in protecting the privacy of youth and in having duly-enacted laws enforced.

Finally, even if the Court were to find some merit in one of SAGA's other arguments, none can "offset" its weak showing on the likelihood of success prong. *See Pimentel v. Dreyfus,* 670 F.3d 1096, 1105 (9th Cir. 2012). SAGA's Motion is accordingly denied.

///

**MEMORANDUM DECISION AND ORDER – 21**

## V. CONCLUSION

As the Court has previously stated, it appreciates this is a difficult case dealing with sensitive issues. Dkt. 60, at 2–3, 34–35. It understands that protecting rights in one manner may curtail rights in another. But that is the price of living in a pluralistic society. *See Romer v. Evans*, 517 U.S. 620, 631 (1996). The Court does not mean to present mere platitudes or discount the feelings of all interested parties. It understands that real people—real teenagers, who are simply trying to live their lives and are ill-suited to recognize the nuances of technical legal arguments—are on the receiving end of the Court's decision, whichever way the Court rules.

But when all is said and done, the Court finds SAGA has failed to meet its burden to obtain preliminary injunctive relief because it is unlikely to succeed on its claims since the State has outlined a legitimate governmental interest—privacy—related to the action it took in passing S.B. 1100.Thus, the Court denies SAGA's motion and will not enjoin S.B. 1100 as applied to SAGA's members and restrooms at Boise High School.

## VI. ORDER

1. SAGA's Motion for Preliminary Injunction and, in the alternative, Temporary Restraining Order (Dkt. 86) is DENIED.

2. SAGA's Motion to Seal (Dkt. 102) is GRANTED. The documents filed at Dkts. 99 and 100 shall remain under seal.

DATED: August 7, 2025

David C. Nye
Chief U.S. District Court Judge